# EXHIBIT A

## INDUSTRIAL BUILDING LEASE

1.     **BASIC TERMS**. This **Section 1** contains the Basic Terms of this Lease between Landlord and Tenant, named below. Other Sections of the Lease referred to in this **Section 1** explain and define the Basic Terms and are to be read in conjunction with the Basic Terms.

1.1.    **Effective Date** of Lease: April 12, 2006.

1.2.    **Landlord**: FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company.

1.3.    **Tenant**: ALTO U.S., INC., a Delaware corporation.

1.4.    **Premises**: Approximately 15.761 acres of land situated at the corner of Highway 412 and 265, Springdale, Arkansas, on which two buildings (referred to as the "**Buildings**") are located, which Buildings contain approximately 232,743 rentable square feet, as legally described on **Exhibit A** attached hereto.

1.5.    **Lease Term**: Approximately ten (10) years (the "**Term**"), commencing April 12, 2006 (the "**Commencement Date**") and ending, subject to **Section 2.3** and **Section 2.5** below, on April 11, 2016 (the "**Expiration Date**").

1.6.    **Permitted Uses**: (See **Section 4.1**) The Buildings may be used for any lawful purpose.

1.7.    **Tenant's Guarantor** (collectively): NKT Holding A/S, a Danish corporation, during the Term, and Nilfisk-Advance A/S, a Danish corporation, during any Renewal Term (the "**Renewal Term Guarantor**").

1.8.    **Brokers** (See **Section 22**): United Properties Brokerage LLC.

1.9.    **Security/Damage Deposit**: None.

1.10.   **Exhibits to Lease**: The following exhibits are attached to and made a part of this Lease. **Exhibit A** (Legal Description); **Exhibit B** (Tenant Operations Inquiry Form); **Exhibit C** (Tenant's Equipment); **Exhibit D** (Broom Clean Condition and Repair Requirements); **Exhibit E** (Termination Value/Purchase Price); and **Exhibit F** (Form of Guaranty).

2.     **LEASE OF PREMISES; RENT**.

2.1.    **Lease of Premises for Lease Term**. Landlord hereby leases the Premises to Tenant, and Tenant hereby rents the Premises from Landlord, for the Term and subject to the conditions of this Lease.

2.2.    **Types of Rental Payments**. Tenant shall pay net base rent to Landlord in monthly installments, in advance, on the first day of each and every calendar month during the Term of this Lease (the "**Base Rent**") in the amounts and for the periods as set forth below:

### Rental Payments

| Lease Period | Annual Base Rent | Monthly Base Rent |
|---|---|---|
| Commencement Date – 4/11/2007 | $684,506.72 | $57,042.23 |
| 4/12/2007 – 4/11/2008 | $693,063.05 | $57,755.25 |
| 4/12/2008 – 4/11/2009 | $701,726.34 | $58,477.20 |
| 4/12/2009 – 4/11/2010 | $710,497.92 | $59,208.16 |
| 4/12/2010 – 4/11/2011 | $719,379.14 | $59,948.26 |
| 4/12/2011 – 4/11/2012 | $728,371.38 | $60,697.62 |
| 4/12/2012 – 4/11/2013 | $737,476.02 | $61,456.34 |
| 4/12/2013 – 4/11/2014 | $746,694.48 | $62,224.54 |
| 4/12/2014 – 4/11/2015 | $756,028.16 | $63,002.35 |
| 4/12/2015 – 4/11/2016 | $765,478.51 | $63,789.88 |

FWP-000392

Tenant shall also pay all Operating Expenses as defined in and pursuant to **Section 3** below. To the extent that such Operating Expenses have been paid by Landlord (though nothing contained herein shall be deemed to impose upon Landlord any obligation to so pay any Operating Expenses), the same shall be reimbursed by Tenant and such, together with any other amounts owed by Tenant to Landlord hereunder shall collectively be referred to as **"Additional Rent"**. In the event any monthly installment of Base Rent or Additional Rent, or both, is not paid within five (5) days of the date when due, a late charge in an amount equal to Five Hundred and No/100 Dollars ($500.00) (the **"Late Charge"**; the Late Charge, Default Interest, as defined in **Section 21.3** below, Base Rent and Additional Rent shall collectively be referred to as **"Rent"**) shall be paid by Tenant to Landlord, 75 Remittance Drive, Suite 1449, Chicago, Illinois 60675-1449, or if sent by overnight courier, The Northern Trust Co., 350 N. Orleans Street, Receipt & Dispatch, 8th Floor, Chicago, Illinois 60654, Attention: First Industrial, L.P., Suite 1449 (or such other entity designated as Landlord's management agent, if any, and if Landlord so appoints such a management agent, the **"Agent"**), or pursuant to such other directions as Landlord shall designate in this Lease or otherwise in writing.

        **2.3.**   <u>Covenants Concerning Rental Payments; Initial and Final Rent Payments</u>. Tenant shall pay the Rent promptly when due, without notice or demand, and without any abatement, deduction or setoff. No payment by Tenant, or receipt or acceptance by Agent or Landlord, of a lesser amount than the correct Rent shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or letter accompanying any payment be deemed accord and satisfaction, and Agent or Landlord may accept payment without prejudice to its right to recover the balance due or to pursue any other remedy available to Landlord. If the Commencement Date occurs on a day other than the first day of a calendar month, the Rent due for the first calendar month of the Term shall be prorated on a per diem basis (based on a three hundred sixty [360] day, twelve [12] month year) and paid to Landlord on the Commencement Date. In the event of any failure by Tenant to pay or discharge any such amount, Landlord shall have all rights, powers and remedies provided for herein or by law or otherwise in the case of nonpayment of Rent.

        **2.4.**   <u>Net Lease; Nonterminability</u>.

        **2.4.1.**   This Lease is a complete "bond net lease" and Tenant's obligations arising or accruing during the Term of this Lease to pay all Base Rent, Additional Rent, and all other payments hereunder required to be made by Tenant shall be absolute and unconditional, and Tenant shall pay all Base Rent, Additional Rent and all other payments required to be made by Tenant without notice, demand, counterclaim, set-off, deduction, or defense and without abatement, suspension, deferment, diminution or reduction, free from any charges, assessments, impositions, expenses or deductions of any and every kind and nature whatsoever. All costs, expenses and obligations of every kind and nature whatsoever relating to the Premises and the appurtenances thereto and the use and occupancy thereof which may arise or become due during the Term, (whether or not the same shall become payable during the Term of this Lease or thereafter) shall be paid by Tenant, and Landlord is not responsible for any costs, charges, expenses or outlays of any nature whatsoever arising from or relating to the Premises or the use or occupancy thereof, and Landlord, Landlord's mortgagee or lender and their respective employees, shareholders, officers, directors, members, managers, trustees, partners or principals, disclosed or undisclosed, and their respective employees, shareholders, officers, directors, members, managers, trustees, partners, invitees, agents or principals, disclosed or undisclosed and all of their respective successors and assigns (hereinafter collectively referred to as the **"Indemnitees"** and each individually as an **"Indemnitee"**), shall be indemnified and saved harmless by Tenant from and against the same other than by reason of such Indemnitee's willful misconduct or negligence. The willful misconduct or negligence of Landlord and the Indemnitee parties of Landlord shall not be imputed to Landlord's mortgagee or lender and the Indemnitee parties of such mortgagee or lender. Tenant assumes the sole responsibility for the condition, use, operation, maintenance, subletting and management of the Premises, and Tenant shall indemnify, defend and hold the Indemnitees harmless pursuant to the provisions of **Section 17.2** below. It is the purpose and intention of the parties to this Lease that the Base Rent due hereunder shall be absolutely net to the Landlord and that this Lease shall yield, net to the Landlord, the Rent and all other payments hereunder required to be made by Tenant as provided in this Lease.

        **2.4.2.**   Except as otherwise expressly provided in **Sections 18** and **21** of this Lease, this Lease shall not terminate, nor shall Tenant have any right to terminate this Lease or to be released or discharged from any obligations or liabilities hereunder for any reason, including, without limitation: (i) any damage to or destruction of the Premises; (ii) any restriction, deprivation (including eviction) or prevention of, or any interference with, any use or the occupancy of the Premises (whether due to any default in or failure of Landlord's title to the Premises or otherwise); (iii) any condemnation, requisition or other taking or sale of the use, occupancy or title of or to the Premises; (iv) any action, omission or breach on the part of Landlord under this Lease or any other agreement between Landlord and Tenant; (v) the inadequacy or failure of the description of the Premises to demise and let to Tenant the property intended to be leased hereby; (vi) any sale or other disposition of the Premises; (vii) the impossibility or illegality of performance by Landlord or Tenant or both; (viii) any action of any court, administrative agency or other governmental authority; or (ix) any other cause, whether similar or dissimilar to the foregoing, any present or future law notwithstanding. Nothing in this

FWP-000393

paragraph shall be construed as an agreement by Tenant to perform any illegal act or to violate the order of any court, administrative agency or other governmental authority.

2.4.3.    Tenant will remain obligated under this Lease in accordance with its terms, and will not take any action to terminate (except in accordance with the provisions of **Sections 18 and 21** of this Lease, rescind or avoid this Lease for any reason, notwithstanding any bankruptcy, insolvency, reorganization, liquidation, dissolution or other proceeding affecting Landlord or any assignee of Landlord, or any action with respect to this Lease which may be taken by any receiver, trustee or liquidator or by any court. Tenant waives all rights at any time conferred by statute or otherwise to quit, terminate or surrender this Lease or the Premises, or to any abatement or deferment of any amount payable by Tenant hereunder, or for claims against any Indemnitee for damages, loss or expense suffered by Tenant on account of any cause referred to in this **Section 2.4** or otherwise (except claims arising out of the negligence or willful misconduct by such Indemnitee).

2.5.    <u>Option to Renew</u>.

2.5.1.    Tenant shall have the option ("**Renewal Option**") to renew this Lease for four (4) consecutive terms of five (5) years each (each, a "**Renewal Term**"), on all the same terms and conditions set forth in this Lease, except that Base Rent during the Renewal Term shall be equal to Fair Market Rent (as defined in **Section 2.5.2** below). Tenant shall deliver written notice to Landlord of Tenant's election to exercise the Renewal Option ("**Renewal Notice**") not less than twelve (12) months, nor more than twenty-four (24) months, prior to the expiration date of the original Term or the first, second or third Renewal Term, as applicable (the "**Notice Period**"); and if Tenant fails to timely deliver the Renewal Notice to Landlord during the Notice Period, then Tenant shall automatically be deemed to have irrevocably waived and relinquished the Renewal Option.

2.5.2.    For the purposes of this Lease, "**Fair Market Rent**" shall be initially determined by Landlord, in its sole, but good faith, discretion based upon the annual base rental rates then being charged in the industrial market sector of the geographic area where the Buildings are situated for comparable space and for a lease term commencing on or about the commencement date of the Renewal Term and equal in duration to the Renewal Term, taking into consideration: the geographic location, quality and age of the Buildings; the location and configuration of the relevant space within the Buildings; the extent of service to be provided to the proposed tenant thereunder; applicable distinctions between "gross," "net" and "bondable" leases; the creditworthiness and quality of Tenant and Guarantor; leasing commissions; and all other relevant terms, conditions or factors. Landlord shall notify Tenant of Landlord's determination of Fair Market Rent for the Renewal Term, in writing (the "**Base Rent Notice**") within forty five (45) days after receiving the Renewal Notice.

2.5.3.    Tenant shall then have thirty (30) days after Landlord's delivery of the Base Rent Notice in which to advise Landlord, in writing (the "**Base Rent Response Notice**"), whether Tenant (i) is prepared to accept the Fair Market Rent established by Landlord in the Base Rent Notice and proceed to lease the Premises, during the Renewal Term, at that Fair Market Rent; or (ii) elects to withdraw and revoke its Renewal Notice, whereupon the Renewal Option shall automatically be rendered null and void; or (iii) elects to contest Landlord's determination of Fair Market Rent. In the event that Tenant fails to timely deliver the Base Rent Response Notice, then Tenant shall automatically be deemed to have elected (i) above. Alternatively, if Tenant timely elects (ii), then this Lease shall expire on the original expiry date of the initial Term or then current Renewal Term, as the case may be. If, however, Tenant timely elects (iii), then the following provisions shall apply:

2.5.3.1.    The Fair Market Rent shall be determined by either the Independent Brokers or the Determining Broker, as provided and defined below.

2.5.3.2.    Within thirty (30) days after Tenant timely delivers its Base Rent Response Notice electing to contest Landlord's determination of Fair Market Value, each of Landlord and Tenant shall advise the other, in writing (the "**Arbitration Notice**"), of both (i) the identity of the individual that each of Landlord and Tenant, respectively, is designating to act as Landlord's or Tenant's, as the case may be, duly authorized representative for purposes of the determination of Fair Market Rent pursuant to this **Section 2.5.3** (the "**Representatives**"); and (ii) a list of three (3) proposed licensed real estate brokers, any of which may serve as one of the Independent Brokers (collectively, the "**Broker Candidates**"). Each Broker Candidate shall be duly licensed in the jurisdiction in which the Premises is located;

(A)    shall have at least ten (10) years experience, on a full-time basis, leasing industrial space (warehouse/distribution/ancillary office) in the same general geographic area as that in which the Premises is located, and at least three (3) of those ten (10) years of experience shall have been

consecutive and shall have elapsed immediately preceding the date on which Tenant delivers the Renewal Notice; and

(B)     shall be independent and have no then-pending (as of the date Landlord or Tenant designates the broker as a Broker Candidate) brokerage relationship, formal or informal, oral or written, or any direct or indirect financial or other business interest with any or all of Landlord, Tenant, and any affiliates of either or both of Landlord and Tenant ("**Brokerage Relationship**"), nor may there have been any such Brokerage Relationship at any time during the two (2) year period immediately preceding the broker's designation, by Landlord or Tenant, as a Broker Candidate.

2.5.3.3.     Within fourteen (14) days after each of Landlord and Tenant delivers its Arbitration Notice to the other, Landlord and Tenant shall cause their respective Representatives to conduct a meeting at a mutually convenient time and location. At that meeting, the two (2) Representatives shall examine the list of six (6) Broker Candidates and shall each eliminate two (2) names from the list on a peremptory basis. In order to eliminate four (4) names, first, the Tenant's Representative shall eliminate a name from the list and then the Landlord's Representative shall eliminate a name therefrom. The two (2) Representatives shall alternate in eliminating names from the list of six (6) Broker Candidates in this manner until each of them has eliminated two (2) names. The two (2) Representatives shall immediately contact the remaining two (2) Broker Candidates (the "**Independent Brokers**"), and engage them, as behalf of Landlord and Tenant, to determine the Fair Market Rent in accordance with the provisions of this **Section 2.5.3**.

2.5.3.4.     The Independent Brokers shall determine the Fair Market Rent within thirty (30) days of their appointment. Landlord and Tenant shall each make a written submission to the Independent Brokers (no more than ten (10) pages in length, in the aggregate, per submitting party), advising of the rate that the submitting party believes should be the Fair Market Rate, together with whatever written evidence or supporting data that the submitting party desires in order to justify its desired rate of Fair Market Rent; provided, in all events, however, that the aggregate maximum length of each party's submission shall not exceed ten (10) pages (each such submission package, a "**FMR Submission**"). The Independent Brokers shall be obligated to choose one (1) of the parties' specific proposed rates of Fair Market Rent, without being permitted to effectuate any compromise position.

2.5.3.5.     In the event, however, that the Independent Brokers fail to reach agreement, within twenty (20) days after the date on which both Landlord and Tenant deliver the FMR Submissions to the Independent Brokers (the "**Decision Period**"), as to which of the two (2) proposed rates of Fair Market Rent should be selected, then, within five (5) days after the expiration of the Decision Period, the Independent Brokers shall jointly select a real estate broker who (i) meets all of the qualifications of a Broker Candidate, but was not included in the original list of six (6) Broker Candidates; and (ii) is not affiliated with any or all of (A) either or both of the Independent Brokers and (B) the real estate brokerage companies with which either or both of the Independent Brokers is affiliated (the "**Determining Broker**"). The Independent Brokers shall engage the Determining Broker on behalf of Landlord and Tenant (but without expense to the Independent Brokers), and shall deliver the FMR Submissions to the Determining Broker within five (5) days after the date on which the Independent Brokers select the Determining Broker pursuant to the preceding sentence (the "**Submission Period**"). Neither Landlord nor Tenant shall contact the Determining Broker, nor make any further presentations.

2.5.3.6.     The Determining Broker shall make a determination of the Fair Market Rent within twenty (20) days after the date on which the Submission Period expires. The Determining Broker shall be required to select one of the parties' specific proposed rates of Fair Market Rent, without being permitted to effectuate any compromise position.

2.5.3.7.     The decision of the Independent Brokers or the Determining Broker, as the case may be, shall be conclusive and binding on Landlord and Tenant, and neither party shall have any right to contest or appeal such decision. Judgment may be entered, in a court of competent jurisdiction, upon the decision of the Independent Brokers or the Determining Broker, as the case may be.

2.5.3.8.     In the event that the initial Term expires and the Renewal Term commences prior to the date on which the Independent Brokers or the Determining Broker, as the case may be, renders their/its decision as to the Fair Market Rent, then from the commencement date of the Renewal Term through the date on which the Fair Market Rent is determined under this **Section 2.5.3** (the "**Determination Date**"), Tenant shall pay monthly Base Rent to Landlord at a rate equal to one hundred ten percent (110%) of the rate of monthly Base Rent in effect on the expiration date of the initial term (the "**Temporary Base Rent**"). Within ten (10) business days after the Determination Date, Landlord shall pay to Tenant, or Tenant shall pay to Landlord, depending

FWP-000395

on whether the Fair Market Rent is less than or greater than the Temporary Base Rent, whatever sum that Landlord or Tenant, as the case may be, owes the other (the **"Catch-Up Payment"**), based on the Temporary Base Rent actually paid and the Fair Market Rent due (as determined by the Independent Brokers or the Determining Broker, as the case may be) during that portion of the Renewal Term that elapses before the Catch-Up Payment is paid, in full (together with interest thereon, as provided below). The Catch-Up Payment shall bear interest at the rate of Prime (defined below), plus three percent (3.0%) per annum from the date each monthly component of the Catch-Up Payment would have been due, had the Fair Market Rent been determined prior to the commencement of the Renewal Term, through the date on which the Catch-Up Payment is paid, in full (inclusive of interest thereon). For purposes hereof, **"Prime"** shall mean the per annum rate of interest publicly announced by the JP Morgan Chase Bank, or its successor, from time to time, as its **"prime"** or **"base"** or **"reference"** rate of interest.

                **2.5.3.9.**        The party whose proposed rate of Fair Market Rent is not selected by the Independent Brokers or the Determining Broker, as the case may be, shall bear all reasonable costs of counsel, experts or other representatives that are retained by both parties, together with all other costs of the arbitration proceeding described in this **Section 2.5.3**, including, without limitation, the fees, costs and expenses imposed or incurred by any or all of the Independent Brokers and the Determining Broker.

                **2.5.3.10.**        Unless otherwise expressly agreed in writing, during the period of time that any arbitration proceeding is pending under this **Section 2.5.3**, Landlord and Tenant shall continue to comply with all those terms and provisions of this Lease that are not the subject of their dispute and arbitration proceeding, most specifically including, but not limited to, Tenant's monetary obligations under this Lease; and, with respect to the payment of Base Rent during that portion of the Renewal Term that elapses during the pendency of any arbitration proceeding under this **Section 2.5.3**, the provisions of **Section 2.5.3.8** shall apply.

                **2.5.3.11.**        During any period of time that an arbitration is pending or proceeding under this Section 2.5.3, Tenant shall have no right to assign this Lease or enter into any sublease for all or a portion of the Premises, notwithstanding any provision to the contrary in this Lease.

           **2.5.4.**    The Renewal Option is granted subject to all of the following conditions:

                **2.5.4.1.**        As of the date on which Tenant delivers its Renewal Notice and continuing through the commencement date of the Renewal Term, this Lease shall be in full force and effect and no act or omission which shall constitute a breach or Default by Tenant under this Lease beyond any applicable period of cure or notice.

                **2.5.4.2.**        There shall be no further right of renewal after the expiration of the fourth Renewal Term.

                **2.5.4.3.**        The Renewal Option is personal to Tenant. In the event that Tenant assigns its interest under this Lease, whether or not in accordance with the requirements of **Section 8** below, and whether directly or indirectly, the provisions of this **Section 2.5** shall not be available to, or run to the benefit of, and may not be exercised by, any assignee or sublessee of Tenant.

                **2.5.4.4.**        The Premises shall be delivered to Tenant during the Renewal Term(s) on an as-is where-as basis, with no obligation on the part of Landlord to perform any tenant improvements at the Premises.

                **2.5.4.5.**        Tenant delivers to Landlord contemporaneously with the each Renewal Notice a fully executed Guaranty (as hereinafter defined), or renewal thereof, from the Renewal Term Guarantor.

    **3.**      **OPERATING EXPENSES.**

          **3.1.**      **Definitional Terms Relating to Operating Expenses.** For purposes of this Section and other relevant provisions of the Lease:

                **3.1.1.**    **Operating Expenses.** The term **"Operating Expenses"** shall mean all costs, expenses and charges of every kind or nature relating to, or incurred in connection with, the ownership, maintenance and operation of the Premises, including, but not limited to the following: (i) Taxes, as hereinafter defined in **Section 3.1.2**; (ii) dues, fees or other costs and

DOCS-#2130837-v2-Industrial_Building_Lease_Arkansas_Nilfisk (2).DOC        5

expenses, of any nature, due and payable to any association or comparable entity to which Landlord, as owner of the Premises, is a member or otherwise belongs and that governs or controls any aspect of the ownership and operation of the Premises; and (iii) any real estate taxes and common area maintenance expenses levied against, or attributable to, the Premises under any declaration of covenants, conditions and restrictions, reciprocal easement agreement or comparable arrangement that encumbers and benefits the Premises and other real property (e.g. a business park).

        **3.1.2.**   <u>Taxes</u>.  The term "Taxes" shall mean (i) all governmental taxes, assessments, fees and charges of every kind or nature (other than Landlord's income, franchise or similar taxes), whether general, special, ordinary or extraordinary, due at any time or from time to time, during the Term and any extensions thereof, in connection with the ownership, leasing, or operation of the Premises, or of the personal property and equipment located therein or used in connection therewith; and (ii) any reasonable expenses incurred by Landlord in contesting such taxes or assessments and/or the assessed value of the Premises.  For purposes hereof, Tenant shall be responsible for any Taxes that are due and payable at any time or from time to time during the Term, which obligation shall survive the termination or expiration of this Lease.  Landlord agrees that, so long as Tenant is not in Default under this Lease, and no event which with the giving of notice or the passage of time, or both, shall have occurred under this Lease, Tenant shall have the sole right, at its sole expense and after prior written notice to Landlord, by appropriate proceeding diligently prosecuted, to contest the validity or amount of the Taxes; provided, however, that in no event shall such contest result in or permit the sale or forfeiture of the Premises or any portion thereof or interest therein to satisfy the same.  Upon the written request of Tenant, Landlord agrees to assist Tenant as may be reasonably necessary so as to allow such contest by Tenant during the Term or any Renewal Term; provided, however, that Landlord shall incur no costs or expenses in connection therewith, all such costs and expenses to be incurred by Tenant.  Any such costs and expenses which are not timely paid by Tenant or repaid to Landlord, as the case may be, shall be deemed to be Additional Rent under this Lease.

        **3.1.3.**   <u>Operating Year</u>.  The term **"Operating Year"** shall mean the calendar year commencing January 1st of each year during the Term; provided for the first year of the Term the Operating Year shall be from the Commencement Date through December 31 of 2006; and the last Operating Year shall expire on the Expiration Date.

        **3.2.**   <u>Payment of Operating Expenses</u>.  Tenant shall directly pay, to the appropriate entity, all Operating Expenses.

    **4.**    <u>USE OF PREMISES AND COMMON AREAS</u>.

        **4.1.**   <u>Use of Premises</u>.  The Premises shall be used by the Tenant for the purpose(s) set forth in **Section 1.6** above and for no other purpose whatsoever.  Tenant shall not, at any time, use or occupy, or suffer or permit anyone to use or occupy, the Premises, or do or permit anything to be done in the Premises, in any manner that may (a) violate any Certificate of Occupancy for the Premises; (b) cause, or be liable to cause, injury to, all or any portion of the Premises (including, but not limited to, the structural elements of the Premises) or any equipment, facilities or systems therein; (c) exceed the load bearing capacity of the floor of the Premises; (d) impair or tend to impair the character or appearance of the Premises in such a manner as to constitute waste; or (e) have any detrimental environmental effect on the Premises which (i) arises out of a violation or violations of Environmental Laws or (ii) results in any material increased risk of liability to Landlord, in Landlord's reasonable judgment, above that as described in the initial Tenant Operations Inquiry Form.  On or prior to the date hereof, Tenant has completed and delivered for the benefit of Landlord a **"Tenant Operations Inquiry Form"** in the form attached hereto as **Exhibit B** describing the nature of Tenant's business operations at the Premises, which form is intended to, and shall be, relied upon by Landlord.  From time to time during the Term (but no more often than once in any twelve month period unless Tenant is in default hereunder or unless Tenant assigns this Lease or subleases all or any portion of the Premises, whether or not in accordance with **Section 8**), Tenant shall provide an updated and current Tenant Operations Inquiry Form upon Landlord's request.  Tenant agrees to indemnify Landlord as set forth in **Section 17.2** below.

        **4.2.**   <u>Signage</u>.  Any and all signage must at all times fully comply with all applicable laws, regulations and ordinances.  Tenant shall remove all signs of Tenant upon the expiration or earlier termination of this Lease and immediately repair any damage to the Premises caused by, or resulting from, such removal.

        **4.3.**   <u>Liens</u>.  During the Term, Tenant will promptly, but no later than sixty (60) days after the filing thereof, or such shorter period as shall prevent the forfeiture of the Premises, remove and discharge of record, by bond or otherwise, any charge, lien, security interest or encumbrance upon the Premises, or any Base Rent or Additional Rent which arises for any reason, including all liens which arise out of the possession, use, occupancy, construction, repair or rebuilding of the Premises or by reason of labor or materials furnished or claimed to have been furnished to Tenant for the Premises, but not including any permitted encumbrances or

any mechanics liens created by Landlord; provided that if Tenant contests any such lien it may do so, so long as during any such lien contest it posts with Landlord or its title insurance company a bond, letter of credit or other security in an amount of 125% of the contested lien. Nothing contained in this Lease shall be construed as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to or for the performance of any contractor, laborer, materialman, or vendor of any labor or services or for the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof. Notice is hereby given that during the Term Landlord will not be liable for any labor, services or materials furnished or to be furnished to Tenant, or to anyone holding an interest in the Premises or any part thereof through or under Tenant, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises. In the event of the failure of Tenant to discharge any charge, lien, security interest or encumbrances as aforesaid, Landlord may, if not discharged by Tenant within three (3) business days after written notice to Tenant, discharge such items by payment or bond or both, and **Section 23.4** hereof shall apply.

5.    **CONDITION AND DELIVERY OF PREMISES**. Tenant agrees that Tenant is familiar with the condition of the Premises, and Tenant hereby accepts the foregoing on an "AS-IS," "WHERE-IS" basis. Tenant acknowledges that neither Landlord nor Agent, nor any representative of Landlord, has made any representation as to the condition of the foregoing or the suitability of the foregoing for Tenant's intended use. Tenant represents and warrants that Tenant has made its own inspection of the foregoing. Neither Landlord nor Agent shall be obligated to make any repairs, replacements or improvements (whether structural or otherwise) of any kind or nature to the foregoing in connection with, or in consideration of, this Lease.

6.    **SUBORDINATION; ESTOPPEL CERTIFICATES; ATTORNMENT**.

6.1.    **Subordination and Attornment**. This Lease is and shall be subject and subordinate at all times to any mortgage or deed of trust ("**Mortgage**") that may now exist or hereafter be placed upon, and encumber, any or all of (a) the Premises or (b) all or any portion of Landlord's interest or estate in the Premises; provided that the mortgagee of any such Mortgage shall agree to recognize this Lease and Tenant's rights hereunder, including the quiet enjoyment of the possession of the Premises provided the Tenant is not in default. Tenant hereby covenants and agrees that Tenant shall attorn to any successor to Landlord. Tenant, Landlord and the mortgagee under any such Mortgage, shall execute and deliver to one another, and in a reasonable form, a subordination, non-disturbance and attornment agreement.

6.2.    **Estoppel Certificate**. Tenant agrees, from time to time and within ten (10) days after request by Landlord, to deliver to Landlord, or Landlord's designee, an estoppel certificate stating such matters pertaining to this Lease as may be reasonably requested by Landlord. Failure by Tenant to timely execute and deliver such certificate shall constitute an acceptance of the Premises and acknowledgment by Tenant that the statements included therein are true and correct without exception.

6.3.    **Transfer by Landlord**. In the event of a sale or conveyance by Landlord of the Premises, the same shall operate to release Landlord from any future liability for any of the covenants or conditions, express or implied, herein contained in favor of Tenant, and in such event Tenant agrees to look solely to Landlord's successor in interest ("**Successor Landlord**") with respect thereto; provided such Successor Landlord has assumed the obligations of Landlord hereunder. Tenant agrees to attorn to such Successor Landlord.

7.    **QUIET ENJOYMENT**. Subject to the provisions of this Lease, so long as Tenant pays all of the Rent and performs all of its other obligations hereunder, Tenant shall not be disturbed in its possession of the Premises by Landlord, Agent or any other person lawfully claiming through or under Landlord.

8.    **ASSIGNMENT AND SUBLETTING**. Tenant shall not (a) assign (whether directly or indirectly), in whole or in part, this Lease, or (b) allow this Lease to be assigned, in whole or in part, by operation of law or otherwise, including, without limitation, by transfer of a controlling interest (*i.e.* greater than a fifty percent (50%) interest) of stock, membership interests or partnership interests, or by merger or dissolution, which transfer of a controlling interest, merger or dissolution shall be deemed an assignment for purposes of this Lease, or (c) mortgage or pledge this Lease, or (d) sublet the Premises, in whole or in part, without (in the case of any or all of (a) through (d) above) the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed. Tenant may, however, assign this Lease or sublease a portion of the Premises to a wholly-owned subsidiary or an affiliate of Tenant provided that such affiliate and Tenant are under the same common ownership and control, and provided further that Tenant advises Landlord, in writing, in advance, and otherwise complies with the succeeding provisions of this **Section 8**. In no event shall any assignment or sublease ever release Tenant from any obligation or liability hereunder. Any purported assignment, mortgage, transfer, pledge or sublease made without the prior written consent of Landlord shall be absolutely null and void. No assignment of

DOCS-#2130837-v2-Industrial_Building_Lease_Arkansas_Nilfisk (2).DOC          7

Doc# 2130837\2

this Lease shall be effective and valid unless and until the assignee executes and delivers to Landlord an assumption of all obligations of Tenant hereunder in form and substance reasonably satisfactory to Landlord. Regardless of whether or not an assignee executes and delivers any documentation to Landlord pursuant to the preceding sentence, any assignee shall be deemed to have automatically attorned to Landlord in the event of any termination of this Lease. If this Lease is assigned, or if the Premises (or any part thereof) are sublet or used or occupied by anyone other than Tenant, whether or not in violation of this Lease, Landlord or Agent may (without prejudice to, or waiver of its rights), collect Rent from the assignee, subtenant or occupant. In the event of an assignment of this Lease and the payment of consideration from the assignee to the Tenant in connection with the leasehold interest of Tenant (the "**Consideration**"), fifty percent (50%) of such Consideration shall be paid to Landlord; provided however such Consideration shall not include amounts paid to Tenant by assignee for Tenant's personal property, the business operations within the Premises, reimbursements of costs or expenses incurred by Tenant in preparing the Premises for the assignee (whether such reimbursements are made in lump sum payments or over time), and similar such payments. With respect to the allocable portion of the Premises sublet, in the event that the total rent and any other Considerations received under any sublease by Tenant is greater than the total Rent required to be paid, from time to time, under this Lease, Tenant shall pay to Landlord fifty percent (50%) of such excess as received from any subtenant and such amount shall be deemed a component of the Additional Rent.

9. **COMPLIANCE WITH LAWS**.

9.1. **Compliance with Laws**. Tenant shall, at its sole expense (regardless of the cost thereof), comply with all local, state and federal laws, rules, regulations and requirements now or hereafter in force and all judicial and administrative decisions in connection with the enforcement thereof with respect to the Premises, Tenant's use or occupancy thereof and its business conducted thereon (collectively, "**Laws**"), whether such Laws (a) pertaining to either or both of the Premises and Tenant's use and occupancy thereof; (b) concern or address matters of an environmental nature; (c) require the making of any structural, unforeseen or extraordinary changes; and (d) involve a change of policy on the part of the body enacting the same, including, in all instances described in (a) through (d), but not limited to, the Americans With Disabilities Act of 1990 (42 U.S.C. Section 12101 *et seq.*). If any license or permit is required for the conduct of Tenant's business in the Premises, Tenant, at its expense, shall procure such license prior to the Commencement Date, and shall maintain such license or permit in good standing throughout the Term. Tenant shall give prompt notice to Landlord of any written notice it receives of the alleged violation of any Law or requirement of any governmental or administrative authority with respect to either or both of the Premises and the use or occupation thereof.

9.2. **Hazardous Materials**. If, at any time or from time to time during the Term (or any extension thereof), any Hazardous Material (defined below) is generated, transported, stored, used, treated or disposed of at, to, from, on or in the Premises by, or as a result of any act or omission of, any or all of Tenant and any or all of Tenant's Parties (defined below): (a) Tenant shall, at its own cost, at all times comply (and cause all others to comply) with all Laws relating to Hazardous Materials, and Tenant shall further, at its own cost, obtain and maintain in full force and effect at all times all permits and other approvals required in connection therewith; (b) Tenant shall promptly provide Landlord or Agent with complete copies of all communications, permits or agreements with, from or issued by any governmental authority or agency (federal, state or local) or any private entity relating in any way to the presence, release, threat of release, or placement of Hazardous Materials on or in the Premises or any portion of the Premises, or the generation, transportation, storage, use, treatment, or disposal at, on, in or from the Premises, of any Hazardous Materials; (c) Landlord, Agent and their respective agents and employees shall, at their sole cost and expense, have the right to either or both (x) enter the Premises and (y) conduct appropriate tests for the purposes of ascertaining Tenant's compliance with all applicable Laws or permits relating in any way to the generation, transport, storage, use, treatment, disposal or presence of Hazardous Materials on, at, in or from all or any portion of the Premises; and (d) upon written request by Landlord or Agent, Tenant shall provide Landlord, at Landlord's sole cost and expense, with the results of reasonably appropriate tests of air, water or soil demonstrating that Tenant complies with all applicable Laws or permits relating in any way to the generation, transport, storage, use, treatment, disposal or presence of Hazardous Materials on, at, in or from all or any portion of the Premises (but if the same demonstrates that Tenant is not in such compliance then such tests shall be at Tenant's cost). This **Section 9.2** does not authorize the generation, transportation, storage, use, treatment or disposal of any Hazardous Materials at, to, from, on or in the Premises in contravention of this **Section 9**. Tenant covenants to investigate, clean up and otherwise remediate, at Tenant's sole expense, any release of Hazardous Materials caused, contributed to, or created by any or all of (i) Tenant and (ii) any or all of Tenant's officers, directors, members, managers, partners, invitees, agents, employees, contractors or representatives ("**Tenant Parties**") during the Term. Such investigation and remediation shall be performed only after Tenant has obtained Landlord's prior written consent, which consent shall not be unreasonably delayed, conditioned or denied; provided, however, that Tenant shall be entitled to respond immediately to an emergency without first obtaining such consent. All remediation shall be performed in strict compliance with Laws and to the reasonable satisfaction of Landlord. Tenant shall not enter into any settlement agreement, consent decree or other compromise with respect to any claims relating to any Hazardous Materials in any way connected to the Premises without first obtaining Landlord's

written consent (which consent shall not be unreasonably delayed, conditioned or denied) and affording Landlord the reasonable opportunity to participate in any such proceedings. As used herein, the term, "**Hazardous Materials**," shall mean any waste, material or substance (whether in the form of liquids, solids or gases, and whether or not airborne) that is or may be deemed to be or include a pesticide, petroleum, asbestos, polychlorinated biphenyl, radioactive material, urea formaldehyde or any other pollutant or contaminant that is or may be deemed to be hazardous, toxic, ignitable, reactive, corrosive, dangerous, harmful or injurious, or that presents a risk to public health or to the environment, and that is or becomes regulated by any Law. The undertakings, covenants and obligations imposed on Tenant under this **Section 9.2** shall survive the termination or expiration of this Lease.

10. **INSURANCE**.

    **10.1.**   **Tenant's Policies**. Tenant shall purchase, at its own expense, and keep in force at all times during this Lease the policies of insurance set forth below (collectively, "**Tenant's Policies**"). All Tenant's Policies shall (a) be issued by an insurance company with a Best rating of A- or better and otherwise reasonably acceptable to Landlord and shall be licensed to do business in the state in which the Premises is located; (b) provide that said insurance shall not be canceled or not renewed unless thirty (30) days' prior written notice shall have been given to Landlord; (c) provide for deductible amounts that are reasonably acceptable to Landlord (and its lender, if applicable) and (d) otherwise be in such form, and include such coverages, as Landlord may reasonably require. The Tenant's Policies described in (i) and (ii) of **Section 10.2** below shall (1) provide coverage on an occurrence basis; (2) name Landlord and First Industrial, L.P. (and its lender, if applicable) as additional insured; (3) provide coverage, to the extent insurable, for the indemnity obligations of Tenant under this Lease; (4) contain a separation of insured parties provision; and (5) provide coverage with no exclusion for a pollution incident arising from a hostile fire. All Certificates of Insurance and applicable endorsements, including, without limitation, an "Additional Insured-Managers or Landlords of Premises" endorsement shall be delivered to Landlord prior to the Commencement Date and renewals thereof shall be delivered to Landlord's Corporate and Regional Notice Addresses prior to the applicable expiration date of each Tenant's Policy. In the event that Tenant fails, at any time or from time to time, to comply with the requirements of the preceding sentence, Landlord may after not less than five (5) days prior written notice: order such insurance and charge the cost thereof to Tenant, which amount shall be payable by Tenant to Landlord upon demand, as Additional Rent. Tenant shall give prompt notice to Landlord and Agent of any bodily injury, death, personal injury, advertising injury or property damage occurring in and about the Premises.

    **10.2.**   **Coverage Amounts**. Tenant shall purchase and maintain, throughout the Term, a Tenant's Policy(ies) of (i) "all-risk" commercial property insurance covering the improvements constructed, installed or located on the Premises (but excluding Tenant's Property) against all loss or damage caused by fire, ice, hurricane, windstorm and such other risks of physical loss or damage as are covered by a causes of loss special form insurance policy, which coverage shall, at all times, be in an amount equal to one hundred percent (100%) of the then "full replacement cost" of the Premises subject to a deductible not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) ("**Full Replacement Cost**" shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade); (ii) commercial general or excess liability insurance, including personal injury and property damage (the "**Liability Insurance**"), in the amount of not less than Two Million and No/100 Dollars ($2,000,000.00) per claim, and Five Million and No/100 Dollars ($5,000,000.00) of excess liability insurance; (iii) comprehensive automobile liability insurance covering Tenant against any personal injuries or deaths of persons and property damage based upon or arising out of the ownership, use, occupancy or maintenance of a motor vehicle at the Premises and all areas appurtenant thereto in the amount of not less than One Million and No/100 Dollars ($1,000,000.00), combined single limit; (iv) commercial property insurance covering the Premises Tenant's personal property (at their full replacement cost); (v) workers' compensation insurance per the applicable state statutes covering all employees of Tenant; (vi) rent loss insurance for the benefit of Landlord; (vii) earthquake and flood insurance with policy amounts reasonably acceptable to Landlord; (viii) from and after April 1, 2006 through the remaining Term of this Lease, Tenant shall be required to carry terrorism insurance if such insurance is commercially available and the cost of the policy for such insurance for any twelve (12) month period is not more than Ten Thousand and No/100 Dollars ($10,000.00); and (ix) during any period of construction or during which any Alterations are being made, builder's risk coverage in an amount sufficient for such Alterations or other work or improvements performed on the Premises by Tenant. Notwithstanding anything to the contrary contained in this **Section 10**, (A) Landlord shall have the right, subsequent to a Default by Tenant beyond any applicable period of notice or cure, to, upon written notice to Tenant, purchase the aforementioned Tenant's Policies on Tenant's behalf and charge the cost thereof to Tenant, which amounts shall be payable by Tenant to Landlord, upon demand as Additional Rent; and (B) the Liability Insurance may be written on a claims made basis, rather than on an occurrence basis, provided that such claims made basis Liability Insurance policy is either in effect on the Commencement Date, or is made to be retroactive to a date no later than the date of this Lease; and if such claims made basis Liability Insurance policy is not continuously renewed during the Term and through the second anniversary of the expiration or any earlier termination of this Lease, then Tenant shall obtain a tail insurance policy in form reasonably acceptable to Landlord, with a minimum

DOCS-#2130837-v2-Industrial_Building_Lease_Arkansas_Nilfisk (2).DOC    9

Doc# 2130837\2

FWP-000400

term of two (2) years beyond the expiration or non-renewal period of such claims made basis Liability Insurance policy; provided that the foregoing does not excuse Tenant from having separate Liability Insurance (either on an occurrence basis or a claims made basis) during all periods of the Lease Term, including during any part for which the two (2) year tail period may apply. The preceding clause (B) shall survive the expiration or any earlier termination of this Lease.

        **10.3.**   **Waiver of Subrogation**. Notwithstanding anything to the contrary in this Lease, Landlord and Tenant mutually waive their respective rights of recovery against each other and each other's officers, directors, constituent partners, members, agents and employees, and Tenant further waives such rights against (a) each lessor under any ground or underlying lease encumbering the Premises and (b) each lender under any mortgage or deed of trust or other lien encumbering the Premises (or any portion thereof or interest therein), to the extent any loss is insured against or required to be insured against under this Lease, including, but not limited to, losses, deductibles or self-insured retentions covered by Landlord's or Tenant's commercial property, general liability, automobile liability or workers' compensation policies described above, This provision is intended to waive, fully and for the benefit of each party to this Lease, any and all rights and claims that might give rise to a right of subrogation by any insurance carrier. Each party shall cause its respective insurance policy(ies) to be endorsed to evidence compliance with such waiver.

        **11.**    **ALTERATIONS**. Tenant may, from time to time, at its expense, make alterations or improvements in and to the Premises (hereinafter collectively referred to as **"Alterations"**), provided that Tenant first obtains the written consent of Landlord, which consent shall not be unreasonably delayed, conditioned or denied; provided further that notice only and not consent shall be required of Alterations that: (a) are less than Ten Thousand and No/100 Dollars ($10,000.00) per occurrence, are non-structural and the structural integrity of the Premises shall not be affected; (b) the proper functioning of the mechanical, electrical, heating, ventilating, air-conditioning ("HVAC"), sanitary and other service systems of the Premises shall not be affected; and (c) Tenant shall have appropriate insurance coverage, reasonably satisfactory to Landlord, regarding the performance and installation of the Alterations. Additionally, before proceeding with any Alterations, Tenant shall (i) at Tenant's expense, obtain all necessary governmental permits and certificates for the commencement and prosecution of Alterations; (ii) if Landlord's consent is required for the planned Alteration, submit to Landlord, for its written approval, working drawings, plans and specifications and all permits for the work to be done and Tenant shall not proceed with such Alterations until it has received Landlord's approval (if required); and (iii) cause those contractors, materialmen and suppliers engaged to perform the Alterations to deliver to Landlord certificates of insurance (in a form reasonably acceptable to Landlord) evidencing policies of commercial general liability insurance (providing the same amount of coverages as required in **Section 10** above) and workers' compensation insurance. If Landlord's consent is required for any Alteration, Landlord shall have fourteen (14) business days after receipt of all items required to be delivered by Tenant pursuant to **clause (ii)** of the previous sentence, to review such items and give written approval or disapproval thereof to Tenant. If such written approval is not sent by Landlord to Tenant on or before the expiration of such fourteen (14) business day period, Landlord shall be deemed to have approved such items. Such insurance policies shall satisfy the obligations imposed under **Section 10**. Tenant shall cause the Alterations to be performed in compliance with all applicable permits, Laws and requirements of public authorities. Tenant shall cause the Alterations to be diligently performed in a good and workmanlike manner, using new materials and equipment at least equal in quality and class to the standards for the Premises established by Landlord. Tenant shall provide Landlord with "as built" plans, copies of all construction contracts, governmental permits and certificates and proof of payment for all labor and materials, including, without limitation, copies of paid invoices and final lien waivers. If Landlord's consent to any Alterations is required, and Landlord provides that consent, then at the time Landlord so consents, Landlord shall also advise Tenant whether or not Landlord shall require that Tenant remove such Alterations at the expiration or termination of this Lease (failure to so advise shall be the equivalent of not requiring removal). If Landlord requires Tenant to remove the Alterations, then, during the remainder of the Term, Tenant shall be responsible for the maintenance of appropriate commercial property insurance (pursuant to **Section 10**) therefor; however, if Landlord shall not require that Tenant remove the Alterations, such Alterations shall constitute Landlord's Property at the end of the Term or earlier termination of this Lease. The parties do not intend that the making of Alterations shall: (A) constitute income to Landlord; or (B) result in some or all of the federal, state or municipal income tax deductions which Landlord would otherwise be permitted to report with respect to the Premises or this Lease being deferred or denied; or (C) cause this Lease not to be a true lease for federal income tax purposes. Notwithstanding anything herein to the contrary, Landlord reserves the right to withhold its consent to any proposed Alteration (or the financing of any such improvement) if Landlord concludes that the making or financing or such improvements would result in some or all of federal, state or municipal income tax deductions which Landlord would otherwise be permitted to report with respect to the Premises or this Lease being deferred or denied or cause this Lease not to be a true lease for federal income tax purposes.

        **12.**    **LANDLORD'S AND TENANT'S PREMISES**. All fixtures, machinery and equipment (specifically excluding the list of Tenant's Equipment attached hereto as **Exhibit C**), improvements and appurtenances attached to, or built into, the Premises at the commencement of, or during the Term, whether or not placed there by or at the expense of Tenant, shall become and remain a part

of the Premises; shall be deemed the property of Landlord (the "**Landlord's Property**"), without compensation or credit to Tenant; and shall not be removed by Tenant at the Expiration Date (except for Alterations required to be removed pursuant to **Section 11**). In no event shall Tenant remove any of the following materials or equipment without Landlord's prior written consent (which consent may be given or withheld in Landlord's sole discretion): any power wiring or power panels, lighting or lighting fixtures, wall or window coverings, carpets or other floor coverings, heaters, air conditioners or any other HVAC equipment, fencing or security gates, or other similar Buildings operating equipment and decorations. At or before the Expiration Date, or the date of any earlier termination, Tenant, at its expense, shall remove from the Premises all of Tenant's personal property and any Alterations that Landlord requires be removed pursuant to **Section 11** (including, without limitation the personal property listed on **Exhibit C**), and Tenant shall repair (to Landlord's reasonable satisfaction) any damage to the Premises resulting from such installation and/or removal. Any other items of Tenant's personal property that shall remain in the Premises after the Expiration Date, or following an earlier termination date, may, at the option of Landlord, be deemed to have been abandoned, and in such case, such items may be retained by Landlord as its property or be disposed of by Landlord, in Landlord's sole and absolute discretion and without accountability, at Tenant's expense.

13.      **REPAIRS AND MAINTENANCE.**

        13.1.      **Tenant Responsibilities.** Tenant acknowledges that, with full awareness of its obligations under this Lease, Tenant has accepted the condition, state of repair and appearance of the Premises. Except for events of damage, destruction or casualty to the Premises (as addressed in **Section 18** below), Tenant agrees that, at its sole expense, it shall put, keep and maintain the Premises, including any Alterations and any altered, rebuilt, additional or substituted Buildings, structures and other improvements thereto or thereon, in the same condition that exists on the Commencement Date (reasonable wear and tear excepted), and in a safe condition, repair and appearance (collectively, the "**Required Condition**") and shall make all repairs and replacements necessary therefore. Without limiting the foregoing, Tenant shall promptly make all structural and nonstructural, foreseen and unforeseen, ordinary and extraordinary changes, replacements and repairs of every kind and nature, and correct any patent or latent defects (discovered during the Term) in the Premises, which may be required to put, keep and maintain the Premises in the Required Condition. Tenant will keep the Premises orderly and free and clear of rubbish. Tenant covenants to perform or observe all terms, covenants and conditions of any easement, restriction, covenant, declaration or maintenance agreement (collectively, "**Easements**") to which the Premises are currently subject or become subject pursuant to this Lease, whether or not such performance is required of Landlord under such Easements, including, without limitation, payment of all amounts due from Landlord or Tenant (whether as assessments, service fees or other charges) under such Easements. Tenant shall deliver to Landlord promptly, but in no event later than five (5) business days after receipt thereof, copies of all written notices received from any party thereto regarding the non-compliance of the Premises or Landlord's or Tenant's performance of obligations under any Easements. Tenant shall, at its expenses, use reasonable efforts to enforce compliance with any Easements benefiting the Premises by any other person or entity or property subject to such Easement. Landlord shall not be required to maintain, repair or rebuild, or to make any alterations, replacements or renewals of any nature to the Premises, or any part thereof, whether ordinary or extraordinary, structural or nonstructural, foreseen or not foreseen, or to maintain the Premises or any part thereof in any way or to correct any patent or latent defect therein. Tenant hereby expressly waives any right to make repairs at the expense of Landlord which may be provided for in any Law in effect at the Commencement Date or that may thereafter be enacted. If Tenant shall vacate or abandon the Premises, it shall give Landlord immediate written notice thereof.

        13.2.      **HVAC Maintenance Contract.** Tenant shall also maintain, in full force and effect, a preventative maintenance and service contract with a reputable service provider for maintenance of the HVAC systems of the Premises (the "**HVAC Maintenance Contract**"). The terms and provisions of any such HVAC Maintenance Contract shall require that the service provider maintain the Premises' HVAC system in accordance with the manufacturer's recommendations and otherwise in accordance with normal, customary and reasonable practices in the geographic area in which the Premises is located and for HVAC systems comparable to the Premises' HVAC system. Within thirty (30) days following the Commencement Date, Tenant shall procure and deliver to Landlord the HVAC Maintenance Contract. Thereafter, Tenant shall provide to Landlord a copy of renewals or replacements of such HVAC Maintenance Contract no later than thirty (30) days prior to the then-applicable expiry date of the existing HVAC Maintenance Contract. If Tenant fails to timely deliver to Landlord the HVAC Maintenance Contract (or any applicable renewal or replacement thereof), then Landlord shall have the right to contract directly for the periodic maintenance of the HVAC systems in the Premises and to charge the cost thereof back to Tenant as Additional Rent. Notwithstanding the foregoing, Tenant shall be entitled to perform its own preventative maintenance for filters, HVAC chemical's and soft water.

        14.      **UTILITIES.** Tenant shall purchase all utility services and shall provide for garbage, cleaning and extermination services. Tenant shall pay the utility charges for the Premises directly to the utility or municipality providing such service, all charges shall be paid by Tenant before they become delinquent. Tenant shall be solely responsible for the repair and maintenance of any

FWP-000402

meters necessary in connection with such services. Tenant's use of electrical energy in the Premises shall not, at any time, exceed the capacity of either or both of (a) any of the electrical conductors and equipment in or otherwise servicing the Premises; and (b) the HVAC systems of the Premises.

15. **INVOLUNTARY CESSATION OF SERVICES**. It is understood and agreed that Landlord or Agent shall have no liability or responsibility for a cessation of any services to the Premises that occurs as a result of causes beyond Landlord's or Agent's reasonable control. No such interruption of any service shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord or Agent liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease, including, but not limited to, the obligation to pay Rent.

16. **LANDLORD'S RIGHTS**. Landlord, Agent and their respective agents, employees and representatives shall have the right to enter and/or pass through the Premises at any time or times upon reasonable prior notice (except in the event of emergency) to examine and inspect the Premises and to show them to actual and prospective lenders, prospective purchasers or mortgagees of the Premises or providers of capital to Landlord and its affiliates; and in connection with the foregoing, to install a sign at or on the Premises to advertise the Premises for lease or sale; during the period of six (6) months prior to the Expiration Date (or at any time, if Tenant has vacated or abandoned the Premises or is in default under this Lease) as extended if a Renewal Option has been exercised, Landlord and its agents may exhibit the Premises to prospective tenants. Additionally, Landlord and Agent shall have the following rights with respect to the Premises, exercisable without notice to Tenant, without liability to Tenant, and without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for setoff or abatement of Rent: (a) to have pass keys, access cards, or both, to the Premises; and (b) to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant vacates or abandons the Premises for more than thirty (30) consecutive days or without notice to Landlord of Tenant's intention to reoccupy the Premises.

17. **NON-LIABILITY AND INDEMNIFICATION**.

17.1. **Non-Liability**. None of Landlord, Agent, any other managing agent, or their respective affiliates, owners, partners, directors, officers, agents and employees (collectively the "**Landlord Parties**") shall be liable to Tenant for any loss, injury or damage, to Tenant or to any other person, or to its or their property, irrespective of the cause of such injury, damage or loss, other than the negligence or willful misconduct of Landlord Parties. Further, none of Landlord Parties shall be liable to Tenant (a) for any damage caused by other persons in, upon or about the Premises, or caused by operations in construction of any public or quasi-public work; (b) with respect to matters for which Landlord is liable, for consequential or indirect damages purportedly arising out of any loss of use of the Premises or any equipment or facilities therein by Tenant or any person claiming through or under Tenant; (c) for any defect in the Premises; (d) for injury or damage to person or property caused by fire, or theft, or resulting from the operation of heating or air conditioning or lighting apparatus, or from falling plaster, or from steam, gas, electricity, water, rain, snow, ice or dampness, that may leak or flow from any part of the Premises, or from the pipes, appliances or plumbing work of the same; or (e) for punitive damages. The provisions of this **Section 17.21** shall survive the expiration or termination of this Lease.

17.2. **Tenant Indemnification**. Except for the Landlord's negligence or willful misconduct, Tenant hereby indemnifies, defends, and holds Landlord Parties harmless from and against any and all Losses (defined below) arising from or in connection with any or all of: (a) the conduct or management of the Premises or any business therein, or any work or Alterations done, or any condition created by any or all of Tenant and Tenant's Parties in or about the Premises during the Term or during the period of time, if any, prior to the Commencement Date that Tenant is given access to the Premises; (b) any act, omission or negligence of any or all of Tenant and Tenant's Parties; (c) any accident, injury or damage whatsoever occurring in, at or upon the Premises and caused by any or all of Tenant and Tenant's Parties; (d) any breach by Tenant of any or all of its warranties, representations and covenants under this Lease; (e) any actions necessary to protect Landlord's interest under this Lease in a bankruptcy proceeding or other proceeding under the Bankruptcy Code relating to this Lease or Tenant; (f) the creation or existence of any Hazardous Materials in, at, on or under the Premises, if and to the extent brought to the Premises or caused by Tenant or any party within Tenant's control; and (g) any violation or alleged violation by any or all of Tenant and Tenant's Parties of any Law or the requirements of insurance bodies applicable to the Premises, including any covenant, condition or restriction affecting the Premises (collectively, "**Tenant's Indemnified Matters**"). In case any action or proceeding is brought against any or all of the Landlord Parties by reason of any of Tenant's Indemnified Matters, Tenant, upon notice from any or all of the Landlord Parties, shall resist and defend such action or proceeding by counsel reasonably satisfactory to Landlord. The term "**Losses**" shall mean all claims, demands, expenses, actions, judgments, damages, penalties, fines, liabilities, losses of every kind and nature, suits, administrative proceedings, costs and fees, including, without limitation, attorneys' and consultants' reasonable fees and expenses, and the costs of cleanup, remediation, removal and restoration, that are in any way related to any matter covered by the foregoing indemnity; provided the

FWP-000403

foregoing shall not include consequential or indirect damages or losses, such as lost profits or investment opportunities; nor shall they include punitive damages. The provisions of this **Section 17.2** shall survive the expiration or termination of this Lease.

18.    **CASUALTY AND CONDEMNATION.**

18.1.    **Casualty**. If the Buildings or other improvements on the Premises shall be damaged or destroyed by fire or other casualty (each, a **"Casualty"**), Tenant, at Tenant's sole cost and expense, shall promptly and diligently repair, rebuild or replace the Buildings and other improvements, so as to restore the Premises to the condition in which they were immediately prior to such damage or destruction, irrespective of whether any insurance proceeds are adequate or available to repair, rebuild or replace the Buildings. The net proceeds of any insurance (other than rent insurance) recovered by reason of such damage or destruction in excess of the cost of adjusting the insurance claim and collecting the insurance proceeds (such excess being hereinafter called the "**net insurance proceeds"**) shall be held in trust by Landlord or held by any holder of an interest in the Premises which may be superior to Tenant's interest under this Lease (a **"Holder"**) and released for the purpose of paying the fair and reasonable cost of restoring the Buildings and other improvements. Such net insurance proceeds shall be released from time to time as the work progresses to Tenant or to Tenant's contractors. Notwithstanding the foregoing, (i) if the cost to restore the Buildings and improvements in accordance with this **Section 18.1** is less than One Million Five Hundred Thousand and No/100 Dollars ($1,500,000.000); (ii) at the time of the occurrence of such Casualty, there is no Event of Default under this Lease and no condition or event which with the giving of notice or passage of time, or both, would constitute a breach under this Lease; (iii) the Casualty occurs prior to the last twelve (12) months of the Term; and (iv) the restoration will be completed no later that six (6) months prior to the end of the Term, then Landlord shall make the net insurance proceeds available to Tenant subject to a Holder's right to disburse the net insurance proceeds either directly or through an escrow; and if not so required by a Holder, then the net insurance proceeds will be paid over to Tenant and used solely for the purpose of restoring the Buildings and improvements. Prior to the commencement of the work, Tenant shall deliver to Landlord reasonable proof that such net insurance proceeds are adequate to pay the cost of such restoration. If such net insurance proceeds are not adequate, Tenant shall pay, out of funds other than such net insurance proceeds, the amount by which such cost will exceed such net insurance proceeds and shall furnish proof to Landlord of the payment of such excess for work performed, before Landlord or any such Holder shall release any part of such net insurance proceeds. If such net insurance proceeds are more than adequate, the amount by which such net insurance proceeds exceed the cost of restoration will be retained by Landlord or applied to repayment of any mortgage loan.

18.2.    **Condemnation.**

18.2.1.    **Condemnation of Entire Premises**.  If all or substantially all of the Premises is taken or condemned for a public or quasi-public use (**"Condemnation"**), the provisions of **Section 18.3** shall apply.

18.2.2.    **Partial Condemnation**.  If less than all or substantially all of the Premises is subject to a Condemnation, Tenant shall restore the Buildings and other improvements upon the Premises to a condition and size as nearly comparable as reasonably possible to the condition and size thereof immediately prior to the Condemnation, and there shall be an equitable abatement of the minimum rent according to the value of the Premises before and after the Condemnation. In the event that the parties are unable to agree upon the amount of such abatement, either party may submit the issue for arbitration pursuant to the rules then obtaining of the American Arbitration Association and the determination or award rendered by the arbitrator/s/ shall be final, conclusive and binding upon the parties and not subject to appeal, and judgment thereon may be entered in any court of competent jurisdiction.

18.2.3.    **Award**.  Tenant shall have the right to make a claim against the condemnor for moving and related expenses which are payable to tenants under applicable law without reducing the awards otherwise payable to Landlord and the Holders. Except as aforesaid, Tenant hereby waives all claims against Landlord and all claims against the condemnor, and Tenant hereby assigns to Landlord all claims against the condemnor including, without limitation, all claims for leasehold damages and diminution in the value of Tenant's leasehold interest. If only part of the Premises is Condemned, the net proceeds of any Condemnation award recovered by reason of any taking or Condemnation of the Premises in excess of the cost of collecting the award and in excess of any portion thereof attributable to the then current market value of the land taken or Condemned (such excess being hereinafter called the **"net condemnation proceeds"**) shall be held in trust by Landlord or any Holder and released for the purpose of paying the fair and reasonable cost of restoring the Buildings and other improvements damaged by reason of the taking or Condemnation. Such net Condemnation proceeds shall be released from time to time as the work progresses to Tenant or to Tenant's contractors. Prior to the commencement of the work, Tenant shall deliver to Landlord reasonable proof that such net condemnation proceeds are adequate to pay the cost of such restoration. If such net condemnation proceeds are not adequate, Tenant shall pay, out

of funds other than such net condemnation proceeds, the amount by which such cost will exceed such net condemnation proceeds and shall furnish proof to Landlord of the payment of such excess for work performed before Landlord or any such Holder shall release any part of such net condemnation proceeds. If such net condemnation proceeds are more than adequate, the amount by which such net condemnation proceeds exceed the cost of restoration will be retained by Landlord or applied to repayment of any Mortgage Loan secured by the Premises.

      **18.2.4.** **Temporary Taking**. If the condemnor should take only the right to possession for a fixed period of time or for the duration of an emergency or other temporary condition (a "**Temporary Taking**"), then, notwithstanding anything hereinabove provided, this Lease shall continue in full force and effect without any abatement of rent, but the amounts payable by the condemnor with respect to any period of time prior to the expiration or sooner termination of this Lease shall be paid by the condemnor to Landlord and the condemnor shall be considered a subtenant of Tenant. If the amounts payable hereunder by the condemnor are paid in monthly installments, Landlord shall apply the amount of such installments, or as much thereof as may be necessary for the purpose, toward the amount of rent due from Tenant as rent for that period, and Tenant shall pay to Landlord any deficiency between the monthly amount thus paid by the condemnor and the amount of the rent, while Landlord shall pay over to Tenant any excess of the amount of the award over the amount of the rent.

    **18.3.**    **Termination of Lease Following Major Casualty or Major Condemnation.**

      **18.3.1.** If a (i) Casualty, (ii) Condemnation, or (iii) Material Temporary Taking shall affect all or a substantial portion of the Premises, and:

        **18.3.1.1.** in the case of a Casualty, such Casualty shall be deemed a "total loss" for insurance purposes or shall be determined to be a loss of such dimension that the Premises cannot be completely restored or rebuilt within two hundred seventy (270) days computed after the hypothetical date of commencement of such construction (a "**Major Casualty**"); or

        **18.3.1.2.** in the case of a partial Condemnation (other than a Temporary Taking), such Condemnation shall, in Tenant's and Landlord's reasonable judgment, render the Premises unsuitable for restoration for continued use and occupancy of Tenant's business; or

        **18.3.1.3.** in the case of a total Condemnation;

then Tenant may, at its option, exercisable not later than sixty (60) days after the date of such Major Casualty or Condemnation, deliver to Landlord (A) notice (a "**Termination Notice**") of its intention to terminate this Lease on the next rental payment date that occurs not less than forty five (45) days after the delivery of such notice (the "**Termination Date**"); (B) in the case of a Condemnation, a certificate of an authorized officer of Tenant describing the event giving rise to such termination; (C) in the case of a Major Casualty, (x) the certificate of an architect licensed in the state in which the Premises is located stating that the architect has determined, in its good faith judgment, that the Premises cannot be completely restored or rebuilt for continued use and occupancy in Tenant's business within a building construction period of two hundred seventy (270) days computed from the hypothetical date of commencement of such construction or (y) written confirmation from the issuer of the applicable insurance policy that it will treat the damage to the Building or Buildings as a "total loss"; and (D) an irrevocable offer (a "**Event of Loss Purchase Offer**") by Tenant to Landlord to purchase the Premises on the Termination Date.

    If Landlord shall reject the Event of Loss Purchase Offer by written notice given to Tenant not later than fifteen (15) days prior to the Termination Date, this Lease shall terminate on the Termination Date, except with respect to obligations and liabilities of Tenant or Landlord hereunder, actual or contingent, which have arisen on or prior to the Termination Date, upon payment by Tenant of all of the Base Rent, Additional Rent and other sums then due and payable or accrued hereunder to and including the Termination Date, and the net condemnation proceeds or net insurance proceeds (as the case may be) shall belong to Landlord. Tenant shall, on or before the Termination Date, execute and deliver to Landlord an outright assignment of such proceeds in form and substance reasonably acceptable to Landlord and pay to Landlord an amount equal to any applicable insurance deductible or self-insurance amounts. Unless Landlord shall have rejected the Event of Loss Purchase Offer in accordance with this **Section 18.3.1**, Landlord shall be conclusively considered to have accepted the Event of Loss Purchase Offer. In the event Landlord accepts (or is deemed to have accepted) the Event of Loss Purchase Offer, then, on the Termination Date (1) Tenant shall pay to Landlord a purchase price determined pursuant to **Exhibit E** attached hereto, (2) Landlord shall convey to Tenant or its designee the Premises, and (3) Landlord shall assign to Tenant or its designee all of Landlord's interest in the net condemnation proceeds or net insurance proceeds (as the case may be), by assignment in form and substance reasonably acceptable to Tenant or, if Landlord has already received all or a portion of

such net condemnation proceeds or net insurance proceeds (as the case may be), then Landlord shall pay the same to Tenant or Tenant's designee after deducting Landlord's costs payable by Tenant hereunder. Such sale shall otherwise be consummated in accordance with the terms set forth in **Section 18.3.2** below. In the event Tenant fails to deliver the Termination Notice and the Event of Loss Purchase Offer in accordance with the time deadlines set forth in this **Section 18.3**, then, at Landlord's election, Tenant shall have no right to terminate this Lease or right to make an offer to purchase the Premises, and the Lease will continue in full force and effect.

        **18.3.2.  Closing/Conveyance Procedures**. In the event, pursuant to the terms and conditions of **Section 18.3.1** above, Landlord is to convey its interest in the Premises to Tenant as a result of an Event of Loss Purchase Offer, the following provisions shall apply:

        **18.3.2.1.**     The purchase of the Premises contemplated herein shall be consummated at a closing ("**Loss Closing**") to take place at the offices of Landlord or Landlord's counsel. The Loss Closing shall occur on the date (the "**Loss Closing Date**") which is no later than sixty (60) days after Landlord's receipt of a timely Exercise Notice or such other date as the parties shall mutually agree in writing. The Loss Closing shall be effective as of 11:59 p.m. on the Loss Closing Date. Time is of the essence.

        **18.3.2.2.**     The total purchase price to be paid to Landlord by Tenant at the Loss Closing for the sale hereunder shall be an amount equal to the applicable purchase price set forth on **Exhibit E** attached hereto. In the event of a Loss Closing hereunder, Tenant shall not have the right to escrow or hold back any portion of the purchase price hereunder. The purchase price shall be paid to Landlord at the Loss Closing, by federal wire transfer of immediately available funds.

        **18.3.2.3.**     At the Loss Closing, Landlord shall convey fee simple title to the Premises to Tenant (or its assignee or designee) pursuant to a quitclaim deed, subject to (i) Taxes; (ii) those matters and exceptions shown in Landlord's existing owner's policy of title insurance dated April ___, 2006, issued by First American Title Insurance Company under Policy No. 0505068 Was and the survey prepared by Alan Reid & Associates dated March 13, 2006 as Project Number 05463 (excluding any mortgage financing and related security documents); (iii) those matters that may be otherwise specifically approved, in writing, by Tenant or otherwise deemed approved or accepted by Tenant, or that otherwise result from the construction of any improvements or Alterations by Tenant; (iv) matters arising out of any act of Tenant or any or all of its affiliates, representatives, lenders, agents, contractors, employees or invitees; and (v) any lien, claim or encumbrance or other matter, except liens, claims, adverse encumbrances directly caused by any act of Landlord or its affiliates, representatives, lenders, agents, contractors or employees.

        **18.3.2.4.**     The sale of the Premises as provided for herein shall be made on a strictly "AS IS," "WHERE-IS" basis as of the Loss Closing Date, without any representations or warranties, of any nature whatsoever from Landlord. Landlord hereby specifically disclaims any warranty (oral or written) concerning: (i) the nature and condition of the Premises and the suitability thereof for any and all activities and uses that Tenant may elect to conduct thereon, (ii) the manner, construction, condition and state of repair or lack of repair of any improvements located thereon, (iii) the nature and extent of any right-of-way, lien, encumbrance, license, reservation, condition or otherwise, (iv) the compliance of the Premises or its operation with any laws, rules, ordinances, or regulations of any government or other body; and (v) any other matter whatsoever. Tenant expressly acknowledges that, in consideration of the agreements of Landlord herein, LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES, ANY IMPROVEMENTS LOCATED THEREON, OR ANY SOIL CONDITIONS RELATED THERETO. TENANT SPECIFICALLY ACKNOWLEDGES THAT TENANT IS <u>NOT</u> RELYING ON (AND LANDLORD HEREBY DISCLAIMS AND RENOUNCES) ANY REPRESENTATIONS OR WARRANTIES MADE BY OR ON BEHALF OF LANDLORD OF ANY KIND OR NATURE WHATSOEVER.

        **18.3.2.5.**     If Tenant fails to timely perform or satisfy any of its obligations imposed under this **Section 18.3**, including its obligation to timely close on the purchase of the Premises, then Landlord shall have the right to either: (i) treat such failure as a termination of this Lease the same as if Landlord had given a Termination Notice (without the need for any advance notice or cure period); or (ii) file an action to specifically enforce the terms of this **Section 18.3**), with respect to such default.

        **18.3.2.6.**     Upon the purchase of the Premises pursuant to **Section 18.3.1** above, this Lease shall terminate except for provisions under this Lease that by their terms specifically survive.

FWP-000406

18.3.2.7.      Landlord and Tenant each hereby indemnify, protect and defend and hold the other harmless from and against all losses, claims, costs, expenses, damages (including, but not limited to, reasonable fees of counsel selected by the indemnified party) resulting from the claims of any broker, finder, or other such party claiming by, through or under the acts or agreements of the indemnifying party.  The obligations of the parties pursuant to this **Section 18.3** shall survive any termination of this Lease.

18.3.2.8.      There shall be no prorations of any cost items relating to the Premises, whether Taxes, Operating Expenses or otherwise; provided, however, that if and to the extent that, as of the Loss Closing, Landlord has paid any bills for any ownership expenses incurred (prior to Closing) in connection with the ownership and operation of the Premises and, under the terms of this Lease, Tenant would be required to reimburse Landlord for some or all of such expenses, then at Closing, Tenant shall be required to pay to Landlord, in addition to the purchase price set forth above, any such accrued Operating Expenses (including, but not limited to, Taxes) for which Tenant is responsible under this Lease.

18.3.2.9.      Provided the Loss Closing is consummated in accordance with this **Section 18.3**, Tenant shall pay for all closing costs, including, but not limited to, the cost to record the deed, any transfer taxes, any closing escrow fees, the costs of any title insurance policy and the cost of the survey.  Tenant shall be solely responsible for procuring the title insurance policy and the survey and in no event shall the procurement of those items be a condition precedent to Tenant's obligation to acquire the Premises.  All other costs shall be paid in accordance with local custom.  Each of Landlord and Tenant shall be responsible for their respective attorneys' fees.

19.      **SURRENDER AND HOLDOVER**.  On the last day of the Term, or upon any earlier termination of this Lease, or upon any re-entry by Landlord upon the Premises, after a Tenant Default:  (a) Tenant shall quit and surrender the Premises to Landlord "broom-clean" (as defined by **Exhibit D**, attached hereto and incorporated herein by reference), and in a condition that would reasonably be expected with normal and customary use in accordance with prudent operating practices and in accordance with the covenants and requirements imposed under this Lease, subject only to ordinary wear and tear (as is attributable to deterioration by reason of time and use, in spite of Tenant's reasonable care) and such damage or destruction as Landlord is required to repair or restore under this Lease; (b) Tenant shall remove all of Tenant's personal property therefrom (excluding those items listed on **Exhibit C** attached hereto), and (c) Tenant shall surrender to Landlord any and all keys, access cards, computer codes or any other items used to access the Premises.  Landlord shall be permitted to inspect the Premises in order to verify compliance with this **Section 19** at any time prior to (x) the Expiration Date, (y) the effective date of any earlier termination of this Lease, or (z) the surrender date otherwise agreed to in writing by Landlord and Tenant.  The obligations imposed under the first sentence of this **Section 19** shall survive the termination or expiration of this Lease.  If Tenant remains in possession after the Expiration Date hereof or after any earlier termination date of this Lease or of Tenant's right to possession:  (i)  Tenant shall be deemed a tenant-at-will; (ii) Tenant shall pay one hundred ten percent (110%) of the aggregate of all Rent last prevailing hereunder, and also shall pay all actual damages sustained by Landlord, directly by reason of Tenant's remaining in possession after the expiration or termination of this Lease; (iii) there shall be no renewal or extension of this Lease by operation of law; and (iv) the tenancy-at-will may be terminated by either party hereto upon thirty (30) days' prior written notice given by the terminating party to the non-terminating party.  The provisions of this **Section 19** shall not constitute a waiver by Landlord of any re-entry rights of Landlord provided hereunder or by law.

20.      **EVENTS OF DEFAULT**.

20.1.      **Bankruptcy of Tenant or Guarantor**.  It shall be a default by Tenant under this Lease ("**Default**" or "**Event of Default**") if either or both of Guarantor and Tenant makes an assignment for the benefit of creditors, or files a voluntary petition under any state or federal bankruptcy (including the United States Bankruptcy Code) or insolvency law, or an involuntary petition is filed against Tenant or Guarantor, as the case may be, under any state or federal bankruptcy (including the United States Bankruptcy Code) or insolvency law that is not dismissed within ninety (90) days after filing, or whenever a receiver of Tenant or Guarantor, as the case may be, or of, or for, the property of Tenant or Guarantor, as the case may be, shall be appointed, or Tenant or Guarantor, as the case may be, admits it is insolvent or is not able to pay its debts as they mature (all of the foregoing being collectively referred to as an "**Insolvency Event**").  In the event only of an Insolvency Event of Guarantor, Landlord, in its sole and absolute discretion, and without impairing or affecting Landlord's right or ability to exercise any other remedies available to it under this Lease, may elect to terminate this Lease and/or Tenant's right of possession hereunder by giving Tenant written notice thereof (the "**Termination Election**").  The effective date of such Termination Election shall be nine (9) months after Landlord's written notice thereof to Tenant (the "**Nine Month Notice Period**"), during which time this Lease shall remain in full force and effect and Tenant shall continue to pay the Base Rent installments and any Additional Rent payments pursuant to **Section 2** above and other amounts which become due under this Lease during the Nine Month Period on or before the date such Rent or other amounts become due.  On

or before the expiration of the Nine Month Notice Period, Tenant shall vacate the Premises in accordance with **Section 19** hereof. If at any time during the Nine Month Notice Period Tenant shall be in Default under this Lease, or any event occurs which with the giving of notice or passage of time, or both, could constitute a Default under this Lease, then Landlord may immediately exercise any or all of its remedies under this Lease as if no Nine Month Notice Period had been granted to Tenant by Landlord, and Tenant shall not be entitled to any notice or cure periods which would otherwise be available to Tenant under this Lease to cure such Default or event, all such notice and cure periods being hereby explicitly and absolutely waived by Tenant.

**20.2.    Default Provisions**. In addition to any Default arising under **Section 20.1** above, each of the following shall constitute a Default: (a) if Tenant fails to pay Rent or any other payment when due hereunder within tem (10) days after written notice from Landlord of such failure to pay on the due date; provided, however, that if in any consecutive twelve (12) month period, Tenant shall, on two (2) separate occasions, fail to pay any installment of Rent on the date such installment of Rent is due, then, on the third such occasion and on each occasion thereafter on which Tenant shall fail to pay an installment of Rent on the date such installment of Rent is due, Landlord shall be relieved from any obligation to provide notice to Tenant, and Tenant shall then no longer have a ten (10) day period in which to cure any such failure; (b) if Tenant fails, whether by action or inaction, to timely comply with, or satisfy, any or all of the obligations imposed on Tenant under this Lease (other than the obligation to pay Rent) for a period of thirty (30) days after Landlord's delivery to Tenant of written notice of such default under this **Section 20.2(b)**; provided, however, that if the default cannot, by its nature, be cured within such thirty (30) day period, but Tenant commences and diligently pursues a cure of such default promptly within the initial thirty (30) day cure period, then, as long as Tenant continues to diligently pursue such a cure, Landlord shall not exercise its remedies under **Section 21** unless such default remains uncured for more than ninety (90) days after the initial delivery of Landlord's original default notice; and, at Landlord's election, or (c) Guarantor under that certain Guaranty, dated of even date herewith and attached hereto as **Exhibit F** (the "**Guaranty**"), breaches, defaults under, or fails to comply with any or all of the requirements of the Guaranty, provided Insolvency Events of Guarantor shall be governed by **Section 20.1** above.

21.    **RIGHTS AND REMEDIES**.

**21.1.    Landlord's Cure Rights Upon Default of Tenant**. If a Default occurs, then Landlord may (but shall not be obligated to) cure or remedy the Default for the account of, and at the expense of, Tenant, but without waiving such Default.

**21.2.    Landlord's Remedies**. In the event of any Default by Tenant under this Lease, Landlord, at its option, may, in addition to any and all other rights and remedies provided in this Lease or otherwise at law or in equity do or perform any or all of the following:

**21.2.1.** Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession to Landlord. In such event, Landlord shall be entitled to recover from Tenant all of:

(i) the unpaid Rent that is accrued and unpaid as of the date on which this Lease is terminated and continuing until the date of award;

(ii) an amount equal to the then present value, at the time of award, of the amount by which (x) the unpaid Rent that would otherwise be due and payable under this Lease (had this Lease not been terminated) for the period of time from the date on which this Lease is terminated through the Expiration Date exceeds (y) the then fair rental value of the Premises for the same period; and

(iii) any other amount necessary to compensate Landlord for all the detriment directly caused by the Tenant's failure to perform its obligations under this Lease or which, in the ordinary course of events, would be likely to result therefrom, including but not limited to, the cost of recovering possession of the Premises, expenses of reletting, including renovation and alteration of the Premises reasonably required to relet the Premises and reasonable attorneys' fees.

The said present value referred to in clause (ii) above shall be computed by discounting such amount at the per annum prime rate of interest (as announced in the *Wall Street Journal*) in effect at the time of the award through the Expiration Date. Efforts by Landlord to mitigate damages caused by Tenant's Default shall not waive Landlord's right to recover damages under this Section 21.2. If this Lease is terminated through any unlawful entry and detainer action, Landlord shall have the right to recover in such proceeding any unpaid

Rent and damages as are recoverable in such action, or Landlord may reserve the right to recover all or any part of such Rent and damages in a separate suit; or

**21.2.2.** Continue the Lease and Tenant's right to possession and recover the Rent as it becomes due. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Landlord's interests shall not constitute a termination of the Tenant's right to possession; or

**21.2.3.** Pursue any other remedy now or hereafter available under the laws of the state in which the Premises are located.

**21.2.4.** Without limitation of any of Landlord's rights in the event of a Default by Tenant, Landlord may also exercise its rights and remedies with respect to any security held or maintained by Landlord.

**21.2.5.** In addition to the foregoing, Landlord may also elect to enforce any or all of the terms and provisions of the Guaranty.

Any and all personal property of Tenant that may be removed from the Premises by Landlord pursuant to the authority of this Lease or of law may be handled, removed or stored by Landlord at the sole risk, cost and expense of Tenant, and in no event or circumstance shall Landlord be responsible for the value, preservation or safekeeping thereof, except to the extent required by law. Tenant shall pay to Landlord, upon demand, any and all expenses incurred in such removal and all storage charges for such property of Tenant so long as the same shall be in Landlord's possession or under Landlord's control. Any such property of Tenant not removed from the Premises as of the Expiration Date or any other earlier date on which this Lease is terminated shall be conclusively presumed to have been conveyed by Tenant to Landlord under this Lease as in a bill of sale, without further payment or credit by Landlord to Tenant. Neither expiration or termination of this Lease nor the termination of Tenant's right to possession shall relieve Tenant from its liability under the indemnity provisions of this Lease.

**21.3.** **Additional Rights of Landlord**. All sums advanced by Landlord or Agent on account of Tenant under this Section, or pursuant to any other provision of this Lease, and all Base Rent and Additional Rent, if delinquent or not paid by Tenant and received by Landlord when due hereunder, shall bear interest at the rate of three percent (3%) per annum above the "prime" or "reference" or "base" rate (on a per annum basis) of interest publicly announced as such, from time to time, by the JP Morgan Chase Bank, or its successor (**"Default Interest"**), from the due date thereof until paid, and such interest shall be and constitute Additional Rent and be due and payable upon Landlord's or Agent's submission of an invoice therefor. The various rights, remedies and elections of Landlord reserved, expressed or contained herein are cumulative and no one of them shall be deemed to be exclusive of the others or of such other rights, remedies, options or elections as are now or may hereafter be conferred upon Landlord by law.

**21.4.** **Event of Bankruptcy**. In addition to, and in no way limiting the other remedies set forth herein, Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition, or other similar type proceeding under the federal bankruptcy laws, as now enacted or hereinafter amended, then: (a) "adequate assurance of future performance" by Tenant pursuant to Bankruptcy Code Section 365 will include (but not be limited to) payment of a new security deposit in the amount of two times the then current Base Rent payable hereunder; (b) any person or entity to which this Lease is assigned, pursuant to the provisions of the Bankruptcy Code, shall be deemed, without further act or deed, to have assumed all of the obligations of Tenant arising under this Lease on and after the effective date of such assignment, and any such assignee shall, upon demand by Landlord, execute and deliver to Landlord an instrument confirming such assumption of liability; (c) notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as "Rent", shall constitute "rent" for the purposes of Section 502(b)(6) of the Bankruptcy Code; and (d) if this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered to Landlord or Agent (including Base Rent, Additional Rent and other amounts hereunder), shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the bankruptcy estate of Tenant. Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord or Agent shall be held in trust by Tenant or Tenant's bankruptcy estate for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

**22.** **BROKER**. Tenant covenants, warrants and represents that the broker set forth in **Section 1.8** was the only broker to represent Tenant in the negotiation of this Lease (**"Tenant's Broker"**). Landlord covenants, warrants and represents that no brokers

FWP-000409

represented Landlord in the negotiation of this Lease. Tenant shall be solely responsible for paying the commission of Tenant's Broker. Each party agrees to and hereby does defend, indemnify and hold the other harmless against and from any brokerage commissions or finder's fees or claims therefor by a party claiming to have dealt with the indemnifying party and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses, for any breach of the foregoing. The foregoing indemnification shall survive the termination or expiration of this Lease.

23.    **MISCELLANEOUS**.

23.1.    **Merger**. All prior understandings and agreements between the parties are merged in this Lease, which alone fully and completely expresses the agreement of the parties. No agreement shall be effective to modify this Lease, in whole or in part, unless such agreement is in writing, and is signed by the party against whom enforcement of said change or modification is sought.

23.2.    **Notices**. Any notice required to be given by either party pursuant to this Lease, shall be in writing and shall be deemed to have been properly given, rendered or made only if personally delivered, or if sent by Federal Express or other comparable commercial overnight delivery service, addressed to the other party at the addresses set forth below each party's respective signature block (or to such other address as Landlord or Tenant may designate to each other from time to time by written notice), and shall be deemed to have been given, rendered or made on the day so delivered or on the first business day after having been deposited with the courier service.

23.3.    **Non-Waiver**. The failure of either party to insist, in any one or more instances, upon the strict performance of any one or more of the obligations of this Lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations of this Lease or of the right to exercise such election, but the Lease shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt and acceptance by Landlord or Agent of Base Rent or Additional Rent with knowledge of breach by Tenant of any obligation of this Lease shall not be deemed a waiver of such breach.

23.4.    **Advances by Landlord**. If Tenant shall fail to make or perform any payment or act required by this Lease within any applicable cure period, then Landlord may at its option make such payment or perform such act for the account of Tenant, and Landlord shall not thereby be deemed to have waived any default or released Tenant from any obligation hereunder. Landlord shall give Tenant five (5) days notice (except in the case of an emergency) prior to Landlord making such payment or protective advance. All amounts so paid by Landlord and all incidental costs and expenses (including reasonable attorneys' fees and expenses) actually incurred in connection with such payment or performance, together with interest at the annual rate equal to three percent (3%) above the prime rate as announced from time to time in New York City by the JP Morgan Chase Bank, or its successor from and including the date of the making of such payment or of the incurring of such costs and expenses to and including the date of repayment, shall be paid by Tenant to Landlord on demand.

23.5.    **Parties Bound**. Except as otherwise expressly provided for in this Lease, this Lease shall be binding upon, and inure to the benefit of, the successors and assignees of the parties hereto. Tenant hereby releases Landlord named herein from any obligations of Landlord for any period subsequent to the conveyance and transfer of Landlord's ownership interest in the Premises. In the event of such conveyance and transfer, Landlord's obligations shall thereafter be binding upon each transferee (whether Successor Landlord or otherwise). No obligation of Landlord shall arise under this Lease until the instrument is signed by, and delivered to, both Landlord and Tenant.

23.6.    **Recordation of Lease**. Tenant shall not record or file this Lease, but Landlord agrees that a memorandum hereof shall be filed at Tenant's sole cost in the public records of the county where the Premises are located.

23.7.    **Governing Law; Construction**. This Lease shall be governed by and construed in accordance with the laws of the state in which the Premises is located. If any provision of this Lease shall be invalid or unenforceable, the remainder of this Lease shall not be affected but shall be enforced to the extent permitted by law. The captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation. This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted. Each covenant, agreement, obligation, or other provision of this Lease to be performed by Tenant, shall be construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease. All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. This

FWP-000410

Lease may be executed in counterpart and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

**23.8.** <u>Time</u>. Time is of the essence for this Lease. If the time for performance hereunder falls on a Saturday, Sunday or a day that is recognized as a holiday in the state in which the Premises is located, then such time shall be deemed extended to the next day that is not a Saturday, Sunday or holiday in said state.

**23.9.** <u>Authority to Execute</u>. Each of Tenant and the person(s) executing this Lease on behalf of Tenant, Landlord and the person(s) executing this Lease on behalf of Landlord hereby represent, warrant, and covenant with and to the other as follows: the individual(s) acting as signatory on behalf of Tenant or Landlord, as the case may be, is(are) duly authorized to execute this Lease; Tenant and Landlord have procured (whether from its members, partners or board of directors, as the case may be), the requisite authority to enter into this Lease; this Lease is and shall be fully and completely binding upon Tenant and Landlord. Landlord and Tenant shall timely and completely perform all of their respective obligations hereunder.

**23.10.** <u>WAIVER OF TRIAL BY JURY</u>. THE LANDLORD AND THE TENANT, TO THE FULLEST EXTENT THAT THEY MAY LAWFULLY DO SO, HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING BROUGHT BY ANY PARTY TO THIS LEASE WITH RESPECT TO THIS LEASE, THE PREMISES, OR ANY OTHER MATTER RELATED TO THIS LEASE OR THE PREMISES.

**23.11.** <u>Arbitration of Certain Disputes</u>. Any controversy or claim arising out of or relating to this Lease (excluding **Section 2.5**) which involves less than Five Hundred Thousand and No/100 Dollars ($500,000.00) or which relates to a denial of any consent or approval shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, including its Expedited Procedures, and utilizing a single arbitrator and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction; provided however, that in no event shall a failure to pay Rent be subject to arbitration, nor shall Landlord be required to arbitrate rather than commence or otherwise utilize an unlawful detainer or similar action for Tenant's failure or claimed failure to pay Rent; nor shall any such unlawful detainer action commenced by Landlord be subject to a stay, temporary injunction or temporary restraining order on grounds that part or all of the controversy involved in such unlawful detainer action is subject to arbitration; nor shall the existence or commencement of any such arbitration prevent the commencement of any such unlawful detainer action or be grounds for staying, enjoining or restraining the commencement of any such unlawful detainer action. Any arbitration of this Lease shall be conducted in the county in which the Premises is located, unless the parties specifically agree in writing to another location.

**23.12.** <u>Attorney's Fees</u>. If either party brings any action or legal proceeding (including arbitration) for damages for an alleged breach of any provision of this Lease, to recover Rent or other sums due, to terminate the tenancy of the Premises or to enforce, protect or establish any term, condition or covenant of this Lease or right of either party, the prevailing party shall be entitled to recover as a part of such action or proceedings, or in a separate action brought for that purpose, reasonable attorneys' fees and costs to be fixed and determined by the court (or arbitrator) in such action or proceeding.

**23.13.** <u>Financial Information</u>. From time to time during the Term, Tenant shall deliver to Landlord information and documentation describing and concerning Tenant's financial condition, and in form and substance reasonably acceptable to Landlord, within ten (10) days following Landlord's written request therefor. Upon Landlord's request, Tenant shall provide to Landlord the most currently available audited financial statement of Tenant; and if no such audited financial statement is available, then Tenant shall instead deliver to Landlord its most currently available balance sheet, operating statement, income statement and statements of cash flow and equity. Furthermore, upon the delivery of any such financial information from time to time during the Term, Tenant shall be deemed to automatically represent and warrant to Landlord that the financial information delivered to Landlord is true, accurate and complete, and that there has been no adverse change in the financial condition of Tenant since the date of the then-applicable financial information.

**23.14.** <u>Confidential Information</u>. The parties agree to maintain in strict confidence the economic terms of this Lease and any or all other materials, data and information delivered to or received by any or all of the Landlord Parties and the Tenant Parties either prior to or during the Term in connection with the negotiation and execution hereof; provided, however, that Landlord may disclose this Lease or any portion hereof and/or such information to any potential mortgagee or purchaser of the Premises, or to any affiliate, consultant or attorney in connection therewith, and any such party shall maintain such information in strict confidence.

FWP-000411

**23.15.    Submission of Lease.**  Submission of this Lease to Tenant for signature does not constitute a reservation of space or an option to lease.  This Lease is not effective until execution by and delivery to both Landlord and Tenant.

**23.16.    Counterparts.**  This Lease may be executed in multiple counterparts, but all such counterparts shall together constitute a single, complete and fully-executed document.

[SIGNATURE PAGE FOLLOWS]

FWP-000412

**IN WITNESS WHEREOF,** Landlord and Tenant have duly executed this Lease as of the day and year first above written.

LANDLORD:

FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC,
a Delaware limited liability company

By:  FR Net Lease Co Investment Manager 5, LLC, a Delaware limited
liability company, its managing member

By:  First Industrial Development Services, Inc., a Maryland
corporation, its sole member

By: _____

Name: _Patrick Hunt_____

Its: _Managing Director_____

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**TENANT:**

ALTO U.S., INC.,
a Delaware corporation

By: _____

Its: *Sr. VP + CFO*


Landlord's Addresses for Notices:

FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC
c/o First Industrial Acquisitions, Inc.
311 South Wacker Drive, Suite 4000
Chicago, Illinois 60606
Attn: Executive Vice President-Operations

With a copy to:

First Industrial Realty Trust, Inc.
7625 Golden Triangle Drive, Suite T
Eden Prairie, MN 55344
Attn: Jeff Borst

With a copy to:

Barack Ferrazzano Kirschbaum Perlman & Nagelberg LLP
333 West Wacker Drive
Suite 2700
Chicago, Illinois 60606
Attn: Suzanne Bessette-Smith

Tenant's Addresses for Notices:

ALTO U.S., INC.
c/o Nilfisk-Advance, Inc.
14600 21st Avenue North
Plymouth, MN 55447-3408
Attn: Daniel Pjevach and Scott Lunger

With a copy to:

Lindquist & Vennum P.L.L.P.
4200 IDS Center, 80 S. 8th St.
Minneapolis, MN 55402
Attn: Larry B. Guthrie

## EXHIBIT A

### PREMISES

A PART OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SECTION TWELVE (12), TOWNSHIP SEVENTEEN (17) NORTH, RANGE THIRTY (30) WEST AND A PART OF THE FRACTIONAL NORTHWEST QUARTER (FRL NW ¼) OF THE NORTHWEST QUARTER (NW ¼) OF SECTION SEVEN (7), TOWNSHIP SEVENTEEN (17) NORTH, RANGE TWENTY-NINE (29) WEST, ALL IN WASHINGTON COUNTY, ARKANSAS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12); THENCE S01°05'17"E ALONG THE WEST LINE OF SAID 40 ACRE TRACT 312.01 FEET; THENCE N89°05'01"E 29.75 FEET TO AN EXISTING IRON REBAR ON THE EAST RIGHT-OF-WAY LINE OF POWELL STREET FOR THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE, N89°05'01"E 387.25 FEET TO A SET ½" IRON REBAR; THENCE N01°05'17"W 265.42 FEET TO A SET ½" IRON REBAR ON THE SOUTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY #412; THENCE N88°53'06"E 273.08 FEET ALONG SAID RIGHT-OF-WAY LINE TO A SET ½" IRON REBAR; THENCE LEAVING SAID RIGHT-OF-WAY LINE, S01°05'17"E 266.37 FEET TO A SET ½" IRON REBAR; THENCE N89°05'01"E 344.25 FEET TO AN EXISTING IRON REBAR; THENCE N00°51'11"W 266.61 FEET TO AN EXISTING IRON REBAR ON THE SOUTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY #412; THENCE N88°41'26"E 278.01 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING COTTON SPINDLE ON THE EAST LINE OF THE NORTHEAST QUARTER (NE ¼) OF THE NORHTEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12); THENCE N88°41'26"E 5.39 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING ARKANSAS HIGHWAY COMMISSION RIGHT-OF-WAY MONUMENT; THENCE S00°45'46"E ALONG SAID RIGHT-OF-WAY LINE 6.00 FEET; THENCE N89°13'01"E 232.61 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING AHC RIGHT-OF-WAY MONUMENT; THENCE N00°36'45"W 5.92 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING AHC RIGHT-OF-WAY MONUMENT; THENCE N89°13'28"E 151.35 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING AHC RIGHT-OF-WAY MONUMENT; THENCE S47°01'52"E 89.66 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING IRON REBAR AT THE WEST RIGHT-OF-WAY LINE OF ARKANSAS HIGHWAY #265; THENCE S04°05'48"E 234.38 FEET ALONG SAID ARKANSAS HIGHWAY #265 RIGHT-OF-WAY LINE TO AN EXISTING IRON REBAR; THENCE LEAVING SAID RIGHT-OF-WAY LINE, S89°07'35"W 228.47 FEET TO AN EXISTING IRON REBAR; THENCE S52°11'01"W 5.41 FEET TO AN EXISTING IRON REBAR; THENCE S89°15'03"W 234.54 FEET TO AN EXISTING CHISELED "X" IN CONCRETE, SAID POINT BEING ON THE EAST LINE OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12); THENCE S00°51'11"E 317.00 FEET ALONG THE EAST LINE OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12) TO A SET ½" IRON REBAR; THENCE LEAVING THE EAST LINE OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12), S89°03'05"W 1062.87 FEET TO AN EXISTING IRON REBAR; THENCE N00°46'47"W 180.00 FEET TO A SET ½" IRON REBAR; THENCE S89°09'51"W 219.90 FEET TO AN EXISTING IRON REBAR ON THE EAST RIGHT-OF-WAY LINE OF POWELL STREET; THENCE N00°51'53"W 168.28 FEET TO THE POINT OF BEGINNING, CONTAINING 15.82 ACRES, MORE OR LESS.

**LEASE EXHIBIT B**

**TENANT OPERATIONS INQUIRY FORM**

1.  Name of Company/Contact:  Clarke/Mike Acree, Facilities Manager.

2.  Address/Phone:  2100 Hwy. 265, Springdale, AR 72764 / 479-750-1000

3.  Provide a brief description of your business and operations:  Manufacture floor cleaning equipment.

4.  Will you be required to make filings and notices or obtain permits as required by Federal and/or State regulations for the operations at the proposed facility?  Specifically:

      a. SARA Title III Section 312 (Tier II) reports       **YES**   NO

             (> 10,000lbs. of hazardous materials STORED at any one time)

      b. SARA Title III Section 313 (Tier III) Form R reports    YES   **NO**

             (> 10,000lbs. of hazardous materials USED per year)

      c. NPDES or SPDES Stormwater Discharge permit     **YES**   NO

             (answer "No" if "No-Exposure Certification" filed)

      d. EPA Hazardous Waste Generator ID Number      **YES**   NO

5.  Provide a list of chemicals and wastes that will be used and/or generated at the proposed location. Routine office and cleaning supplies are not included. Make additional copies if required.

| Chemical/Waste | Approximate Annual Quantity Used or Generated | Storage Container(s) (i.e. Drums, Cartons, Totes, Bags, ASTs, USTs, etc) |
|---|---|---|
| Universal waste (batteries) | Generate under 200 batteries a year | Original case, Totes & Pallets w/sideboards |
| Universal waste (light bulbs) | Generate under 300 bulbs a year | Cardboard boxes. |
| Old Paint | Generate under 50 gallons a year | Drum |
| Waste Oil | Generate under 200 gallons a year | Drums |
| Computers / Circuit boards / Monitors | Generate under 5,000 pounds a year | Totes &Pallets w/sideboards |

B-1

Doc# 2130837\2

| Chemical/Waste | Approximate Annual Quantity Used or Generated | Storage Container(s) (i.e. Drums, Cartons, Totes, Bags, ASTs, USTs, etc) |
|---|---|---|
| | | |
| | | |

B-2

FWP-000417

## LEASE EXHIBIT C

## <u>TENANT'S EQUIPMENT</u>

All of Tenant's equipment, trade fixtures and other personal property except for:

1.      Raised Floor in Computer Room of the Office Building.
2.      Any computers needed to run HVAC and/or security systems.

FWP-000418

**LEASE EXHIBIT D**

**BROOM CLEAN CONDITION AND REPAIR REQUIREMENTS**

- All lighting is to be placed into good working order. This includes replacement of bulbs, ballasts, and lenses as needed.

- All truck doors and dock levelers should be serviced and placed in good operating order (including, but not limited to, overhead door springs, rollers, tracks and motorized door operator). This would include the necessary (a) replacement of any dented truck door panels, broken panels and cracked lumber, and (b) adjustment of door tension to insure proper operation. All door panels that are replaced shall be painted to match the building standard.

- All structural steel columns in the warehouse and office should be inspected for damage, and must be repaired. Repairs of this nature shall be pre-approved by the Landlord prior to implementation.

- HVAC system shall be in good working order, including the necessary replacement of any parts to return the unit to a well-maintained condition. This includes, but is not limited to, filters, thermostats, warehouse heaters and exhaust fans. Upon move-out, Landlord will have an exit inspection performed by a certified mechanical contractor to determine the condition of the HVAC system.

- All holes in the sheet rock walls (other than from picture hangers) shall be repaired prior to move-out.

- Flooring shall be free of excessive dust, dirt, grease, oil and stains. Cracks in concrete and asphalt shall be acceptable as long as they are ordinary wear and tear, and are not the result of misuse, or existed at the commencement date of this Lease.

- Facilities shall be returned in a clean condition, including, but not limited to, the cleaning of the coffee bar, restroom areas, windows, and other portions of the Premises.

- There shall be no protrusion of anchors from the warehouse floor and all holes shall be appropriately patched. If machinery/equipment is removed, the electrical lines shall be properly terminated at the nearest junction box.

- All exterior windows with cracks or breakage shall be replaced.

- Tenant shall provide keys for all locks on the Premises, including front doors, rear doors, and interior doors.

- All mechanical and electrical systems shall be left in a safe condition that confirms to code. Bare wires and dangerous installations shall be corrected to Landlord's reasonable satisfaction.

- All plumbing fixtures shall be in good working order, including, but not limited to, the water heater. Faucets and toilets shall not leak.

- All dock bumpers shall be left in place and well-secured.

- Drop grid ceiling shall be free of excessive dust from lack of changing filters. No ceiling tiles may be missing or damaged.

- All trash shall be removed from both inside and outside of the Buildings.

- All signs in front of Buildings and on glass entry door and rear door shall be removed.

- Remove all pads for machinery and repair and seal any roof penetrations.

## LEASE EXHIBIT E

### TERMINATION VALUE

In the event Tenant has the right to purchase the Premises pursuant to **Section 18.3.1**, the purchase price shall be an amount equal to the sum of the following:  (i) 110% of the amount of the current Landlord's equity investment in the Premises (including all related acquisition costs including, but not limited to, legal fees, brokerage commissions, environmental consultants and engineering consultants and any unreimbursed improvements and capital expenditures), and (ii) the principal amount of any then-outstanding debt on the Premises.

The determination of the purchase price under this **Exhibit E** shall be determined by Landlord in its sole but reasonable discretion and shall be conclusive absent manifest error.

### LEASE EXHIBIT F

### FORM OF GUARANTY OF LEASE

GUARANTY OF LEASE (this "**Guaranty**") made as of April 12, 2006, by NKT **HOLDING A/S**, a corporation under the laws of Denmark, with an address at CVR-no. 62 72 52 14, Vibeholms Allé 25, DK-2605 Brondby, DENMARK ("**Guarantor**"), to FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company, having an office at 311 South Wacker Drive, Suite 4000, Chicago, Illinois · 60606 ("**Landlord**").

## W I T N E S S E T H :

**WHEREAS:**

1.      Landlord has been requested by Alto U.S. Inc., a Delaware corporation, with an office at c/o Nilfisk-Advance, Inc., 14600 21st Avenue North, Plymouth, MN. 55447 ("**Tenant**"), to enter into an Industrial Building Lease dated as of the date hereof (the "**Lease**"), whereby Landlord would lease to Tenant, and Tenant would rent from Landlord, certain premises located at the Southwest corner of Highway 412 and Highway 265, Springdale, Arkansas, as more particularly described in the Lease (the "**Premises**").

2.      Guarantor, a parent company (either directly or remotely) of Tenant, acknowledges the receipt of adequate consideration arising out of its relationship with the Tenant and the execution and delivery of the Lease.

3.      Guarantor acknowledges that Landlord would not enter into the Lease unless this Guaranty accompanied the execution and delivery of the Lease.

4.      Guarantor hereby acknowledges receipt of a copy of the Lease.

NOW, **THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

24.      **DEFINITIONS.**  Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.  It is specifically acknowledged and agreed that the use of the word "**Term**" in this Guaranty shall have the same meaning as set forth in the Lease and such word shall not include any "Renewal Term" or "Renewal Option" (as those terms are defined in the Lease).

25.      **COVENANTS OF GUARANTOR**.

25.1.      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety: (i) the full and prompt payment of all Base Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Term of the Lease, and (ii) the full, timely and complete performance of all covenants, terms, conditions, obligations and agreements to be performed by Tenant under the Term of the Lease (all of the obligations described in clauses (i) and (ii), collectively, the "**Obligations**"). If Tenant defaults under the Lease, Guarantor will promptly pay and perform all of the Obligations, and pay to Landlord, when and as due, all Base Rent and Additional Rent payable by Tenant under the Term of the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to any or all of the Lease, this Guaranty and applicable Laws.

F-1

FWP-000421

**25.2.**    Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent and Additional Rent and any other rent, sums and charges due under the Term of the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months throughout the Term in any subsequent Action, (ii) Landlord may, at its option, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations and (iii) Landlord may seek and obtain recovery against Guarantor in a joint Action against Tenant and Guarantor or in any independent Action against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease.

**25.3.**    Any default or failure by the Guarantor to perform any of its Obligations under this Guaranty shall be deemed an immediate default by Tenant under the Lease.

## 26.    GUARANTOR'S OBLIGATIONS UNCONDITIONAL.

**26.1.**    This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of acceptance of this Guaranty which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant. However, notwithstanding anything else contained in this Guaranty to the contrary, if Landlord proceeds directly against Guarantor without commencing any Action against Tenant, Guarantor shall have the right to contest (the same as Tenant would have if such an Action had been commenced against Tenant) the existence of a default under the Lease, if a dispute exists as to whether or not such a default has occurred.

**26.2.**    The Obligations of Guarantor hereunder are with respect to the Term and not for any Renewal Term or Renewal Option nor if Tenant holds over beyond the Expiration Date. Landlord (by virtue of accepting this Guaranty) and Guarantor agree that any claim of Landlord under this Guarantee must be brought against Guarantor within 12 months subsequent to the Expiration Date or any such claim shall be deemed waived. Notwithstanding the foregoing, Guarantor agrees that Landlord shall not be deemed to waive (after said 12 months subsequent to the Expiration Date) any claim relating to an environmental matter, unless Tenant and/or Guarantor has provided Landlord an environmental Phase I (and Phase II if so recommended by the Phase I or if requested by Landlord) from an environmental engineering firm reasonably acceptable to Landlord, dated within 45 days (either prior or subsequent to) the Expiration Date.

**26.3.**    This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same), (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations, (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant, (iv) any extension of time that may be granted by Landlord to Tenant, (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise), (vi) any subletting, concession, franchising, licensing or permitting of the Premises, (vii) any changed or different use of the Premises, (viii) any other dealings or matters occurring between Landlord and Tenant, (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from other persons or entities, (x) the release by Landlord of any other guarantor, (xi) Landlord's release of any security provided under the Lease, or (xii) Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Laws. Without limiting the foregoing, this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions. Landlord (by virtue of accepting this Guaranty) and Guarantor agree that although any amendment of the Lease ("**Amendment**") shall not diminish the Obligations of Guarantor, neither shall such Amendment which either increases the Base Rent or extends the

F-2

FWP-000422

Term be deemed to increase the Obligations of Guarantor so as to include such increased Base Rent or lengthened Term within the Obligations being guaranteed hereby, unless Guarantor consents to such Amendment.

26.4.    Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.,* as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

27.    **WAIVERS OF GUARANTOR.**

27.1.    Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty and notice of dishonor, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this **Section 4,** would constitute grounds for relieving Guarantor of its obligations hereunder, (iv) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any collateral and (v) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

27.2.    WITH RESPECT TO ANY ACTION, GUARANTOR HEREBY WAIVES TRIAL BY JURY, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES AND/OR THE PROPERTY; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE, THE PREMISES AND/OR THE PROPERTY; ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES AND/OR THE PROPERTY. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

28.    **SUBROGATION.** Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in either or both of the Premises and the Property, which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall hold such amount in trust for Landlord and shall pay such amount to Landlord immediately following receipt by Guarantor, to be applied against the Obligations, whether matured or unmatured, in such order as Landlord may determine. Guarantor hereby

F-3

FWP-000423

subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to Landlord under the Lease.

**29.** **REPRESENTATIONS AND WARRANTIES OF GUARANTOR.** Guarantor represents and warrants that:

**29.1.** Guarantor is a Danish corporation; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

**29.2.** The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or any contractual restriction binding on or affecting Guarantor or any of its properties, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

**29.3.** There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

**29.4.** Guarantor's principal place of business is CVR-no. 62 72 52 14, Vibeholms Allé 25, DK-2605 Brondby, DENMARK.

**29.5.** Guarantor is the indirect owner of Tenant, through a series of vertical subsidiary corporations.

**30.** **NOTICES.** Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be given as provided in the Lease, as follows:

**30.1.** if to Guarantor at Guarantor's address set forth on the first page of this Guaranty, Attention: Ole Bramsnaes, Legal Counsel; and

**30.2.** if to Landlord, at Landlord's address set forth on the signature page of the Lease (with a copy to Landlord's attorney as also set forth on the signature page to the Lease); or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this **Section 30**.

**31.** **CONSENT TO JURISDICTION; WAIVER OF IMMUNITIES.**

**31.1.** Guarantor hereby irrevocably (i) submits to the non-exclusive personal jurisdiction in the State of Arkansas, the courts thereof and the United States District Courts sitting therein in any Action arising out of or relating to this Guaranty, and (ii) agrees that all claims in respect of such Action may be heard and determined in such Arkansas state courts or United States District Courts. Guarantor hereby irrevocably appoints NATIONAL CORPORATE RESEARCH, LTD. (or his successor) whose address is 3208 Asher Avenue, Little Rock, Arkansas 72204, or any other party having and maintaining a place of business in the State of Arkansas, whom Tenant may from time to time designate (after giving Landlord at least ten (10) days prior written notice thereof) (the **"Process Agent"**), as its agent to receive, on behalf of Guarantor, service of copies of the summons and complaint and any other process which may be served in any such Action. Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's address, and Guarantor hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service, Guarantor also irrevocably consents to the service of any and all process in any such Action by the mailing of copies of such process to Guarantor at its address specified in **Section 30** hereof. Guarantor agrees that a

F-4

FWP-000424

final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted under applicable Laws.

      **31.2.** Guarantor irrevocably waives, to the fullest extent permitted by applicable Laws, and agrees not to assert, by way of motion, as a defense or otherwise (i) any objection which it may have or may hereafter have to the laying of the venue of any such Action brought in any of the courts described in **Section 31**, (ii) any claim that any such Action brought in any such court has been brought in an inconvenient forum, or (iii) any claim that Guarantor is not personally subject to the jurisdiction of any such courts. Guarantor agrees that final judgment in any such Action brought in any such court shall be conclusive and binding upon Guarantor and may be enforced by Landlord in the courts of any state, in any federal court, and in any other courts having jurisdiction over Guarantor or any of its property, and Guarantor agrees not to assert any defense, counterclaim or right of set-off in any Action brought by Landlord to enforce such judgment.

      **31.3.** Nothing in this **Section 31** shall limit or affect Landlord's right to (i) serve legal process in any other manner permitted by applicable Laws, or (ii) bring any Action against Guarantor or its property in the courts of any other jurisdictions.

      **31.4.** Guarantor hereby irrevocably waives, with respect to itself and its property, any diplomatic or sovereign immunity of any kind or nature, and any immunity from the jurisdiction of any court or from any legal process, to which Guarantor may be entitled, and agrees not to assert any claims of any such immunities in any Action brought by Landlord under or in connection with this Guaranty. Guarantor acknowledges that the making of such waivers, and Landlord's reliance on the enforceability thereof, is a material inducement to Landlord to enter into the Lease.

      **31.5.** Guarantor agrees to execute, deliver and file all such further instruments as may be necessary under the Laws of the State of Arkansas, in order to make effective (i) the appointment of the Process Agent, (ii) the consent by Guarantor to jurisdiction of the state courts of Arkansas and the federal courts sitting in Little Rock, Arkansas, and (iii) all of the other provisions of this **Section 31**.

    **32.**   <u>**MISCELLANEOUS**</u>.

      **32.1.** Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part. If Landlord disposes of its interest in the Lease, **"Landlord"**, as used in this Guaranty, shall mean Landlord's successors and assigns under the Lease. This Guaranty may not be assigned by Guarantor.

      **32.2.** Guarantor promises to pay all of Landlord's expenses, including, without limitation, attorneys' fees and costs, incurred by Landlord in enforcing the terms and conditions of either or both of the Lease and this Guaranty.

      **32.3.** Guarantor shall, from time to time within ten (10) days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications). Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises and/or Property.

      **32.4.** If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

      **32.5.** The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and

Doc# 2130837\2

FWP-000425

its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

      **32.6.**    Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and *vice versa*. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

      **32.7.**    Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

      **32.8.**    The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Arkansas without giving effect to the principles of conflicts of law.

      **32.9.**    The execution of this Guaranty prior to execution of the Lease shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

      **32.10.**    Until such time as Guarantor's audited financial statements are no longer publicly available, Guarantor shall not be required to deliver financial statements to Landlord. From and after such time, Guarantor shall deliver to Landlord, upon request by Landlord, financial statements for Guarantor prepared by an independent public accountant in the ordinary course of the business and in accordance with customary accounting practices applicable to business operations similar (in terms of the entity's domicile and whether such entity is a privately held or a public company) to that of Guarantor.

<div align="center">[SIGNATURE PAGE FOLLOWS]</div>

FWP-000426

**IN WITNESS WHEREOF,** Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR:

**NKT HOLDING A/S,** a Danish corporation

By: _____
Name: _____ .
Its: _____

F-7

FWP-000427

# EXHIBIT A-1

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made as of June 12, 2015 (the "**Effective Date**") by and among **FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC**, a Delaware limited liability company ("**Landlord**"), **NILFISK, INC.**, a Minnesota corporation ("**Tenant**"), and **NKT HOLDING A/S**, a corporation under the laws of Denmark ("**Guarantor**," whether one or more).

### RECITALS:

A.     Landlord and Alto U.S., Inc., a Delaware corporation ("**Original Tenant**"), entered into that Industrial Building Lease dated effective April 12, 2006 (the "**Lease**"), relating to approximately 15.761 acres of land situated at the corner of Highway 412 and 265, Springdale, Arkansas (the "**Original Premises**").

B.     Guarantor guaranteed the obligations of Tenant under the Lease, pursuant to that Guaranty of Lease dated as of April 12, 2006 (the "**Lease Guaranty**").

C.     Tenant is the successor-in-interest to Original Tenant and is the owner of the interest of the "Tenant" under the Lease.

D.     Tenant desires to extend the Lease with respect to a portion of the Original Premises, and Landlord has agreed to such extension, upon the terms and conditions hereinafter described, and Guarantor desires to consent to such terms.

E.     All capitalized terms used in this Amendment shall have the meanings given to them in the Lease, as amended hereby, unless otherwise defined herein.

### AGREEMENT:

NOW, THEREFORE, for and in consideration of the foregoing recitals, Ten and No/100 Dollars ($10.00) in hand paid and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord, Tenant and Guarantor hereby acknowledge and agree to the following:

1.     Surrender Space. The Original Premises consists of approximately 15.761 acres of land situated at the corner of Highway 412 and 265, Springdale, Arkansas, on which two buildings are located as follows:  (a) a warehouse building containing approximately 200,541 rentable square feet, with an address of 979 East Robinson Ave., Springdale, Arkansas 72764 (the "**Warehouse Building**"), and located on approximately 12.72 acres of land (the "**Warehouse Building Parcel**"); and (b) an office building containing approximately 32,192 rentable square feet, with an address of 2100 Highway 265, Springdale, Arkansas (the "**Office Building**"), and located on approximately 3.041 acres of land (the "**Office Building Parcel**").

(a)     Effective as of April 12, 2016 (the "**Surrender Date**"), Tenant shall surrender to Landlord all of its right, title and interest in and to the Office Building and the Office Building Parcel (the "**Surrender Space**").  Landlord agrees to accept the Surrender Space in its current condition.  All rent and other payments and charges due by Tenant under the Lease for the

FIRST AMENDMENT TO LEASE – PAGE 1

FWP-000428

Surrender Space shall remain payable through the Surrender Date. Landlord and Tenant acknowledge and agree that the obligations of Tenant and Landlord set forth in the Lease which by the terms thereof survive the termination of the Lease shall indeed survive the surrender of the Surrender Space, including without limitation reconciliation obligations for Operating Expenses (collectively, the "**Surviving Lease Obligations**").

(b)    Effective as of the Surrender Date, the term "Premises" as used in the Lease shall refer to the Original Premises less the Surrender Space, which Landlord and Tenant agree consists of the Warehouse Building and the Warehouse Building Parcel (the "**Premises**"). Accordingly, all references in the Lease to the Buildings shall be deemed as of the Surrender Date to refer only to the Warehouse Building. As of the Surrender Date, Exhibit A attached to the Lease is hereby deleted and replaced with Exhibit A attached hereto. A Site Plan of the Premises as of the Surrender Date is attached hereto as Exhibit A-1.

(c)    Tenant represents and warrants that, except for the Sublease (defined below), it has not made any assignment, sublease, transfer, conveyance or other disposition of: (i) the Surrender Space or any portion thereof; or (ii) the Lease or any portion of its interest in the Lease. "**Sublease**" means that certain Sublease Agreement dated as of February 14, 2014, between Tenant, as Sublessor, and Tyson Shared Services, Inc. ("**Tyson**"), as Sublessee (as consented to by Landlord by that Consent to Sublease Agreement dated as of April 1, 2014, among Landlord, Tenant and Tyson), and that Excess Rents Agreement dated as of April 1, 2014, between Landlord and Tenant. Tenant hereby agrees to indemnify, defend and hold harmless Landlord against all actions, demands, liabilities, costs, expenses, rights of action, or causes of action based on, arising out of, or in connection with any breach of any of the foregoing representations and warranties. The indemnity shall be deemed to be in addition to the Surviving Lease Obligations.

2.    Extended Term. The Term of the Lease is hereby extended for a period of five (5) years beginning April 12, 2016 and terminating on April 30, 2021, unless sooner terminated pursuant to the provisions of the Lease (the "**Extended Term**"). The Expiration Date under the Lease shall be amended to be April 30, 2021.

3.    Base Rent. During the Extended Term, the Base Rent for the Premises shall be as follows:

| Lease Dates | Per Building Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| 4/12/16 - 4/11/17 | $3.15 | $631,704.15 | $52,642.04 |
| 4/12/17-4/11/18 | $3.19 | $639,725.79 | $53,310.48 |
| 4/12/18-4/11/19 | $3.23 | $647,747.43 | $53,978.85 |
| 4/12/19-4/11/20 | $3.27 | $655,769.07 | $54,647.42 |
| 4/12/20-4/30/21 | $3.31 | $663,790.71 | $55,315.89 |

FWP-000429

Tenant agrees to pay the Base Rent in equal monthly installments at the place designated by Landlord on the first (1st) day of each month, in advance, plus all applicable rental, sales or use taxes thereon, together with all other amounts due under the terms of the Lease.

4.    Renewal Options.  Sections 2.5.1, 2.5.2 and 2.5.3 of the Lease are hereby deleted and replaced with the following:

"**2.5.1** Tenant shall have the option ("**Renewal Option**") to renew this Lease for two (2) consecutive terms of five (5) years each (each, a "**Renewal Term**"), on all the same terms and conditions set forth in the Lease, except that Base Rent during  the Renewal Term shall be equal to Fair Market Rent (as defined in **Section 2.5.2** below).  No later than twelve (12) months prior to expiration of the applicable term, Landlord shall deliver written notice to Tenant of Landlord's determination of Fair Market Rent for the ensuing Renewal Term (the "**Base Rent Notice**").

**2.5.2**  For the purposes of this Lease, "**Fair Market Rent**" shall be initially determined by Landlord, in its sole, but good faith, discretion based upon the annual base rental rates then being charged in the industrial market sector of the geographic area where the Building is situated for comparable space and for a lease term commencing on or about the commencement date of the Renewal Term and equal in duration to the Renewal Term, taking into consideration:   the geographic location, quality and age of the Building; the location and configuration of the relevant space within the Building; the extent of service to be provided to the proposed tenant thereunder; applicable distinctions between "gross," "net" and "bondable" leases; the creditworthiness and quality of Tenant and Guarantor; leasing commissions; tenant allowances; rental abatements and all other relevant terms, conditions or factors.

**2.5.3**   No later than six (6) months prior to expiration of the applicable term, Tenant shall advise Landlord in writing (the "**Renewal Notice**") whether Tenant (i) is prepared to accept the Fair Market Rent established by Landlord in the Base Rent Notice and proceed to lease the Premises, during the Renewal Term, at that Fair Market Rent; or (ii) elects not to exercise the Renewal Option, whereupon the Renewal Option shall automatically be rendered null and void; or (iii) elects to contest Landlord's determination of Fair Market Rent.  In the event that Tenant fails to timely deliver the Renewal Notice, then Tenant shall automatically be deemed to have elected (i) above.  Alternatively, if Tenant timely elects (ii), then this Lease shall expire on the original expiry date of the initial Term or then current Renewal Term, as the case may be.  If, however, Tenant timely elects (iii) then the following provisions shall apply:"

The words "Base Rent Response Notice" in the first line of Section 2.5.3.2 are hereby deleted and replaced with the words "Renewal Notice."

5.    Tenant's Guarantor.  The Renewal Term Guarantor, Nilfisk-Advance A/S, a Danish corporation, has changed its name to Nilfisk A/S.  The definition of Renewal Term Guarantor set forth in Section 1.7 of the Lease is hereby amended to Nilfisk A/S, a Danish corporation.  Tenant acknowledges that, for purposes of identifying the Guarantor under Section 1.7 of the Lease, the Extended Term is considered to be part of the Term under the Lease and is not considered to be part of any Renewal Term or Renewal Option.  Therefore, NKT Holding A/S shall continue as Guarantor through the Expiration Date, and Nilfisk A/S will become the Guarantor upon execution of a Guaranty in connection with Tenant's exercise of a Renewal Option under Section 2.5 of the Lease, as amended by this Amendment.

6.    As-Is.  Tenant hereby acknowledges that: (a) Tenant accepts the Premises as suitable for the purposes for which the same are leased; (b) that the renewal of the Lease is on an "As-Is" basis and Landlord has made no representations or warranties concerning the Premises; and (c) Landlord has fully complied with Landlord's obligations contained in the Lease.

7.    Tenant Improvements.  Any physical improvements that Tenant desires to perform in the Premises during the Extended Term (the "**Tenant's Work**") shall be subject to Landlord's prior written consent (if required under Section 11 of the Lease) and all other terms and conditions as set forth in the Lease.  The entire cost of performing any Tenant's Work (including design of the Tenant's Work, costs of construction, labor and materials, and related taxes and insurance costs, all of which costs are herein collectively called the "**Total Construction Costs**") shall be paid by Tenant.  Landlord shall reimburse Tenant for a portion of the Total Construction Costs: (i) limited to the lesser of (A) actual construction costs incurred by third parties on behalf of Tenant in its construction of Tenant's Work; and (B) an amount up to, but not exceeding, $100,000.00 (the "**Allowance**"); and (ii) conditioned upon Landlord's receipt of written notice from Tenant that Tenant's Work has been completed and accepted by Tenant.  Landlord shall make payment of the Allowance (limited as described above) within thirty (30) days following Tenant's delivery to Landlord of:  (a) third-party invoices for costs incurred by Tenant in constructing Tenant's Work; (b) evidence that Tenant has paid the invoices for such costs; (c) lien waivers from any contractor or subcontractor who has constructed any portion of Tenant's Work or any materialman who has supplied materials used or incorporated into any portion of Tenant's Work; and (d) anything else Landlord or Landlord's lender may reasonably request.  All requests for funding any portion of the Allowance must be submitted within twelve (12) months after the Effective Date.

8.    Notices.  The Lease is hereby amended to provide the following as Landlord's and Tenant's addresses for all notices under the Lease:

Landlord's Addresses for Notices:

FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC
c/o AEW Capital Management
Two Seaport Lane
Boston, MA 02210-2021
Attn:  Asset Manager

FWP-000431

With a copy to:

FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC
c/o Transwestern
14881 Quorum Drive
Dallas, TX 75254
Attn:  Property Manager

Tenant's Addresses for Notices:

NILFISK, INC.
14600 21st Ave. North
Plymouth, MN 55447
Attn:  Real Property Leasing Manager

With a copy to:

NILFISK, INC.
14600 21st Ave. North
Plymouth, MN 55447
Attn:  Legal Dept.

9.      Brokers.  Tenant warrants that it has had no dealing with any broker or agent in connection with the negotiation or execution of this Amendment other than Sage Partners, representing Landlord, and Colliers International, representing Tenant, and Tenant agrees to indemnify, defend and hold Landlord and Landlord's Indemnitees harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

10.     Ratification.  Except as modified by this Amendment, the Lease and all the terms, covenants, conditions and agreements thereof are hereby in all respects ratified, confirmed and approved.  Tenant hereby affirms that on the date hereof no breach or default by either party has occurred and that the Lease, and all of its terms, conditions, covenants, agreements and provisions, except as hereby modified, are in full force and effect with no defenses or offsets thereto, and Tenant hereby releases Landlord of and from all liabilities, claims, controversies, causes of action and other matters of every nature which, through the date hereof, have or might have arisen out of or in any way in connection with the Lease and/or the Premises demised thereunder.

11.     Entire Agreement.  This Amendment contains the entire understanding between the parties with respect to the matters contained herein.  Except as modified by this Amendment, the Lease shall remain unchanged and shall continue in full force and effect.  No representations, warranties, covenants or agreements have been made concerning or affecting the subject matter of this Amendment, except as are contained herein and in the Lease.  This Amendment may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change or modification or discharge is sought.

FWP-000432

12.    Consent of Guarantor.   Guarantor hereby consents to the terms of this Amendment and agrees that the execution and delivery of this Amendment will in no way change or modify the obligations of Guarantor under the Lease Guaranty and that the Lease Guaranty is hereby ratified and remains in full force and effect through the expiration of the Extended Term.  Guarantor acknowledges that, for purposes of Sections 1 and 3(b) of the Lease Guaranty, the Extended Term is considered to be part of the Term under the Lease and is not considered to be part of any Renewal Term or Renewal Option.

13.    Representations and Warranties.   Tenant hereby represents and warrants to Landlord that:  (a) Tenant is in good standing under the laws of the State of Minnesota and is authorized to conduct business in the State of Arkansas; (b) Tenant has full corporate power and authority to enter into this Amendment and to perform all of Tenant's obligations under the Lease, as amended by this Amendment; and (c) each person (and all of the persons if more than one signs) signing this Amendment on behalf of Tenant is duly and validly authorized to do so.

14.    Counterparts.   This Amendment may be executed in any number of identical counterparts each of which shall be deemed to be an original and all, when taken together, shall constitute one and the same instrument.  A facsimile or similar transmission of a counterpart signed by a party hereto shall be regarded as signed by such party for purposes hereof.

15.    Interpretation.   In the event of any conflict between the provisions of the Lease and the provisions of this Amendment, the provisions of this Amendment shall control.  All paragraph headings of this Amendment are inserted for convenience only and shall not affect the construction or interpretation hereof.

16.    Effect of Submission.   Submission of this instrument for examination and signature by Tenant does not constitute an offer to lease or a reservation of or option for lease, and this instrument is not effective as a lease amendment or otherwise until executed and delivered by both Landlord and Tenant.

[Signature pages follow]

FWP-000433

IN WITNESS WHEREOF, Landlord and Tenant have executed and delivered this Amendment as of the date and year first above written.

**LANDLORD:**

**FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

Matthew Tracy
Authorized Signatory

FWP-000434

**TENANT:**

**NILFISK, INC.,**
a Minnesota corporation

By: _Diane Lapp_
Name: _Diane Lapp_
Title: _CFO_

**GUARANTOR:**

**NKT HOLDING A/S,**
a Danish corporation

By:_____
Name: _____
Title: _____

By:_____
Name: _____
Title: _____

FWP-000435

**TENANT:**

**NILFISK, INC.,**
a Minnesota corporation

By: _____
Name: _____
Title: _____

**GUARANTOR:**

**NKT HOLDING A/S,**
a Danish corporation

By: _____
Name: _____ MICHAEL HEDEGAARD LYNG
Title: _____ GROUP EXECUTIVE DIRECTOR

By: _____
Name: _____ JENS DUE OLSEN
Title: _____ CHAIRMAN

FWP-000436

## EXHIBIT A

A PART OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SECTION TWELVE (12), TOWNSHIP SEVENTEEN (17) NORTH, RANGE THIRTY (30) WEST OF THE FIFTH PRINCIPAL MERIDIAN, WASHINGTON COUNTY, ARKANSAS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE NORTHEAST QUARTER (NE ¼) OF THE NORTHEAST QUARTER (NE ¼) OF SAID SECTION TWELVE (12); THENCE ALONG THE WEST LINE OF SAID 40 ACRE TRACT, S01°05'17"E A DISTANCE OF 312.01 FEET; THENCE N89°05'01"E A DISTANCE OF 29.75 FEET TO AN EXISTING IRON REBAR ON THE EAST RIGHT-OF-WAY LINE OF POWELL STREET FOR THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID RIGHT-OF-WAY LINE, N89°05'01"E A DISTANCE OF 387.25 FEET TO A SET 1/2 –INCH IRON REBAR; THENCE N01°05'17"W 265.42 FEET TO A SET ½-INCH IRON REBAR ON THE SOUTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY #412; THENCE N88°53'06"E 273.08 FEET ALONG SAID RIGHT-OF-WAY LINE TO A SET ½-INCH IRON REBAR; THENCE LEAVING SAID RIGHT-OF-WAY LINE, S01°05'17"E 266.37 FEET TO A SET ½-INCH IRON REBAR; THENCE N89°05''01"E 344.25 FEET TO AN EXISTING IRON REBAR; THENCE N00°51'11" 266.61 FEET TO AN EXISTING IRON REBAR ON THE SOUTH RIGHT-OF-WAY LINE OF U.S. HIGHWAY #412; THENCE N88°41'26"E 278.00 FEET ALONG SAID RIGHT-OF-WAY LINE TO AN EXISTING COTTON SPINDLE ON THE EAST LINE OF THE NORTHEAST QUARTER (NE1/4) OF THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION TWELVE (12); THENCE S00°51'11"E 616.52 FEET ALONG THE EAST LINE OF THE NORTHEAST QUARTER (NE1/4) OF THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION TWELVE (12) TO A SET ½" IRON PIN; THENCE LEAVING THE EAST LINE OF THE NORTHEAST QUARTER (NE1/4) OF THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION TWELVE (12), S89°03'05"W 1062.87 FEET TO AN EXISTING IRON REBAR; THENCE N00°46'47"W 180.00 FEET TO A SET ½" IRON REBAR; THENCE S89°09'51"W 219.90 FEET TO AN EXISTING IRON REBAR ON THE EAST RIGHT-OF-WAY LINE OF POWELL STREET; THENCE N00°51'53"W 168.28 FEET TO THE POINT OF BEGINNING.

SAID TRACT OR PARCEL OF LAND CONTAINING 12.72 ACRES (554,177 SQ. FT.), MORE OR LESS.

FWP-000437

## EXHIBIT A-1

**PART OF THE NW1/4 - NE1/4
SECTION 12, T-17-N, R-30-W
SPRINGDALE, AR
12.72 ACRES
(554,177 SQ. FT.)
PARCEL NO'S.
815-29232-100
815-29233-000
815-29232-020**





FWP-000438

# EXHIBIT A-2

## SECOND AMENDMENT TO LEASE AGREEMENT

THIS **SECOND AMENDMENT TO LEASE AGREEMENT** ("**Agreement**") is entered into as of October _10_, 2017 by and between **FORT WORTH PARTNERS, LLC** ("**Landlord**"), and **NILFISK, INC.**, a Minnesota corporation ("**Tenant**").

## RECITALS:

A.    FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company ("**Original Landlord**") and ALTO U.S., Inc. a Delaware corporation ("**Original Tenant**"), entered into to a certain Industrial Building Lease dated as of April 12, 2006, as amended by that certain First Amendment to Lease dated as of June 12, 2015 between Original Landlord and Tenant (collectively, the "**Lease**"), which Lease was assigned by Original Landlord to Landlord and by Original Tenant to Tenant, under which Landlord is currently leasing to Tenant certain premises located at the Southwest corner of Highway 412 and Highway 265, Springdale, Arkansas, as more particularly described in the Lease (the "**Premises**").

B.    The Tenant's obligations under the Lease are guaranteed by NKT HOLDING A/S, a corporation under the laws of Denmark (the "**Existing Guarantor**"), pursuant to a Lease Guaranty Of Lease dated April 12, 2006, executed by Existing Guarantor in favor of Original Landlord (the "**Existing Guaranty**"), as assigned to Landlord.

C.    Tenant has requested that Landlord consent to the replacement of the Existing Guarantor with a new guarantor, and Landlord has agreed to such request but only on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing Recitals, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Recitals; Definitions**.  The foregoing Recitals are true and accurate and are incorporated herein as part of the agreement of the parties.  Any word or term with an initial capital letter shall have the meaning given to it in this Agreement or if not so defined herein shall have the meaning given to it in the Lease.

2.    **New Guarantor and New Guaranty**.  Simultaneously with Tenant's execution hereof, Tenant shall deliver to Landlord a guarantee executed by its Affiliate, NILFISK HOLDING A/S, a corporation under the laws of Denmark (the "**New Guarantor**"), in form and substance identical to that which is attached as **Exhibit A**, guaranteeing the payment of rent and the performance by Tenant of all the terms and provisions of the Lease (the "**New Guaranty**").  Any reference in the Lease to the Guarantor or Guaranty shall hereby be replaced with the New Guarantor and New Guaranty.

3.    **Extended Term**.  The Term of the Lease is hereby extended for a period of eighteen (18) months, unless sooner terminated pursuant to the provisions of the Lease.  The Expiration Date under the Lease shall be amended to be October 31, 2022.

4.    **Base Rent**.  Commencing on the date of this Agreement, the Base Rent for the Premises shall be as follows:

| Lease Dates | Per Building Square Foot | Annual Base Rent | Monthly Base Rent |
|---|---|---|---|
| Date of this Agreement-04/11/18 | $3.19 | $639,725.79 | $53,310.48 |
| 04/12/18-04/11/19 | $3.24 | $649,321.68 | $54,110.14 |
| 04/12/19-04/11/20 | $3.28 | $658,412.18 | $54,867.68 |
| 04/12/20-04/11/21 | $3.33 | $666,971.54 | $55,580.96 |
| 04/12/21-04/11/22 | $3.37 | $675,642.17 | $56,303.51 |
| 04/12/22-10/31/22 | $3.41 | $684,087.70 | $57,007.31 |

5.    **Release of Existing Guarantor**.  Upon (a) the full execution of this Agreement by Tenant and Landlord, and (b) Landlord's receipt of the original New Guaranty executed by New Guarantor, the Existing Guarantor shall be released from the Existing Guaranty.

6.    **Leasing Commissions**.  Each of the parties represents and warrants that there are no claims for leasing commissions in connection with this Agreement, and agrees to indemnify the other party against, and hold it harmless from all liabilities arising from any claim for leasing commissions asserted by a broker, agent or other person or entity claiming through the indemnifying party, including without limitation, reasonable attorneys' fees incurred in connection therewith.

7.    **Ratification**.  Except as amended by this Agreement, all of the terms, covenants, and conditions of the Lease shall remain in full force and effect and are hereby ratified and confirmed.  In the event of a conflict between the terms of the Lease and the terms of this Agreement, the terms of this Agreement shall control.

8.    **Authority of Parties**.  Landlord represents and warrants to Tenant that Landlord has full power, right and authority to execute and perform this Agreement.  Tenant represents and warrants to Landlord that Tenant has full power, right and authority to execute and perform this Agreement.

9.    **Counterparts**.  This Agreement may be executed in one or more counterparts, each evidencing, however, the single agreement between the parties.

[Signature page follows.]

DOCS-#6046061-v1

FWP-000444

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

**TENANT**:                                          **LANDLORD**:
NILFISK, INC.                                         FORT WORTH PARTNERS, LLC

By: _____          By: _____
Its: _____          Its: _____

                                                     By: _____
                                                     Its: _____


## List of Exhibits

Exhibit A – Form of Guaranty of Lease

FWP-000445

## GUARANTY OF LEASE

**GUARANTY OF LEASE** (this "**Guaranty**") made as of October _10^th_, 2017, by NILFISK HOLDING A/S, a corporation under the laws of Denmark, with an address at Kornmarksvej 1, DK-2605 Broendby, Denmark ("**Guarantor**"), to Fort Worth Partners, LLC, having an office at 1662 E. Amber Drive, Fayetteville, AR 72703 ("**Landlord**").

### WITNESSETH:

**WHEREAS:**

1.      Landlord has been requested by Nilfisk, Inc., a Minnesota corporation, with an office at 9435 Winnetka Avenue North, Brooklyn Park, MN 55445 ("**Tenant**"), to enter into a Second Amendment to Lease Agreement dated as of the date hereof (the "**Second Amendment**") to amend that certain Industrial Building Lease dated as of April 12, 2006 between FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company ("**Original Landlord**") and ALTO U.S., Inc. a Delaware corporation ("**Original Tenant**"), as amended by that certain First Amendment to Lease dated as of June 12, 2015 between Original Landlord and Tenant (collectively, the "**Lease**"), which Lease was assigned by Original Landlord to Landlord and by Original Tenant to Tenant, whereby Landlord would lease to Tenant, and Tenant would rent from Landlord, certain premises located at the Southwest corner of Highway 412 and Highway 265, Springdale, Arkansas, as more particularly described in the Lease (the "**Premises**").

2.      Guarantor, a parent company (either directly or remotely) of Tenant, acknowledges the receipt of adequate consideration arising out of its relationship with the Tenant and the execution and delivery of the Lease.

3.      Guarantor acknowledges that Landlord would not enter into the Second Amendment unless this Guaranty accompanied the execution and delivery of the Second Amendment.

4.      Guarantor hereby acknowledges receipt of a copy of the Lease and the Second Amendment.

**NOW, THEREFORE**, in consideration of the execution and delivery of the Lease and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor covenants and agrees as follows:

1.      **DEFINITIONS**. Defined terms used in this Guaranty and not otherwise defined herein have the meanings assigned to them in the Lease.

2.      **COVENANTS OF GUARANTOR**.

2.1.      Guarantor absolutely, unconditionally and irrevocably guarantees, as a primary obligor and not merely as a surety, (i) the full and prompt payment of all Base Rent and Additional Rent and all other rent, sums and charges of every type and nature payable by Tenant under the Lease, and (ii) the full, timely and complete performance of all covenants, terms,

FWP-000446

conditions, obligations and agreements to be performed by Tenant under the Lease (all of the obligations described in clauses (i) and (ii), collectively, the "**Obligations**"). If Tenant defaults under the Lease, Guarantor will promptly pay and perform all of the Obligations, and pay to Landlord, when and as due, all Base Rent and Additional Rent payable by Tenant under the Lease, together with all damages, costs and expenses to which Landlord is entitled pursuant to any or all of the Lease, this Guaranty and applicable Laws.

2.2.     Guarantor agrees with Landlord that (i) any action, suit or proceeding of any kind or nature whatsoever (an "**Action**") commenced by Landlord against Guarantor to collect Base Rent and Additional Rent and any other rent, sums and charges due under the Lease for any month or months shall not prejudice in any way Landlord's rights to collect any such amounts due for any subsequent month or months in any subsequent Action, (ii) Landlord may, at its option, join Guarantor in any Action against Tenant in connection with or based upon either or both of the Lease and any of the Obligations and (iii) Landlord may seek and obtain recovery against Guarantor in a joint Action against Tenant and Guarantor or in any independent Action against Guarantor without Landlord first asserting, prosecuting, or exhausting any remedy or claim against Tenant or against any security of Tenant held by Landlord under the Lease.

2.3.     Any default or failure by the Guarantor to perform any of its Obligations under this Guaranty shall be deemed an immediate default by Tenant under the Lease.

### 3.     GUARANTOR'S OBLIGATIONS UNCONDITIONAL.

3.1.     This Guaranty is an absolute and unconditional guaranty of payment and of performance, and not of collection, and shall be enforceable against Guarantor without the necessity of the commencement by Landlord of any Action against Tenant, and without the necessity of any notice of acceptance of this Guaranty which Guarantor hereby expressly waives in advance. The obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant. However, notwithstanding anything else contained in this Guaranty to the contrary, if Landlord proceeds directly against Guarantor without commencing any Action against Tenant, Guarantor shall have the right to contest (the same as Tenant would have if such an Action had been commenced against Tenant) the existence of a default under the Lease, if a dispute exists as to whether or not such a default has occurred.

3.2.     This Guaranty is a continuing guarantee and will remain in full force and effect notwithstanding, and the liability of Guarantor hereunder shall be absolute and unconditional irrespective of: (i) any modifications, alterations or amendments of the Lease (regardless of whether Guarantor consented to or had notice of same), (ii) any releases or discharges of Tenant other than the full release and complete discharge of all of the Obligations, (iii) Landlord's failure or delay to assert any claim or demand or to enforce any of its rights against Tenant, (iv) any extension of time that may be granted by Landlord to Tenant, (v) any assignment or transfer of all of any part of Tenant's interest under the Lease (whether by Tenant, by operation of law, or otherwise), (vi) any subletting, concession, franchising, licensing or permitting of the Premises, (vii) any changed or different use of the Premises, (viii) any other dealings or matters occurring between Landlord and Tenant, (ix) the taking by Landlord of any additional guarantees, or the receipt by Landlord of any collateral, from other persons or entities, (x) the release by Landlord of any other guarantor, (xi) Landlord's release of any security provided under the Lease, or (xii)

DOCS-#6047028-v1
4828-4523-5025.1

Landlord's failure to perfect any landlord's lien or other lien or security interest available under applicable Laws. Without limiting the foregoing, this Guaranty shall be applicable to any obligations of Tenant arising in connection with a termination of the Lease, whether voluntary or otherwise. Guarantor hereby consents, prospectively, to Landlord's taking or entering into any or all of the foregoing actions or omissions.

3.3.    Guarantor hereby expressly agrees that the validity of this Guaranty and the obligations of Guarantor hereunder shall in no way be terminated, affected, diminished or impaired by reason of the assertion or the failure to assert by Landlord against Tenant, of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease or by relief of Tenant from any of Tenant's obligations under the Lease or otherwise by (i) the release or discharge of Tenant in any state or federal creditors' proceedings, receivership, bankruptcy or other proceeding; (ii) the impairment, limitation or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease, resulting from the operation of any present or future provision of the United States Bankruptcy Code (11 U.S.C. § 101 et seq., as amended), or from other statute, or from the order of any court; or (iii) the rejection, disaffirmance or other termination of the Lease in any such proceeding. This Guaranty shall continue to be effective if at any time the payment of any amount due under the Lease or this Guaranty is rescinded or must otherwise be returned by Landlord for any reason, including, without limitation, the insolvency, bankruptcy, liquidation or reorganization of Tenant, Guarantor or otherwise, all as though such payment had not been made, and, in such event, Guarantor shall pay to Landlord an amount equal to any such payment that has been rescinded or returned.

4.    **WAIVERS OF GUARANTOR.**

4.1.    Without limitation of the foregoing, Guarantor waives (i) notice of acceptance of this Guaranty and notice of dishonor, (ii) notice of any actions taken by Landlord or Tenant under the Lease or any other agreement or instrument relating thereto, (iii) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Obligations, omission of or delay in which, but for the provisions of this Section 4, would constitute grounds for relieving Guarantor of its obligations hereunder, (iv) any requirement that Landlord protect, secure, perfect, insure or proceed against any security interest or lien, or any property subject thereto, or exhaust any right or take any action against Tenant or any collateral and (v) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.

4.2.    WITH RESPECT TO ANY ACTION, GUARANTOR HEREBY WAIVES TRIAL BY JURY, INCLUDING ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PERSON OR ENTITY WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH: THIS GUARANTY; THE LEASE; ANY LIABILITY OR OBLIGATION OF TENANT IN ANY MANNER RELATED TO THE PREMISES AND/OR THE PROPERTY; ANY CLAIM OF INJURY OR DAMAGE IN ANY WAY RELATED TO THE LEASE, THE PREMISES AND/OR THE PROPERTY; ANY ACT OR OMISSION OF TENANT, ITS AGENTS, EMPLOYEES, CONTRACTORS, SUPPLIERS, SERVANTS, CUSTOMERS, CONCESSIONAIRES, FRANCHISEES, PERMITTEES OR LICENSEES; OR ANY ASPECT

OF THE USE OR OCCUPANCY OF, OR THE CONDUCT OF BUSINESS IN, ON OR FROM THE PREMISES AND/OR THE PROPERTY. IN ADDITION, GUARANTOR HEREBY WAIVES, BOTH WITH RESPECT TO THE LEASE AND WITH RESPECT TO THIS GUARANTY, ANY AND ALL RIGHTS WHICH ARE WAIVED BY TENANT UNDER THE LEASE, IN THE SAME MANNER AS IF ALL SUCH WAIVERS WERE FULLY RESTATED HEREIN. THE LIABILITY OF GUARANTOR UNDER THIS GUARANTY IS PRIMARY AND UNCONDITIONAL.

5.    **SUBROGATION**. Guarantor shall not be subrogated, and hereby waives and disclaims any claim or right against Tenant by way of subrogation or otherwise, to any of the rights of Landlord under the Lease or otherwise, or in either or both of the Premises and the Property, which may arise by any of the provisions of this Guaranty or by reason of the performance by Guarantor of any of its Obligations hereunder. Guarantor shall look solely to Tenant for any recoupment of any payments made or costs or expenses incurred by Guarantor pursuant to this Guaranty. If any amount shall be paid to Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid and performed in full, Guarantor shall hold such amount in trust for Landlord and shall pay such amount to Landlord immediately following receipt by Guarantor, to be applied against the Obligations, whether matured or unmatured, in such order as Landlord may determine. Guarantor hereby subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to Landlord under the Lease.

6.    **REPRESENTATIONS AND WARRANTIES OF GUARANTOR**. Guarantor represents and warrants that:

6.1.    Guarantor is a Danish corporation; has all requisite power and authority to enter into and perform its obligations under this Guaranty; and this Guaranty is valid and binding upon and enforceable against Guarantor without the requirement of further action or condition.

6.2.    The execution, delivery and performance by Guarantor of this Guaranty does not and will not (i) contravene any applicable Laws or any contractual restriction binding on or affecting Guarantor or any of its properties, or (ii) result in or require the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties.

6.3.    There is no action, suit or proceeding pending or threatened against or otherwise affecting Guarantor before any court or other governmental authority or any arbitrator that may materially adversely affect Guarantor's ability to perform its obligations under this Guaranty.

6.4.    Guarantor's principal place of business is Kornmarksvej 1, DK-2605 Broendby, Denmark.

6.5.    Guarantor is the indirect owner of Tenant, through a series of vertical subsidiary corporations.

7.    **NOTICES**. Any consents, notices, demands, requests, approvals or other communications given under this Guaranty shall be given as provided in the Lease, as follows:

FWP-000449

7.1.    if to Guarantor at Guarantor's address set forth on the first page of this Guaranty, Attention: Hans Flemming Jensen, Legal Counsel; and

7.2.    if to Landlord, at Landlord's address set forth on the signature page of the Lease (with a copy to Landlord's attorney as also set forth on the signature page to the Lease); or to such other addresses as either Landlord or Guarantor may designate by notice given to the other in accordance with the provisions of this Section.

8.      **CONSENT TO JURISDICTION; WAIVER OF IMMUNITIES.**

8.1.    Guarantor hereby irrevocably (i) submits to the non-exclusive personal jurisdiction in the State of Arkansas, the courts thereof and the United States District Courts sitting therein in any Action arising out of or relating to this Guaranty, and (ii) agrees that all claims in respect of such Action may be heard and determined in such Arkansas state courts or United States District Courts. Guarantor hereby irrevocably appoints NATIONAL CORPORATE RESEARCH, LTD. (or his successor) whose address is 3208 Asher Avenue, Little Rock, Arkansas 72204, or any other party having and maintaining a place of business in the State of Arkansas, whom Tenant may from time to time designate (after giving Landlord at least ten (10) days prior written notice thereof) (the **"Process Agent"**), as its agent to receive, on behalf of Guarantor, service of copies of the summons and complaint and any other process which may be served in any such Action. Such service may be made by mailing or delivering a copy of such process to Guarantor in care of the Process Agent at the Process Agent's address, and Guarantor hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. As an alternative method of service, Guarantor also irrevocably consents to the service of any and all process in any such Action by the mailing of copies of such process to Guarantor at its address specified in Section 7 hereof. Guarantor agrees that a final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted under applicable Laws.

8.2.    Guarantor irrevocably waives, to the fullest extent permitted by applicable Laws, and agrees not to assert, by way of motion, as a defense or otherwise (i) any objection which it may have or may hereafter have to the laying of the venue of any such Action brought in any of the courts described in this Section, (ii) any claim that any such Action brought in any such court has been brought in an inconvenient forum, or (iii) any claim that Guarantor is not personally subject to the jurisdiction of any such courts. Guarantor agrees that final judgment in any such Action brought in any such court shall be conclusive and binding upon Guarantor and may be enforced by Landlord in the courts of any state, in any federal court, and in any other courts having jurisdiction over Guarantor or any of its property, and Guarantor agrees not to assert any defense, counterclaim or right of set-off in any Action brought by Landlord to enforce such judgment.

8.3.    Nothing in this Section shall limit or affect Landlord's right to (i) serve legal process in any other manner permitted by applicable Laws, or (ii) bring any Action against Guarantor or its property in the courts of any other jurisdictions.

8.4.    Guarantor hereby irrevocably waives, with respect to itself and its property, any diplomatic or sovereign immunity of any kind or nature, and any immunity from the jurisdiction

of any court or from any legal process, to which Guarantor may be entitled, and agrees not to assert any claims of any such immunities in any Action brought by Landlord under or in connection with this Guaranty. Guarantor acknowledges that the making of such waivers, and Landlord's reliance on the enforceability thereof, is a material inducement to Landlord to enter into the Second Amendment.

8.5.    Guarantor agrees to execute, deliver and file all such further instruments as may be necessary under the Laws of the State of Arkansas, in order to make effective (i) the appointment of the Process Agent, (ii) the consent by Guarantor to jurisdiction of the state courts of Arkansas and the federal courts sitting in Little Rock, Arkansas, and (iii) all of the other provisions of this Section.

9.    **MISCELLANEOUS**.

9.1.    Guarantor further agrees that Landlord may, without notice, assign this Guaranty in whole or in part. If Landlord disposes of its interest in the Lease, **"Landlord"**, as used in this Guaranty, shall mean Landlord's successors and assigns under the Lease. This Guaranty may not be assigned by Guarantor.

9.2.    Guarantor promises to pay all of Landlord's expenses, including, without limitation, attorneys' fees and costs, incurred by Landlord in enforcing the terms and conditions of either or both of the Lease and this Guaranty.

9.3.    Guarantor shall, from time to time within ten (10) days after receipt of Landlord's request, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating such modifications). Such certificate may be relied upon by any prospective purchaser, lessor or lender of all or a portion of the Premises and/or Property.

9.4.    If any portion of this Guaranty shall be deemed invalid, unenforceable or illegal for any reason, such invalidity, unenforceability or illegality shall not affect the balance of this Guaranty, which shall remain in full force and effect to the maximum permitted extent.

9.5.    The provisions, covenants and guaranties of this Guaranty shall be binding upon Guarantor and its heirs, successors, legal representatives and assigns, and shall inure to the benefit of Landlord and its successors and assigns, and shall not be deemed waived or modified unless such waiver or modification is specifically set forth in writing, executed by Landlord or its successors and assigns, and delivered to Guarantor.

9.6.    Whenever the words "include", "includes", or "including" are used in this Guaranty, they shall be deemed to be followed by the words "without limitation", and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Guaranty shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

9.7.    Each of the rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law or in the Lease or this Guaranty.

9.8.    The provisions of this Guaranty shall be governed by and interpreted solely in accordance with the internal laws of the State of Arkansas without giving effect to the principles of conflicts of law.

9.9.    The execution of this Guaranty prior to execution of the Second Amendment shall not invalidate this Guaranty or lessen the Obligations of Guarantor hereunder.

9.10.    Until such time as Guarantor's audited financial statements are no longer publicly available, Guarantor shall not be required to deliver financial statements to Landlord. From and after such time, Guarantor shall deliver to Landlord, upon request by Landlord, financial statements for Guarantor prepared by an independent public accountant in the ordinary course of the business and in accordance with customary accounting practices applicable to business operations similar (in terms of the entity's domicile and whether such entity is a privately held or a public company) to that of Guarantor.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, Guarantor has executed this Guaranty as of the day and year first above written.

GUARANTOR
**NILFISK    HOLDING    A/S**,    a    Danish
corporation

By: _____

Name: _____ HU LUND _____

Its: _____

DOCS-#6047028-v1

FWP-000453

# EXHIBIT A

## FORM OF GUARANTY OF LEASE

See attached.

FWP-000454

# EXHIBIT A-3

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS **THIRD AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is made and entered into as to be effective the _____ day of October, 2021, by and between **FORT WORTH PARTNERS, LLC**, an Arkansas limited liability company ("Landlord"), and **NILFISK, INC.**, a Minnesota corporation ("Tenant") (Landlord and Tenant referred to herein separately as a "Party" and collectively as the "Parties").

**WHEREAS**, FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company ("Original Landlord") and ALTO U.S., Inc., a Delaware corporation ("Original Tenant") entered into a certain Industrial Building Lease dated as of April 12, 2006 (the "Original Lease"), as amended by that certain First Amendment to Lease dated as of June 12, 2015 between Original Landlord and Tenant (the "First Amendment"), which Lease was assigned by Original Landlord to Landlord and by Original Tenant to Tenant, under which Landlord is currently leasing to Tenant certain premises located at the Southwest corner of Highway 412 and Highway 265, Springdale, Arkansas, as more particularly described in the Lease (the "Premises");

**WHEREAS**, Landlord and Tenant subsequently amended and modified certain terms and conditions of the Original Lease, as amended by the First Amendment, by executing and entering into that certain Second Amendment to Lease Agreement, dated October 10th, 2017 (the "Second Amendment;" and collectively with the Original Lease and the First Amendment, the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to amend, modify and revise the Lease in accordance with the terms and provisions set forth below.

**NOW THEREFORE**, for and in consideration of the forgoing premises and mutual promises and covenants of the parties hereto, as set forth herein and in the Lease, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    Amendment to Lease. This Amendment does hereby amend, revise and modify the Lease only as follows:

(a)    Term. The term of the Lease is hereby extended for a period of twenty-four (24) months, unless sooner terminated pursuant to the terms of the Lease. The Expiration Date under the Lease shall be October 31, 2024.

(b)    Base Rent. The base rent for the Premises shall be $61,000 per month from October 31, 2021 until October 31, 2023, and $62,525 per month from October 31, 2023 until October 31, 2024. This provision does not amend or modify any additional rental obligations of Tenant under the Lease.

2.    Lease Commission. Upon the full execution and delivery of this Amendment, Landlord shall pay a leasing commission to Hughes Marino in an amount equal to 3% of the gross base rent for October 31, 2022 until October 31, 2024. Tenant warrants and represents that no

4866-0438-6816.3

1

additional commissions are or may become due or owing with respect to the Lease or this Amendment. Tenant agrees to indemnify Landlord for any fees, costs, expenses or damages incurred by Tenant as a result of the inaccuracy or breach of this representation and warranty.

3.    No Assignment or Sublease. Tenant represents and warrants that Tenant currently occupies the Premises and Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto.

4.    No Defaults under Lease. The Parties acknowledge and agree as follows:

(a)    Tenant has accepted possession of the Premises, and any improvements required by the terms of the Lease have been completed to the full and complete satisfaction of Tenant.

(b)    All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder.

(c)    Tenant has not delivered any notice to Landlord regarding a default by Landlord thereunder.

(d)    Tenant has no knowledge of any fact that, with the passing of time or providing of notice, would constitute an event of default under the Lease.

(e)    As of the date hereof, there is no claim of setoff under the Lease or otherwise against rent or other charges due or to become due thereunder.

5.    Conflicts; Ratification.  In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall supersede and control.  The Lease, as amended by this Amendment, contains the entire agreement of the Parties and no representations, inducements, promises or agreements, oral or otherwise, between the Parties not embodied herein shall be of any force or effect.  Except as herein modified and amended, all terms and conditions of the Lease, including but not limited to that certain attendant Guaranty of Lease executed by NILFISK HOLDING A/S, a Denmark corporation, in favor of Landlord, are incorporated herein and shall remain in full force and effect, and are hereby ratified and confirmed by Landlord and Tenant, and, by signing below, the named guarantor of the Lease.

6.    Miscellaneous.

6.1.    Definitions.  All capitalized terms used herein shall have the meanings given to such terms in the Lease, except as further defined herein.

6.2.    Authority.  Each of the Parties represents and warrants that such Party has full power and authority to execute and deliver this Amendment and to perform the respective obligations of such Party pursuant hereto. Each of the Parties has duly authorized the execution, delivery and performance of this Amendment and each person signing this Amendment is duly authorized and has all requisite authority to execute and deliver this Amendment on behalf of the Party for which such person is signing. This Amendment constitutes the valid and legally binding

2

NILFISK-FWP-3841

obligations of the Parties enforceable in accordance with the provisions hereof. The invalidity of this Amendment with respect to any Party shall not affect this Amendment regarding any other Party.

      6.3.    Modification and Waiver. This Amendment may not be changed, amended or modified in any respect whatsoever or any obligation contained herein be waived, except in writing signed by the Parties.

      6.4.    Review; Construction of Agreement. Each Party acknowledges and agrees that, prior to the execution of this Amendment, such Party had an adequate opportunity to seek all desired legal or other professional advice in connection herewith and that each such Party has, to the satisfaction of such Party, obtained such legal and professional advice regarding this Amendment. The fact that one of the Parties to this Amendment may be deemed to have drafted or structured any provision of this Amendment shall not be considered in construing or interpreting any particular provision of this Amendment, either in favor of or against such Party. Whenever used herein, the singular number includes the plural, the plural the singular, and the use of any gender includes all genders. The paragraph headings are inserted for convenience of reference only and shall not be deemed to be a part of this Amendment.

      6.5.    Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

      6.6.    Governing Law. This Amendment shall be governed by and interpreted pursuant to the laws of the State of Arkansas without regard to principles of conflicts of laws that would require or permit the application of any other law.

      6.7.    Successors and Assigns. The terms and provisions of this Amendment shall bind, and inure to the benefit of, the Parties and their respective successors and assigns.

      6.8.    Severability. If any provision of this Amendment shall for any reason and to any extent be invalid or unenforceable, the remainder of this Amendment and the application of such provision shall not be affected thereby, but rather shall be enforced to the maximum extent possible.

      6.9.    Entire Agreement. This Amendment and the Lease constitute the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements, whether written or oral. No covenants, agreements, terms, provisions, undertakings, statements, representations or warranties, whether written or oral, made or executed by any Party or any employee, representative or agent thereof, shall be binding upon any Party unless specifically set forth in the Lease or in this Amendment.

3

NILFISK-FWP-3842

EXECUTED and DELIVERED to be effective of as of the day and year first above written.

**LANDLORD:**

**FORT WORTH PARTNERS, LLC,**

_____

Sarah Sparks Diebold, Manager

**TENANT:**

**NILFISK, INC.,**

By: _____

Name: Carl Mosier

Title: Director DC Operations, Americas

Reviewed, affirmed, acknowledged, consented to and agreed to by:

**NILFISK HOLDING A/S**

By: _____

Name: BIRGIT JESPERSEN

Title: SVP SUPPLY CHAIN

NILFISK-FWP-3843

# EXHIBIT B

# MKA International, Inc.
## Construction Consultants & Engineers
### 100% Employee Owned Company

**OUR RESOURCES**

BUILDING TECHNOLOGY & ENGINEERING

CONSTRUCTION CONSULTING

CONSTRUCTION COST ESTIMATING

CONSTRUCTION MANAGEMENT

DATA MANAGEMENT & DOCUMENT CONTROL

FIRE & ELECTRICAL FORENSICS

GEOTECHNICAL ENGINEERING & APPLIED GEOLOGY

MECHANICAL, ELECTRICAL & PLUMBING (MEP) CONSULTING

PROJECT SCHEDULING & SCHEDULE DELAY ANALYSIS

RESTORATION CONSULTING

ROOF CONSULTING

**OUR SERVICE SOLUTIONS**

CONSTRUCTION DEFECTS CONSULTING

CONTRACT DISPUTES & SURETY CLAIMS CONSULTING

PROPERTY LOSS & BUILDER'S RISK CLAIMS CONSULTING

# FORT WORTH PARTNERS LLC v. NILFISK, INC.
### 979 E. ROBINSON AVENUE
### SPRINGDALE, AR 72764

# ENGINEERING EVALUATION REPORT

Case No.: 5:22-cv-05181-TLB
File No.: FEC-FEC.FID1493528
Claim No.: PLEASE ADVISE
MKA Project No.: 2023.1496

June 9, 2023

**Prepared For:**

MR. MARSHALL S. NEY
**FRIDAY, ELDREDGE & CLARK, LLP**
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR 72758
(479) 695-6049

**Prepared By:**

MR. ANDRE SLINTAK, PE
AND
MR. KEVIN MCMAHON
**MKA INTERNATIONAL, INC.**
7100 W. Camino Real, Suite 405
Boca Raton, FL 33433
954.759.6968
www.mkainc.com

*Copyright 2023. Unauthorized reproduction of this report is prohibited.*



# TABLE OF CONTENTS

**I.    LETTER REPORT, DATED JUNE 9, 2023**


**II.    EXHIBITS**

      **A.    TORNADO PATH MAP**

      **B.    ENVISTA REPORT**

      **C.    ENGINEERING CONSULTANTS INC. REPORT**

      **D.    TORNADO REPAIR COST ESTIMATE**


**III.    PHOTOGRAPHS**

# I. LETTER REPORT, DATED JUNE 9, 2023

---

MKA International, Inc.

Fort Worth Partners LLC v. Nilfisk, Inc.

June 9, 2023

MKA Project No.:  2023.1496

FWP-000003

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

1600 NW SAMPLE REAL, SUITE 406
BOCA RATON, FL 33433
[T] 954.759.6966 :: [F] 954.759.6559
WWW.MKAINC.COM

FLORIDA CONTRACTOR LICENSE: CGC054353

June 9, 2023

MARSHALL S. NEY                                    Sent via email to:  mney@fridayfirm.com
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR 72758

RE:  FORT WORTH PARTNERS LLC V. NILFISK, INC.
      CASE NO.: 5:22-CV-05181-TLB
      FILE NO.: FEC-FEC.FID1493528
      MKA PROJECT NO.: 2023.1496
      ENGINEERING EVALUATION REPORT

Dear Marshall Ney:

In response to your request, **MKA International, Inc.** (**MKA**) has performed an evaluation of damage to Fort Worth Partners (**FWP**) property located at 979 East Robinson Avenue in Springdale, Arkansas. The purpose of this evaluation was to evaluate the repairability of FWP's structures which sustained damage on March 30, 2022 as a result of a tornado.

Our findings in this report are based on the following:

- Site visit performed on May 24, 2023 to evaluate the remaining portion of the structures and foundation slabs.  The investigation was of a visual nature only and no destructive testing was undertaken.  Andre Slintak, PE (**MKA**) lead the investigation accompanied by Stephen Prichard (**MKA**).

- Review of available weather data **(see Exhibit A)**.

- Review of the Structural Damage Report prepared by Envista Forensics dated April 26, 2022 **(see Exhibit B)**.



## MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 2 of 16

- Review of the Building Code Implications Report prepared by Engineering Consultants, Inc. dated October 20, 2022 **(see Exhibit C).**

- Review of historical aerial images **(see Photos 1-4).**

- Discussion with City of Springdale Building Department's Structural Plans Examiner, Ed Stith on May 24, 2023.

- Review of the 2021 Arkansas Fire Prevention Code Vol. II – Building (**AFPC**).

### Event Background

During the early morning of March 30, 2022, severe thunderstorms moved east across northwestern Arkansas. One thunderstorm spawned a reported EF-3 tornado which resulted in severe damage to numerous structures in Johnson and Springdale, Arkansas. As a result of this tornado FWP's property sustained catastrophic damage due to the force of wind and impact from windborne debris. *MKA* was asked to document the condition of the remaining portion of one building, evaluate the foundations, and determine the repairability of the structures.

### Weather Background

Weather information was obtained from a quality controlled service offered by the National Centers for Environmental Information (NCEI) of the National Oceanic and Atmospheric Administration (NOAA). According to the NOAA Damage Assessment Toolkit, during the early morning hours of March 30, 2022, the subject tornado touched down in Johnson, Arkansas and tracked northeast into Springdale, Arkansas, in the vicinity of the subject property. The path length of the subject tornado was reported to be approximately 5.2 miles with a maximum width of 350 yards. A tornado path map for the subject tornado was obtained from the NOAA Damage Assessment Toolkit (**see Exhibit A – Tornado Path Map**). Based on the tornado path map, the subject buildings were located along the path of the tornado, which consisted of EF-3 (135-145 miles per hour) wind speed damage-indicators on the Enhanced Fujita scale.

# MKA International, Inc.
## Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 3 of 16

**Property Description**

There is an east building and a west building at the subject property which directly abutted each other at the west and east gable walls, respectively. The subject buildings are single-story warehouse structures that were originally constructed circa 1987; it is apparent that there were additions but no records were available for review to indicate the dates of such activity. The total measured footprint of the combined buildings is approximately 200,000 square feet, spanning approximately 1,000 feet in the east-west direction, and 200 feet in the north-south direction.

The buildings are framed as two separate entities with abutting gable walls situated 500 feet from the east and west ends. For the purpose of this report, the building at the east half is referred to as the "east building", and the section of the building at the west half is referred to as the "west building". In this report, the main entrances to the buildings faces north onto Robinson Avenue **(see Photos 1-4)**.

The construction of the buildings consists of the following:

- Structural systems consist of a steel framed structure with tapered I-shaped steel columns and beams utilized as steel moment resistant frames in the north-south direction, and cable cross bracing in the east-west direction of the building. The moment frames provide lateral resistance to wind and seismic loading as well as support for gravity loads such as dead loads of the building structures and finishes. At both buildings, the frames are equally spaced at 25 feet.  At the base of the east building's moment frames, two ¾ inch diameter threaded anchors were used to fasten the base plates to the concrete foundation.  At the interior of the structure, each interior moment frame was partially supported by three posts equally spaced at 50 feet; the east building used 8-inch diameter round posts with 3/16-inch-thick wall and the west building's posts could not be determined as the structure was demolished prior to *MKA*'s site visit.

- The roof is low slope with a ridge oriented in east-west direction at the approximate centerline of the buildings. Roof framing consists of 8-inch-deep Z-shaped steel purlins with 3-inch flanges spanning in the east-west direction

FWP-000006

**MKA International, Inc.**
Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 4 of 16

supported by the steel beams; the purlins are equally spaced at 5 feet. The roof purlins support the R-panel metal roof deck and faced insulation. At the underside of the roof purlins, there are steel cables in an X-configuration at some intermediate bays as part of the lateral resisting system to transfer loads to the steel moment frames.

- The exterior wall framing is comprised of steel girts consisting of 8-inch-deep Z-shaped sections spanning between the moment frame columns; the girts are generally spaced at 5 feet; however, the bottom spacing is 7 feet 3 inches and the top space is approximately 4 feet. The gable walls consist of a moment frame with 8 x 8 x ¼ end posts equally spaced at 20 feet.
- Exterior wall finishes consist of insulated R-panel metal siding. Interior wall finishes consist of a combination of exposed metal walls in the warehouse areas.

- The floor system consists of a concrete slab on grade with control joints cut into the surface of the slab on a 12.5-foot square grid. The thickness of the slab is not known at this time.

- The foundation system was not visible; however, construction is consistent with isolated concrete spread footings at columns with grade beams below the slab between the spread footings as well as a continuous thickened slab edge along the perimeter of the buildings. The structure is situated upon a slope; therefore, near the north side of the structure, the slab is approximately 4 to 5 feet above the ground. It was apparent that the columns were fastened by anchors which were cast into footings that are monolithic with the retaining walls.

At the interior of the building there were office and utility spaces which occupied free-standing structures consisting of 6-inch nominal thickness concrete masonry units (CMU). In addition, there were several modular office spaces consisting of pre-fabricated insulated panels.

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 5 of 16

**Document Review**

The Structural Damage Report prepared by Envista Forensics (Envista) dated April 26, 2022 **(see Exhibit B – Envista Report)**, made the following conclusions: (quoted)

> *1. The structural condition of the main frames and braces between grids 20 and 9 did not show clear signs of damage or reduction in performance after the event of March 30th.*

> *2. The cross braces in the remaining structure performed as designed and remain in working condition after the March 30th event.*

> *3. The structural frame in grid 21.1 is not of the same design as the typical frame observed in the remaining structure. It could not be inspected up close during the visit, however, given the different structural system it is recommended to be replaced.*

> *4. The structural frame in grid 9 was not inspected due to safety barriers and debris on the vicinity. It is recommended that a closer inspection be performed of this frame when accessible to determine its residual integrity.*

> *5. The remaining cross brace cables need to be retightened so that both directions have the same tension.*

> *6. Wall panels do not need to be replaced; however, they should be repaired where local damage exists and reconnected to the sill plate if noted separated at locations.*

> *7. Roof membrane should be replaced in the remaining building. The roof panels should be evaluated in a case-by-case basis to determine if replacements are necessary.*

> *8. The concrete in the east and west ends of the building could not be assessed due to the debris still in the area. In areas of the perimeter, it was noted that some locations showed damage due to expansion anchor pull out. Local repair of concrete areas will be necessary during the replacement of the damaged frames.*

At the beginning of the report, the author states, "*Crawford Global Technical Services retained Envista to determine extend*(sic) *of damage to the structural systems…*"

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 6 of 16

The author of the report, Guillermo Ramirez, PhD, did not appear on the State of Arkansas Board of Licensure for Professional Engineers and Professional Surveyors' Roster of Professional Engineers as of an online search performed on May 31, 2023 (see screen capture immediately below).



*MKA* **Commentary**: Envista reported the extent of damage as declared in its purpose statement; however, the report suggests that repairs can be made to the remaining portion of the east building and that the cross-bracing system should be re-tightened in order to re-use the remaining portion of the structure. None of the requirements of the AFPC were discussed in the report.

The Building Code Implications Report prepared by Engineering Consultants, Inc. (EC) dated October 20, 2022 **(see Exhibit C)**, was reviewed.   The EC Report concluded: (quote)

> *"Due to the extent of the observed structural damage, the listed Code sections require upgrading the entire building structure into compliance with current code standards. I found no exceptions exempting the remaining portions of the building framing, nor foundations, from these upgrade requirements. In contrast, upgrade into compliance for non-damaged portions of the building (all foundations and remaining framing) required for code compliance are specifically included as part of the required repair.*

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA Project No.: 2023.1496
June 9, 2023
Page 7 of 16

*In my opinion, the remaining portions of the building, PEMB (Pre-Engineered Metal Building) and foundations, are required to be brought into compliance with the current Code."* Verbiage in parentheses added by *MKA* for clarity.

*MKA* **Commentary**: The EC report discusses the requirements of the applicable building codes in depth. In general, *MKA* is in agreement with the analysis contained the EC report with a few exceptions. EC analyzes the structures as one building, *MKA*, based on its physical inspection of the damaged structures considers there to be two separate buildings which abutted each other.

The 1987 BOCA National Building Code was reviewed; the Code reportedly in force at the time of original construction. Within BOCA, Section 1112 specifies wind load. Specifically, Figure 1112.3.2 indicates the Basic Wind Speed for design purposes (see screen capture immediately below, the red dot approximately indicates Springdale, Arkansas).



# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 8 of 16

The Basic Wind Speed values are specified as fastest mile speeds at 33 feet above ground in Category C exposure. Table 1112.3.3b within BOCA indicates that the effective velocity pressure for a building in exposure Category C at an approximate height of 20-40 feet above ground is 16 pounds per square foot (16 PSF).

In contrast, the City of Springdale Building Department, which per City Ordinance 22-31 adopted the 2021 Arkansas Fire Prevention Code, specifies that commercial buildings, at a minimum, use 115 mph as the basic design wind speed. This speed is specified as a 3-second wind gust. For comparison purposes, the 70 mph fastest mile basic wind speed specified in the BOCA code is approximately equal to an 84 mph 3-second gust design wind speed. For design purposes, the basic wind loading from a 115 mph speed is approximately **87%** greater than that of an 84 mph speed.

A critical term in the IEBC, as referenced in the AFPC, is *Substantial Structural Damage*,

> "*A condition where any of the following apply:*
>
> *1.The vertical elements of the lateral force-resisting system have suffered damage such that the lateral <u>load</u>-carrying capacity of any story in <u>any horizontal direction has been reduced by more than 33 percent from its predamage condition</u>.*
>
> *2.The capacity of any vertical component carrying gravity load, or any group of such components, that has a tributary area more than 30 percent of the total area of the structure's floor(s) and roof(s) <u>has been reduced more than 20 percent from its predamage condition</u>, and the remaining capacity of such affected elements, with respect to all dead and live loads, <u>is less than 75 percent of that required by the International Building Code</u> for new buildings of similar structure, purpose and location.*" Underline emphases added by *MKA*.

Section 101.4.7 of AFPC provides that repairs can be assessed per the IEBC. Therein, the IEBC Section 405.2.3.3 states, "*If the evaluation does not establish that the building in its predamage condition complies with the provisions of Section 405.2.3.1, then the building shall be retrofitted to comply with the provisions of this section. The wind loads for the repair and retrofit shall be those required by the building code in effect at the time of original*

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 9 of 16

*construction, <u>unless the damage was caused by wind, in which case the wind loads shall be in accordance with the International Building Code</u>. The seismic loads for this retrofit design shall be those required by the building code in effect at the time of original construction, but not less than the reduced seismic forces*." Underline emphasis added by **MKA**.

## Discussion with City of Springdale Building Department

On May 24, 2023, **MKA** physically visited the City of Springdale Building Department.  During this visit **MKA** directly conversed with Mr. Ed Stith, Structural Plans Examiner. Mr. Stith stated the following:

- **MKA** conveyed that a physical inspection of the predominantly damaged structures was just performed.

- **MKA** voiced the opinion that the structures were, in fact, two separate structures which abutted each other; Mr. Stith agreed.

- **MKA** inquired if the provisions of the 2021 AFPC are applicable or if the International Existing Building Code (IEBC) should be used.  Mr. Stith stated that for an engineering evaluation, the IEBC could be used.

- Mr. Stith stated that there will be a big disparity between the significantly lower design wind speed from 1987 when compared to the design wind speed of the AFPC.

- Mr. Stith stated that there isn't going to be a way around demolishing the structural systems and reconstructing in compliance with the current code.

## Site Observations

The following is a summary of observations made during the site visit:

## MKA International, Inc.
### Construction Consultants & Engineers
*100% Employee Owned Company*

MARSHALL S. NEY
MKA Project No.: 2023.1496
June 9, 2023
Page 10 of 16

**Remaining Section of East Building:**

- Approximately 200 feet at the east end of the east building had been removed prior to *MKA's* site visit. Photo taken near northeast corner, facing southwest (**see Photo 5**).

- At the east end of the building section, there were displaced and deformed roof z-purlins. Temporary wood framing with plywood sheathing had been installed at the east end of the remaining building section (**see Photos 6 and 7**).

- There were displaced lights, sprinkler lines, conduits and electrical boxes at the east end of the remaining building section. Interior columns were mechanically fastened to the roof beams of the moment frames (**see Photos 7 and 8**).

- At the northeast corner of the building, the edges of the roof trim were deformed (**see Photo 9**).

- The cable bracing at the roof did not have evidence of displacement or sagging at the east end of the building (**see Photos 10 and 11**).

- Torn/displaced insulation was observed throughout the remaining section of the east building. Debris was also observed on the concrete slab (**see Photos 11-14**).

- Deformation/displacement of the wall and roof framing at the west end of the east building was noted (**see Photo 15**).

- At the west end of the building, displaced electrical conduits and sprinkler lines were observed (**see Photos 15 and 16**).

- The steel roof beam and the ends of the roof purlins at the west end of the east building were deformed. Metal roof panels were missing/ displaced at the northwest corner (**see Photos 15-17**).

## MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 11 of 16

- Temporary wood framing with plywood sheathing had been installed at the west end of the remaining building section (**see Photo 17**).

- The steel framing at the northwest entrance to the building was deformed and corroded. Displaced and deformed metal roof panels were observed above and at either side of the northwest entrance (**see Photo 18**).

**Removed Section of the East Building:**

- Cracks and spalling were observed in the northeast and northwest concrete stairs to the east of the remaining building section. The steel railing at the northeast stairs was partially displaced and the railing at the northwest stairs was completely displaced/ missing (**see Photos 19-21**).

- At the loading dock, along the north side of the building, cracks and spalling were observed along the edge of the concrete slab; specifically at numerous locations of the column anchor bolts (**see Photos 22-23**).

- Sheared, deformed and corroded anchor bolts were observed throughout the concrete slab to the east of the remaining building section. The locations of the anchor bolts are coincident with the locations of the columns. At some anchor bolt locations, cracks in the concrete slab were noted. There were also deformed and displaced steel plates observed at end column locations (**see Photos 24-26**).

- Corroded and deformed remaining column sections were observed throughout the concrete slab. Portions of the columns at the east side of the remaining building were noted to penetrate through the slab consistent with the use of a spread footing beneath the visible slab surface (**see Photos 27-28**).

- A partially collapsed section of the subject building was observed adjacent to the southeast corner of the remaining portion of the east building. Displacement of the CMU (concrete masonry unit) blocks at the partially collapsed section were noted. Displaced electrical conduits were also observed (**see Photos 29-30**).

# MKA International, Inc.
## Construction Consultants & Engineers
*100% Employee Owned Company*

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 12 of 16

**West Building:**

- The west building was removed prior to *MKA*'s site visit (**see Photo 31**).

- Cracks and spalling were observed at the northwest and northeast concrete stairs leading to the slab where the west building was located. One railing at the northwest stairs was completely displaced, and both railings at the northeast stairs were completely displaced (**see Photos 31-33**).

- A displaced mechanical unit was observed at the north side of the concrete slab where the west building was located (**see Photo 34**).

- Spalling was observed along the perimeter of the concrete slab **(see Photo 35).**

- Sheared, deformed and corroded anchor bolts were observed throughout the concrete slab. The locations of the anchor bolts are coincident with the locations of the columns. At some anchor bolt locations, adjacent cracks in the concrete slab were noted. In addition to the anchor bolts, corroded, deformed and displaced steel plates were observed at end column locations. At the location of interior column bases for the west building, the column base plates were noted to have been mechanically fastened to the foundations with threaded anchors, the configuration is consistent with the use of spread footings beneath the visible slabs (**see Photos 35-38**).

- Cracks in the concrete slab at the joint between the east and west buildings were observed. Prior to the tornado, the end columns at the west end of the east building, and at the east end of the west building, resided on either side of the joint (**see Photo 39).**

In summary, 100% of the west building was damaged and approximately 40% of the east building was damaged; however, there are aspects of the remaining portion of the east building that are also damaged which are not accounted for in the 40% approximation.

**MKA International, Inc.**
Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 13 of 16

## Analysis

The visible evidence explicitly indicates that more than 33% of the lateral force resisting of the east structures was catastrophically damaged during the March 30, 2022 wind event and more than 20% of vertical load carrying components were also catastrophically damaged. The IEBC, in consideration of the aforementioned extent of damage due to wind, requires that the structure be evaluated for compliance with the wind provisions of the current code which would require resistance to an approximate 87% increase in wind load.

To the extent that the remaining portion of the east building could be retrofitted to resist current wind load specifications, the foundation will be a limiting factor in that the foundation is of an unknown design. Additionally, pre-existing anchor bolts have been catastrophically damaged and, in numerous locations, resulted in cracking of the foundation; these anchor bolts cannot be reused.

Furthermore, City of Springdale Ordinance 22-32 states, "*All buildings or structures which are unsafe, unsanitary or not provided with adequate egress; or which are substandard, constitute a fire hazard or are* underlined_*otherwise dangerous to human life*; or which, in relation to existing use, constitute a hazard to safety or health by reason of inadequate maintenance, dilapidation, obsolescence or abandonment, are severally, in contemplation of this section, *unsafe buildings. All such unsafe buildings are hereby declared illegal and shall be abated by repair and rehabilitation or by* demolition *in accordance with…*"* (Underline Emphasis added by **MKA**)

As discussed within this report, repair and/or rehabilitation is not feasible due to the requirements found in the IEBC which speak to the cause of original damage having been the result of wind. Rehabilitation or repair to accommodate the current wind conditions is limited by the performance of the unknown foundation.

Per City of Springdale Ordinance 22-246, "*The 1991 Edition of the Standard Existing Buildings Code, including all appendixes thereto, as published by the Southern Building Code Congress International, Inc., is adopted by reference; except the "Building Official" designation therein is amended to chief city inspector.*" Therein, Section 101.5.1 states, "*The building official shall determine the extent to which the existing system shall be made to*

# MKA International, Inc.

**Construction Consultants & Engineers**
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 14 of 16

*conform to the requirements of the technical codes for new construction.*"  Per Mr. Stith, the requirements of the IEBC would be applicable as referenced in the AFPC.

## Conclusion

The entirety of the west building was catastrophically damaged during the subject wind event. As such, replacement of the structure must be designed in accordance with the specifications of the current AFPC.  The east building did sustain Substantial Structural Damage due to the force of wind; therefore, the east building cannot be repaired since the foundation is of an unknown type and has also been significantly damaged.  The entirety of both building structures must be demolished in order to be reconstructed as well as the portions of the foundation that support each of the columns.  The surface of the slabs has been gouged and scraped whether by direct physical damage due to the force of wind or as a result of demolition.  Nonetheless, the slab on grade portion of the facility no longer provides a flush riding surface for equipment or sensitive machinery.  The spread footings for the interior columns, as well as at the locations of the frame column base plates, are of an unknown foundation type, concrete strength, and capacity.  Removal and replacement of the spread footings for the replacement structures will entail removal of the 12 ½ square slab sections at each interior column quadrant and the frame footings along the south and north edges of the slab will require removal and replacement of two 12 ½ square slab sections.

With spacing of the frames at 25 feet on-center, there are 41 frames; each with two columns at the south and north side, respectively.  In addition, there are 117 spread footings to support the interior columns.  82 sections of slab will need to be removed in order to remove and replace the unknown foundations at each frame column base and 117 sections of slab will need to be made to remove and replace in the footings. In all, approximately 98,750 square feet will require removal and replacement in order to replace the unknow foundations; this is approximately 49% of the existing slab.  It is anticipated, that removal and replacement of the entirety of the existing slab will not only be more economical, it will restore the slab surface to the pre-loss condition without the presence of gouges, mars, and other performance hindering blemishes.

## MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 15 of 16

## Repairs

Based on our physical inspection of the remaining portion of the structure as well as the remaining portions of the foundation that was visible at the site, **MKA** has developed an estimate in the RCV amount of $27,722,974.03 (**see Exhibit D**). This estimate captures (not exhaustively) demolition and replacement of the engineered metal buildings, removal and replacement of the foundations and slabs, demolition and reconstruction of the interior office and utility spaces, ramps, stairways, entrance canopies, etc. In addition, costs associated with the activities listed are also captured in the estimate which are necessary to mobilize, administer, and manage the construction activities. Permits, engineering, and other soft costs are also considered in the estimate.

## Limitations

This report has been prepared for Friday, Eldredge & Clark, LLP and Fort Worth Partners, LLC as per the assignment in our letter of engagement and can be distributed as they deem fit.

Our findings in this report are limited to visual observations of areas of damage as observed by **MKA** as well as information identified in the beginning of this report. If any additional information is provided to **MKA** after the issuance of this report, we reserve the right to review such information and, if necessary, modify our opinions accordingly. No warranty, either expressed or implied, is given about the general or specific condition of the property as it affects the owner or prospective future owner.

Reliance upon information, observations or findings contained in this report should not be made by any party except the intended recipients.

The remedial scope of repairs outlined in this report should be considered conceptual in nature. The Owner should retain their own professionals to develop and implement a complete design and oversee the work. We will make ourselves available to discuss this approach with the Owner's consultants if so requested.

FWP-000018



**International, Inc.**

Construction Consultants & Engineers
100% Employee Owned Company

MARSHALL S. NEY
MKA PROJECT NO.: 2023.1496
June 9, 2023
Page 16 of 16

Please do not hesitate to call, if you have any questions regarding the above.

Sincerely,

*MKA* INTERNATIONAL, INC.



Kevin McMahon
Vice President

Andre Slintak, PE
State of Arkansas Professional Engineer
License No. 17873
KMM/AES

# II. EXHIBITS

# EXHIBIT A

# TORNADO PATH MAP



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS
EXHIBIT A



1.  Graphic of the subject tornado's path through Washington County on March 30, 2022.
    Obtained from NOAA National Weather Service (NWS) – Damage Assessment Toolkit.

Exhibit A Page 1 of 2

FWP-000022



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**
**EXHIBIT A**



2.  Graphic of the subject building's relative location to the March 30, 2022 subject tornado path. Obtained from NOAA National Weather Service (NWS) – Damage Assessment Toolkit.

FWP-000023

# Exhibit B

# Envista Report

**ENVISTA**
**F O R E N S I C S**

Location Address:
22130 Merchants Way Suite 150,
Katy, TX 77449

TOLL-FREE 888.782.3473
**envistaforensics.com**

# REPORT ON STRUCTURAL DAMAGE AFTER TORNADO AT NILFISK INC. WAREHOUSE IN SPRINGDALE AR

## GUILLERMO RAMIREZ

Client Insurance File No: 3960001
Envista Matter No: MAT-137403-D4Z1
REPORT DATE: April 26, 2022

Prepared For:
Mike Grinnan
Crawford Global Technical Services
National General Adjuster
P.O. Box 402
Wentzville MO 63385
michael_grinnan@us.crawco.com

CERTAINTY IN AN UNCERTAIN WORLD

PT&C Forensic Consulting Services, P.A. | TX Firm Registration # F-19410 | NC Firm Registration # C-2837

FWP-000025

**PURPOSE**

Crawford Global Technical Services retained Envista to determine extend of damage to the structural systems of the Nilfisk Inc. (Nilfisk) warehouse located at 979 East Robinson Avenue, Springdale, AR 72764, after an EF-3 tornado event that occurred on March 30th, 2022.

**BACKGROUND**

Based on observations made of the standing structure and visible debris on site, the subject building consisted of a steel-framed one-story structure supported on a concrete slab foundation. The exterior walls of the subject building were of industrial corrugated metal sheeting and the roof was comprised of corrugated metal roof panels. The interior walls and ceilings were covered by a combination of exposed metal walls in the warehouse areas and CMU and gypsum board (drywall) walls at the break rooms and office areas. The Washington County Appraisal District reports the building was constructed in 1987, subsequent modifications/additions have been performed on the property, however, neither the district or the owner had specific data available. For the purposes of discussion within this letter the front of the building was considered to be north-facing (Figure 1).



*Figure 1 General layout of Nilfisk Inc. warehouse prior to March 30, 2022 (CONNECTExplorer)*

Reportedly, the subject building was damaged during a storm that produced tornadic activity in the area on or about March 30, 2022.

**CONCLUSIONS**

After conducting an inspection at the subject property located at 979 East Robinson Avenue, Springdale, AR 72764, it is Envista's professional opinion that:

1. The structural condition of the main frames and braces between grids 20 and 9 did not show clear signs of damage or reduction in performance after the event of March 30th.
2. The cross braces in the remaining structure performed as designed and remain in working condition after the March 30th event.
3. The structural frame in grid 21.1 is not of the same design as the typical frame observed in the remaining structure. It could not be inspected up close during the visit, however, given the different structural system it is recommended to be replaced.
4. The structural frame in grid 9 was not inspected due to safety barriers and debris on the vicinity. It is recommended that a closer inspection be performed of this frame when accessible to determine its residual integrity.
5. The remaining cross brace cables need to be retightened so that both directions have the same tension.
6. Wall panels do not need to be replaced; however, they should be repaired where local damage exists and reconnected to the sill plate if noted separated at locations.
7. Roof membrane should be replaced in the remaining building. The roof panels should be evaluated in a case-by-case basis to determine if replacements are necessary.
8. The concrete in the east and west ends of the building could not be assessed due to the debris still in the area. In areas of the perimeter, it was noted that some locations showed damage due to expansion anchor pull out. Local repair of concrete areas will be necessary during the replacement of the damaged frames.

**DOCUMENTS REVIEWED**

The following documents and materials were reviewed and/or referenced as part of Envista's investigation, and/or contain information pertinent to the discussion and conclusions presented herein:

1. Climatic Data https://www.wunderground.com/. (Attachment B, Weather Data)
2. General layout of building, provided by Jose Damian, Quality Manager for Nilfisk Inc.

**PROVIDED INFORMATION**

Present during Envista's inspection were representatives from Nilfisk, Guillermo Ramirez and Keith Nygaard from Envista, Mark Harmann from JS Held and Michael Grinnan from Crawford Global. During the inspection, Envista was not allowed to approach the areas with debris from the collapse due to safety considerations. The group entered the portion of the structure still standing for observations.

Jose Damian, quality manager for the property provided Envista with a digital file containing the general layout of the building. This layout is shown in Figure 2 of this report.

Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 2 General layout of Nilfisk Warehouse (Jose Damian)*



*Figure 3 Overall view of damaged and remaining warehouse*



**WEATHER DATA**

A thunderstorm front moved through Arkansas on Wednesday March 30th, 2022, hitting the areas of Little Rock, Johnson and Springdale. A tornado developed south of Joyce Boulevard and east of Steele Boulevard, which is southwest of the Northwest Arkansas Mall in Fayetteville, according to the weather service. From there, it traveled across Main Drive in Johnson and into Springdale, damaging numerous homes and businesses and flipping vehicles. It was reported that seven people were injured, according to Springdale police.

The National Weather Service designated the tornado that hit Springdale as an EF-3, meaning that it had winds from 136 to 165 mph.  The tornado was on the ground for 5.2 miles from 4:04 am. to 4:12 am, according to the National Weather Service in Tulsa. Its maximum width was 350 yards.

**OBSERVATIONS**

Envista's team noted that of the previously existing warehouse, complete bays on the west and east ends of the building had collapsed (Figure 3).  Only a central portion of the building remained standing with some damage to the building envelope evident.
From the outside, it was noted that the internal structure of the east and west ends of the building had collapsed with no observable structure remaining standing and undamaged in those areas.  As seen on Figure 3, the debris from the former structure was still in the area, so no observations could be made beyond looking at the perimeter.

From the information provided by Nilfisk (Figure 2) and the interior survey performed by Envista, the remaining structure was contained by the gridlines 20 to 9 and A to E.  The main entrance is located in the bay between grids 20 and 19 along grid A on the north side of the building.  The main structural system located at grids 9 to 20 is a steel rigid frame in the north south direction; lateral stability in the east west direction is provided by a series of cross braces at 4 bays of the remaining structure (Figure 4).  The cross braces were braided steel cables attached to the structure by turn buckles, located at the north and south walls and the roof structure at the designated bays.

Figure 5, shows an elevation of the rigid frames noted inside of the building.  These frames were typical for grids 9 to 20.  The horizontal members were of I-shaped steel members with a tapered profile, the end columns were tapered steel flanged shapes with the interior columns measured as 8" structural tubes.  Figure 6 shows a layout of the remaining structure showing the frame distribution as described in this paragraph.  The spacing between the columns in the rigid frame was measured as 50ft on center, while the spacing between the frames as estimated at 25ft on center.  Safety barriers did not allow for a close observation of the frame in grid 9.  The portion of the structure standing in grid 21.1 was not typical of the frames observed in the other grids.  Envista was informed that the warehouse was likely a product of several modifications/additions, which would explain the different structural system that was noted for this grid (**Error! Reference source not found.**) and later observations on areas of the collapse debris that will be noted in this report.

FWP-000029

Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 4 Floor plan of remaining structure*



*Figure 5 Typical rigid frame for the remaining portion of the warehouse.*

FWP-000030

Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 6 Layout of frames to the remaining portion of the warehouse.*



*Figure 7 Different structural system (opposite side of wood barrier) noted for remaining portion.*



*Figure 8 Detail of perimeter columns at grids A and D*

The perimeter columns were anchored to the concrete slab by a base plate with two bolts embedded into the concrete (Figure 9), the interior structural tube columns were embedded in the concrete (Figure 9) but it is expected that they also had base plates with anchors to the foundation.

As previously mentioned, the lateral stability in the east-west direction is provided by cross braces in the ceiling and in the perimeter walls at 4 locations of the remaining bays (Figure 10 and Figure 11). The braces were braided steel cables connected to the frames by turnbuckles as it can be seen on Figure 8.

As mentioned previously, it was not possible to survey the area with the debris at the east and west portions of the building. However, based on the general layout noted on the exterior (Figure 3) and the information provided by Nilfisk (Figure 2), these areas were loading and unloading areas with truck docks, in addition, the symbols on the general layout plan for the columns depict different column profiles in these areas than the ones observed in the remaining portion of the building. Therefore, it is expected that the structural systems at these locations were different than the ones observed. In addition, from the site observations at the perimeter of the damaged areas, it can be seen that, at the east portion, the connection of the columns to the base plate and the cross brace connection failed during the collapse (Figure 12). On the west side of the building the connection to the slab was fractured with bolt failure and severe deformation of the base plate (Figure 13). In other cases, in the west side, the failure was a pull out of expansion bolts used in the framing of the columns, this pullout resulted in damage in the concrete slab as well (Figure 14).

Several areas of water intrusion on the ceiling were identified by bulging of the ceiling membrane and complete tear outs at other locations (Figure 15)

FWP-000032



*Figure 9 Detail of base of interior columns in typical interior frames*



*Figure 10 Cross brace detail at perimeter walls (Typ.)*



*Figure 11 Cross brace at ceiling of east-most bay of remaining portion.*



*Figure 12 Base plate and brace failure on columns at the east side of the property*



*Figure 13 Anchor bolt failure on west side columns*



*Figure 14 Expansion bolt failure with resulting damage to the concrete slab.*



*Figure 15 Water penetration in ceiling (red=tear out; yellow=wrinkles)*

No widespread damage, that can be attributed to the March 30th event, was observed in the exterior wall panels away from the immediate areas at the ends of the remaining structure.  At one location on the north face of the remaining structure, the wall panel lifted from the bottom connection (Figure 16).  In preparation to removing existing inventory in the warehouse a hole was cut on the north side wall panels (Figure 17). On the south side of the remaining structure no additional damage, that can be attributed to the March 30th event, was observed on the wall panels (Figure 18).

No racking was noted on interior CMU walls or partitions in the remaining portion of the building.  No structural cracking was observed and, there was no leaning for the walls out of tolerance.



*Figure 16 Localized panel damage on the remaining structure*



*Figure 17 Opening on north side panel cut after the event of March 30th*

Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 18 Wall panel condition on the south side of the remaining structure*



*Figure 19 Measured lean angles at frames of remaining structure.*

FWP-000038



*Figure 20 Brace tension at north and south facing wall locations*

FWP-000039

**DISCUSSION**

The remaining frames were checked using a water bubble and digital level for signs of leaning as the result of lateral forces induced by the high winds. As it can be seen on Figure 5, the plumbness of the columns was measured by a digital and bubble combination level which showed that no measurable displacement or rotation had taken place in the north-south direction. All the columns tested at different locations measured at 90 degrees from the horizontal. In the east-west direction, all the frames measured showed a slight lean towards the west with the out of plumb angle measuring between 89.5 and 89.9 degrees (Figure 19). This is within acceptable construction tolerance and is not likely a sign of significant movement by the frames during the event. No signs of distress or permanent damage was identified in the columns of beam elements of the frames. No concrete cracking was noted at the base of the 8" structural columns or at the base plates or bolts of the perimeter columns part of the frame. The frames at grids 20 to 10 gave no indications of degradation in their ability to perform their structural functions. The frame at grid 9 could not be evaluated up close, but it is estimated that its condition will be similar to the conditions noted for the other frames in grids 20 to 10. The frame in grid 21.1 of Figure 4, was also not evaluated up close, however, given its different nature from the frames in the other grids, it is recommended that it be replaced completely.

The tension on the cables part of the cross brace systems at the walls were noted to be slightly different with the cables facing the west direction having a tighter feel than those facing the east direction (Figure 20). Upon hand testing, both directions did not show signs of connection issues or physical integrity. Nevertheless, it is recommended that both directions are tightened to the same level of tension.

**CONCLUSIONS**

After conducting an inspection at the subject property located at 979 East Robinson Avenue, Springdale, AR 72764, it is Envista's professional opinion that:

1. The structural condition of the main frames and braces between grids 20 and 9 did not show clear signs of damage or reduction in performance after the event of March 30th.
2. The cross braces in the remaining structure performed as designed and remain in working condition after the March 30th event.
3. The structural frame in grid 21.1 is not of the same design as the typical frame observed in the remaining structure. It could not be inspected up close during the visit, however, given the different structural system it is recommended to be replaced.
4. The structural frame in grid 9 was not inspected due to safety barriers and debris on the vicinity. It is recommended that a closer inspection be performed of this frame when accessible to determine its residual integrity.
5. The remaining cross brace cables need to be retightened so that both directions have the same tension.
6. Wall panels do not need to be replaced; however, they should be repaired where local damage exists and reconnected to the sill plate if noted separated at locations.
7. Roof membrane should be replaced in the remaining building. The roof panels should be evaluated in a case-by-case basis to determine if replacements are necessary.



8. The concrete in the east and west ends of the building could not be assessed due to the debris still in the area. In areas of the perimeter, it was noted that some locations showed damage due to expansion anchor pull out. Local repair of concrete areas will be necessary during the replacement of the damaged frames.

**CLOSURE**

Photographs taken during our work, which are not included in this report, are retained in our files and are available to you upon request.

This report is for the exclusive use of our client and is not intended for any other purpose. Our report is based on information made available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted by the discovery of additional information.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call or email.


Sincerely,

Envista Forensics

Guillermo Ramirez, PhD.
Principal Engineer


Attachment A: Photographs
Attachment B: Weather Data
Attachment C: Provided Information

FWP-000041

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

# ATTACHMENT A
#
# Photographs

Photographs taken during our inspection, which have not been included in this report, have been retained in our files and will be made available to you upon your request. Note that the brightness and/or contrast of some photographs may have been enhanced for purposes of clarity. Some photographs may be cropped from their original sizes in order to emphasize a specific item or feature. No significant changes to any photographs were made that would alter factual representations.



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 1.**



*View of north face west corner of building*

**Photograph 2.**



*View of north face east corner of building*

**ENVISTA**
F O R E N S I C S

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 3.**



*View north face west collapsed side of building*

**Photograph 4.**



*View of north face east collapsed side of building*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 5.**



*View of east end of collapsed building looking south*

**Photograph 6.**



*View of east end of collapsed building looking north*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 7.**



*View of south side of building looking west*

**Photograph 8.**



*View interior of building looking to west end with wood barrier*

**ENVISTA**
F O R E N S I C S

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 9.**



*View of perimeter column*

**Photograph 10.**



*View of perimeter column with brace*

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 11.**



*View of typical interior 8" tube column*

**Photograph 12.**



*View of x-brace on wall*

**ENVISTA**
F O R E N S I C S

Insured: Nilfisk Inc.                                    Envista Matter No: MAT-137403-D4Z1
Location: 979 East Robinson Avenue, Springdale, AR 72764    Crawford Global Technical Services Claim No: 3960001

**Photograph 13.**



*View of interior of building looking at the east end*

**Photograph 14.**



*View of brace connection on collapsed side of building*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 15.**



*View of failed anchor bolts*

**Photograph 16.**



*View of pull out failure on expansion anchors*

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 17.**



*View of tear out and wrinkling of membrane in roof*

**Photograph 18.**



*View of localized damage in wall panel on north side of building*

**F O R E N S I C S**

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 19.**



*View of cut to wall panel on north side*

**Photograph 20.**



*View of south face of building*



# Attachment B

# Weather Data

FWP-000053



Search Locations                                           Log in ⊕ Log…  ⚙

★  Recent Cities
   Springdale, AR (/weather/us/ar/springdale/36.19,-94.13)

36.28 °N, 94.3 °W

# Bentonville, AR Weather History ★ 🏠

☁ **58° NORTHWEST ARKANSAS REGIONAL AIRPORT STATION (/DASHBOARD/PWS/KARSPRIN54?CM_VEN=LOCALWX_PWSDASH)** | CHANGE ∨

HISTORY (/HISTORY/DAILY/US/AR/BENTONVILLE/KXNA)

- TODAY (/WEATHER/KXNA)
- HOURLY (/HOURLY/KXNA)
- 10-DAY (/FORECAST/KXNA)
- CALENDAR (/CALENDAR/US/AR/BENTONVILLE/KXNA)
- HISTORY (/HISTORY/DAILY/US/AR/BENTONVILLE/KXNA)
- WUNDERMAP (/WUNDERMAP?LAT=36.28&LON=-94.3)

Daily (/history/daily/KXNA/date/2022-3-30)   Weekly (/history/weekly/KXNA/date/2022-3-30)   Monthly (/history/monthly/KXNA/date/2022-3)

| March | 30 | 2022 | View |



FWP-000054

# Summary

| Temperature (° F) | Actual | Historic Avg. | Record | ▲ |
|---|---|---|---|---|
| High Temp | 70 | 64.5 | 84 | |
| Low Temp | 38 | 39.1 | 17 | |
| Day Average Temp | 52.48 | 51.8 | - | |
| **Precipitation (Inches)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Precipitation (past 24 hours from 11:53:00) | 0.78 | 4.70 | - | |
| **Dew Point (° F)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Dew Point | 49.77 | - | - | |
| High | 61 | - | - | |
| Low | 35 | - | - | |
| Average | 49.77 | - | - | |
| **Wind (MPH)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Max Wind Speed | 24 | - | - | |
| Visibility | 10 | - | - | |
| **Sea Level Pressure (Hg)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Sea Level Pressure | 28.34 | - | - | |
| **Astronomy** | **Day Length** | **Rise** | **Set** | ▲ |
| Actual Time | 12h 30m | 7:07 AM | 7:38 PM | |
| Civil Twilight | | 6:41 AM | 8:04 PM | |
| Nautical Twilight | | 6:11 AM | 8:34 PM | |
| Astronomical Twilight | | 5:40 AM | 9:05 PM | |
| Moon: waning crescent | | 6:36 AM | 6:10 PM | |

# Daily Observations

| Time | Temperature | Dew Point | Humidity | Wind | Wind Speed | Wind Gust | Pressure | Precip. | Condition |
|---|---|---|---|---|---|---|---|---|---|
| 12:53 AM | 70 °F | 55 °F | 59 % | S | 24 mph | 35 mph | 28.20 in | 0.0 in | Light Rain / Windy |
| 1:53 AM | 69 °F | 55 °F | 61 % | S | 18 mph | 26 mph | 28.20 in | 0.0 in | Cloudy |
| 2:53 AM | 68 °F | 56 °F | 65 % | S | 14 mph | 0 mph | 28.15 in | 0.0 in | Cloudy |
| 3:44 AM | 65 °F | 59 °F | 81 % | SW | 9 mph | 21 mph | 28.13 in | 0.1 in | Heavy T-Storm |
| 3:47 AM | 64 °F | 59 °F | 83 % | WSW | 14 mph | 21 mph | 28.14 in | 0.1 in | Heavy T-Storm |
| 3:53 AM | 63 °F | 60 °F | 90 % | SSW | 16 mph | 25 mph | 28.14 in | 0.2 in | Heavy T-Storm |
| 4:03 AM | 63 °F | 60 °F | 90 % | SSW | 10 mph | 0 mph | 28.14 in | 0.0 in | T-Storm |

FWP-000055

| Time | Temperature | Dew Point | Humidity | Wind | Wind Speed | Wind Gust | Pressure | Precip. | Condition |
|------|-------------|-----------|----------|------|------------|-----------|----------|---------|-----------|
| 4:11 AM | 63 °F | 61 °F | 93 % | SW | 10 mph | 0 mph | 28.14 in | 0.1 in | T-Storm |
| 4:28 AM | 62 °F | 61 °F | 96 % | SW | 9 mph | 0 mph | 28.15 in | 0.1 in | Rain |
| 4:36 AM | 62 °F | 60 °F | 93 % | WSW | 14 mph | 0 mph | 28.15 in | 0.2 in | Rain |
| 4:51 AM | 61 °F | 59 °F | 94 % | WSW | 13 mph | 0 mph | 28.14 in | 0.2 in | T-Storm |
| 4:53 AM | 61 °F | 59 °F | 93 % | WSW | 9 mph | 0 mph | 28.13 in | 0.3 in | Heavy T-Storm |
| 5:06 AM | 60 °F | 58 °F | 93 % | WSW | 13 mph | 22 mph | 28.13 in | 0.0 in | Rain |
| 5:44 AM | 59 °F | 57 °F | 93 % | S | 8 mph | 0 mph | 28.13 in | 0.1 in | T-Storm |
| 5:53 AM | 59 °F | 57 °F | 93 % | SSW | 7 mph | 0 mph | 28.12 in | 0.1 in | Rain |
| 6:31 AM | 58 °F | 57 °F | 97 % | SSW | 6 mph | 0 mph | 28.11 in | 0.1 in | Rain |
| 6:53 AM | 58 °F | 57 °F | 97 % | S | 9 mph | 0 mph | 28.11 in | 0.2 in | Rain |
| 7:40 AM | 57 °F | 56 °F | 96 % | SSE | 5 mph | 0 mph | 28.10 in | 0.2 in | Heavy Rain |
| 7:53 AM | 57 °F | 56 °F | 96 % | E | 7 mph | 0 mph | 28.06 in | 0.3 in | Light Rain |
| 8:18 AM | 57 °F | 56 °F | 96 % | SE | 12 mph | 0 mph | 28.06 in | 0.0 in | Light Rain |
| 8:53 AM | 57 °F | 56 °F | 96 % | SSE | 6 mph | 0 mph | 28.09 in | 0.0 in | Light Rain |
| 9:53 AM | 57 °F | 56 °F | 96 % | S | 7 mph | 0 mph | 28.09 in | 0.0 in | Cloudy |
| 10:06 AM | 57 °F | 56 °F | 96 % | SSW | 8 mph | 0 mph | 28.12 in | 0.0 in | Cloudy |
| 10:30 AM | 57 °F | 56 °F | 96 % | SSW | 3 mph | 0 mph | 28.12 in | 0.0 in | Light Rain |
| 10:53 AM | 57 °F | 56 °F | 96 % | SE | 9 mph | 0 mph | 28.08 in | 0.0 in | Light Rain |
| 11:24 AM | 58 °F | 56 °F | 93 % | SE | 10 mph | 0 mph | 28.09 in | 0.0 in | Light Rain |
| 11:53 AM | 58 °F | 57 °F | 97 % | SSE | 9 mph | 0 mph | 28.10 in | 0.0 in | Light Rain |
| 12:17 PM | 50 °F | 49 °F | 96 % | NW | 16 mph | 33 mph | 28.07 in | 0.0 in | Light Rain |
| 12:53 PM | 47 °F | 46 °F | 97 % | NW | 17 mph | 28 mph | 28.11 in | 0.0 in | Light Rain |
| 1:47 PM | 46 °F | 45 °F | 93 % | NNW | 16 mph | 28 mph | 28.10 in | 0.1 in | Rain |
| 1:48 PM | 46 °F | 44 °F | 93 % | NNW | 15 mph | 28 mph | 28.10 in | 0.1 in | Rain |
| 2:18 PM | 46 °F | 44 °F | 93 % | NNW | 13 mph | 0 mph | 28.08 in | 0.0 in | Fog |
| 2:25 PM | 45 °F | 44 °F | 97 % | NW | 14 mph | 23 mph | 28.09 in | 0.0 in | Cloudy |
| 2:53 PM | 44 °F | 43 °F | 96 % | NW | 13 mph | 0 mph | 28.10 in | 0.0 in | Cloudy |
| 3:53 PM | 43 °F | 42 °F | 97 % | NW | 12 mph | 22 mph | 28.11 in | 0.0 in | Fog |
| 4:16 PM | 43 °F | 40 °F | 89 % | NW | 12 mph | 29 mph | 28.13 in | 0.0 in | Cloudy |
| 4:53 PM | 42 °F | 40 °F | 92 % | WNW | 13 mph | 30 mph | 28.16 in | 0.0 in | Light Rain |
| 5:44 PM | 41 °F | 39 °F | 93 % | NW | 12 mph | 22 mph | 28.18 in | 0.0 in | Cloudy |
| 5:53 PM | 41 °F | 39 °F | 93 % | WNW | 20 mph | 30 mph | 28.19 in | 0.0 in | Light Rain |
| 6:53 PM | 40 °F | 37 °F | 89 % | WNW | 9 mph | 0 mph | 28.22 in | 0.0 in | Cloudy |
| 7:22 PM | 39 °F | 37 °F | 93 % | WNW | 8 mph | 0 mph | 28.24 in | 0.0 in | Light Rain |
| 7:27 PM | 39 °F | 37 °F | 93 % | WNW | 13 mph | 22 mph | 28.24 in | 0.0 in | Light Rain |
| 7:53 PM | 39 °F | 37 °F | 93 % | WNW | 10 mph | 0 mph | 28.24 in | 0.0 in | Light Rain |
| 8:53 PM | 38 °F | 35 °F | 89 % | NW | 13 mph | 28 mph | 28.28 in | 0.0 in | Cloudy |
| 9:53 PM | 38 °F | 35 °F | 89 % | WNW | 7 mph | 0 mph | 28.30 in | 0.0 in | Cloudy |
| 10:00 PM | 38 °F | 35 °F | 89 % | WNW | 7 mph | 0 mph | 28.31 in | 0.0 in | Cloudy |
| 10:53 PM | 38 °F | 35 °F | 89 % | W | 6 mph | 0 mph | 28.31 in | 0.0 in | Mostly Cloudy |
| 11:53 PM | 39 °F | 35 °F | 86 % | W | 10 mph | 0 mph | 28.34 in | 0.0 in | Cloudy |

FWP-000056



Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

# ATTACHMENT C
#
# Information Provided to Envista

Provided by Nilfisk Inc.

**ENVISTA**
FORENSICS

Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001



# EXHIBIT C

# ENGINEERING CONSULTANTS INC. REPORT

# ENGINEERING CONSULTANTS, INC.

**401 WEST CAPITOL AVENUE, SUITE 305**
**LITTLE ROCK, ARKANSAS  72201-3401**
**PHONE:  501-376-3752**
**www.ecilr.com**

October 20, 2022

Mr. Marshall Ney
Friday Eldredge & Clark, LLP
Little Rock, Arkansas   72201

RE:    Nilfisk Warehouse
       979 E Robinson Ave
       Springdale, AR 72764
       Building Code Implications after Storm Damage
       ECI Project Number: 22-340

Dear Mr. Ney,

Per your request a site visit was made to the above referenced facility on July 20, 2022. The purpose of the visit was to perform a visual observation of storm damage due to a March 30, 2022, EF-3 tornado and determine what part, if any, of the existing building structure could be salvaged and reused. This evaluation does not pertain to any building system other than the pre-engineered metal building (PEMB) and the concrete foundations.

The existing building is a 1,000-ft± (E-W) x 200-ft± (N-S) pre-engineered metal building (PEMB). The building was constructed around 1981. The PEMB frames span north-south and are spaced 25-ft on center. The building is dock high supported on a concrete wall and shallow foundations. The western 500-ft± and the eastern 200-ft± had been destroyed by the tornado. The central 300-ft± remained standing. At the time of the site visit the eastern section of the PEMB had been removed and the western section of the PEMB was in the process of being demolished and removed. The slab on grade and foundations for the entire structure were in place at the time of the site visit.

The western and eastern sections of the PEMB that were being demolished and removed obviously cannot be salvaged. Regarding the central 300-ft, approximately 25-ft of the roof and wall framing at each east and west end were damaged to the point of not being considered salvageable, leaving approximately 250-ft of the PEMB that could be considered salvageable. This would leave approximately 25% of the original PEMB that could reasonably be considered for reuse.

This report focuses primarily on the Code requirements for reuse and rehabilitation of wind damaged existing structures.

Frank M. Allison, PE          J. Richard Brown, PE          S. Grant Jordan, PE          Brian D. Miller, PE    FWP-000060

Nilfisk Warehouse
Springdale, Arkansas                                                   October 20, 2022
Building Code Implications after Storm Damage
ECI Project Number: 22-340

**Building Code Discussion:**

The following are selected excerpts from the 2012 Arkansas Fire Prevention Code Volume 2, hereafter referred to as the Code. Discussion of Code interpretations follow:

Definitions, p36 of the Code includes definitions for Substantial Damage and Substantial Structural Damage:

A. Substantial Damage. Damage of any origin sustained by a structure whereby the cost of restoring the structure to its before-damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.
B. Substantial Structural Damage. A condition where:
    1. In any story, the vertical elements of the lateral force-resisting system have suffered damage such that the lateral load-carrying capacity of the structure in any horizontal direction has been reduced by more than 33 percent from its pre-damage condition: or
    2. The capacity of any vertical gravity load-carrying component, or any group of such components, that supports more than 30 percent of the total area of the structure's floors and roofs has been reduced more than 20 percent from its pre-damage condition and the remaining capacity of such affected elements, with respect to all dead and live loads, is less than 75 percent of that required by this code for new buildings of similar structure, purpose, and location.

Conditions for both Substantial Damage and Substantial Structural Damage appear to have been met.

**Section 3405 Repairs**

1. Per Section 3405.1: Work on nondamaged components that is necessary for the required *repair* of damaged components shall be considered part of the *repair* and shall not be subject to the requirements for *alterations* in this chapter.
2. All repairs which are proceeded by complete demolition will be replaced with repairs that meet the code for new construction.
3. All damaged building where substantial repairs take place in more than 50 percent of the area of the building may be evaluated by the *building official* for upgrades which comply with the 2012 life safety requirements.

FWP-000061

Nilfisk Warehouse                                                                    Page **3** of **4**
Springdale, Arkansas                                                          October 20, 2022
Building Code Implications after Storm Damage
ECI Project Number: 22-340

Per Section 3405.2:

> **Exceptions**: 1. Buildings assigned to *Seismic Design Category* A, B, or C whose *substantial damage* was not caused by earthquake need not be evaluated or rehabilitated for load combinations that include earthquake effects.

Per Section 3405.2.1 **Evaluation**.  The building shall be evaluated by a *registered design professional*, and the evaluation findings shall be submitted to the *building official*. The evaluation shall establish whether the damaged building, if repaired to its pre-damage state, would comply with the provisions of this code for wind and earthquake loads.

Per Section 3405.2.3 Extent **of repair for noncompliant buildings.** If the evaluation does not establish compliance of the pre-damage building in accordance with Section 3404.2.1, then the building shall be rehabilitated to comply with applicable provision of this code for load combinations that include wind and seismic loads. The wind loads for the repair shall be as required by the building code in effect at the time of original construction unless the damage was caused by wind.  In which case the wind loads shall be as required by this code.

Per Section 3405.3.1 **Lateral force-resisting elements**. Regardless of the level of damage to the vertical elements of the lateral force-resisting system, if *substantial structural damage* to the gravity load-carrying components was caused primarily by wind or earthquake effect, then the building shall be evaluated in accordance with Section 3405.2.1 and, if noncompliant, rehabilitated in accordance with Section 3405.2.3.

**Discussion:**

Since more than 33% of the lateral force resisting system (frames) were destroyed and since more that 20% of the vertical load-carrying components (columns) supporting roof were destroyed, upgrades to comply with current Code provisions are mandated for all replacement structural components.

Since damage to the structure was due to wind, not earthquake, seismic upgrades to existing framing may not have been specifically required otherwise. However, since Substantial Structural Damage was caused by wind, compliance with the wind load provisions of the current code is mandated for all remaining structural components. Therefore, repair of all remaining structural building components, at least into compliance with current code wind load provisions, is required.

ENGINEERING CONSULTANTS, INC.    401 W. CAPITOL AVE STE 305    LITTLE ROCK, AR  72201    501-376-3752    WWW.ECILR.COM

FWP-000062

Nilfisk Warehouse
Springdale, Arkansas
Building Code Implications after Storm Damage
ECI Project Number: 22-340

Page **4** of **4**
October 20, 2022

Lacking detailed fabrication drawings for the remaining PEMB framing, an accurate structural analysis to determine compliance with the current Code would be prohibitive to perform and would likely require destructive testing. Although the foundations may not have been damaged, upgrades of foundations to comply with the current Code would be considered part of the necessary repair. Without detailed design drawings, verification of uplift capacity of existing foundations would also be prohibitive to perform and would likely require destructive testing.

**Summary and Conclusion:**

Due to the extent of the observed structural damage, the listed Code sections require upgrading the entire building structure into compliance with current code standards. I found no exceptions exempting the remaining portions of the building framing, nor foundations, from these upgrade requirements. In contrast, upgrade into compliance for non-damaged portions of the building (all foundations and remaining framing) required for code compliance are specifically included as part of the required repair.

In my opinion, the remaining portions of the building, PEMB and foundations, are required to be brought into compliance with the current Code.

If you have questions or need further assistance, please give me a call.



Frank M. Allison, PE
President
501.859.9828  direct
501.680.1520   cell
fallison@ecilr.com

FMA/hs
22-340 10-21-2022 nilfisk report.Docx

FWP-000063

# EXHIBIT D

# TORNADO REPAIR COST ESTIMATE



## MKA International, Inc.

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

| | | | |
|---|---|---|---|
| Insured: | Fort Worth Partners LLC v. Nilfisk, Inc. | | |
| Property: | 979 E. Robinson Avenue | | |
| | Springdale, AR 72764 | | |

| | | | |
|---|---|---|---|
| Claim Rep.: | Mr. Marshall Ney | Business: | (497) 695-6049 |
| Company: | Friday, Eldredge & Clark, LLP | E-mail: | mney@fridayfirm.com |
| Business: | 3350 S. Pinnacle Hills Parkway, Suite 301 | | |
| | Rogers, AR 72758 | | |

| | | | |
|---|---|---|---|
| Estimator: | S. Craig Prichard / Kevin McMahon | Business: | (770) 446-9606 |
| Company: | MKA International, Inc. | E-mail: | kmcmahon@mkainc.com |
| Business: | 11695 Johns Creek Parkway, Suite 250 | | |
| | Johns Creek, GA 30097 | | |

**Claim Number:** FEC-FEC.FID1493528    **Policy Number:** PENDING    **Type of Loss:** Tornado

| | | | |
|---|---|---|---|
| Date Contacted: | 4/20/2023 12:00 PM | | |
| Date of Loss: | 3/30/2022 12:00 PM | Date Received: | 4/20/2023 12:00 PM |
| Date Inspected: | 5/24/2023 8:00 AM | Date Entered: | 5/18/2023 11:40 AM |

| | |
|---|---|
| Price List: | ARFA8X_01JUN23 |
| | Restoration/Service/Remodel |
| Estimate: | 2023_1496_FTWORTH_R3 |

FWP-000065



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CAVEAT**

This document has been prepared for Mr. Marshall Ney of Friday, Eldredge & Clark, LLP. Reliance upon this document or upon information, observations or opinions contained herein should not be made by any party except the intended recipient designated on the title sheet of this estimate report.

The intent of this evaluation is to prepare an opinion of the probable cost of construction for work to be performed at the Fort Worth Partners LLC v. Nilfisk, Inc. site located at 979 E. Robinson Avenue, Springdale, AR.

This opinion assumes a specific scope and methodology; the user is cautioned that changes in either scope and/or methodology could have a reciprocal effect on this opinion. If this should occur, we reserve the right to review such changes and modify our opinion accordingly. Furthermore, our opinion assumes that the work will be competitively bid and, as such, it is advisable to solicit at least four (4) bids when a decision is made for the project to go forward.

Our opinion is based on the following notes:

**General Notes**

The scope represented in the estimate was derived based on:

• Site observations conducted by MKA International, Inc. (MKA) on March 24, 2023.
• Photographs, measurements, and sketches developed during the site observations.
• Review of an Engineering Evaluation report prepared by Mr. Guillermo Ramirez, PE  of Envista Forensics, dated April 26, 2022.
• Review of an Engineering Evaluation report prepared by Mr. Frank Allison, PE  of Engineering Consultans, Inc. dated October 20, 2022.
• Review of an estimate prepared by C.R. Crawford Construction, dated May 19, 2022.
• Review of an estimate prepared by Napa Construction, undated.
• Review of an estimate prepared by Mr. Mark Hartmann of J.S. Held, LLC, dated April 27, 2022.
• Review of an Engineering Evaluation report prepared by Mr. Andre Slintak, PE of MKA, dated June 9, 2023.

**General Building Description:**

The structure is a metal building of approximately 200,000 square-feet. In addition, the building is steel framed and set upon a concrete slab. Elevation finishes include aluminum windows, glass storefront doors, steel doors, metal overhead doors, box gutters and downspouts, and exhaust vents. The roof is covered with a standing seam metal panel.

Interior finishes include concrete block wall offices and service areas. Fully assembled modular offices are present.

Mechanical, electrical and plumbing systems (MEPs) are typical for a building of this nature.

**General Building Condition:**

West and East ends of the building were removed prior to the MKA site observation.

**Description of Affected Elements:**

Refer to the MKA Engineering Evaluation report for additional details.

**Physical Site Restrictions:**

There is space available in the parking lot for the contractor to stage equipment and materials.

FWP-000066



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**Repair Methodology:**

The contractor will demolish the remaining portion of the structure including foundation, framing, and offices. Once demolition is complete, the contractor will rebuild the structure in a logical sequence.

The construction duration for the scope included is assumed to be eighteen (18) months (excluding permits, design and procurement).

Our evaluation contemplates returning the facility to its pre-loss configuration using contemporary materials of like kind and quality. Furthermore, this evaluation is governed by the following assumptions and exclusions:

*Assumptions:*

• Regarding foundation replacement, no destructive or exploratory testing was undertaken by MKA and our scope is limited to visual observations.
• Regarding fencing, the chain link fence is included at fifty (50%) reflecting a shared fence.
• The work will be completed by one (1) general contractor making use of trade subcontractors.
• Work will be performed during normal business hours.
• Repairs will be performed in a code-compliant manner.
• Wage rates are for skilled tradespeople in Fayetteville, AR.
• Materials and equipment are supplied by local vendors.
• General Conditions have been included in the body of the estimate.

*Exclusions:*

Costs associated with:

• Emergency demolition/temporary shoring/drying/clean-up costs.
• Overtime/acceleration.
• Betterments.
• Code upgrades.
• Hazardous material testing and abatement.

**Actual Cash Value (ACV):**

Depreciation has not been applied to the estimate.

**Limitations:**

MKA provides construction consulting services to Property Owners and to Construction, Legal & Insurance Industries (including residential/commercial owners, contractors, architects, engineers, insurers, attorneys, etc.).

Any terms utilized in this repair or replacement cost estimate that are typically referenced in insurance claims are only included if defined and directed by the insurance carrier and/or their representatives.

FWP-000067



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**2023_1496_FTWORTH_R3**

### GENERAL CONDITIONS

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 1. Commercial Supervision / Project Management - per hour | 2,880.00 HR | 0.00 | 71.62 | 0.00 | 41,253.12 | 247,518.72 |
| Supervision included at forty (40) hours per week over the course of (64) weeks. | | | | | | |
| 2. General Laborer - per hour | 5,760.00 HR | 0.00 | 48.60 | 0.00 | 55,987.20 | 335,923.20 |
| Two (2) laborers included at forty (40) hours per week over the course of (64) weeks to assist with daily site cleanup, material acquisition, and miscellaneous tasks.. | | | | | | |
| 3. Dumpster load - Approx. 40 yards, 7-8 tons of debris | 100.00 EA | 984.00 | 0.00 | 9,594.00 | 19,680.00 | 127,674.00 |
| 4. Skid steer loader and operator | 480.00 HR | 0.00 | 96.54 | 0.00 | 9,267.84 | 55,607.04 |
| 5. Crane and operator - 30 ton capacity | 600.00 HR | 0.00 | 172.00 | 0.00 | 20,640.00 | 123,840.00 |
| 6. Telehandler/forklift (per month) - no operator | 18.00 MO | 0.00 | 3,063.00 | 0.00 | 11,026.80 | 66,160.80 |
| 7. Scissor lift - 26' platform height (per month) | 36.00 MO | 0.00 | 1,176.00 | 0.00 | 8,467.20 | 50,803.20 |
| 8. Job-site cargo container - pick up/del. (each way) 16'-40' | 8.00 EA | 0.00 | 99.40 | 77.53 | 159.04 | 1,031.77 |
| 9. Job-site cargo/storage container - 40' long (per month) | 72.00 MO | 0.00 | 115.84 | 813.20 | 1,668.10 | 10,821.78 |
| 10. Temporary toilet (per month) | 72.00 MO | 0.00 | 151.00 | 0.00 | 2,174.40 | 13,046.40 |
| 11. Temporary hand washing station (per month) | 36.00 MO | 0.00 | 270.00 | 0.00 | 1,944.00 | 11,664.00 |
| 12. Temporary construction office - portable (trailer) | 18.00 MO | 0.00 | 279.08 | 0.00 | 1,004.68 | 6,028.12 |
| 13. Temporary power usage (per month) - Commercial | 18.00 MO | 0.00 | 235.54 | 413.37 | 847.94 | 5,501.03 |
| 14. Temporary water - usage - (per month) - Commercial | 18.00 MO | 0.00 | 56.00 | 0.00 | 201.60 | 1,209.60 |
| 15. Temporary fencing - 9+ months (per month) | 30,600.00 LF | 0.00 | 0.67 | 0.00 | 4,100.40 | 24,602.40 |
| 16. Final cleaning - construction - Commercial | 200,000.00 SF | 0.00 | 0.24 | 4,680.00 | 9,600.00 | 62,280.00 |
| Totals: GENERAL CONDITIONS | | | | 15,578.10 | 188,022.32 | 1,143,712.06 |

### Demolition

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 17. Demolition of Existing Structure | 60,000.00 SF | 12.20 | 0.00 | 0.00 | 146,400.00 | 878,400.00 |

FWP-000068



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Demolition

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 18.  Demolition of Existing Foundation | 200,000. | SF 00 | 8.10 | 0.00 | 0.00 | 324,000.00 | 1,944,000.00 |
| Totals:  Demolition | | | | | 0.00 | 470,400.00 | 2,822,400.00 |

### Superstructure

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 19.  Column - 8" pipe w/base pl./top bkt. | 2,730.00 | LF | 0.00 | 60.40 | 11,030.29 | 32,978.40 | 208,900.69 |
| 20.  Angle - L 5" x 3 1/2" x 1/4" thick | 2,400.00 | LF | 0.00 | 18.48 | 2,473.38 | 8,870.40 | 55,695.78 |
| 21.  Steel purlins - C-shape - 8" | 60,000. | LF 00 | 0.00 | 9.71 | 37,030.50 | 116,520.00 | 736,150.50 |
| 22.  Wide Flange Beam - 23 1/2"d. x 7"w. x 3/8"thick | 920.00 | LF | 0.00 | 89.00 | 5,883.42 | 16,376.00 | 104,139.42 |
| 23.  Wide Flange Beam - 18 1/8"d. x 7 1/2"w. x 3/8"thick | 7,960.00 | LF | 0.00 | 86.01 | 48,583.86 | 136,927.92 | 870,151.38 |
| 24.  Column anchor bolt - 1" x 12" x 2" w/2 nuts & washers | 1,196.00 | EA | 0.00 | 33.97 | 3,027.20 | 8,125.62 | 51,780.94 |
| 25.  Column top bracket - 3/4" bottom & 1/4" sides | 199.00 | EA | 0.00 | 71.47 | 1,014.56 | 2,844.50 | 18,081.59 |
| 26.  Round post - w/base - 5" x 5" x .258 wall thickness | 400.00 | LF | 0.00 | 19.09 | 602.16 | 1,527.20 | 9,765.36 |
| 27.  Rectangular tube - 8" x 2" x .1875 wall thickness - galv. | 1,000.00 | LF | 0.00 | 44.52 | 3,984.83 | 8,904.00 | 57,408.83 |
| 28.  Structural Steel Installer - per hour | 960.00 | HR | 0.00 | 62.61 | 0.00 | 12,021.12 | 72,126.72 |
| 29.  Seal & paint column - two coats | 1,922.00 | LF | 0.00 | 6.05 | 93.70 | 2,325.62 | 14,047.42 |
| 30.  Concrete slab - 48" foundation mat - finished in place | 200,000. | SF 00 | 0.00 | 23.88 | 444,015.00 | 955,200.00 | 6,175,215.00 |
| 31.  Footings - labor & materials - Reinforced | 264.67 | CY | 0.00 | 447.07 | 4,607.03 | 23,665.20 | 146,598.25 |
| 32.  Concrete ramp slab on grade | 1,800.00 | SF | 0.00 | 8.70 | 751.14 | 3,132.00 | 19,543.14 |
| 33.  Concrete step - labor & material | 64.00 | CY | 0.00 | 398.78 | 909.60 | 5,104.38 | 31,535.90 |
| 34.  Concrete sealer - brush or spray applied | 200,000. | SF 00 | 0.00 | 1.00 | 14,430.00 | 40,000.00 | 254,430.00 |
| 35.  Paint striping warehouse floor | 200,000. | SF 00 | 0.00 | 1.33 | 5,265.00 | 53,200.00 | 324,465.00 |
| Totals:  Superstructure | | | | | 583,701.67 | 1,427,722.36 | 9,150,035.92 |

FWP-000069



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| Elevations | Formula Elevation 1000' x 23' x 0" |
|---|---|
| 20,753.00 SF Walls | 803.00 LF Floor Perimeter |
| 23,000.00 SF Long Wall | 23,000.00 SF Short Wall |
| 1,000.00 LF Ceil. Perimeter | |

| Missing Wall - Goes to Floor | (9) 3' X 7' | Opens into Exterior |
|---|---|---|
| Missing Wall - Goes to Floor | (14) 10' X 12' | Opens into Exterior |
| Missing Wall - Goes to Floor | (2) 12' X 14' | Opens into Exterior |
| Missing Wall - Goes to Floor | 6' X 7' | Opens into Exterior |



| Subroom 1:  East | Formula Elevation 200' x 23' x 0" |
|---|---|
| 4,600.00 SF Walls | 200.00 LF Floor Perimeter |
| 4,600.00 SF Long Wall | 4,600.00 SF Short Wall |
| 200.00 LF Ceil. Perimeter | |



| Subroom 2:  South | Formula Elevation 1000' x 23' x 0" |
|---|---|
| 22,874.00 SF Walls | 982.00 LF Floor Perimeter |
| 23,000.00 SF Long Wall | 23,000.00 SF Short Wall |
| 1,000.00 LF Ceil. Perimeter | |

| Missing Wall - Goes to Floor | (6) 3' X 7' | Opens into Exterior |
|---|---|---|

FWP-000070



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Elevations**



| Subroom 3: West | Formula Elevation 200' x 23' x 6' |
|---|---|
| 5,179.00 SF Walls | 197.00 LF Floor Perimeter |
| 5,200.00 SF Long Wall | 5,200.00 SF Short Wall |
| 200.36 LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**  **3' X 7'**  **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 36. Vinyl-faced/laminated insulation - 4" | 53,406.00 SF | 0.00 | 1.13 | 4,217.74 | 12,069.76 | 76,636.28 |
| 37. Wall/roof panel - corrugated - 24 gauge | 53,406.00 SF | 0.00 | 5.11 | 16,037.82 | 54,580.94 | 343,523.42 |
| 38. Closure strips for metal panels | 5,280.00 LF | 0.00 | 1.27 | 262.55 | 1,341.12 | 8,309.27 |
| 39. Outside/Inside corner - 26 gauge | 110.00 LF | 0.00 | 5.71 | 34.11 | 125.62 | 787.83 |
| 40. Metal J trim - metal building | 440.00 LF | 0.00 | 3.24 | 50.19 | 285.12 | 1,760.91 |
| 41. Metal Structure Installer - per hour | 640.00 HR | 0.00 | 62.61 | 0.00 | 8,014.08 | 48,084.48 |
| 42. Gutter / downspout - box - aluminum - 7" to 8" | 3,850.00 LF | 0.00 | 22.91 | 6,771.77 | 17,640.70 | 112,615.97 |
| 43. Sectional overhead door, 10' x 12' | 14.00 EA | 0.00 | 1,529.55 | 1,570.09 | 4,282.74 | 27,266.53 |
| 44. Sectional overhead door, 10' x 14' | 2.00 EA | 0.00 | 1,884.18 | 293.45 | 753.68 | 4,815.49 |
| 45. Commercial overhead door opener - Hoist/jack-shaft type | 16.00 EA | 0.00 | 971.54 | 1,217.03 | 3,108.92 | 19,870.59 |
| 46. Loading dock - door seals - large | 14.00 EA | 0.00 | 1,576.22 | 1,611.72 | 4,413.42 | 28,092.22 |
| 47. Recessed dock levelers - 10 ton | 14.00 EA | 0.00 | 8,221.88 | 9,481.13 | 23,021.26 | 147,608.71 |
| 48. Commercial sign face | 200.00 SF | 0.00 | 28.36 | 487.50 | 1,134.40 | 7,293.90 |
| 49. Scissor folding gate door - steel | 1,960.00 SF | 0.00 | 7.65 | 1,205.84 | 2,998.80 | 19,198.64 |
| 50. Steel door, 3' x 7' - fire rated | 16.00 EA | 0.00 | 627.12 | 909.48 | 2,006.78 | 12,950.18 |
| 51. Steel door frame - 3' opening | 16.00 EA | 0.00 | 312.96 | 413.40 | 1,001.48 | 6,422.24 |
| 52. Storefront door - alum. anodized frame, 3'x7' -Single pane | 2.00 EA | 0.00 | 1,369.75 | 230.39 | 547.90 | 3,517.79 |
| 53. Door closer - Commercial grade | 18.00 EA | 0.00 | 134.53 | 193.05 | 484.30 | 3,098.89 |
| 54. Lockset - keyed - Heavy duty - Commercial grade | 16.00 EA | 0.00 | 253.31 | 364.06 | 810.60 | 5,227.62 |
| 55. Door pull plate, 4" x 16" | 2.00 EA | 0.00 | 64.50 | 9.75 | 25.80 | 164.55 |

FWP-000071



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Elevations**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 56.  LAM - Indirect metal halide | 24.00 EA | 0.00 | 385.01 | 643.71 | 1,848.04 | 11,731.99 |
| 57.  Aluminum window, horiz. slider 12-23 sf | 5.00 EA | 0.00 | 261.36 | 91.23 | 261.36 | 1,659.39 |
| 58.  Gable mount power attic vent - Large | 38.00 EA | 0.00 | 535.80 | 619.29 | 4,072.08 | 25,051.77 |
| 59.  Deck planking - treated lumber (per SF) | 300.00 SF | 0.00 | 4.97 | 49.73 | 298.20 | 1,838.93 |
| 60.  Deck guard rail - treated lumber | 125.00 LF | 0.00 | 28.70 | 138.45 | 717.50 | 4,443.45 |
| 61.  6" x 6" square wood post - treated (3 BF per LF) | 72.00 LF | 0.00 | 8.50 | 32.92 | 122.40 | 767.32 |
| 62.  Precast concrete or block pier | 12.00 EA | 0.00 | 28.53 | 7.06 | 68.48 | 417.90 |
| 63.  Handrail - Steel pipe - Floor mounted - 2 rail | 468.00 LF | 0.00 | 58.87 | 2,366.83 | 5,510.24 | 35,428.23 |
| 64.  Paint handrail - wall mounted | 936.00 LF | 0.00 | 1.15 | 16.43 | 215.28 | 1,308.11 |
| Totals:  Elevations | | | | 49,326.72 | 151,761.00 | 959,892.60 |

**Fencing**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 65.  Chain link fence w/posts & top rail - 6' high - 9 gauge | 800.00 LF | 0.00 | 23.57 | 1,279.98 | 3,771.20 | 23,907.18 |
| Totals:  Fencing | | | | 1,279.98 | 3,771.20 | 23,907.18 |

**Roof**

**Roof**

| 200,693.24 Surface Area | 2,006.93 Number of Squares |
|---|---|
| 2,401.39 Total Perimeter Length | 1,000.00 Total Ridge Length |

F1(A)
Roof

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 66.  Vinyl-faced/laminated insulation - 4" | 200,693. SF 24 | 0.00 | 1.13 | 15,849.75 | 45,356.68 | 287,989.79 |
| 67.  Metal roofing - Premium grade | 200,693. SF 24 | 0.00 | 11.04 | 85,510.37 | 443,130.68 | 2,744,294.42 |

FWP-000072



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Roof

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 68. Additional charge for high roof (2 stories or greater) | 2,006.93 SQ | 0.00 | 18.57 | 0.00 | 7,453.74 | 44,722.43 |
| 69. Hip / Ridge cap - metal roofing | 1,000.00 LF | 0.00 | 6.10 | 282.75 | 1,220.00 | 7,602.75 |
| 70. Gable trim for metal roofing - 26 gauge | 401.39 LF | 0.00 | 6.15 | 115.45 | 493.72 | 3,077.72 |
| 71. Eave trim for metal roofing - 26 gauge | 2,000.00 LF | 0.00 | 5.39 | 427.05 | 2,156.00 | 13,363.05 |
| 72. Closure strips for metal roofing - inside and/or outside | 3,401.39 LF | 0.00 | 1.91 | 169.13 | 1,299.34 | 7,965.12 |
| 73. Ridge end cap for metal roofing | 2.00 EA | 0.00 | 25.67 | 2.40 | 10.26 | 64.00 |
| 74. Neoprene pipe jack flashing for metal roofing | 20.00 EA | 0.00 | 59.55 | 56.86 | 238.20 | 1,486.06 |
| 75. Exhaust cap - through roof - 6" to 8" | 26.00 EA | 0.00 | 98.55 | 128.02 | 512.46 | 3,202.78 |
| Totals: Roof | | | | 102,541.78 | 501,871.08 | 3,113,768.12 |
| Total: Roof | | | | **102,541.78** | **501,871.08** | **3,113,768.12** |

### Electrical

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 76. Commercial electrical (SF of bldg) - Heavy load | 200,000.00 SF | 0.00 | 18.62 | 85,020.00 | 744,800.00 | 4,553,820.00 |
| 77. Equipment wiring - Commercial | 200,000.00 SF | 0.00 | 1.26 | 13,260.00 | 50,400.00 | 315,660.00 |
| 78. Data network wiring | 20,000.00 SF | 0.00 | 2.50 | 916.50 | 10,000.00 | 60,916.50 |
| 79. Fire alarm system - per SF | 200,000.00 SF | 0.00 | 1.38 | 10,920.00 | 55,200.00 | 342,120.00 |
| 80. Comm. Security system - rough-in - High grade | 200,000.00 SF | 0.00 | 0.21 | 1,755.00 | 8,400.00 | 52,155.00 |
| 81. Surveillance monitor - 14" color | 4.00 EA | 0.00 | 517.52 | 140.60 | 414.02 | 2,624.70 |
| 82. Surveillance camera - color | 10.00 EA | 0.00 | 557.02 | 390.00 | 1,114.04 | 7,074.24 |
| 83. Public Address Speaker - loudspeaker/paging horn | 25.00 EA | 0.00 | 205.04 | 204.95 | 1,025.20 | 6,356.15 |
| 84. Television antenna | 1.00 EA | 0.00 | 150.33 | 8.53 | 30.06 | 188.92 |
| 85. Receiver for digital satellite system | 4.00 EA | 0.00 | 219.93 | 42.90 | 175.94 | 1,098.56 |
| Totals: Electrical | | | | 112,658.48 | 871,559.26 | 5,342,014.07 |

FWP-000073



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### Fire Suppresion

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 86.  Exposed fire sprinkler system (SF of bldg) | 200,000. SF 00 | 0.00 | 3.66 | 23,205.00 | 146,400.00 | 901,605.00 |
| 87.  Concealed fire sprinkler system (SF of bldg) | 20,000. SF 00 | 0.00 | 3.95 | 2,886.00 | 15,800.00 | 97,686.00 |
| Totals:  Fire Suppresion | | | | 26,091.00 | 162,200.00 | 999,291.00 |

### Mechanical

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 88.  Space Heater - Ceiling hung gas unit 320,000 BTU warehouse | 20.00 EA | 0.00 | 2,953.67 | 4,018.70 | 11,814.68 | 74,906.78 |
| 89.  Furnace vent - double wall, 6" | 200.00 LF | 0.00 | 30.77 | 358.02 | 1,230.80 | 7,742.82 |
| 90.  Heating and cooling system - furnaces - Commercial | 20,000. SF 00 | 0.00 | 9.45 | 9,730.50 | 37,800.00 | 236,530.50 |
| 91.  HVAC Technician - per hour | 960.00 HR | 0.00 | 92.07 | 0.00 | 17,677.44 | 106,064.64 |
| 92.  Cast iron pipe (no-hub) with fitting and hanger, 2" | 2,600.00 LF | 0.00 | 39.28 | 2,902.58 | 20,425.60 | 125,456.18 |
| 93.  Rough in plumbing - per fixture | 25.00 EA | 0.00 | 685.36 | 420.59 | 3,426.80 | 20,981.39 |
| 94.  Plumber - per hour | 480.00 HR | 0.00 | 110.00 | 0.00 | 10,560.00 | 63,360.00 |
| Totals:  Mechanical | | | | 17,430.39 | 102,935.32 | 635,042.31 |

### Plywood Separation

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 95.  Stud wall - 2" x 6" - 24" oc | 8,500.00 SF | 0.00 | 2.60 | 787.31 | 4,420.00 | 27,307.31 |
| 96.  Sheathing - plywood - 1/2" CDX | 17,000. SF 00 | 0.00 | 1.68 | 1,558.05 | 5,712.00 | 35,830.05 |
| 97.  Carpenter - General Framer - per hour | 80.00 HR | 0.00 | 57.88 | 0.00 | 926.08 | 5,556.48 |
| Totals:  Plywood Separation | | | | 2,345.36 | 11,058.08 | 68,693.84 |

### Modular Offices

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|

FWP-000074



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

## CONTINUED - Modular Offices

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 98. Fully-Assembled Modular Office System | 2,476.00 SF | 0.00 | 460.60 | 45,590.28 | 228,089.12 | 1,414,125.00 |
| Includes shipping and installation of the modular offices. | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals: Modular Offices | | | | 45,590.28 | 228,089.12 | 1,414,125.00 |

## Main Level

### Foyer                                                                 Height: 9'

| | |
|---|---|
| 408.00 SF Walls | 160.00 SF Ceiling |
| 568.00 SF Walls & Ceiling | 160.00 SF Floor |
| 17.78 SY Flooring | 43.00 LF Floor Perimeter |
| 52.00 LF Ceil. Perimeter | |

| Door | 6' X 6' 8" | Opens into Exterior |
|---|---|---|
| Door | 3' X 6' 8" | Opens into Exterior |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 99. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 160.00 SF | 0.00 | 2.29 | 12.95 | 73.28 | 452.63 |
| 100. Metal studding, 3 5/8" wide, 16" OC, 25 gauge | 408.00 SF | 0.00 | 3.03 | 66.43 | 247.24 | 1,549.91 |
| 101. 5/8" drywall - hung, taped, floated, ready for paint | 408.00 SF | 0.00 | 2.34 | 30.23 | 190.94 | 1,175.89 |
| 102. Tile - vinyl composition | 160.00 SF | 0.00 | 1.97 | 30.73 | 63.04 | 408.97 |
| 103. Cove base molding - rubber or vinyl, 4" high | 43.00 LF | 0.00 | 2.03 | 8.51 | 17.46 | 113.26 |
| 104. Batt insulation - 6" - R19 - paper / foil faced | 160.00 SF | 0.00 | 1.33 | 15.76 | 42.56 | 271.12 |
| 105. Suspended ceiling system - 2' x 4' | 160.00 SF | 0.00 | 3.52 | 29.95 | 112.64 | 705.79 |
| 106. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 107. Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 108. Storefront door - alum. anodized frame, 3'x7' -Single pane | 2.00 EA | 0.00 | 1,369.75 | 230.39 | 547.90 | 3,517.79 |
| 109. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 110. Seal/prime then paint the walls twice (3 coats) | 408.00 SF | 0.00 | 1.33 | 12.33 | 108.52 | 663.09 |
| 111. Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |

FWP-000075



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Foyer

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 112.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| Totals:  Foyer | | | | 482.16 | 1,583.40 | 9,982.67 |



| Compressors | | Height: 12' |
|---|---|---|
| 924.00 SF Walls | 425.83 SF Ceiling | |
| 1,349.83 SF Walls & Ceiling | 425.83 SF Floor | |
| 47.31 SY Flooring | 75.67 LF Floor Perimeter | |
| 83.67 LF Ceil. Perimeter | | |

**Door**          **8' X 10'**          **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 113.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 425.83 SF | 0.00 | 2.29 | 34.46 | 195.04 | 1,204.65 |
| 114.  Block - 6" x 8" x 16" - in place - reinforced | 924.00 SF | 0.00 | 9.33 | 374.77 | 1,724.18 | 10,719.87 |
| 115.  Batt insulation - 6" - R19 - paper / foil faced | 425.83 SF | 0.00 | 1.33 | 41.93 | 113.28 | 721.56 |
| 116.  5/8" drywall - hung, taped, floated, ready for paint | 425.83 SF | 0.00 | 2.34 | 31.55 | 199.28 | 1,227.27 |
| 117.  Seal/prime then paint the ceiling twice (3 coats) | 425.83 SF | 0.00 | 1.33 | 12.87 | 113.28 | 692.50 |
| 118.  Seal block with masonry sealer | 924.00 SF | 0.00 | 0.92 | 33.33 | 170.02 | 1,053.43 |
| 119.  Paint masonry | 924.00 SF | 0.00 | 0.80 | 22.52 | 147.84 | 909.56 |
| 120.  Sectional overhead door, 10' x 10' | 1.00 EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 121.  Commercial overhead door opener - Hoist/jack-shaft type | 1.00 EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 122.  Fluorescent - four tube - 4' - strip light | 6.00 EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 123.  Exhaust fan - slant wall - 36" - 3 blade | 1.00 EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |
| Totals:  Compressors | | | | 857.98 | 3,555.82 | 22,192.79 |

FWP-000076



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| Battery Charger | | | | Height: 12' |
|---|---|---|---|---|
| 1,636.00 SF Walls | | | 945.00 SF Ceiling | |
| 2,581.00 SF Walls & Ceiling | | | 945.00 SF Floor | |
| 105.00 SY Flooring | | | 135.00 LF Floor Perimeter | |
| 143.00 LF Ceil. Perimeter | | | | |

| **Door** | | **8' X 10'** | | **Opens into Exterior** | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
| 124. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 945.00 SF | 0.00 | 2.29 | 76.47 | 432.82 | 2,673.34 |
| 125. Block - 6" x 8" x 16" - in place - reinforced | 1,636.00 SF | 0.00 | 9.33 | 663.56 | 3,052.78 | 18,980.22 |
| 126. Batt insulation - 6" - R19 - paper / foil faced | 945.00 SF | 0.00 | 1.33 | 93.06 | 251.38 | 1,601.29 |
| 127. Suspended ceiling system - 2' x 4' | 945.00 SF | 0.00 | 3.52 | 176.90 | 665.28 | 4,168.58 |
| 128. Seal/prime then paint the ceiling twice (3 coats) | 945.00 SF | 0.00 | 1.33 | 28.56 | 251.38 | 1,536.79 |
| 129. Seal block with masonry sealer | 1,636.00 SF | 0.00 | 0.92 | 59.02 | 301.02 | 1,865.16 |
| 130. Paint masonry | 1,636.00 SF | 0.00 | 0.80 | 39.88 | 261.76 | 1,610.44 |
| 131. Sectional overhead door, 10' x 10' | 1.00 EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 132. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 133. Fluorescent - four tube - 4' - strip light | 6.00 EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 134. Exhaust fan - slant wall - 36" - 3 blade | 1.00 EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |

| Totals:  Battery Charger | | | | 1,444.00 | 6,109.32 | 38,099.77 |
|---|---|---|---|---|---|---|



| **Office 1** | | | **Height: 12'** |
|---|---|---|---|
| 600.44 SF Walls | | 172.08 SF Ceiling | |
| 772.53 SF Walls & Ceiling | | 172.08 SF Floor | |
| 19.12 SY Flooring | | 48.67 LF Floor Perimeter | |
| 54.67 LF Ceil. Perimeter | | | |

| **Window** | **3' 4" X 2' 4"** | **Opens into OFFICE_2** |
|---|---|---|
| **Door** | **3' X 6' 8"** | **Opens into OFFICE_2** |
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |
| **Door** | **3' X 6' 8"** | **Opens into Exterior** |

FWP-000077



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Office 1

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 135.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 172.08 | SF | 0.00 | 2.29 | 13.93 | 78.82 | 486.81 |
| 136.  Block - 6" x 8" x 16" - in place - reinforced | 390.44 | SF | 0.00 | 9.33 | 158.36 | 728.56 | 4,529.73 |
| 137.  Tile - vinyl composition | 172.08 | SF | 0.00 | 1.97 | 33.05 | 67.80 | 439.85 |
| 138.  Cove base molding - rubber or vinyl, 4" high | 48.67 | LF | 0.00 | 2.03 | 9.63 | 19.76 | 128.19 |
| 139.  Batt insulation - 6" - R19 - paper / foil faced | 172.08 | SF | 0.00 | 1.33 | 16.95 | 45.78 | 291.60 |
| 140.  Suspended ceiling system - 2' x 4' | 172.08 | SF | 0.00 | 3.52 | 32.21 | 121.14 | 759.07 |
| 141.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 3.00 | EA | 0.00 | 216.81 | 27.50 | 130.08 | 808.01 |
| 142.  Ceiling diffusers / grills - square, lay-in - 24" | 4.00 | EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 143.  Aluminum window, picture/fixed 3-11 sf | 2.00 | EA | 0.00 | 140.00 | 14.73 | 56.00 | 350.73 |
| 144.  Window blind - aluminum - 1" - 7. 1 to 14 SF | 2.00 | EA | 0.00 | 87.95 | 8.97 | 35.18 | 220.05 |
| 145.  Steel door, 3' x 7' | 2.00 | EA | 0.00 | 454.02 | 78.98 | 181.60 | 1,168.62 |
| 146.  Steel door frame - 3' opening | 2.00 | EA | 0.00 | 312.96 | 51.68 | 125.18 | 802.78 |
| 147.  Glass lite - half lite | 2.00 | EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 148.  Lockset - keyed - Medium duty - Commercial grade | 2.00 | EA | 0.00 | 130.72 | 21.60 | 52.28 | 335.32 |
| 149.  Door hinges (set of 3) | 6.00 | EA | 0.00 | 42.83 | 7.56 | 51.40 | 315.94 |
| 150.  Seal block with masonry sealer | 600.44 | SF | 0.00 | 0.92 | 21.66 | 110.48 | 684.54 |
| 151.  Paint masonry | 600.44 | SF | 0.00 | 0.80 | 14.64 | 96.08 | 591.07 |
| 152.  Paint door slab only - 1 coat (per side) | 4.00 | EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |
| 153.  Paint door/window trim & jamb - 2 coats (per side) | 8.00 | EA | 0.00 | 31.95 | 3.99 | 51.12 | 310.71 |
| 154.  Carpet - metal transition strip | 3.00 | LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Totals:  Office 1 | | | | | 577.44 | 2,152.02 | 13,489.57 |

FWP-000078



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| Office 2 | | | | | Height: 12' |
|---|---|---|---|---|---|

| | | |
|---|---|---|
| 660.44 SF Walls | | 215.83 SF Ceiling |
| 876.28 SF Walls & Ceiling | | 215.83 SF Floor |
| 23.98 SY Flooring | | 53.67 LF Floor Perimeter |
| 59.67 LF Ceil. Perimeter | | |

| | | | |
|---|---|---|---|
| **Door** | **3' X 6' 8"** | | **Opens into Exterior** |
| **Window** | **3' 4" X 2' 4"** | | **Opens into Exterior** |
| **Window** | **3' 4" X 2' 4"** | | **Opens into OFFICE_1** |
| **Door** | **3' X 6' 8"** | | **Opens into OFFICE_1** |

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 155. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 215.83 | SF | 0.00 | 2.29 | 17.47 | 98.86 | 610.58 |
| 156. Block - 6" x 8" x 16" - in place - reinforced | 450.44 | SF | 0.00 | 9.33 | 182.70 | 840.52 | 5,225.83 |
| 157. Glue down carpet | 248.21 | SF | 0.00 | 2.31 | 55.90 | 114.68 | 743.95 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 158. Carpet - metal transition strip | 3.00 | LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 159. Cove base molding - rubber or vinyl, 4" high | 53.67 | LF | 0.00 | 2.03 | 10.62 | 21.80 | 141.37 |
| 160. Batt insulation - 6" - R19 - paper / foil faced | 215.83 | SF | 0.00 | 1.33 | 21.25 | 57.42 | 365.72 |
| 161. Suspended ceiling system - 2' x 4' | 215.83 | SF | 0.00 | 3.52 | 40.40 | 151.94 | 952.06 |
| 162. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 | EA | 0.00 | 216.81 | 36.66 | 173.44 | 1,077.34 |
| 163. Ceiling diffusers / grills - square, lay-in - 24" | 4.00 | EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 164. Aluminum window, picture/fixed 3-11 sf | 1.00 | EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 165. Window blind - aluminum - 1" - 7.1 to 14 SF | 2.00 | EA | 0.00 | 87.95 | 8.97 | 35.18 | 220.05 |
| 166. Steel door, 3' x 7' | 1.00 | EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 167. Steel door frame - 3' opening | 1.00 | EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 168. Glass lite - half lite | 1.00 | EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 169. Lockset - keyed - Medium duty - Commercial grade | 1.00 | EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 170. Door hinges (set of 3) | 3.00 | EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 171. Seal block with masonry sealer | 660.44 | SF | 0.00 | 0.92 | 23.83 | 121.52 | 752.95 |
| 172. Paint masonry | 660.44 | SF | 0.00 | 0.80 | 16.10 | 105.68 | 650.13 |
| 173. Paint door slab only - 1 coat (per side) | 2.00 | EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |

FWP-000079



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Office 2**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 174.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |
| Totals:  Office 2 | | | | 548.23 | 2,125.10 | 13,298.65 |

**Conference Room**  **Height: 12'**

| | |
|---|---|
| 952.44  SF Walls | 428.75  SF Ceiling |
| 1,381.19  SF Walls & Ceiling | 428.75  SF Floor |
| 47.64  SY Flooring | 78.00  LF Floor Perimeter |
| 84.00  LF Ceil. Perimeter | |

| Door | 3' X 6' 8" | Opens into OFFICE_3 |
|---|---|---|
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into Exterior |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 175.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 428.75 SF | 0.00 | 2.29 | 34.70 | 196.36 | 1,212.90 |
| 176.  Block - 6" x 8" x 16" - in place - reinforced | 742.44 SF | 0.00 | 9.33 | 301.13 | 1,385.40 | 8,613.50 |
| 177.  Glue down carpet | 493.06 SF | 0.00 | 2.31 | 111.05 | 227.80 | 1,477.82 |
| 15 % waste added for Glue down carpet. | | | | | | |
| 178.  Carpet - metal transition strip | 6.00 LF | 0.00 | 2.65 | 1.55 | 3.18 | 20.63 |
| 179.  Cove base molding - rubber or vinyl, 4" high | 78.00 LF | 0.00 | 2.03 | 15.44 | 31.66 | 205.44 |
| 180.  Batt insulation - 6" - R19 - paper / foil faced | 428.75 SF | 0.00 | 1.33 | 42.22 | 114.04 | 726.50 |
| 181.  Suspended ceiling system - 2' x 4' | 428.75 SF | 0.00 | 3.52 | 80.26 | 301.84 | 1,891.30 |
| 182.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 0.00 | 216.81 | 54.99 | 260.18 | 1,616.03 |
| 183.  Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 184.  Aluminum window, picture/fixed 3-11 sf | 2.00 EA | 0.00 | 140.00 | 14.73 | 56.00 | 350.73 |
| 185.  Window blind - aluminum - 1" - 7.1 to 14 SF | 3.00 EA | 0.00 | 87.95 | 13.45 | 52.78 | 330.08 |
| 186.  Steel door, 3' x 7' | 2.00 EA | 0.00 | 454.02 | 78.98 | 181.60 | 1,168.62 |
| 187.  Steel door frame - 3' opening | 2.00 EA | 0.00 | 312.96 | 51.68 | 125.18 | 802.78 |

FWP-000080



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Conference Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 188. Glass lite - half lite | 2.00 EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 189. Lockset - keyed - Medium duty - Commercial grade | 2.00 EA | 0.00 | 130.72 | 21.60 | 52.28 | 335.32 |
| 190. Door hinges (set of 3) | 6.00 EA | 0.00 | 42.83 | 7.56 | 51.40 | 315.94 |
| 191. Seal block with masonry sealer | 952.44 SF | 0.00 | 0.92 | 34.36 | 175.24 | 1,085.84 |
| 192. Paint masonry | 952.44 SF | 0.00 | 0.80 | 23.22 | 152.40 | 937.57 |
| 193. Paint door slab only - 1 coat (per side) | 4.00 EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |
| 194. Paint door/window trim & jamb - 2 coats (per side) | 8.00 EA | 0.00 | 31.95 | 3.99 | 51.12 | 310.71 |

| Totals: Conference Room | | | | 952.13 | 3,617.62 | 22,657.93 |



**Office 3**                                                                 **Height: 12'**

| | |
|---|---|
| 422.00 SF Walls | 84.40 SF Ceiling |
| 506.40 SF Walls & Ceiling | 84.40 SF Floor |
| 9.38 SY Flooring | 33.83 LF Floor Perimeter |
| 36.83 LF Ceil. Perimeter | |

| **Door** | **3' X 6' 8"** | | **Opens into CONFERENCE_R** | | | |
|---|---|---|---|---|---|---|

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 195. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 84.40 SF | 0.00 | 2.29 | 6.83 | 38.66 | 238.77 |
| 196. Block - 6" x 8" x 16" - in place - reinforced | 317.60 SF | 0.00 | 9.33 | 128.82 | 592.64 | 3,684.67 |
| 197. Tile - vinyl composition | 84.40 SF | 0.00 | 1.97 | 16.21 | 33.26 | 215.74 |
| 198. Cove base molding - rubber or vinyl, 4" high | 33.83 LF | 0.00 | 2.03 | 6.70 | 13.74 | 89.11 |
| 199. Batt insulation - 6" - R19 - paper / foil faced | 84.40 SF | 0.00 | 1.33 | 8.31 | 22.46 | 143.02 |
| 200. Suspended ceiling system - 2' x 4' | 84.40 SF | 0.00 | 3.52 | 15.80 | 59.42 | 372.31 |
| 201. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 202. Ceiling diffusers / grills - square, lay-in - 24" | 1.00 EA | 0.00 | 110.21 | 6.84 | 22.04 | 139.09 |
| 203. Aluminum window, picture/fixed 3-11 sf | 1.00 EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 204. Window blind - aluminum - 1" - 7. 1 to 14 SF | 1.00 EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |

FWP-000081



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Office 3**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 205.  Seal block with masonry sealer | 422.00 SF | 0.00 | 0.92 | 15.22 | 77.64 | 481.10 |
| 206.  Paint masonry | 422.00 SF | 0.00 | 0.80 | 10.29 | 67.52 | 415.41 |
| Totals:  Office 3 | | | | 245.19 | 1,059.70 | 6,603.28 |



**Office 4**                                                                                   **Height: 12'**

| 414.22 SF Walls | 84.40 SF Ceiling |
|---|---|
| 498.63 SF Walls & Ceiling | 84.40 SF Floor |
| 9.38 SY Flooring | 33.83 LF Floor Perimeter |
| 36.83 LF Ceil. Perimeter | |

| Door | 3' X 6' 8" | Opens into Exterior |
|---|---|---|
| Window | 3' 4" X 2' 4" | Opens into Exterior |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 207.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 84.40 SF | 0.00 | 2.29 | 6.83 | 38.66 | 238.77 |
| 208.  Block - 6" x 8" x 16" - in place - reinforced | 191.82 SF | 0.00 | 9.33 | 77.80 | 357.94 | 2,225.42 |
| 209.  Glue down carpet | 97.06 SF | 0.00 | 2.31 | 21.86 | 44.84 | 290.91 |
| 210.  Carpet - metal transition strip | 3.00 LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 211.  Cove base molding - rubber or vinyl, 4" high | 33.83 LF | 0.00 | 2.03 | 6.70 | 13.74 | 89.11 |
| 212.  Batt insulation - 6" - R19 - paper / foil faced | 84.40 SF | 0.00 | 1.33 | 8.31 | 22.46 | 143.02 |
| 213.  Suspended ceiling system - 2' x 4' | 84.40 SF | 0.00 | 3.52 | 15.80 | 59.42 | 372.31 |
| 214.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 215.  Ceiling diffusers / grills - square, lay-in - 24" | 1.00 EA | 0.00 | 110.21 | 6.84 | 22.04 | 139.09 |
| 216.  Aluminum window, picture/fixed 3-11 sf | 1.00 EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 217.  Window blind - aluminum - 1" - 7.1 to 14 SF | 1.00 EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |
| 218.  Steel door frame - 3' opening | 2.00 EA | 0.00 | 312.96 | 51.68 | 125.18 | 802.78 |
| 219.  Glass lite - half lite | 2.00 EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 220.  Lockset - keyed - Medium duty - Commercial grade | 2.00 EA | 0.00 | 130.72 | 21.60 | 52.28 | 335.32 |
| 221.  Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |

FWP-000082



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Office 4

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 222.  Seal block with masonry sealer | 414.22 SF | 0.00 | 0.92 | 14.94 | 76.22 | 472.24 |
| 223.  Paint masonry | 414.22 SF | 0.00 | 0.80 | 10.10 | 66.28 | 407.76 |
| 224.  Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 225.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |
| Totals:  Office 4 | | | | 311.96 | 1,165.16 | 7,302.68 |



| **Ozark Conference Room** | | | | | | **Height: 12'** |
|---|---|---|---|---|---|---|

734.22 SF Walls              249.38 SF Ceiling
983.60 SF Walls & Ceiling   249.38 SF Floor
27.71 SY Flooring           60.50 LF Floor Perimeter
63.50 LF Ceil. Perimeter

| **Door** | **3' X 6' 8"** | **Opens into Exterior** |
|---|---|---|
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 226.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 249.38 SF | 0.00 | 2.29 | 20.18 | 114.22 | 705.48 |
| 227.  Block - 6" x 8" x 16" - in place - reinforced | 524.22 SF | 0.00 | 9.33 | 212.62 | 978.20 | 6,081.79 |
| 228.  Glue down carpet | 286.78 SF | 0.00 | 2.31 | 64.59 | 132.50 | 859.55 |
| 15 % waste added for Glue down carpet. | | | | | | |
| 229.  Carpet - metal transition strip | 6.00 LF | 0.00 | 2.65 | 1.55 | 3.18 | 20.63 |
| 230.  Cove base molding - rubber or vinyl, 4" high | 60.50 LF | 0.00 | 2.03 | 11.97 | 24.56 | 159.35 |
| 231.  Batt insulation - 6" - R19 - paper / foil faced | 249.38 SF | 0.00 | 1.33 | 24.56 | 66.34 | 422.58 |
| 232.  Suspended ceiling system - 2' x 4' | 249.38 SF | 0.00 | 3.52 | 46.68 | 175.56 | 1,100.06 |
| 233.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 0.00 | 216.81 | 36.66 | 173.44 | 1,077.34 |
| 234.  Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 235.  Aluminum window, picture/fixed 3-11 sf | 1.00 EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 236.  Window blind - aluminum - 1" - 7.1 to 14 SF | 1.00 EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |
| 237.  Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |

FWP-000083



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Ozark Conference Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 238. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 239. Glass lite - half lite | 1.00 EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 240. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 241. Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 242. Seal block with masonry sealer | 734.22 SF | 0.00 | 0.92 | 26.49 | 135.10 | 837.07 |
| 243. Paint masonry | 734.22 SF | 0.00 | 0.80 | 17.90 | 117.48 | 722.76 |
| 244. Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 245. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |

| Totals: Ozark Conference Room | | | | 587.55 | 2,296.56 | 14,366.80 |
|---|---|---|---|---|---|---|



| **Womens RR** | | | | | | **Height: 12'** |
|---|---|---|---|---|---|---|

| 988.00 SF Walls | 268.14 SF Ceiling |
|---|---|
| 1,256.14 SF Walls & Ceiling | 268.14 SF Floor |
| 29.79 SY Flooring | 81.00 LF Floor Perimeter |
| 84.00 LF Ceil. Perimeter | |

| **Door** | **3' X 6' 8"** | | **Opens into Exterior** | | | |
|---|---|---|---|---|---|---|

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 246. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 268.14 SF | 0.00 | 2.29 | 21.70 | 122.80 | 758.54 |
| 247. Block - 6" x 8" x 16" - in place - reinforced | 778.00 SF | 0.00 | 9.33 | 315.56 | 1,451.74 | 9,026.04 |
| 248. Tile - vinyl composition | 268.14 SF | 0.00 | 1.97 | 51.50 | 105.64 | 685.38 |
| 249. Cove base molding - rubber or vinyl, 4" high | 81.00 LF | 0.00 | 2.03 | 16.03 | 32.88 | 213.34 |
| 250. Batt insulation - 6" - R19 - paper / foil faced | 268.14 SF | 0.00 | 1.33 | 26.40 | 71.32 | 454.35 |
| 251. Suspended ceiling system - 2' x 4' | 268.14 SF | 0.00 | 3.52 | 50.20 | 188.78 | 1,182.83 |
| 252. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 0.00 | 216.81 | 36.66 | 173.44 | 1,077.34 |
| 253. Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 254. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 255. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |

FWP-000084



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Womens RR**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 256.  Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 257.  Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 258.  Seal block with masonry sealer | 988.00 SF | 0.00 | 0.92 | 35.64 | 181.80 | 1,126.40 |
| 259.  Paint masonry | 988.00 SF | 0.00 | 0.80 | 24.08 | 158.08 | 972.56 |
| 260.  Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 261.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| 262.  Sink - circular wash fountain - Commercial | 1.00 EA | 0.00 | 4,494.40 | 385.85 | 898.88 | 5,779.13 |
| 263.  Toilet | 5.00 EA | 0.00 | 508.50 | 148.41 | 508.50 | 3,199.41 |
| 264.  Toilet seat | 5.00 EA | 0.00 | 55.03 | 15.34 | 55.04 | 345.53 |
| 265.  Handicap grab bar - Stainless steel, 1 1/2" x 30" | 2.00 EA | 0.00 | 73.92 | 9.54 | 29.56 | 186.94 |
| 266.  Bathroom mirror - w/metal frame - surface mtd - Commercial | 42.00 SF | 0.00 | 23.72 | 61.18 | 199.24 | 1,256.66 |
| 267.  Paper towel dispenser | 2.00 EA | 0.00 | 68.81 | 9.35 | 27.52 | 174.49 |
| 268.  Toilet paper dispenser - double roll | 5.00 EA | 0.00 | 58.57 | 16.94 | 58.58 | 368.37 |
| 269.  Toilet seat cover dispenser | 5.00 EA | 0.00 | 63.79 | 17.12 | 63.80 | 399.87 |
| 270.  Toilet partition - oversized/handicap | 1.00 EA | 0.00 | 691.00 | 46.31 | 138.20 | 875.51 |
| 271.  Toilet partition (plastic laminate or baked enamel steel) | 4.00 EA | 0.00 | 565.78 | 147.42 | 452.62 | 2,863.16 |
| Totals:  Womens RR | | | | 1,544.57 | 5,234.70 | 32,952.86 |



| Womens RR | | Height: 12' |
|---|---|---|
| 1,036.00  SF Walls | | 303.14  SF Ceiling |
| 1,339.14  SF Walls & Ceiling | | 303.14  SF Floor |
| 33.68  SY Flooring | | 85.00  LF Floor Perimeter |
| 88.00  LF Ceil. Perimeter | | |

| Door | | 3' X 6' 8" | Opens into Exterior | | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
| 272.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 303.14 SF | 0.00 | 2.29 | 24.53 | 138.84 | 857.56 |

FWP-000085



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Womens RR

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 273. Block - 6" x 8" x 16" - in place - reinforced | 826.00 | SF | 0.00 | 9.33 | 335.03 | 1,541.32 | 9,582.93 |
| 274. Tile - vinyl composition | 303.14 | SF | 0.00 | 1.97 | 58.23 | 119.44 | 774.86 |
| 275. Cove base molding - rubber or vinyl, 4" high | 85.00 | LF | 0.00 | 2.03 | 16.82 | 34.52 | 223.89 |
| 276. Batt insulation - 6" - R19 - paper / foil faced | 303.14 | SF | 0.00 | 1.33 | 29.85 | 80.64 | 513.67 |
| 277. Suspended ceiling system - 2' x 4' | 303.14 | SF | 0.00 | 3.52 | 56.75 | 213.42 | 1,337.22 |
| 278. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 | EA | 0.00 | 216.81 | 36.66 | 173.44 | 1,077.34 |
| 279. Ceiling diffusers / grills - square, lay-in - 24" | 4.00 | EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 280. Steel door, 3' x 7' | 1.00 | EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 281. Steel door frame - 3' opening | 1.00 | EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 282. Lockset - keyed - Medium duty - Commercial grade | 1.00 | EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 283. Door hinges (set of 3) | 3.00 | EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 284. Seal block with masonry sealer | 1,036.00 | SF | 0.00 | 0.92 | 37.37 | 190.62 | 1,181.11 |
| 285. Paint masonry | 1,036.00 | SF | 0.00 | 0.80 | 25.25 | 165.76 | 1,019.81 |
| 286. Paint door slab only - 1 coat (per side) | 2.00 | EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 287. Paint door/window trim & jamb - 2 coats (per side) | 2.00 | EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| 288. Sink - circular wash fountain - Commercial | 1.00 | EA | 0.00 | 4,494.40 | 385.85 | 898.88 | 5,779.13 |
| 289. Toilet | 5.00 | EA | 0.00 | 508.50 | 148.41 | 508.50 | 3,199.41 |
| 290. Toilet seat | 5.00 | EA | 0.00 | 55.03 | 15.34 | 55.04 | 345.53 |
| 291. Urinal - wall hung | 4.00 | EA | 0.00 | 773.25 | 197.76 | 618.60 | 3,909.36 |
| 292. Handicap grab bar - Stainless steel, 1 1/2" x 30" | 2.00 | EA | 0.00 | 73.92 | 9.54 | 29.56 | 186.94 |
| 293. Bathroom mirror - w/metal frame - surface mtd - Commercial | 42.00 | SF | 0.00 | 23.72 | 61.18 | 199.24 | 1,256.66 |
| 294. Paper towel dispenser | 2.00 | EA | 0.00 | 68.81 | 9.35 | 27.52 | 174.49 |
| 295. Toilet paper dispenser - double roll | 5.00 | EA | 0.00 | 58.57 | 16.94 | 58.58 | 368.37 |
| 296. Toilet seat cover dispenser | 5.00 | EA | 0.00 | 63.79 | 17.12 | 63.80 | 399.87 |
| 297. Toilet partition - oversized/handicap | 1.00 | EA | 0.00 | 691.00 | 46.31 | 138.20 | 875.51 |
| 298. Toilet partition (plastic laminate or baked enamel steel) | 4.00 | EA | 0.00 | 565.78 | 147.42 | 452.62 | 2,863.16 |

FWP-000086



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Womens RR

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 299.  Urinal partition (plastic laminate or baked enamel steel) | 4.00 EA | 0.00 | 168.75 | 44.14 | 135.00 | 854.14 |
| Totals:  Womens RR | | | | 1,829.19 | 6,159.82 | 38,787.97 |



**Water Heater**                                                      **Height: 12'**

| | |
|---|---|
| 340.00 SF Walls | 52.25 SF Ceiling |
| 392.25 SF Walls & Ceiling | 52.25 SF Floor |
| 5.81 SY Flooring | 27.00 LF Floor Perimeter |
| 30.00 LF Ceil. Perimeter | |

**Door**                          **3' X 6' 8"**                  **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 300.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 52.25 SF | 0.00 | 2.29 | 4.23 | 23.94 | 147.82 |
| 301.  Block - 6" x 8" x 16" - in place - reinforced | 226.00 SF | 0.00 | 9.33 | 91.67 | 421.72 | 2,621.97 |
| 302.  Tile - vinyl composition | 52.25 SF | 0.00 | 1.97 | 10.04 | 20.58 | 133.55 |
| 303.  Cove base molding - rubber or vinyl, 4" high | 27.00 LF | 0.00 | 2.03 | 5.34 | 10.96 | 71.11 |
| 304.  Batt insulation - 6" - R19 - paper / foil faced | 52.25 SF | 0.00 | 1.33 | 5.15 | 13.90 | 88.54 |
| 305.  Suspended ceiling system - 2' x 4' | 52.25 SF | 0.00 | 3.52 | 9.78 | 36.78 | 230.48 |
| 306.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 1.00 EA | 0.00 | 216.81 | 9.17 | 43.36 | 269.34 |
| 307.  Ceiling diffusers / grills - square, lay-in - 24" | 1.00 EA | 0.00 | 110.21 | 6.84 | 22.04 | 139.09 |
| 308.  Water heater - 40 gallon - Electric - 6 yr | 1.00 EA | 0.00 | 925.04 | 54.41 | 185.00 | 1,164.45 |
| 309.  Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 310.  Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 311.  Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 312.  Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 313.  Seal block with masonry sealer | 340.00 SF | 0.00 | 0.92 | 12.27 | 62.56 | 387.63 |
| 314.  Paint masonry | 340.00 SF | 0.00 | 0.80 | 8.29 | 54.40 | 334.69 |
| 315.  Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |

FWP-000087



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Water Heater

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 316. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| Totals: Water Heater | | | | 299.16 | 1,123.36 | 7,039.31 |

### Break Room                                                      Height: 12'



| | |
|---|---|
| 1,344.89 SF Walls | 770.00 SF Ceiling |
| 2,114.89 SF Walls & Ceiling | 770.00 SF Floor |
| 85.56 SY Flooring | 108.00 LF Floor Perimeter |
| 123.00 LF Ceil. Perimeter | |

| Door | 6' X 6' 8" | Opens into Exterior |
|---|---|---|
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Window | 3' 4" X 2' 4" | Opens into Exterior |
| Door | 3' X 6' 8" | Opens into OFFICE_5 |
| Door | 3' X 6' 8" | Opens into OFFICE_6 |
| Door | 3' X 6' 8" | Opens into Exterior |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 317. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 770.00 SF | 0.00 | 2.29 | 62.31 | 352.66 | 2,178.27 |
| 318. Block - 6" x 8" x 16" - in place - reinforced | 924.89 SF | 0.00 | 9.33 | 375.14 | 1,725.84 | 10,730.20 |
| 319. 5/8" drywall - hung, taped, floated, ready for paint | 140.00 SF | 0.00 | 2.34 | 10.37 | 65.52 | 403.49 |
| 320. Tile - vinyl composition | 770.00 SF | 0.00 | 1.97 | 147.90 | 303.38 | 1,968.18 |
| 321. Cove base molding - rubber or vinyl, 4" high | 108.00 LF | 0.00 | 2.03 | 21.38 | 43.84 | 284.46 |
| 322. Batt insulation - 6" - R19 - paper / foil faced | 770.00 SF | 0.00 | 1.33 | 75.83 | 204.82 | 1,304.75 |
| 323. Suspended ceiling system - 2' x 4' | 770.00 SF | 0.00 | 3.52 | 144.14 | 542.08 | 3,396.62 |
| 324. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 0.00 | 216.81 | 54.99 | 260.18 | 1,616.03 |
| 325. Ceiling diffusers / grills - square, lay-in - 24" | 6.00 EA | 0.00 | 110.21 | 41.06 | 132.26 | 834.58 |
| 326. Kitchen Sink - single basin | 1.00 EA | 0.00 | 318.17 | 20.62 | 63.64 | 402.43 |
| 327. Sink faucet - Kitchen | 1.00 EA | 0.00 | 264.55 | 18.33 | 52.92 | 335.80 |

FWP-000088



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Break Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 328. Sink strainer and drain assembly | 1.00 EA | 0.00 | 48.59 | 1.75 | 9.72 | 60.06 |
| 329. Drinking fountain | 1.00 EA | 0.00 | 401.59 | 20.80 | 80.32 | 502.71 |
| 330. Cabinetry - lower (base) units | 12.00 LF | 0.00 | 236.75 | 238.28 | 568.20 | 3,647.48 |
| 331. Countertop - flat laid plastic laminate | 12.00 LF | 0.00 | 40.15 | 33.63 | 96.36 | 611.79 |
| 332. Backsplash - plastic laminate | 12.00 SF | 0.00 | 6.56 | 3.63 | 15.74 | 98.09 |
| 333. Cabinet knob or pull | 12.00 EA | 0.00 | 7.75 | 4.14 | 18.60 | 115.74 |
| 334. Aluminum window, picture/fixed 3-11 sf | 6.00 EA | 0.00 | 140.00 | 44.19 | 168.00 | 1,052.19 |
| 335. Steel door, 3' x 7' | 2.00 EA | 0.00 | 454.02 | 78.98 | 181.60 | 1,168.62 |
| 336. Steel door frame - 6' opening | 1.00 EA | 0.00 | 367.15 | 30.42 | 73.44 | 471.01 |
| 337. Glass lite - half lite | 2.00 EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 338. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 339. Door hinges (set of 3) | 6.00 EA | 0.00 | 42.83 | 7.56 | 51.40 | 315.94 |
| 340. Seal block with masonry sealer | 1,204.89 SF | 0.00 | 0.92 | 43.47 | 221.70 | 1,373.67 |
| 341. Paint masonry | 1,204.89 SF | 0.00 | 0.80 | 29.37 | 192.78 | 1,186.06 |
| 342. Seal/prime then paint the surface area twice (3 coats) | 140.00 SF | 0.00 | 1.33 | 4.23 | 37.24 | 227.67 |
| 343. Paint door slab only - 1 coat (per side) | 4.00 EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |
| 344. Paint door/window trim & jamb - 2 coats (per side) | 14.00 EA | 0.00 | 31.95 | 6.98 | 89.46 | 543.74 |

| Totals: Break Room | | | | 1,564.15 | 5,688.84 | 35,697.09 |
|---|---|---|---|---|---|---|



| **IT Closet** | | | | | | **Height: 12'** |
|---|---|---|---|---|---|---|

296.00 SF Walls                    42.17 SF Ceiling
338.17 SF Walls & Ceiling          42.17 SF Floor
  4.69 SY Flooring                 23.33 LF Floor Perimeter
 26.33 LF Ceil. Perimeter

| **Door** | | **3' X 6' 8"** | | **Opens into OFFICE_6** | | |
|---|---|---|---|---|---|---|
| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
| 345. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 42.17 SF | 0.00 | 2.29 | 3.41 | 19.32 | 119.30 |

FWP-000089



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - IT Closet

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 346.  Block - 6" x 8" x 16" - in place - reinforced | 204.00  SF | 0.00 | 9.33 | 82.74 | 380.66 | 2,366.72 |
| 347.  Tile - vinyl composition | 42.17  SF | 0.00 | 1.97 | 8.10 | 16.62 | 107.79 |
| 348.  Cove base molding - rubber or vinyl, 4" high | 23.33  LF | 0.00 | 2.03 | 4.62 | 9.48 | 61.46 |
| 349.  Batt insulation - 6" - R19 - paper / foil faced | 42.17  SF | 0.00 | 1.33 | 4.15 | 11.22 | 71.46 |
| 350.  Suspended ceiling system - 2' x 4' | 42.17  SF | 0.00 | 3.52 | 7.89 | 29.68 | 186.01 |
| 351.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 1.00  EA | 0.00 | 216.81 | 9.17 | 43.36 | 269.34 |
| 352.  Ceiling diffusers / grills - square, lay-in - 24" | 1.00  EA | 0.00 | 110.21 | 6.84 | 22.04 | 139.09 |
| 353.  Steel door, 3' x 7' | 1.00  EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 354.  Steel door frame - 3' opening | 1.00  EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 355.  Lockset - keyed - Medium duty - Commercial grade | 1.00  EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 356.  Door hinges (set of 3) | 3.00  EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 357.  Seal block with masonry sealer | 296.00  SF | 0.00 | 0.92 | 10.68 | 54.46 | 337.46 |
| 358.  Paint masonry | 296.00  SF | 0.00 | 0.80 | 7.22 | 47.36 | 291.38 |
| 359.  Paint door slab only - 1 coat (per side) | 2.00  EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 360.  Paint door/window trim & jamb - 2 coats (per side) | 2.00  EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |

| Totals:  IT Closet | | | | 226.79 | 862.32 | 5,400.65 |
|---|---|---|---|---|---|---|



| **Office 5** | | | **Height: 12'** |
|---|---|---|---|
| 534.22  SF Walls | | 127.32  SF Ceiling | |
| 661.54  SF Walls & Ceiling | | 127.32  SF Floor | |
| 14.15  SY Flooring | | 43.83  LF Floor Perimeter | |
| 46.83  LF Ceil. Perimeter | | | |

| **Door** | 3' X 6' 8" | **Opens into BREAK_ROOM** |
|---|---|---|
| **Window** | 3' 4" X 2' 4" | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 361.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 127.32  SF | 0.00 | 2.29 | 10.30 | 58.32 | 360.18 |
| 362.  Block - 6" x 8" x 16" - in place - reinforced | 253.22  SF | 0.00 | 9.33 | 102.71 | 472.50 | 2,937.75 |

FWP-000090



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Office 5

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 363. 5/8" drywall - hung, taped, floated, ready for paint | 118.67 SF | 0.00 | 2.34 | 8.79 | 55.54 | 342.02 |
| 364. Tile - vinyl composition | 127.32 SF | 0.00 | 1.97 | 24.45 | 50.16 | 325.43 |
| 365. Cove base molding - rubber or vinyl, 4" high | 43.83 LF | 0.00 | 2.03 | 8.67 | 17.80 | 115.44 |
| 366. Batt insulation - 6" - R19 - paper / foil faced | 127.32 SF | 0.00 | 1.33 | 12.54 | 33.86 | 215.74 |
| 367. Suspended ceiling system - 2' x 4' | 127.32 SF | 0.00 | 3.52 | 23.83 | 89.64 | 561.64 |
| 368. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 369. Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 370. Aluminum window, picture/fixed 3-11 sf | 1.00 EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 371. Window blind - aluminum - 1" - 7. 1 to 14 SF | 1.00 EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |
| 372. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 373. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 374. Glass lite - half lite | 1.00 EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 375. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 376. Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 377. Seal block with masonry sealer | 345.55 SF | 0.00 | 0.92 | 12.47 | 63.58 | 393.96 |
| 378. Paint masonry | 415.55 SF | 0.00 | 0.80 | 10.13 | 66.48 | 409.05 |
| 379. Seal/prime then paint the surface area twice (3 coats) | 118.67 SF | 0.00 | 1.33 | 3.59 | 31.56 | 192.98 |
| 380. Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 381. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |
| Totals: Office 5 | | | | 360.16 | 1,402.14 | 8,773.05 |

FWP-000091



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| Office 6 | | Height: 12' |
|---|---|---|
| 522.00 SF Walls | | 127.32 SF Ceiling |
| 649.32 SF Walls & Ceiling | | 127.32 SF Floor |
| 14.15 SY Flooring | | 40.83 LF Floor Perimeter |
| 46.83 LF Ceil. Perimeter | | |

| **Door** | **3' X 6' 8"** | **Opens into BREAK_ROOM** |
|---|---|---|
| **Door** | **3' X 6' 8"** | **Opens into IT_CLOSET** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 382. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 127.32 SF | 0.00 | 2.29 | 10.30 | 58.32 | 360.18 |
| 383. Block - 6" x 8" x 16" - in place - reinforced | 241.00 SF | 0.00 | 9.33 | 97.75 | 449.70 | 2,795.98 |
| 384. 5/8" drywall - hung, taped, floated, ready for paint | 118.67 SF | 0.00 | 2.34 | 8.79 | 55.54 | 342.02 |
| 385. Tile - vinyl composition | 127.32 SF | 0.00 | 1.97 | 24.45 | 50.16 | 325.43 |
| 386. Cove base molding - rubber or vinyl, 4" high | 40.83 LF | 0.00 | 2.03 | 8.08 | 16.58 | 107.54 |
| 387. Batt insulation - 6" - R19 - paper / foil faced | 127.32 SF | 0.00 | 1.33 | 12.54 | 33.86 | 215.74 |
| 388. Suspended ceiling system - 2' x 4' | 127.32 SF | 0.00 | 3.52 | 23.83 | 89.64 | 561.64 |
| 389. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 390. Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 391. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 392. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 393. Glass lite - half lite | 1.00 EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 394. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 395. Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 396. Seal block with masonry sealer | 403.33 SF | 0.00 | 0.92 | 14.55 | 74.22 | 459.83 |
| 397. Paint masonry | 403.33 SF | 0.00 | 0.80 | 9.83 | 64.54 | 397.03 |
| 398. Seal/prime then paint the surface area twice (3 coats) | 118.67 SF | 0.00 | 1.33 | 3.59 | 31.56 | 192.98 |
| 399. Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 400. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |

Totals: Office 6                                               343.56    1,328.44    8,314.17

FWP-000092



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



**Offices** | **Height: 12'**

| | |
|---|---|
| 1,116.00 SF Walls | 507.50 SF Ceiling |
| 1,623.50 SF Walls & Ceiling | 507.50 SF Floor |
| 56.39 SY Flooring | 93.00 LF Floor Perimeter |
| 93.00 LF Ceil. Perimeter | |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 401. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 507.50 SF | 0.00 | 2.29 | 41.07 | 232.44 | 1,435.69 |
| 402. Block - 6" x 8" x 16" - in place - reinforced | 906.00 SF | 0.00 | 9.33 | 367.47 | 1,690.60 | 10,511.05 |
| 403. 5/8" drywall - hung, taped, floated, ready for paint | 328.00 SF | 0.00 | 2.34 | 24.30 | 153.50 | 945.32 |
| 404. Tile - vinyl composition | 507.50 SF | 0.00 | 1.97 | 97.48 | 199.96 | 1,297.22 |
| 405. Cove base molding - rubber or vinyl, 4" high | 93.00 LF | 0.00 | 2.03 | 18.41 | 37.76 | 244.96 |
| 406. Batt insulation - 6" - R19 - paper / foil faced | 507.50 SF | 0.00 | 1.33 | 49.98 | 135.00 | 859.96 |
| 407. Suspended ceiling system - 2' x 4' | 507.50 SF | 0.00 | 3.52 | 95.00 | 357.28 | 2,238.68 |
| 408. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 10.00 EA | 0.00 | 216.81 | 91.65 | 433.62 | 2,693.37 |
| 409. Ceiling diffusers / grills - square, lay-in - 24" | 8.00 EA | 0.00 | 110.21 | 54.74 | 176.34 | 1,112.76 |
| 410. Aluminum window, picture/fixed 3-11 sf | 2.00 EA | 0.00 | 140.00 | 14.73 | 56.00 | 350.73 |
| 411. Window blind - aluminum - 1" - 7. 1 to 14 SF | 2.00 EA | 0.00 | 87.95 | 8.97 | 35.18 | 220.05 |
| 412. Steel door, 3' x 7' | 4.00 EA | 0.00 | 454.02 | 157.95 | 363.22 | 2,337.25 |
| 413. Steel door frame - 3' opening | 4.00 EA | 0.00 | 312.96 | 103.35 | 250.36 | 1,605.55 |
| 414. Glass lite - half lite | 4.00 EA | 0.00 | 227.04 | 63.45 | 181.64 | 1,153.25 |
| 415. Lockset - keyed - Medium duty - Commercial grade | 4.00 EA | 0.00 | 130.72 | 43.20 | 104.58 | 670.66 |
| 416. Door hinges (set of 3) | 12.00 EA | 0.00 | 42.83 | 15.13 | 102.80 | 631.89 |
| 417. Seal block with masonry sealer | 1,116.00 SF | 0.00 | 0.92 | 40.26 | 205.34 | 1,272.32 |
| 418. Paint masonry | 997.33 SF | 0.00 | 0.80 | 24.31 | 159.58 | 981.75 |
| 419. Seal/prime then paint the surface area twice (3 coats) | 328.00 SF | 0.00 | 1.33 | 9.91 | 87.24 | 533.39 |
| 420. Paint door slab only - 1 coat (per side) | 8.00 EA | 0.00 | 25.23 | 4.26 | 40.36 | 246.46 |
| 421. Paint door/window trim & jamb - 2 coats (per side) | 16.00 EA | 0.00 | 31.95 | 7.97 | 102.24 | 621.41 |

FWP-000093



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Offices

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Totals: Offices | | | | 1,333.59 | 5,105.04 | 31,963.72 |

**Production**      **Height: 12'**

| | |
|---|---|
| 924.00 SF Walls | 425.83 SF Ceiling |
| 1,349.83 SF Walls & Ceiling | 425.83 SF Floor |
| 47.31 SY Flooring | 75.67 LF Floor Perimeter |
| 83.67 LF Ceil. Perimeter | |

**Door**      **8' X 10'**      **Opens into Exterior**

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 422. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 425.83 | SF | 0.00 | 2.29 | 34.46 | 195.04 | 1,204.65 |
| 423. Block - 6" x 8" x 16" - in place - reinforced | 714.00 | SF | 0.00 | 9.33 | 289.60 | 1,332.32 | 8,283.54 |
| 424. Batt insulation - 6" - R19 - paper / foil faced | 425.83 | SF | 0.00 | 1.33 | 41.93 | 113.28 | 721.56 |
| 425. 5/8" drywall - hung, taped, floated, ready for paint | 425.83 | SF | 0.00 | 2.34 | 31.55 | 199.28 | 1,227.27 |
| 426. Seal/prime then paint the ceiling twice (3 coats) | 425.83 | SF | 0.00 | 1.33 | 12.87 | 113.28 | 692.50 |
| 427. Seal block with masonry sealer | 924.00 | SF | 0.00 | 0.92 | 33.33 | 170.02 | 1,053.43 |
| 428. Paint masonry | 924.00 | SF | 0.00 | 0.80 | 22.52 | 147.84 | 909.56 |
| 429. Sectional overhead door, 10' x 10' | 1.00 | EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 430. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 | EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 431. Fluorescent - four tube - 4' - strip light | 6.00 | EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 432. Exhaust fan - slant wall - 36" - 3 blade | 1.00 | EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |
| Totals: Production | | | | | 772.81 | 3,163.96 | 19,756.46 |

FWP-000094



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| Supply Room | | | | | Height: 12' |
|---|---|---|---|---|---|
| 1,300.00 SF Walls | | | 700.00 SF Ceiling | | |
| 2,000.00 SF Walls & Ceiling | | | 700.00 SF Floor | | |
| 77.78 SY Flooring | | | 107.00 LF Floor Perimeter | | |
| 115.00 LF Ceil. Perimeter | | | | | |

| Door | | | 8' X 10' | | Opens into Exterior | |
|---|---|---|---|---|---|---|
| **DESCRIPTION** | **QTY** | **REMOVE** | **REPLACE** | **TAX** | **O&P** | **TOTAL** |
| 433. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 700.00 SF | 0.00 | 2.29 | 56.65 | 320.60 | 1,980.25 |
| 434. Block - 6" x 8" x 16" - in place - reinforced | 1,090.00 SF | 0.00 | 9.33 | 442.10 | 2,033.94 | 12,645.74 |
| 435. Batt insulation - 6" - R19 - paper / foil faced | 700.00 SF | 0.00 | 1.33 | 68.93 | 186.20 | 1,186.13 |
| 436. 5/8" drywall - hung, taped, floated, ready for paint | 700.00 SF | 0.00 | 2.34 | 51.87 | 327.60 | 2,017.47 |
| 437. Seal/prime then paint the ceiling twice (3 coats) | 700.00 SF | 0.00 | 1.33 | 21.16 | 186.20 | 1,138.36 |
| 438. Seal block with masonry sealer | 1,300.00 SF | 0.00 | 0.92 | 46.90 | 239.20 | 1,482.10 |
| 439. Paint masonry | 1,300.00 SF | 0.00 | 0.80 | 31.69 | 208.00 | 1,279.69 |
| 440. Sectional overhead door, 10' x 10' | 1.00 EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 441. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 442. Fluorescent - four tube - 4' - strip light | 6.00 EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 443. Exhaust fan - slant wall - 36" - 3 blade | 1.00 EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |
| Totals: Supply Room | | | | 1,025.85 | 4,394.64 | 27,393.69 |



| Maintence | | | | | Height: 12' |
|---|---|---|---|---|---|
| 924.00 SF Walls | | | 425.83 SF Ceiling | | |
| 1,349.83 SF Walls & Ceiling | | | 425.83 SF Floor | | |
| 47.31 SY Flooring | | | 75.67 LF Floor Perimeter | | |
| 83.67 LF Ceil. Perimeter | | | | | |

| Door | | | 8' X 10' | | Opens into Exterior | |
|---|---|---|---|---|---|---|
| **DESCRIPTION** | **QTY** | **REMOVE** | **REPLACE** | **TAX** | **O&P** | **TOTAL** |

FWP-000095



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Maintence**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 444. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 425.83 SF | 0.00 | 2.29 | 34.46 | 195.04 | 1,204.65 |
| 445. Block - 6" x 8" x 16" - in place - reinforced | 714.00 SF | 0.00 | 9.33 | 289.60 | 1,332.32 | 8,283.54 |
| 446. Batt insulation - 6" - R19 - paper / foil faced | 425.83 SF | 0.00 | 1.33 | 41.93 | 113.28 | 721.56 |
| 447. 5/8" drywall - hung, taped, floated, ready for paint | 425.83 SF | 0.00 | 2.34 | 31.55 | 199.28 | 1,227.27 |
| 448. Seal/prime then paint the ceiling twice (3 coats) | 425.83 SF | 0.00 | 1.33 | 12.87 | 113.28 | 692.50 |
| 449. Seal block with masonry sealer | 924.00 SF | 0.00 | 0.92 | 33.33 | 170.02 | 1,053.43 |
| 450. Paint masonry | 924.00 SF | 0.00 | 0.80 | 22.52 | 147.84 | 909.56 |
| 451. Sectional overhead door, 10' x 10' | 1.00 EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 452. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 453. Fluorescent - four tube - 4' - strip light | 6.00 EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 454. Exhaust fan - slant wall - 36" - 3 blade | 1.00 EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |
| Totals: Maintence | | | | 772.81 | 3,163.96 | 19,756.46 |



**Machine Shop**     **Height: 12'**

| | |
|---|---|
| 924.00 SF Walls | 425.83 SF Ceiling |
| 1,349.83 SF Walls & Ceiling | 425.83 SF Floor |
| 47.31 SY Flooring | 75.67 LF Floor Perimeter |
| 83.67 LF Ceil. Perimeter | |

**Door**     **8' X 10'**     **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 455. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 425.83 SF | 0.00 | 2.29 | 34.46 | 195.04 | 1,204.65 |
| 456. Block - 6" x 8" x 16" - in place - reinforced | 714.00 SF | 0.00 | 9.33 | 289.60 | 1,332.32 | 8,283.54 |
| 457. Batt insulation - 6" - R19 - paper / foil faced | 425.83 SF | 0.00 | 1.33 | 41.93 | 113.28 | 721.56 |
| 458. 5/8" drywall - hung, taped, floated, ready for paint | 425.83 SF | 0.00 | 2.34 | 31.55 | 199.28 | 1,227.27 |
| 459. Seal/prime then paint the ceiling twice (3 coats) | 425.83 SF | 0.00 | 1.33 | 12.87 | 113.28 | 692.50 |

FWP-000096



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Machine Shop**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 460. Seal block with masonry sealer | 924.00 SF | 0.00 | 0.92 | 33.33 | 170.02 | 1,053.43 |
| 461. Paint masonry | 924.00 SF | 0.00 | 0.80 | 22.52 | 147.84 | 909.56 |
| 462. Sectional overhead door, 10' x 10' | 1.00 EA | 0.00 | 1,220.69 | 85.12 | 244.14 | 1,549.95 |
| 463. Commercial overhead door opener - Hoist/jack-shaft type | 1.00 EA | 0.00 | 971.54 | 76.06 | 194.30 | 1,241.90 |
| 464. Fluorescent - four tube - 4' - strip light | 6.00 EA | 0.00 | 111.33 | 41.18 | 133.60 | 842.76 |
| 465. Exhaust fan - slant wall - 36" - 3 blade | 1.00 EA | 0.00 | 1,604.29 | 104.19 | 320.86 | 2,029.34 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Totals: Machine Shop | | | | 772.81 | 3,163.96 | 19,756.46 |



**Womens RR**                                                                 **Height: 12'**

| | |
|---|---|
| 460.00 SF Walls | 100.00 SF Ceiling |
| 560.00 SF Walls & Ceiling | 100.00 SF Floor |
| 11.11 SY Flooring | 37.00 LF Floor Perimeter |
| 40.00 LF Ceil. Perimeter | |

**Door**                              **3' X 6' 8"**                    **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Area not observed, included based upon presence of the area noted in the site map. | | | | | | |
| 466. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 100.00 SF | 0.00 | 2.29 | 8.09 | 45.80 | 282.89 |
| 467. Block - 6" x 8" x 16" - in place - reinforced | 460.00 SF | 0.00 | 9.33 | 186.58 | 858.36 | 5,336.74 |
| 468. Tile - vinyl composition | 100.00 SF | 0.00 | 1.97 | 19.21 | 39.40 | 255.61 |
| 469. Cove base molding - rubber or vinyl, 4" high | 37.00 LF | 0.00 | 2.03 | 7.32 | 15.02 | 97.45 |
| 470. Batt insulation - 6" - R19 - paper / foil faced | 100.00 SF | 0.00 | 1.33 | 9.85 | 26.60 | 169.45 |
| 471. Suspended ceiling system - 2' x 4' | 100.00 SF | 0.00 | 3.52 | 18.72 | 70.40 | 441.12 |
| 472. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 473. Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 474. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 475. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |

FWP-000097



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - Womens RR

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 476. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 477. Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 478. Seal block with masonry sealer | 460.00 SF | 0.00 | 0.92 | 16.59 | 84.64 | 524.43 |
| 479. Paint masonry | 460.00 SF | 0.00 | 0.80 | 11.21 | 73.60 | 452.81 |
| 480. Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 481. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| 482. Sink - wall mounted | 1.00 EA | 0.00 | 322.95 | 9.97 | 64.60 | 397.52 |
| 483. Toilet | 1.00 EA | 0.00 | 508.50 | 29.68 | 101.70 | 639.88 |
| 484. Toilet seat | 1.00 EA | 0.00 | 55.03 | 3.07 | 11.00 | 69.10 |
| 485. Handicap grab bar - Stainless steel, 1 1/2" x 30" | 2.00 EA | 0.00 | 73.92 | 9.54 | 29.56 | 186.94 |
| 486. Bathroom mirror - w/metal frame - surface mtd - Commercial | 9.00 SF | 0.00 | 23.72 | 13.11 | 42.70 | 269.29 |
| 487. Paper towel dispenser | 1.00 EA | 0.00 | 68.81 | 4.68 | 13.76 | 87.25 |
| 488. Toilet paper dispenser - double roll | 1.00 EA | 0.00 | 58.57 | 3.39 | 11.72 | 73.68 |
| 489. Toilet seat cover dispenser | 1.00 EA | 0.00 | 63.79 | 3.42 | 12.76 | 79.97 |
| Totals:  Womens RR | | | | 468.42 | 1,860.54 | 11,631.63 |



**Men's RR**                                                                 **Height: 12'**

| | |
|---|---|
| 460.00 SF Walls | 100.00 SF Ceiling |
| 560.00 SF Walls & Ceiling | 100.00 SF Floor |
| 11.11 SY Flooring | 37.00 LF Floor Perimeter |
| 40.00 LF Ceil. Perimeter | |

**Door**                          **3' X 6' 8"**              **Opens into Exterior**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Area not observed, included based upon presence of the area noted in the site map. | | | | | | |
| 490. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 100.00 SF | 0.00 | 2.29 | 8.09 | 45.80 | 282.89 |
| 491. Block - 6" x 8" x 16" - in place - reinforced | 340.00 SF | 0.00 | 9.33 | 137.90 | 634.44 | 3,944.54 |
| 492. Tile - vinyl composition | 100.00 SF | 0.00 | 1.97 | 19.21 | 39.40 | 255.61 |

FWP-000098



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Men's RR**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 493.  Cove base molding - rubber or vinyl, 4" high | 37.00 LF | 0.00 | 2.03 | 7.32 | 15.02 | 97.45 |
| 494.  Batt insulation - 6" - R19 - paper / foil faced | 100.00 SF | 0.00 | 1.33 | 9.85 | 26.60 | 169.45 |
| 495.  Suspended ceiling system - 2' x 4' | 100.00 SF | 0.00 | 3.52 | 18.72 | 70.40 | 441.12 |
| 496.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 497.  Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 498.  Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 499.  Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 500.  Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 501.  Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 502.  Seal block with masonry sealer | 460.00 SF | 0.00 | 0.92 | 16.59 | 84.64 | 524.43 |
| 503.  Paint masonry | 460.00 SF | 0.00 | 0.80 | 11.21 | 73.60 | 452.81 |
| 504.  Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 505.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 0.00 | 31.95 | 1.00 | 12.78 | 77.68 |
| 506.  Sink - wall mounted | 1.00 EA | 0.00 | 322.95 | 9.97 | 64.60 | 397.52 |
| 507.  Toilet | 1.00 EA | 0.00 | 508.50 | 29.68 | 101.70 | 639.88 |
| 508.  Toilet seat | 1.00 EA | 0.00 | 55.03 | 3.07 | 11.00 | 69.10 |
| 509.  Handicap grab bar - Stainless steel, 1 1/2" x 30" | 2.00 EA | 0.00 | 73.92 | 9.54 | 29.56 | 186.94 |
| 510.  Bathroom mirror - w/metal frame - surface mtd - Commercial | 9.00 SF | 0.00 | 23.72 | 13.11 | 42.70 | 269.29 |
| 511.  Paper towel dispenser | 1.00 EA | 0.00 | 68.81 | 4.68 | 13.76 | 87.25 |
| 512.  Toilet paper dispenser - double roll | 1.00 EA | 0.00 | 58.57 | 3.39 | 11.72 | 73.68 |
| 513.  Toilet seat cover dispenser | 1.00 EA | 0.00 | 63.79 | 3.42 | 12.76 | 79.97 |
| Totals:  Men's RR | | | | 419.74 | 1,636.62 | 10,239.43 |

FWP-000099



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| **Break Room 2** | | **Height: 12'** |
|---|---|---|
| 1,760.67 SF Walls | | 1,158.36 SF Ceiling |
| 2,919.02 SF Walls & Ceiling | | 1,158.36 SF Floor |
| 128.71 SY Flooring | | 146.00 LF Floor Perimeter |
| 152.00 LF Ceil. Perimeter | | |

| **Door** | **6' X 6' 8"** | **Opens into Exterior** |
|---|---|---|
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Area not observed, included based upon presence of the area noted in the site map. | | | | | | |
| 514. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 1,158.36 SF | 0.00 | 2.29 | 93.74 | 530.52 | 3,276.90 |
| 515. Block - 6" x 8" x 16" - in place - reinforced | 1,760.67 SF | 0.00 | 9.33 | 714.13 | 3,285.42 | 20,426.60 |
| 516. Tile - vinyl composition | 1,158.36 SF | 0.00 | 1.97 | 222.49 | 456.40 | 2,960.86 |
| 517. Cove base molding - rubber or vinyl, 4" high | 146.00 LF | 0.00 | 2.03 | 28.90 | 59.28 | 384.56 |
| 518. Batt insulation - 6" - R19 - paper / foil faced | 1,158.36 SF | 0.00 | 1.33 | 114.07 | 308.12 | 1,962.81 |
| 519. Suspended ceiling system - 2' x 4' | 1,158.36 SF | 0.00 | 3.52 | 216.84 | 815.48 | 5,109.75 |
| 520. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 0.00 | 216.81 | 54.99 | 260.18 | 1,616.03 |
| 521. Ceiling diffusers / grills - square, lay-in - 24" | 6.00 EA | 0.00 | 110.21 | 41.06 | 132.26 | 834.58 |
| 522. Kitchen Sink - single basin | 1.00 EA | 0.00 | 318.17 | 20.62 | 63.64 | 402.43 |
| 523. Sink faucet - Kitchen | 1.00 EA | 0.00 | 264.55 | 18.33 | 52.92 | 335.80 |
| 524. Sink strainer and drain assembly | 1.00 EA | 0.00 | 48.59 | 1.75 | 9.72 | 60.06 |
| 525. Drinking fountain | 1.00 EA | 0.00 | 401.59 | 20.80 | 80.32 | 502.71 |
| 526. Cabinetry - lower (base) units | 12.00 LF | 0.00 | 236.75 | 238.28 | 568.20 | 3,647.48 |
| 527. Countertop - flat laid plastic laminate | 12.00 LF | 0.00 | 40.15 | 33.63 | 96.36 | 611.79 |
| 528. Backsplash - plastic laminate | 12.00 SF | 0.00 | 6.56 | 3.63 | 15.74 | 98.09 |
| 529. Cabinet knob or pull | 12.00 EA | 0.00 | 7.75 | 4.14 | 18.60 | 115.74 |
| 530. Aluminum window, picture/fixed 3-11 sf | 3.00 EA | 0.00 | 140.00 | 22.09 | 84.00 | 526.09 |
| 531. Steel door, 3' x 7' | 2.00 EA | 0.00 | 454.02 | 78.98 | 181.60 | 1,168.62 |
| 532. Steel door frame - 6' opening | 1.00 EA | 0.00 | 367.15 | 30.42 | 73.44 | 471.01 |

FWP-000100



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - Break Room 2**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 533. Glass lite - half lite | 2.00 EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 534. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 535. Door hinges (set of 3) | 6.00 EA | 0.00 | 42.83 | 7.56 | 51.40 | 315.94 |
| 536. Seal block with masonry sealer | 1,760.67 SF | 0.00 | 0.92 | 63.52 | 323.96 | 2,007.30 |
| 537. Paint masonry | 1,760.67 SF | 0.00 | 0.80 | 42.92 | 281.70 | 1,733.16 |
| 538. Paint door slab only - 1 coat (per side) | 4.00 EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |
| 539. Paint door/window trim & jamb - 2 coats (per side) | 10.00 EA | 0.00 | 31.95 | 4.98 | 63.90 | 388.38 |

| Totals: Break Room 2 | | | | 2,122.52 | 7,950.30 | 49,824.20 |
|---|---|---|---|---|---|---|



| **West Office 1** | | | | | | **Height: 12'** |
|---|---|---|---|---|---|---|

|  |  |
|---|---|
| 500.22 SF Walls | 120.00 SF Ceiling |
| 620.22 SF Walls & Ceiling | 120.00 SF Floor |
| 13.33 SY Flooring | 41.00 LF Floor Perimeter |
| 44.00 LF Ceil. Perimeter | |

| **Door** | **3' X 6' 8"** | **Opens into Exterior** |
|---|---|---|
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Area not observed, included based upon presence of the area noted in the site map. | | | | | | |
| 540. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 120.00 SF | 0.00 | 2.29 | 9.71 | 54.96 | 339.47 |
| 541. Block - 6" x 8" x 16" - in place - reinforced | 290.22 SF | 0.00 | 9.33 | 117.71 | 541.56 | 3,367.02 |
| 542. Glue down carpet | 138.00 SF | 0.00 | 2.31 | 31.08 | 63.76 | 413.62 |
| 15 % waste added for Glue down carpet. | | | | | | |
| 543. Carpet - metal transition strip | 3.00 LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 544. Cove base molding - rubber or vinyl, 4" high | 41.00 LF | 0.00 | 2.03 | 8.11 | 16.64 | 107.98 |
| 545. Batt insulation - 6" - R19 - paper / foil faced | 120.00 SF | 0.00 | 1.33 | 11.82 | 31.92 | 203.34 |
| 546. Suspended ceiling system - 2' x 4' | 120.00 SF | 0.00 | 3.52 | 22.46 | 84.48 | 529.34 |
| 547. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |

FWP-000101



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - West Office 1

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 548.  Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 549.  Aluminum window, picture/fixed 3-11 sf | 1.00 EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 550.  Window blind - aluminum - 1" - 7.1 to 14 SF | 1.00 EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |
| 551.  Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 552.  Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 553.  Glass lite - half lite | 1.00 EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 554.  Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 555.  Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 556.  Seal block with masonry sealer | 500.22 SF | 0.00 | 0.92 | 18.05 | 92.04 | 570.29 |
| 557.  Paint masonry | 500.22 SF | 0.00 | 0.80 | 12.19 | 80.04 | 492.41 |
| 558.  Paint door slab only - 1 coat (per side) | 2.00 EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 559.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |
| Totals:  West Office 1 | | | | 374.59 | 1,429.70 | 8,952.66 |



| **West Office 2** | | | | | **Height: 12'** | |
|---|---|---|---|---|---|---|

500.22 SF Walls                    120.00 SF Ceiling
620.22 SF Walls & Ceiling          120.00 SF Floor
 13.33 SY Flooring                  41.00 LF Floor Perimeter
 44.00 LF Ceil. Perimeter

| **Door** | 3' X 6' 8" | **Opens into Exterior** |
|---|---|---|
| **Window** | 3' 4" X 2' 4" | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| Area not observed, included based upon presence of the area noted in the site map. | | | | | | |
| 560.  Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 120.00 SF | 0.00 | 2.29 | 9.71 | 54.96 | 339.47 |
| 561.  Block - 6" x 8" x 16" - in place - reinforced | 290.22 SF | 0.00 | 9.33 | 117.71 | 541.56 | 3,367.02 |
| 562.  Glue down carpet | 138.00 SF | 0.00 | 2.31 | 31.08 | 63.76 | 413.62 |

15 % waste added for Glue down carpet.

FWP-000102



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - West Office 2**

| DESCRIPTION | QTY | | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|---|
| 563.  Carpet - metal transition strip | 3.00 | LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 564.  Cove base molding - rubber or vinyl, 4" high | 41.00 | LF | 0.00 | 2.03 | 8.11 | 16.64 | 107.98 |
| 565.  Batt insulation - 6" - R19 - paper / foil faced | 120.00 | SF | 0.00 | 1.33 | 11.82 | 31.92 | 203.34 |
| 566.  Suspended ceiling system - 2' x 4' | 120.00 | SF | 0.00 | 3.52 | 22.46 | 84.48 | 529.34 |
| 567.  Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 | EA | 0.00 | 216.81 | 18.33 | 86.72 | 538.67 |
| 568.  Ceiling diffusers / grills - square, lay-in - 24" | 2.00 | EA | 0.00 | 110.21 | 13.69 | 44.08 | 278.19 |
| 569.  Aluminum window, picture/fixed 3-11 sf | 1.00 | EA | 0.00 | 140.00 | 7.36 | 28.00 | 175.36 |
| 570.  Window blind - aluminum - 1" - 7. 1 to 14 SF | 1.00 | EA | 0.00 | 87.95 | 4.48 | 17.60 | 110.03 |
| 571.  Steel door, 3' x 7' | 1.00 | EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 572.  Steel door frame - 3' opening | 1.00 | EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 573.  Glass lite - half lite | 1.00 | EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 574.  Lockset - keyed - Medium duty - Commercial grade | 1.00 | EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 575.  Door hinges (set of 3) | 3.00 | EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 576.  Seal block with masonry sealer | 500.22 | SF | 0.00 | 0.92 | 18.05 | 92.04 | 570.29 |
| 577.  Paint masonry | 500.22 | SF | 0.00 | 0.80 | 12.19 | 80.04 | 492.41 |
| 578.  Paint door slab only - 1 coat (per side) | 2.00 | EA | 0.00 | 25.23 | 1.06 | 10.10 | 61.62 |
| 579.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 | EA | 0.00 | 31.95 | 1.99 | 25.56 | 155.35 |
| Totals:  West Office 2 | | | | | 374.59 | 1,429.70 | 8,952.66 |



| **West Conference Room** | **Height: 12'** |
|---|---|
| 972.44 SF Walls | 428.75 SF Ceiling |
| 1,401.19 SF Walls & Ceiling | 428.75 SF Floor |
| 47.64 SY Flooring | 81.00 LF Floor Perimeter |
| 84.00 LF Ceil. Perimeter | |

| **Window** | 3' 4" X 2' 4" | **Opens into Exterior** |
|---|---|---|
| **Window** | 3' 4" X 2' 4" | **Opens into Exterior** |
| **Door** | 3' X 6' 8" | **Opens into Exterior** |

FWP-000103



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### CONTINUED - West Conference Room

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 580. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 428.75 SF | 0.00 | 2.29 | 34.70 | 196.36 | 1,212.90 |
| 581. Block - 6" x 8" x 16" - in place - reinforced | 762.44 SF | 0.00 | 9.33 | 309.25 | 1,422.72 | 8,845.54 |
| 582. Glue down carpet | 493.06 SF | 0.00 | 2.31 | 111.05 | 227.80 | 1,477.82 |
| 15 % waste added for Glue down carpet. | | | | | | |
| 583. Carpet - metal transition strip | 3.00 LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 584. Cove base molding - rubber or vinyl, 4" high | 81.00 LF | 0.00 | 2.03 | 16.03 | 32.88 | 213.34 |
| 585. Batt insulation - 6" - R19 - paper / foil faced | 428.75 SF | 0.00 | 1.33 | 42.22 | 114.04 | 726.50 |
| 586. Suspended ceiling system - 2' x 4' | 428.75 SF | 0.00 | 3.52 | 80.26 | 301.84 | 1,891.30 |
| 587. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 0.00 | 216.81 | 54.99 | 260.18 | 1,616.03 |
| 588. Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 0.00 | 110.21 | 27.37 | 88.16 | 556.37 |
| 589. Aluminum window, picture/fixed 3-11 sf | 2.00 EA | 0.00 | 140.00 | 14.73 | 56.00 | 350.73 |
| 590. Window blind - aluminum - 1" - 7. 1 to 14 SF | 3.00 EA | 0.00 | 87.95 | 13.45 | 52.78 | 330.08 |
| 591. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 592. Steel door frame - 3' opening | 1.00 EA | 0.00 | 312.96 | 25.84 | 62.60 | 401.40 |
| 593. Glass lite - half lite | 1.00 EA | 0.00 | 227.04 | 15.86 | 45.40 | 288.30 |
| 594. Lockset - keyed - Medium duty - Commercial grade | 1.00 EA | 0.00 | 130.72 | 10.80 | 26.14 | 167.66 |
| 595. Door hinges (set of 3) | 3.00 EA | 0.00 | 42.83 | 3.78 | 25.70 | 157.97 |
| 596. Seal block with masonry sealer | 972.44 SF | 0.00 | 0.92 | 35.08 | 178.92 | 1,108.64 |
| 597. Paint masonry | 972.44 SF | 0.00 | 0.80 | 23.70 | 155.60 | 957.25 |
| 598. Paint door slab only - 1 coat (per side) | 4.00 EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |
| 599. Paint door/window trim & jamb - 2 coats (per side) | 8.00 EA | 0.00 | 31.95 | 3.99 | 51.12 | 310.71 |

| Totals: West Conference Room | | | | 865.50 | 3,410.82 | 21,330.41 |
|---|---|---|---|---|---|---|

FWP-000104



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)



| West Great Room | | | | Height: 12' |
|---|---|---|---|---|

| | | |
|---|---|---|
| 3,804.44 SF Walls | 6,300.00 SF Ceiling | |
| 10,104.44 SF Walls & Ceiling | 6,300.00 SF Floor | |
| 700.00 SY Flooring | 317.00 LF Floor Perimeter | |
| 320.00 LF Ceil. Perimeter | | |

| | | |
|---|---|---|
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |
| **Window** | **3' 4" X 2' 4"** | **Opens into Exterior** |
| **Door** | **3' X 6' 8"** | **Opens into Exterior** |

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 600. Joist - floor or ceiling - 2x8 - w/blocking - 16" oc | 6,300.00 SF | 0.00 | 2.29 | 509.83 | 2,885.40 | 17,822.23 |
| 601. Block - 6" x 8" x 16" - in place - reinforced | 3,804.44 SF | 0.00 | 9.33 | 1,543.08 | 7,099.08 | 44,137.59 |
| 602. Glue down carpet | 7,245.00 SF | 0.00 | 2.31 | 1,631.76 | 3,347.20 | 21,714.91 |
| 15 % waste added for Glue down carpet. | | | | | | |
| 603. Carpet - metal transition strip | 3.00 LF | 0.00 | 2.65 | 0.78 | 1.60 | 10.33 |
| 604. Cove base molding - rubber or vinyl, 4" high | 317.00 LF | 0.00 | 2.03 | 62.74 | 128.70 | 834.95 |
| 605. Batt insulation - 6" - R19 - paper / foil faced | 6,300.00 SF | 0.00 | 1.33 | 620.39 | 1,675.80 | 10,675.19 |
| 606. Suspended ceiling system - 2' x 4' | 6,300.00 SF | 0.00 | 3.52 | 1,179.36 | 4,435.20 | 27,790.56 |
| 607. Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 12.00 EA | 0.00 | 216.81 | 109.98 | 520.34 | 3,232.04 |
| 608. Ceiling diffusers / grills - square, lay-in - 24" | 8.00 EA | 0.00 | 110.21 | 54.74 | 176.34 | 1,112.76 |
| 609. Aluminum window, picture/fixed 3-11 sf | 4.00 EA | 0.00 | 140.00 | 29.46 | 112.00 | 701.46 |
| 610. Window blind - aluminum - 1" - 7.1 to 14 SF | 4.00 EA | 0.00 | 87.95 | 17.93 | 70.36 | 440.09 |
| 611. Steel door, 3' x 7' | 1.00 EA | 0.00 | 454.02 | 39.49 | 90.80 | 584.31 |
| 612. Steel door frame - 3' opening | 2.00 EA | 0.00 | 312.96 | 51.68 | 125.18 | 802.78 |
| 613. Glass lite - half lite | 2.00 EA | 0.00 | 227.04 | 31.72 | 90.82 | 576.62 |
| 614. Lockset - keyed - Medium duty - Commercial grade | 2.00 EA | 0.00 | 130.72 | 21.60 | 52.28 | 335.32 |
| 615. Door hinges (set of 3) | 6.00 EA | 0.00 | 42.83 | 7.56 | 51.40 | 315.94 |
| 616. Seal block with masonry sealer | 3,804.44 SF | 0.00 | 0.92 | 137.24 | 700.02 | 4,337.34 |
| 617. Paint masonry | 3,804.44 SF | 0.00 | 0.80 | 92.73 | 608.72 | 3,745.00 |
| 618. Paint door slab only - 1 coat (per side) | 4.00 EA | 0.00 | 25.23 | 2.13 | 20.18 | 123.23 |

FWP-000105



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

**CONTINUED - West Great Room**

| DESCRIPTION | QTY | REMOVE | REPLACE | TAX | O&P | TOTAL |
|---|---|---|---|---|---|---|
| 619. Paint door/window trim & jamb - 2 coats (per side) | 12.00 EA | 0.00 | 31.95 | 5.98 | 76.68 | 466.06 |
| Totals: West Great Room | | | | 6,150.18 | 22,268.10 | 139,758.71 |
| Total: Main Level | | | | 27,627.63 | 104,441.66 | 654,275.73 |
| **Line Item Totals: 2023_1496_FTWORTH_R3** | | | | 984,171.39 | 4,223,831.40 | 26,327,157.83 |

| Additional Charges | Charge |
|---|---|
| Demolition Permit | 1,050.00 |
| Rebuild Permit | 50,000.00 |
| Design / Architect Fees @ 3% | 633,574.65 |
| Bonds / Insurance Fees @ 1% | 211,191.55 |
| Contingency Fee | 500,000.00 |
| **Additional Charges Total** | **$1,395,816.20** |

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 78,864.89 | SF Walls | 15,268.12 | SF Ceiling | 94,133.01 | SF Walls and Ceiling |
| 15,268.12 | SF Floor | 1,696.46 | SY Flooring | 4,280.17 | LF Floor Perimeter |
| 55,800.00 | SF Long Wall | 55,800.00 | SF Short Wall | 4,642.53 | LF Ceil. Perimeter |
| 15,268.12 | Floor Area | 15,917.06 | Total Area | 25,906.89 | Interior Wall Area |
| 21,714.61 | Exterior Wall Area | 1,637.50 | Exterior Perimeter of Walls | | |
| 200,693.24 | Surface Area | 2,006.93 | Number of Squares | 2,401.39 | Total Perimeter Length |
| 1,000.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

FWP-000106



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

## Summary for Building

| | |
|---|---:|
| Line Item Total | 21,119,155.04 |
| Demolition Permit | 1,050.00 |
| Rebuild Permit | 50,000.00 |
| Design / Architect Fees @ 3% | 633,574.65 |
| Bonds / Insurance Fees @ 1% | 211,191.55 |
| Contingency Fee | 500,000.00 |
| Subtotal | 22,514,971.24 |
| Overhead | 2,111,915.70 |
| Profit | 2,111,915.70 |
| Material Sales Tax | 965,869.23 |
| Service Sales Tax | 17,411.43 |
| Storage Rental Tax | 890.73 |
| **Replacement Cost Value** | **$27,722,974.03** |
| **Net Claim** | **$27,722,974.03** |

S. Craig Prichard / Kevin McMahon

FWP-000107



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

### Recap of Taxes, Overhead and Profit

| | Overhead (10%) | Profit (10%) | Material Sales Tax (9.75%) | Cleaning Matl Tax (9.75%) | Service Sales Tax (9.75%) | Manuf. Home Tax (6.5%) | Storage Rental Tax (9.75%) | State Food Tax (1.5%) | Local Food Tax (3.25%) |
|---|---|---|---|---|---|---|---|---|---|
| **Line Items** | | | | | | | | | |
| | 2,111,915.70 | 2,111,915.70 | 965,869.23 | 0.00 | 17,411.43 | 0.00 | 890.73 | 0.00 | 0.00 |
| **Additional Charges** | | | | | | | | | |
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total** | **2,111,915.70** | **2,111,915.70** | **965,869.23** | **0.00** | **17,411.43** | **0.00** | **890.73** | **0.00** | **0.00** |

FWP-000108



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

## Recap by Room

**Estimate: 2023_1496_FTWORTH_R3**

| | | |
|---|---:|---:|
| **GENERAL CONDITIONS** | **940,111.64** | **4.45%** |
| **Demolition** | **2,352,000.00** | **11.14%** |
| **Superstructure** | **7,138,611.89** | **33.80%** |
| **Elevations** | **758,804.88** | **3.59%** |
| **Fencing** | **18,856.00** | **0.09%** |
| **Area: Roof** | | |
| **Roof** | **2,509,355.26** | **11.88%** |
| **Area Subtotal: Roof** | **2,509,355.26** | **11.88%** |
| **Electrical** | **4,357,796.33** | **20.63%** |
| **Fire Suppresion** | **811,000.00** | **3.84%** |
| **Mechanical** | **514,676.60** | **2.44%** |
| **Plywood Separation** | **55,290.40** | **0.26%** |
| **Modular Offices** | **1,140,445.60** | **5.40%** |
| **Area: Main Level** | | |
| **Foyer** | **7,917.11** | **0.04%** |
| **Compressors** | **17,778.99** | **0.08%** |
| **Battery Charger** | **30,546.45** | **0.14%** |
| **Office 1** | **10,760.11** | **0.05%** |
| **Office 2** | **10,625.32** | **0.05%** |
| **Conference Room** | **18,088.18** | **0.09%** |
| **Office 3** | **5,298.39** | **0.03%** |
| **Office 4** | **5,825.56** | **0.03%** |
| **Ozark Conference Room** | **11,482.69** | **0.05%** |
| **Womens RR** | **26,173.59** | **0.12%** |
| **Womens RR** | **30,798.96** | **0.15%** |
| **Water Heater** | **5,616.79** | **0.03%** |
| **Break Room** | **28,444.10** | **0.13%** |
| **IT Closet** | **4,311.54** | **0.02%** |
| **Office 5** | **7,010.75** | **0.03%** |
| **Office 6** | **6,642.17** | **0.03%** |
| **Offices** | **25,525.09** | **0.12%** |
| **Production** | **15,819.69** | **0.07%** |
| **Supply Room** | **21,973.20** | **0.10%** |
| **Maintence** | **15,819.69** | **0.07%** |
| **Machine Shop** | **15,819.69** | **0.07%** |
| **Womens RR** | **9,302.67** | **0.04%** |
| **Men's RR** | **8,183.07** | **0.04%** |
| **Break Room 2** | **39,751.38** | **0.19%** |
| **West Office 1** | **7,148.37** | **0.03%** |
| **West Office 2** | **7,148.37** | **0.03%** |
| **West Conference Room** | **17,054.09** | **0.08%** |

FWP-000109



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

| | | |
|---|---:|---:|
| **West Great Room** | **111,340.43** | **0.53%** |
| **Area Subtotal:  Main Level** | **522,206.44** | **2.47%** |
| **Subtotal of Areas** | **21,119,155.04** | **100.00%** |
| **Total** | **21,119,155.04** | **100.00%** |

FWP-000110



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

## Recap by Category

| O&P Items | Total | % |
|---|---:|---:|
| ACOUSTICAL TREATMENTS | 45,284.07 | 0.16% |
| CABINETRY | 6,989.04 | 0.03% |
| CLEANING | 48,000.00 | 0.17% |
| CONCRETE & ASPHALT | 5,135,507.94 | 18.52% |
| CONT: PACKING,HANDLNG,STORAGE | 9,135.68 | 0.03% |
| GENERAL DEMOLITION | 2,450,400.00 | 8.84% |
| DOORS | 109,500.10 | 0.39% |
| DRYWALL | 9,465.22 | 0.03% |
| ELECTRICAL | 3,976,150.33 | 14.34% |
| ELECTRICAL - SPECIAL SYSTEMS | 381,646.00 | 1.38% |
| MISC. EQUIPMENT - COMMERCIAL | 1,283,291.00 | 4.63% |
| HEAVY EQUIPMENT | 247,009.20 | 0.89% |
| FLOOR COVERING - CARPET | 21,198.94 | 0.08% |
| FLOOR COVERING - RESILIENT | 7,826.19 | 0.03% |
| FLOOR COVERING - VINYL | 3,153.57 | 0.01% |
| FENCING | 18,856.00 | 0.07% |
| FINISH HARDWARE | 13,861.38 | 0.05% |
| FIRE PROTECTION SYSTEMS | 811,000.00 | 2.93% |
| FRAMING & ROUGH CARPENTRY | 96,287.23 | 0.35% |
| GLASS, GLAZING, & STOREFRONTS | 5,479.00 | 0.02% |
| HEAT,  VENT & AIR CONDITIONING | 380,535.86 | 1.37% |
| INSULATION | 307,438.74 | 1.11% |
| LABOR ONLY | 486,201.60 | 1.75% |
| LIGHT FIXTURES | 31,676.97 | 0.11% |
| MASONRY | 191,041.65 | 0.69% |
| METAL STRUCTURES & COMPONENTS | 349,285.52 | 1.26% |
| PLUMBING | 194,542.90 | 0.70% |
| PAINTING | 332,137.58 | 1.20% |
| ROOFING | 2,282,571.90 | 8.23% |
| SOFFIT, FASCIA, & GUTTER | 88,203.50 | 0.32% |
| STEEL COMPONENTS | 1,725,475.85 | 6.22% |
| TOILET & BATH ACCESSORIES | 11,475.22 | 0.04% |
| TEMPORARY REPAIRS | 51,365.16 | 0.19% |
| WINDOWS - ALUMINUM | 5,226.80 | 0.02% |
| WINDOW TREATMENT | 1,934.90 | 0.01% |
| **O&P Items Subtotal** | **21,119,155.04** | **76.18%** |
| **Permits and Fees** | **1,395,816.20** | **5.03%** |
| **Overhead** | **2,111,915.70** | **7.62%** |

FWP-000111



**MKA International, Inc.**

11695 Johns Creek Parkway, Suite 250
Johns Creek, GA 30097
(770) 446-9606 (O)
(770) 446-9612 (F)

| | | |
|---|---|---|
| **Profit** | **2,111,915.70** | **7.62%** |
| **Material Sales Tax** | **965,869.23** | **3.48%** |
| **Service Sales Tax** | **17,411.43** | **0.06%** |
| **Storage Rental Tax** | **890.73** | **0.00%** |
| **Total** | **27,722,974.03** | **100.00%** |

FWP-000112

West Great Room

West Conference Office 2

Break Room 2

West Conference Room

Work Station 1

Machine Shop

Supply Room

Production

Offices

Break Room

Office

Battery Charger

Compressors

6/9/2023

Main Level

2023_1496_FTWORTH_R3

FWP-000113

Roof

Page: 50

N ⇐

6/9/2023

1000'

F1 (A)    **Roof**    F2 (B)

.100
100 4"

.100
100 4"

200'

Roof

2023_1496_FTWORTH_R3

FWP-000114

# III. PHOTOGRAPHS



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



1. Aerial view of subject building prior to tornado, dated February of 2015, obtained from Pictometry.



2. Aerial view of subject building following tornado, dated July of 2022, obtained from Nearmap.

FWP-000116

NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS

MKA International, Inc.
Construction Consultants & Engineers
100% Employee Owned Company



Partially Demolished West Building

3.  Enlarged aerial view of subject building following tornado, dated July of 2022, obtained from Nearmap.



Remaining concrete slab from West Building

Remaining concrete slab from collapsed section of East Building

4.  Aerial view of subject building following debris removal, dated December of 2022, obtained from Pictometry.

FWP-000117



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



5.   Looking southwest towards remaining section of the east building.



6.   Looking southwest at the end of the remaining section of the east building. Displaced roof framing was observed.  Temporary wood walls were observed.

FWP-000118



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



7. Looking northeast towards the end of the remaining section of the east building. Displaced roof framing was observed.  Displaced lights were noted.



8. Typical view of column top plate connection at the east end of the remaining section of the east building.

FWP-000119



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



9.  View of the roof at the northeast corner of the remaining section of the east building. Deformed trim at edge of roof.



10.  Detailed view of the upper northeast corner of the remaining section of the east building. No evidence of displacement to the nuts at the end of the cable bracing at the roof.

FWP-000120



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



11. View of the northeast corner of the remaining section of the east building. Torn/displaced insulation was observed. Deformations in the wall and roof framing were noted.



12. Looking southwest from the northeast corner of the remaining section of the east building. Torn/displaced insulation was observed throughout the remaining section of the building.

FWP-000121



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



13. Looking southwest from the northeast corner of the remaining section of the east building. Debris was observed at the concrete slab.



14. View of the northwest corner of the east building. Debris from displaced/torn roof insulation was observed.

FWP-000122



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



15. Looking towards the southwest corner of the east building. Displaced electrical conduits and sprinkler lines were observed.



16. Detailed view of the southwest corner of the east building. Deformation of the steel roof beam and purlins were observed. A displaced sprinkler line was noted.

FWP-000123



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



See
Photograph 18

17. View of the northwest corner of the east building. Displaced metal roof panels, electrical conduits and sprinkler lines were observed. The steel roof beam and purlins were deformed. Temporary wood walls were observed.



18. View of northwest entrance to the east building. Deformation and corrosion of the steel framing were observed. Dented/displaced metal decking was noted.

FWP-000124



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



See Photograph 20

See Photograph 22

See Photograph 21

19. Looking south towards the concrete slab to the east of the remaining building section, where the collapsed portion of the east building had been removed.



20. Detailed view of the northeast stairs at the east of the remaining building section. The railing had been displaced from the concrete stairs.

FWP-000125



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



21. View of northwest stairs to the east of the remaining building section. Spalling and cracks
were observed. The railing had been completely displaced from the concrete.



22. Detailed view of the north side of the concrete slab to the east of the remaining building
section. Cracks and spalling were observed in the concrete slab.

FWP-000126



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



23. View of the east end of the concrete slab. Cracks and spalling were observed along the east
end of the concrete slab.



24. Detailed view of sheared and corroded anchor bolts at the east concrete slab. A subsequent
crack in the concrete slab was observed.

FWP-000127



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



25. View of the northeast corner of the concrete slab. Deformed and corroded steel plate and bolts were observed.



26. View of deflected/deformed and corroded anchor bolts in the concrete slab to the east of the remaining building section.

FWP-000128



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



27. View of corroded remaining section of a post to the east of the remaining building section.



28. Looking west from the concrete slab to the east of the remaining building section. The
remaining sections of the fractured/corroded columns were observed.

FWP-000129



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



29. View of the partially collapsed building section adjacent to the southeast corner of the remaining portion of the east building. Displacement of the CMU blocks were noted.



30. View of the partially collapsed building section adjacent to the southeast corner of the remaining portion of the building. Displacement of the CMU blocks were noted. Displaced electrical conduit was observed.

FWP-000130



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



31. Looking southeast from the northwest corner of the concrete slab where the west building was located.



32. View of the northwest stairs where the west building was located. Spalling and cracks were observed. The railing was completely displaced from the concrete.



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



33. View of northeast stairs where the west building was located. Cracks and spalling were
observed. Both railings had been completely displaced from the concrete.



34. Detailed view of displaced mechanical unit.

FWP-000132



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



35. Spalling was observed along the perimeter of the concrete slab where the west building
located. Deformed, sheared and corroded anchor bolts were observed throughout the slab.



36. View of deformed/sheared and corroded anchor bolts at previous column locations at the
slab where the west building was located.

FWP-000133



**NILFISK, INC.**
**MKA PROJECT NO. 2023.1496**
**SPRINGDALE, ARKANSAS**



37.  View of corroded steel plate and sheared anchor bolts at the southwest corner of the slab where the west building was located.



38.  View of the southeast corner of the slab where the west building was located, adjacent to the southwest corner of the east building. Deformation/corrosion in the steel plate and bolts were observed.

FWP-000134



NILFISK, INC.
MKA PROJECT NO. 2023.1496
SPRINGDALE, ARKANSAS



39. Detailed view of crack in the concrete slab at the joint between the east building and the west building.

FWP-000135

**MKA International, Inc.**
Construction Consultants & Engineers
100% Employee Owned Company

KEVIN M. MCMAHON

## EXPERIENCE

Kevin M. McMahon is a Construction Consultant at *MKA International, Inc.* (*MKA*), formerly *Madsen, Kneppers & Associates, Inc.*, with over 25 years of experience in the construction industry as well as providing construction consulting for insurance carriers with respect to damage assessments. He has managed numerous large catastrophe-related assignments throughout the United States and the Caribbean and is a large loss expert involving property damage in commercial, industrial facilities and residential developments.

Previously, as Executive Manager of the Southern Region, he focused on the property loss aspects of our services. Mr. McMahon has consulted in many different facets of construction such as builder's risk claims, scheduling, bid analysis, building code issues, and construction accounting. His project experience includes damage assessments, determining repair or replacement scopes, preparation of cost estimates, cost negotiation and project management.

He attended Illinois State University where he studied Construction Management and during this period also worked as a Construction Laborer and Foreman on residential and industrial construction projects. Subsequently, Mr. McMahon was employed as a Construction Superintendent. His duties included scheduling, monitoring and implementing cost control systems on numerous residential projects as well as physically working on the structures under construction. He prepared cost estimates on projects for bidding purposes. As a Project Engineer with Matrex Exhibits, he gained experience in developing blueprints and purchasing materials for various projects.

## WORK HISTORY

| | |
|---|---|
| 2020 – Present | **Vice President** - *MKA International, Inc.*, Dallas, Texas |
| 2016 – 2020 | Executive Manager - *Madsen, Kneppers & Associates, Inc.*, Dallas, Texas |
| 2002 – 2016 | Regional Manager - *Madsen, Kneppers & Associates, Inc.*, Dallas, Texas |
| 1998 – 2002 | Project Consultant - *Madsen, Kneppers & Associates, Inc.*, Chicago, Illinois |
| 1997 – 1998 | Project Engineer - Matrex Exhibits, Addison, Illinois |
| 1996 – 1997 | Construction Superintendent - Rigsby Development, New Lenox, Illinois |
| 1990 – 1996 | Construction Laborer/Foreman - Panice Exhibitor's, Chicago, Illinois |

## EDUCATION

Coursework at Illinois State University, Normal, Illinois; Construction Management

## PROFESSIONAL CERTIFICATIONS & AFFILIATIONS

American Society of Professional Estimators, Member



FWP-000136

**Kevin M. McMahon**
**Record of Deposition and Trial Testimony**

| Date | Project No. | Project Name | Case Name | Case Number | Deposition | Trial | Court | Deposed as |
|------|-------------|--------------|-----------|-------------|------------|-------|-------|-----------|
| 6/27/2019 | 2015.2179L | Accelerator Holdings LLC / Circuit of the Americas LLC - Litigation | Accelerator Holdings, LLC and Circuit of Americas, LLC v. Factory Mutual Insurance Company, Lloyd Rainey, ERWS Site Solutions, LLC, Nelson Forensics, LLC and Datum Engineers, Inc. | D-1-GN-17-004798 | X | | 250th Judicial Court, District Court of Travis County, Texas | Expert |
| 6/12/2015 | 2005.0479L | Bass Pro, Inc. - Litigation | Bass Pro, Inc. v. Dennis Siegmann D/B/A Custom Coating | 07AF-CV00193 | X | | Circuit Court of Taney County Missouri | Percipient |
| 5/19/2015 | 2011.0247L | Simmons Foods, Inc. - Litigation | Simmons Foods, Inc. v. Industrial Risk Insurers, An Unincorporated For Profit Association, Swiss Reinsurance America Corporation, Westport Insurance Company, and Ironshore Specialty Insurance Company | 5:13-cv-05204-TLB | X | | Western District of Arkansas Fayetteville Division | Expert |

FWP-000137

**MKA International, Inc.**
Construction Consultants & Engineers
100% Employee Owned Company

ANDRE E. SLINTAK, PE

## EXPERIENCE

Andre E. Slintak is a licensed Professional Engineer with more than 23 years of engineering design and consulting experience with an emphasis on structures. His consulting work is comprised of both property damage and construction litigation matters.

Property damage includes performing damage assessments throughout the United States and the Caribbean for many types of commercial, residential, institutional, transportation, and industrial structures. In the course of performing this work, he conducts onsite condition assessments; analyzes material, component, and system behavior; and prepares reports of findings. When requested, he includes methods and scope of repair as part of his work product.

Mr. Slintak's work also includes construction litigation matters encompassing construction defects, product liability, temporary traffic control, personal injury, and property damage disputes.

Prior to joining *MKA International, Inc.* (*MKA*), formerly *Madsen, Kneppers & Associates, Inc.*, Mr. Slintak performed inspections and evaluations of concrete and steel highway and rail bridges, cantilever sign structures, mast arms, and retaining walls; these inspections have been both routine and emergent in nature.

His engineering experience includes design, construction, rehabilitation, widening, operations and maintenance of fixed and movable bridges; railroad bridge design; design of deep foundations; design and construction of earth retaining structures; roadway design and maintenance; construction zone traffic control; guardrail design and repair; and maintenance and repair of drainage systems. In conjunction with local contractors and government agencies, he has engineered design solutions for emergency repairs to bridge, sign, and traffic signal structures; developed and executed transportation infrastructure maintenance programs; and planned, budgeted, and constructed large municipal capital projects.

Mr. Slintak also has experience in administration of design-build and construction manager at risk project deliveries. He has served in positions as owner, engineer, and owner's representative for projects he designed requiring him to approve shop drawings, design field changes, process change orders, create as-builts, respond to contractor requests for information, and assess contractor means and methods. This additional experience has made him very familiar with construction practices, techniques, and procedures.

He received his Bachelor of Engineering degree in Naval Architecture from the State University of New York Maritime College in 1994, and his Master of Science degree in Civil Engineering from Florida Atlantic University in 2004. Additionally, he was licensed in the United States Merchant Marine as a Third Mate (Unlimited Tonnage upon Oceans and Near Coastal).



**MKA** International, Inc.
Construction Consultants & Engineers
100% Employee Owned Company

**ANDRE E. SLINTAK, PE**

## WORK HISTORY

| | |
|---|---|
| 2020 – Present | **Regional Manager/Structural Engineer** - *MKA International, Inc.*, Miami, Florida |
| 2017 – 2020 | Structural Engineer - *Madsen, Kneppers & Associates, Inc.*, Miami, Florida |
| 2010 – 2017 | Construction Project Management Supervisor - Broward County Public Works Department, Pompano Beach, Florida |
| 2007 – 2010 | Structures Design Manager - EAC Consulting, Inc., Fort Lauderdale, Florida |
| 2003 – 2007 | Structural Engineer - Washington Group International, Inc., Deerfield Beach, Florida |
| 1997 – 2003 | Marine Equipment and Material Certification Engineer – Bureau Veritas North America, Port Everglades, Florida |
| 1997 – 1997 | Marine Simulator Operator - RTM STAR Center, Dania Beach, Florida |
| 1995 – 1997 | Sales Manager - Future Shop, Washington, Montana, and Utah |
| 1995 – 1995 | Marine Simulator Operator - SIM Ship Corp., Kent, Washington |
| 1994 – 1994 | Mate, United States Merchant Marine - Hornbeck Offshore Services, Morgan City, Louisiana |

## EDUCATION

Master of Business Administration, Florida Atlantic University, Boca Raton, Florida, 2007
Master of Science, Civil Engineering, Florida Atlantic University, Boca Raton, Florida, 2004
Bachelor of Engineering, Naval Architecture and Nautical Science, State University of New York
Maritime College, Throggs Neck, New York, 1994

## PROFESSIONAL CERTIFICATIONS & AFFILIATIONS

American Society of Civil Engineers (ASCE), Member
American Traffic Safety Services Association (ATSSA), Advanced MOT
JLG Boom & Scissor Lift Operator

## PROFESSIONAL ENGINEERING LICENSES

| | | | | | |
|---|---|---|---|---|---|
| Alabama | 37770 | Arkansas | 17873 | Florida | 64756 |
| Louisiana | PE.0042810 | Mississippi | 29337 | North Carolina | 047580 |
| South Carolina | 35867 | Texas | 131303 | | | |



FWP-000139



**ANDRE E. SLINTAK, PE**
*Trial and Testimony History*

**MKA International, Inc.**

## TRIAL TESTIMONY

| No. | DATE | PROJECT NAME | CLIENT | TESTIFYING FOR | SUBJECT | COURT | CASE NO. |
|---|---|---|---|---|---|---|---|
| 1 | 6-Oct-21 | Reliable Shutters and Screens LLC -vs- Terrance Fallon | Reliable Shutters (Malka & Kravitz, PA) | Plaintiff | Contract Dispute | Broward County Civil Court Central Courthouse | 062018-SC-008880-AXXX-NO |
| 2 | 7-Dec-21 | Town of Davie -vs- Ciavarella | Town of Davie | Plaintiff | Code Enforcement | Town of Davie Spec. Mag. | 2019.0028 |
| 3 | 4-Feb-22 | Schwartz -vs- Ocean Home Remodel, Inc. | Jo-Ann Schwartz | Plaintiff | Defective Construction | Palm Beach County Court | 50-2021-SC-017827-XXXX-SB |
| 4 | 14-Sep-22 | Eloquence on the Bay -vs- Ness Racquet Club -vs- CDC Builders v. RC Aluminum Industries, Inc. | RC Aluminum (The Moyer Group) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2016-009912-CA-01 |
| 5 | 17-Mar-23 | Antwon Emery v. Town of Davie | Town of Davie | Defendant | Alleged Improper Roadway Maintenance | Broward County Civil Court South Courthouse | COSO-21-001522 |

## DEPOSITION TESTIMONY

| No. | DATE | PROJECT NAME | CLIENT | TESTIFYING FOR | SUBJECT | COURT | CASE NO. |
|---|---|---|---|---|---|---|---|
| 1 | 16-Oct-17 | AXIS -vs- RC Aluminum Industries, Inc. et al | RC Aluminum (The Moyer Group) | Defendant | Corporate Representative | 11th Judicial Circuit Court Miami Dade County | 2016-022398-CA-01 |
| 2 | 26-Feb-18 | Vizcayne Master Association, Inc. -vs- RC Aluminum Industries, Inc. | RC Aluminum (Lydecker | Diaz) | Defendant | Corporate Representative | 11th Judicial Circuit Court Miami Dade County | 2017-000959-CA-01 |
| 3 | 20-Apr-18 | AXIS -vs- RC Aluminum Industries, Inc. et al | RC Aluminum (The Moyer Group) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2016-022398-CA-01 |
| 4 | 20-Apr-18 | AXIS -vs- FDS Aluminum, Inc. et al | FDS Aluminum (The Moyer Group) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2016-022398-CA-01 |
| 5 | 17-Dec-18 | 18201 Collins Ave -vs- RC Aluminum Industries, Inc. et al | RC Aluminum (The Moyer Group) | Defendant | Corporate Representative | 11th Judicial Circuit Court Miami Dade County | 2016-032830-CA-01 |
| 6 | 26-Feb-19 | 18201 Collins Ave -vs- RC Aluminum Industries, Inc. et al | RC Aluminum (The Moyer Group) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2016-032830-CA-01 |
| 7 | 23-Oct-19 | Imperial Royale at Boca Pointe Condo -vs- Empire Indemnity Insurance Company | Empire Indemnity (Butler, )Weihmuller, Katz, Craig | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 9:18-cv-81642-RLR |
| 8 | 6-Dec-19 | Centre Hills Court -vs- Rockhill Insurance Company | Rockhill (Levy Law Group) | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 9-19-cv-80111-BB |
| 9 | 13-Feb-20 | Gonzalez -vs- Underwriters at Lloyd's, London | Underwriters (Berk, Merchant, and Sims) | Defendant | Property Loss Litigation | 11th Judicial Circuit Court Miami Dade County | 2019-002455-CA-13 |
| 10 | 2-Sep-20 | Diamond Lake Condominium Association, Inc -vs- Empire Indemnity Insurance Company | Empire Indemnity (Galloway, Johnson,Tompkins, Burr & Smith) | Defendant | Property Loss | United States District Court Middle District of Florida | 2:19-cv-00547-SPC-NPM |
| 11 | 15-Apr-21 | Palau Sunset Harbour Condominium Association -vs GT Construction & Development, JA&M Development, et al | JA&M (Baumann, Gant, & Keeley) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2019-027537-CA-44 |
| 12 | 3-Sep-21 | Oasis Tower One Condominium Association -vs- RC Aluminum Industries, Inc et al | RC Aluminum (Lydecker, LLP) | Defendant | Corporate Representative | 12th Judicial Circuit Court Lee County | 2017-CA-000312 |
| 13 | 25-Oct-21 | Anchor Fence Wholesalers -vs- Scottsdale Insurance Co. | Scottsdale Ins. (Hinshaw & Culbertson LLP) | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 1:21-cv-23165-JEM |
| 14 | 27-Oct-21 | Nitzachon 1, LLC -vs- Western World Insurance Company | INTENTIONALLY BLANK | INTENTIONALLY BLANK | Fact Witness | United States District Court Southern District of Florida | 9:21-cv-80761 |
| 15 | 28-Jan-22 | Olga Arguello -vs- Scottsdale Insurance Co. | Scottsdale Ins. (Hinshaw & Culbertson LLP) | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 21-cv-22191 |
| 16 | 1-Feb-22 | Emmanuel Jeune -vs- Great Lakes Insurance | Great Lakes Insurance (Baker-Donelson) | Defendant | Property Loss Litigation | 11th Judicial Circuit Court Miami Dade County | 2020-005033-CA-01 |
| 17 | 2-Feb-22 | Palmetto West Park Condominium -vs- Empire Indemnity Insurance Company | Empire Indemnity (Galloway, Johnson,Tompkins, Burr & Smith) | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 21-cv-21751 |
| 18 | 21-Jun-22 | Samuel A. Dobrow vs WHA & Associates, Inc., et al | Sam Dobrow (Malka & Kravitz) | Plaintiff | Defective Construction | 11th Judicial Circuit Court Miami Dade County | 2019-033818-CA-01 |
| 19 | 25-Aug-22 | Hallandale House of Learning vs Scottsdale Insurance | Scottsdale Ins. (Wilson Elser) | Defendant | Property Loss Litigation | United States District Court Southern District of Florida | 21-62267-CIV |
| 20 | 26-Aug-22 | Hakim v. Today's Custon Design | Mr. Jack Hakim (Malka & Kravitz) | Plaintiff | Defective Construction | 11th Judicial Circuit Court Miami Dade County | 2020-007966-CA-01 |
| 21 | 9-Nov-22 | Lori Stoll v. Indian Harbor Insurance Company | Indian Harbor Insurance Company (Clausen-Miller) | Defendant | Property Loss Litigation | 15th Judicial Circuit Palm Beach County | 2020-CA-013718 |



**ANDRE E. SLINTAK, PE**
*Trial and Testimony History*

**MKA International, Inc.**

### DEPOSITION TESTIMONY (Cont.)

| No. | DATE | PROJECT NAME | CLIENT | TESTIFYING FOR | SUBJECT | COURT | CASE NO. |
|---|---|---|---|---|---|---|---|
| 22 | 25-Jan-23 | Mirasol Ocean Towers v. RC Aluminum Industries, Inc., et al | RC Aluminum (The Moyer Group) | Defendant | Alleged Construction Defect | 11th Judicial Circuit Court Miami Dade County | 2021-023753-CA-01 |
| 23 | 1-Mar-23 | Antwon Emery v. Town of Davie | Town of Davie | Defendant | Alleged Personal Property Damage | 17th Judicial Circuit Court Broward County | COSO-21-001522 |
| 24 | 11-Apr-23 | Foster Marine Contractors v. City of Delray Beach | City of Delray Beach | Defendant/Counter Plaintiff | Breach of Contract | 15th Judicial Circuit Court Palm Beach County | 50-2017-CA-008953-MB-AO |
| 25 | 14-Apr-23 | Roger/Leticia Fana v. Citizens Property Insurance Corp. | Citizens Property Insurance Corp. | Defendant | Property Loss Litigation | 11th Judicial Circuit Court Miami Dade County | 2021-011261-CA-01 |

### ARBITRATION

| No. | DATE | PROJECT NAME | CLIENT | CONSULTING FOR | SUBJECT | ARBITRATOR | CASE NO. |
|---|---|---|---|---|---|---|---|
| 1 | 31-Jul-20 | Nitzachon 1, LLC -vs- BNB Construction, Inc. | BNB Construction, Inc. & Malka & Kravitz, PA | Plaintiff - Counter Claim | Contract Dispute | American Arbitration Association | 01-19-0002-4822 |

### MEDIATION

| No. | DATE | PROJECT NAME | CLIENT | CONSULTING FOR | SUBJECT | MEDIATOR | CASE NO. |
|---|---|---|---|---|---|---|---|
| 1 | 24-Jul-20 | Qureshi -vs- QBE North America | QBE North America | Defendant | Property Loss | FL Dept. of Fin. Services | Claim #743359N |
| 2 | 26-Jul-21 | MREI -vs- Parker Mynchenburg & Assoc., Inc. | Parker Mynchenburg (Lydecker Diaz/Axis Capital) | Defendant | Professional Liability | Nulman Mediation Serv. | Claim #170521 |
| 3 | 3-Nov-21 | Schwartz -vs- Ocean Home Remodel, Inc. | Jo-Ann Schwartz | Plaintiff | Pre-Trial Mediation | Palm Beach County Court | 50-2021-SC-017827-XXXX-SB |
| 4 | 14-Apr-22 | Janice M. Riley, Inc. v. Huntington Pointe Assoc., Inc. vs. Engenuity Group, Inc | Huntington Pointe (Wyman Legal Solutions) | Plaintiff - Counter Claim | Pre-Trial Mediation | Palm Beach County Court | 50-2020-CA-014663-XXXX-MB |

FWP-000141

# MKA International, Inc.
### Construction Consultants & Engineers
100% Employee Owned Company

## FEE SCHEDULE

| Professional Services | Hourly Rate |
|---|---|
| Principals | $350 |
| Architects ⏐ Building Technology Consultants | $195-325 |
| Clerk of The Works Consultants | $110-200 |
| Construction Consultants | $160-325 |
| Construction Cost Estimators | $160-325 |
| Construction Management | $160-325 |
| Electrical Consultants ⏐ Engineers ⏐ Estimators | $170-325 |
| Engineers  [Civil ⏐ Structural] | $210-325 |
| Fire & Electrical Forensic Consultants ⏐ Engineers | $170-325 |
| Geotechnical Consultants ⏐ Engineers ⏐ Geologists | $195-325 |
| Mechanical Consultants ⏐ Engineers ⏐ Estimators | $195-325 |
| Restoration Consultants ⏐ Estimators | $160-325 |
| Roofing Consultants ⏐ Estimators | $195-325 |
| Scheduling Consultants | $195-325 |
| Technical  [Graphics ⏐ Analysts ⏐ Specialized IT Operations] | $110-245 |
| Support Services | $95 |

| Other Services | |
|---|---|
| Deposition / Expert Witness Testimony<br>(2 Hour Minimum ⏐ Travel/Wait Time at Regular Rate) | $525/hr |
| Appraisal Services - Umpire | $525/hr |
| Appraisal Services - Appraiser | $350/hr |
| UAV Services | $250/day |
| Matterport 3D Imagery | $300/3D Space |
| Resistograph (Wood Decay Testing Device) | $300/day |
| K9 Accelerant Detection Services | $200/hr |
| Reimbursable Expenses & Sub-Contractor/Sub-Consultant Services | Cost plus 10% |
| Automobile Use - Based Upon IRS Published Rates | Cost plus 10% |
| Photocopying, Binding and Digital Photo Printing | At MKA Cost |

Revised March 8, 2023

# EXHIBIT C

D. Craig Evans, P.E.

ACE Engineering, Inc.

PO Box 21671

Little Rock, AR 72221

501-804-0153

August 7, 2023

Client:      Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.

Attn: Emily Milholen McCord

4206 South J.B. Hunt Drive, Ste. 200

Rogers, AR 72758-8131

Reference Structure: 979 E. Robinson Avenue, Springdale, AR 72764

Inspection Date: 7/28/2023– 9:00 am

**Subject:**    **Structural Engineering Inspection Report and Evaluation of Engineering Evaluation Report prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023**

## I.    Introduction and Description of Assignment

I am the Principal Structural Engineer and Owner of ACE Engineering, Inc., a structural engineering firm in Little Rock, Arkansas. Nilfisk, Inc. and Nilfisk Holding A/S ("Nilfisk") engaged me as a testifying expert in the lawsuit between Nilfisk and Fort Worth Partners, LLC ("FWP"), currently pending in the United States District Court for the Western District of Arkansas. I was asked to evaluate the Engineering Evaluation Report prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023 ("MKA Report").

This report provides my opinions and basis for my opinions as required under Rule 26(A)(2)(B) of the Federal Rules of Civil Procedure. My opinions and analyses are based on my education, training, and experience in structural engineering.

### a.    Qualifications and Experience

I currently own, operate, and serve as the Principal Structural Engineer for ACE Engineering, Inc. In that role, I design and analyze small to medium size structural projects, including residential and commercial structures. In addition, in my current role, I have inspected and assessed tornado damage in multiple residential and commercial structures. Prior to my current role, I worked as a Senior Structural Engineer, Technical for the US Army Corps of Engineers. I earned my bachelor's degree in civil engineering from Memphis University in 1987. I have been

NILFISK-FWP-4025

licensed as a Professional Engineer in Arkansas since 1996. For more information regarding my education, qualifications, and experience, please see my *curriculum vitae,* which is attached as Exhibit 1.

**b.    Publication History**

I have not authored any publications in the past ten years.

**c.    Testimonial History**

I have testified as an expert witness in the following litigated matters.

- *Jerry Glenn Ball & Bethany Ball vs. Bradley Caubble & Elite Insulation of AR, LLC*, Cross County, AR, Case No. 10CV-21-101-2;
- *David King vs. Allstate Insurance Company, Hot Springs County*, AR, Case No. 30CV-20-147
- *William & Joanna Hill vs. Custom Homes of the Ozarks, Inc.*, Baxter County, AR, Case No. 03-CV-19-189;
- *Ken Lancaster & Tabitha Lancaster vs. Roger's Construction, Inc*., Clark County, AR, Case No. 10CV-11-19;
- *Cliff Lee et al vs. Chuck Hamilton Construction, Inc.,* Pulaski County, AR, Case No. 60CV-17-2822;
- *John Sablatura & Tonja Sablatura vs. Woodhaven Homes,* Pulaski County, AR, Case No. 60CV-17-6658;
- *Jeffery Ford & Sarah Ford vs. Safeco Insurance Company of America*, Pulaski County, AR, Case No. 60CV-15-943;
- *Julian Builders, Inc. vs. Robin Emis*, Cleburne County, AR, Case No. 2012-159-2;
- *Rebecca Scott vs. Wal-Mart Stores, Inc*., Pulaski County, AR, Case No. 60CV-09-2787.

**d.    Fee Schedule**

I was compensated with a flat fee of $4,400 for all work associated with the preparation of this report, and will be compensated at a rate of $200 per hour for any subsequent work or testimony in this case.

**e.    Materials Reviewed**

To prepare my opinions, I reviewed the following documents and materials.

| Document Title | Bates Number |
| --- | --- |

NILFISK-FWP-4026

| | |
|---|---|
| Plaintiff's Complaint and Exhibits, 9/6/22 | n/a |
| Plaintiff's Expert Disclosures, 6/12/23 | n/a |
| CV of Plaintiff's Expert – Kevin McMahon | FWP-000136 – 000137 |
| CV of Plaintiff's Expert – Andre E. Slintak | FWP-000138 – 000141 |
| Engineering Evaluation Report prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023, and Exhibits | FWP-000001 – 000135 |
| J.S. Held Estimate for Repairs | NILFISK-FWP-0028 – 0068 |
| Envista Forensics Report on Structural Damage After Tornado at Nilfisk Inc. Warehouse in Springdale, AR, April 26, 2022, prepared by Guillermo Ramirez | NILFISK-FWP-0069 – 0102 |
| Letter regarding Nilfisk Termination of Lease, 5/26/22 | NILFISK-FWP-0103 – 0109 |
| Springdale site – Tornado Pictures | NILFISK-FWP-1207 – 1208 |
| Pinnacle Structures Inc. Materials Information | NILFISK-FWP-4020 – NILFISK-FWP-4024 |

## II.    Background Facts

Nilfisk leased the building located at 979 E. Robinson Avenue ("Building") from FWP, and Nilfisk and FWP were parties to Industrial Building Lease ("Lease"). As part of the Lease, Nilfisk was required to obtain "'all-risk' commercial property insurance" in an amount equal to "one hundred percent (100%) of the then 'full replacement cost' of the Premises." The Lease defines "Full Replacement Cost" as "the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade." In addition, the Lease provides that if the Building is damaged or destroyed by a casualty, Nilfisk is to "rebuild or replace the Buildings and other improvements, so as to restore the Premises to the condition in which they were immediately prior to such damage or destruction." A tornado touched down in Springdale on March 30, 2022 and caused damage to the Building. The National Oceanic and Atmospheric Administration ("NOAA") considered the tornado an EF-3 with wind speeds up to 145 mph.

### III.    Observations:

On July 28, 2023, I physically visited 979 E. Robinson Avenue to perform a site visit and evaluate the remaining portions of the Building and the foundation. The observations below are based upon a visual inspection at the site, and photographs from the site visit documenting my observations are attached as Exhibit 2. In addition, I reviewed the Envista Forensics Report on Structural Damage After Tornado at Nilfisk Inc. Warehouse in Springdale, AR, April 26, 2022, prepared by Guillermo Ramirez ("Envista Report").

The Building is an industrial building that is approximately 200,000 square feet. Based on my observations of the remaining structure, the Building actually appears to have been two separate 100,000 square foot sections. The east section of the Building and the west section of the Building are approximately 200 feet in the north south direction and 1000 feet in the east west direction. Each side of the Building is approximately 100,000 square feet. Approximately 40,000 square feet of the 100,000 square foot east section of the Building had collapsed. The entire 100,000 square feet of the west section of the Building had collapsed. The collapsed portions of both structures had been removed at the time of my inspection.

The east section of the Building had main frames 9 through 20 that were still standing and appear to be undamaged. A diagram of the framing of the Building included within the Envista Report is included below. Column line 21.1 was a framed end wall with 10 inch wide flange steel columns estimated to be W8x31 and two 8 inch steel channels. The main rigid frames were spaced at 25 feet bay spacing. The main rigid frames consisted of a tapered I-shaped frame with 3-8 inch diameter pipe columns. The center height of the building from the concrete to insulation measured to be 30.3 feet. The column measured 27.5 fee from the concrete slab to the bottom of the base plate. The roof purlins measured to be 8 inch Z-purlins spaced at 5 feet on centers with a 3 inch flange. The tapered I shaped frame varied from approximately 8.5 inches deep to 24 inches deep. The flanges were 6 inches x 1/4 inches. The haunch was approximately 24 inches deep. The roof slope measured to be 1 inch per foot.

NILFISK-FWP-4028



*Figure 4 Floor plan of remaining structure*

The east building had 3 sets of stairs that need concrete repairs and handrails. There were also 5 hydraulic dock levelers. In addition, the east section of the Building had some CMU block office space that was approximately 18 feet deep and 300 feet long. These walls seemed to provide some additional lateral bracing that was not provided by the steel frame. The CMU block walls were cracked at the rigid frame locations.

The east section of the Building had cable bracing between bays 9-10, 14-15, 16-17, and 19-20. Some of these cables appeared to be loose. The bracing and the purlins in bays 9-10 and 20-21.1 were severely damaged. The wall panels, insulation and the roof panels over the entire structure need to be replaced. The roof appears to be sloped at 1 inch per foot slope based on column measurements.

The west section of the Building was measured to be 500 feet x 200 feet.  Based on the foundation imprints, the west building frames were similar to the east building, but the interior bays were spaced at 30 feet and the two end bays were measured at 25 feet each. There were 15-30 feet bays and 2 -25 feet bays equating to 500 feet. These steel frames were no longer available to measure. The west section of the Building had 3 sets of stairs that need concrete repairs and handrails. There were also 9 hydraulic dock levelers. This section of the Building also had a handicap ramp. The stairs were approximately 5 feet wide with approximately 6 treads that measured 12 inches wide and 7-1/4 inches deep. The stairs had some significant cracks in the blocks of concrete. This section of the Building had a loading ramp that had a damaged concrete curb section that was measured to be 7 feet long by 8 inches wide by 12 inches tall. The hand rail was damaged as well.

NILFISK-FWP-4029

There was a trailer park on the south side of this building. It has been over a year since the tornado, but it seems that the trailer park fared well.

The foundation is not known. But based on the forklift traffic and the life span of the Building, the foundation has functioned properly over the years of the structure. The east section of the Building was the only section of the foundation that appeared to have failed due to the concrete failure along the edges. The rigid frame failed at the foundation either due to anchor bolt failure or base plate failure based on the site inspection evidence. The concrete had several cracks throughout the slab. The west section of the Building had a longitudinal crack that appeared to extend the length of the building.

## IV.    Analysis

### a.    Summary of MKA Report Claims Regarding Applicable Codes

The MKA Report contends that the 1987 BOCA National Building Code was the Code "reportedly in force at the time of original construction" of the Building, and that BOCA at that time provided for a "70 mph fastest mile basic wind speed." The MKA Report states that Springdale "City Ordinance 22-31 adopted the 2021 Arkansas Fire Prevention Code," which "specifies that commercial buildings, at a minimum, use 115 mph as the basic design wind speed." The MKA Report goes on to compare 1987 BOCA to the Arkansas Fire Prevention Code, stating the "70 mph fastest mile basic wind speed specified in the BOCA code is approximately equal to an 84 mph 3- second gust design wind speed. For design purposes, the basic wind loading from a 115 mph speed is approximately 87% greater than that of an 84 mph speed."

The MKA Report notes the IEBC is "referenced in the AFPC" and claims that a City of Springdale Building Department employee indicated that "for an engineering evaluation, the IEBC could be used." The MKA Report then relies on the "Substantial Structural Damage" section of the IEBC for its conclusions, which provides:

"A condition where any of the following apply:

1. The vertical elements of the lateral force-resisting system have suffered damage such that the lateral load-carrying capacity of any story in any horizontal direction has been reduced by more than 33 percent from its predamage condition.

2. The capacity of any vertical component carrying gravity load, or any group of such components, that has a tributary area more than 30 percent of the total area of the structure's floor(s) and roof(s) has been reduced more than 20 percent from its predamage condition, and the remaining capacity of such affected elements, with respect to all dead and live loads, is less than 75 percent of that required by the International Building Code for new buildings of similar structure, purpose and location."

NILFISK-FWP-4030

Based on this citation, the MKA Report concludes:

> "The visible evidence explicitly indicates that more than 33% of the lateral force resisting of the east structures was catastrophically damaged during the March 30, 2022 wind event and more than 20% of vertical load carrying components were also catastrophically damaged. The IEBC, in consideration of the aforementioned extent of damage due to wind, requires that the structure be evaluated for compliance with the wind provisions of the current code which would require resistance to an approximate 87% increase in wind load."

The MKA Report then notes that "Section 101.4.7 of AFPC provides that repairs can be assessed per the IEBC." The MKA Report then cites IEBC Section 405.2.3.3, which provides:

> "If the evaluation does not establish that the building in its predamage condition complies with the provisions of Section 405.2.3.1, then the building shall be retrofitted to comply with the provisions of this section. The wind loads for the repair and retrofit shall be those required by the building code in effect at the time of original construction, unless the damage was caused by wind, in which case the wind loads shall be in accordance with the International Building Code. The seismic loads for this retrofit design shall be those required by the building code in effect at the time of original construction, but not less than the reduced seismic forces."

Relying on this Section of the IEBC, the MKA Report concludes "repair and/or rehabilitation is not feasible due to the requirements found in the IEBC which speak to the cause of original damage having been the result of wind." This conclusion is not well founded.

     *b.    Analysis of Applicable Codes*

The comparison of wind speeds in the MKA Report is not an equal comparison. There are two references to the age of the Building: one is 1981 and the other is 1987. In 1987, the 1987 BOCA building code was not adopted yet and does not apply. As a result, the building would be designed to an earlier code. The 1980 Standard Building Code was likely used to design this Building. As indicated in the MKA Report, the wind speeds have changed over the years from 70 mph to 115 mph, but the actual Building Code wind pressure has not been significantly changed. The minimum design pressure used to design a building with a mean roof height of 26 feet was 12 pounds per square foot ("psf") in the 1980 Standard Building Code. The current minimum design pressure is 16 psf according to ASCE 7, but the loading load factoring is different. This load factor change is noted in the code change from ASCE 7-05 to ASCE 7-10 with the increase minimum design pressure from 10 psf to 16 psf with the decrease of the load factor from 1.6 to 1.0 respectively. The building codes have increased over the years in the area of seismic requirements and therefore the Building will require some reinforcing and strengthening. This can easily be done by adding cover plates or additional sections to the existing steel members. This can also be done by providing additional external braces from other parts of the structure.

NILFISK-FWP-4031

c.      *MKA Report Conclusions Regarding the Foundation:*

The MKA Report contends that "[r]ehabilitation or repair to accommodate the current wind conditions is limited by the performance of the unknown foundation." The MKA Report concludes that "[t]he entirety of both building structures must be demolished in order to be reconstructed as well as the portions of the foundation that support each of the columns." Again, this drastic of a conclusion is not warranted, and repairs can bring the Building into compliance with the code.

d.      *Analysis of Foundation and Applicable Codes*

Repairs of the Building can make the Building compliant with the IEBC and AFPC.  The foundation has performed as required over the life of the Building and continued to perform up to the day of the tornado. During the tornado, the steel columns were not pulled out of the foundation. However, the steel structure failed laterally and collapsed. The foundation kickout force did not cause the structure to fail. If it had, the foundation would have had large sections of concrete that would be gone. The exact reinforcing and dimensions are not currently known. The foundation has performed as required by sustained loading from the Building. As indicated by Nilfisk, the concrete slab has also had heavy manufacturing loading from the 14,100 pound Aisle master model 33SE with a lift capacity of 3,300 pounds, and the Toyota LP model 6FGU25 with a machine weight of 9,060 pounds and capacity of 5,000 pounds. The existing Building has a substantial 200,000 square foot foundation. The interior 8 inch diameter columns most assuredly had a spread footing that the column was bolted to prior to pouring the concrete around the pipe block out.

The foundation and the structure have already gone through substantial destructive testing with the tornado event. Some additional destructive testing along with ground penetrating radar scanning or GPR scanning can reveal some of the existing conditions. Concrete coring and test samples can be taken and tests performed on the concrete at the site to provide adequate information to provide design guidance to assure the new and the repaired structure meets and/or exceeds the current IEBC 2021 code requirements. The code mandates meeting the code.  It does not mandate removal and replacement. All replacement components will meet the current code requirements of the IEBC and the AFPC.

Repairs of the Building are expressly allowed under the 2021 IEBC. The relevant portions of the IEBC are included below. Specifically, Section 405.2.3.1 of the IEBC allows for the Building to be "evaluated by a registered design professional, and the evaluation findings shall be submitted to the code official." That evaluation "shall establish whether the damaged building, if repaired to its predamage state would comply with the provisions of the International Building Code for load combinations that include wind." Under Section 405.2.3.3, if that evaluation "does not establish that the building in its predamage condition complies with the provisions of Section 405.2.3.1, then the building shall be retrofitted to comply with the provisions of this section. The

NILFISK-FWP-4032

wind loads for the repair and retrofit shall be those required by the building code in effect at the time of original construction, unless the damage was caused by wind, in which case the wind loads shall be in accordance with the International Building Code." Nothing in these code provisions, including those cited in the MKA Report, require that the Building be demolished and rebuilt. Instead, the IEBC specifically allows for repairs.

**[BS] 405.2.3 Substantial structural damage to vertical elements of the lateral force-resisting system.** A building that has sustained *substantial structural damage* to the vertical elements of its lateral force-resisting system shall be evaluated in accordance with **Section 405.2.3.1**, and either repaired in accordance with **Section 405.2.3.2** or repaired and retrofitted in accordance with **Section 405.2.3.3**, depending on the results of the evaluation.

> **Exceptions:**
>
> 1. Buildings assigned to Seismic Design Category A, B or C whose *substantial structural damage* was not caused by earthquake need not be evaluated or retrofitted for load combinations that include earthquake effects.
> 2. One- and two-family dwellings need not be evaluated or retrofitted for load combinations that include earthquake effects.

**[BS] 405.2.3.1 Evaluation.** The building shall be evaluated by a registered design professional, and the evaluation findings shall be submitted to the *code official*. The evaluation shall establish whether the damaged building, if repaired to its predamage state, would comply with the provisions of the *International Building Code* for load combinations that include wind or earthquake effects, except that the seismic forces shall be the reduced seismic forces.

**[BS] 405.2.3.2 Extent of repair for compliant buildings.** If the evaluation establishes that the building in its predamage condition complies with the provisions of **Section 405.2.3.1**, then the damaged elements shall be permitted to be restored to their predamage condition.

**[BS] 405.2.3.3 Extent of repair for noncompliant buildings.** If the evaluation does not establish that the building in its predamage condition complies with the provisions of **Section 405.2.3.1**, then the building shall be retrofitted to comply with the provisions of this section. The wind loads for the *repair* and *retrofit* shall be those required by the building code in effect at the time of original construction, unless the damage was caused by wind, in which case the wind loads shall be in accordance with the *International Building Code*. The seismic loads for this *retrofit* design shall be those required by the building code in effect at the time of original construction, but not less than the reduced seismic forces.

As explained above, IEBC 2021 Section 405.2.3.1, does require a complete design evaluation, but it does not mandate removal and replacement unless the existing structure cannot meet the new code requirements. Although the foundation and the pre-engineered metal building do have to be brought up to code, that does not mean that the Building has to be fully removed and replaced. Instead, the foundation can be strengthened with additional reinforcing and a concrete overlay. The rigid moment frames can be reinforced with additional steel members. The existing foundation did not fail. The foundation was damaged and the anchor bolts failed, but the concrete foundation did not fail and is still intact.

NILFISK-FWP-4033

## V.     Repair Estimate

The MKA Report provided an estimate of the cost to replace the Building at Exhibit D of $27,722,974.03. The MKA Report's estimated cost to replace the Building ignores portions of the Building that can be salvaged, and is significantly inflated. Based on my physical inspection of the Building, and information provided by Jeff Marcussen, a Senior Preconstruction Specialist for Nabholz Corporation, we have developed an estimate of the approximate cost to rebuild the Building today, attached as Exhibit 3, which totals $14,253,578. The estimate for the approximate cost to repair the Building attached as Exhibit 3 is provided solely to rebut the Tornado Repair Cost Estimate attached as Exhibit D to the MKA Report.

## VI.     Conclusions & Recommendations

Based on my review of case documents and materials, the attached photographs from my visit to the site, the observations noted above and the attached photographs, my conclusions are included below.

o   Forty thousand square feet of the east building and all the one hundred thousand square feet of the west building collapsed due to failure of the rigid frame metal building system. To the south of the building, the trailer park appears to be intact. The foundation system appears to be intact. The foundation will need some crack repair, some additional reinforcing for the lateral kickout forces per the IBC 2021 requirements. The sixty thousand square feet that is still standing survived the storm due to the additional bracing provided by the unreinforced CMU block masonry walls that are on the south side of the interior of the building. The CMU block wall sections are cracked along each of the rigid frames.

o   I disagree with the MKA Report's comparison of the wind speeds. Comparing the wind speeds without comparing the applicable wind pressures is irrelevant and misleading. IEBC 2021 does not mandate the removal of any structure, only that it meets the applicable building code. Therefore, part of the redesign for the Building would be to analyze the existing conditions and provide design repairs as required.

o   I also disagree with the MKA Report's conclusion that "repair and/or rehabilitation [of the Building] is not feasible due to the requirements found in the IEBC." The IEBC does not mandate removal and replacement unless the existing structure cannot meet the new code requirements. Repairs of the Building can make the Building compliant with the IEBC and AFPC.

NILFISK-FWP-4034

o  I generally agree with the observations, opinions, and conclusions within the Envista Report, including, but not limited to, the additions of the foundation reinforcement and the rigid frame reinforcement. A copy of the full Envista Report is attached as Exhibit 4.

o  Foundation repair recommendations: 2 #6 hairpin anchors that are 30 inches on each side shall be provided at each column to provide lateral bracing reinforcing in a 6 inch concrete slab overlay. Rebar anchorage #6 shall be installed into the existing slab at 12 inches on centers along the hairpin anchorage. I recommend some rebar stitching of the building's foundation wall cracks or carbon fiber reinforcing and the repairs to the concrete stairs, ramps, and dock leveler equipment.

o  The existing frames 9 through 21.1 steel frames appear to be mostly intact. These frames may require additional support to get them up to the current code. A rigid frame may require some additional stiffeners. Frame 21.1 will require at least two new 8 inch-deep channels estimated to be MC 8x20 or wide flange beams. The roof Z-purlins will have to be replaced at each of the end bays 9 & 10 and 20 and 21.1. I recommend the roof and the wall panels be replaced, over all of the existing structure.

o  The 8 inch pipe columns were embedded into the concrete.  Based on my experience with construction and design, it is expected that there is a spread footing that is estimated to be at least 5 feet square based on the minimum column loads. The footings could be smaller or larger, but this will require some destructive testing. But based on the condition assessment of the existing structure, with reinforcing, stitch and/or carbon fiber reinforcing, the building can be brought up to the current code.

o  The current steel frame will need the bracing repaired. The existing tapered rigid frame may require some additional lateral support either bolt on or welding on of the steel structure. The CMU block wall cracks will need to be tuck pointed using Helifix anchors with epoxy across the cracks. The upper couple of blocks can be removed and replaced. The damaged CMU block office will have to be removed and replaced.

o  The mechanical and electrical systems will have to be replaced. The dock leveling equipment will have to be removed and replaced. The concrete stairs and ramps will have to be removed and replaced. The handicapped access ramp will have to be repaired.

o  The west building shipping area may need some paving or drainage work.

NILFISK-FWP-4035

NILFISK-FWP-4036



Respectfully,

D. Craig Evans, P.E.
Structural Engineer #8947
ACE Engineering, Inc. #1304

# Daniel (Craig) Evans
## CV
### 3/14/2023

**ACE Engineering, Inc.**
Principal Structural Engineer/Owner
PO Box 21671
Little Rock, AR 72221

Small Structural Engineering firm since April 12, 2007 — Design and/or analyze small to medium size projects. Churches, Parts of University buildings, foundation repairs, retaining walls, parts for prisons, parts of hospitals, pole barns, residential buildings, log framed structures, and other structures.

**Education:** BS in Civil Engineering — Graduated in December 1987 from Memphis University, Memphis Tennessee. December 19, 1987

**Registration & Professional Membership**: Licensed Professional Engineer in Arkansas AR License Number: 8947 — July 19,1996

**Training:**
- Kone Crane — Overhead crane inspection — April 6, 2018
- Hayward Baker Foundation Repair Seminar — April 12,2018
- Design Professional Liability Education — April 24, 2018
- FE 302 — Facilities Engineering July 17, 2020

**Awards:**
Engineer of the Year in 2015 for the Corps of Engineers. Achievement Medal for Civil Service for the design and repair of Montgomery Point Lock and Dam Miter Gates, and miscellaneous performance awards.

**Professional Experience:**

**Structural Engineer GS-0810-13, 6/08/2009 to 10/23/2021**
**Senior Structural Engineer, Technical GS-13, HSS (Hydraulic Steel Structures)**
**US Army Corps of Engineers**
PO Box 867, Little Rock, AR 72203-0867

Serve as a Civil Engineer (Structural) My main responsibilities are working as the Hydraulic Steel Structure Expert. I inspect write reports and lead design team for the repair of the gates for the Little Rock District Corps of Engineers. I also work with the two marine terminal crews to repair the gates as necessary to keep them in operations. I am in the field at least 40 percent of the time. Design and quality assurance for the construction of 110' stoplogs/bulkheads. Design & fabrication of dewatering boxes to access center post anchorage.

I served as the onsite advisor for the Arkansas River historic flood of 2019. I was working in the Riverdale, Little Rock Area where a ring levee was in danger of breaking. I worked to



**EXHIBIT**
**1**

NILFISK-FWP-4037

help protect this area from significant millions of dollars of flood damage. I worked with the fire department to condemn an occupied apartment building due to foundation failure. I made recommendations to provide a riprap rock support berm to support the failing concrete retaining wall where 400 tons of rock were moved in 36 hours.

My current specific responsibilities include design coordinator for a Maintenance Bulkhead and Siphon and the Norfork Dam in North Arkansas. This project is under contract for $7.2 million dollar water resource project that is under construction. I am also responsible for overseeing the construction of the Greers Ferry Maintenance Bulkhead and Closure structure. The Greers Ferry project is a $2.2 million construction project, which includes winches and a floating steel bulkhead. I am the design team leader for the May Branch flood control project that includes 8 box culverts under roadways and railroads a gated hydraulic structure through an existing levee and a roadway bridge. I inspect bridges, hydraulic steel structures, concrete dams, earth dams and levees. I perform engineering analysis on existing bridges, dams, retaining walls, box culverts other structural items.

**Senior Structural Engineer, 07/2008 to 05/2009**
**Thompson Engineering, Inc., 2970 Cottage Hill Road, Mobile, AL 36606**

Project Experience includes a foundation design for a 500,000 SF, 180 feet tall, nuclear fabrication facility in TN for Chicago Bridge and Iron (CB&I). The building is supported on 36-inch concrete caissons embedded into rock.  The river terminal facilities are on a major river system that includes docks wharf and barge unloading and loading facility.  Olin Chemical, Phase II of Evaporator – Foundation Design – The new foundation has a deep foundation system with an open steel frame system that provides support for the manufacturing equipment.

**Rush Evans Construction, Inc & ACE Engineering, Inc, 05/2006 to 07/2008**

I provided structural design plans and specifications, structural engineering reports and construction management for various commercial and residential projects.  ACE Engineering specialized in providing structural engineering connection design for buildings. Rush Evans Construction constructed commercial and residential structures. Work included project management, design and construction management.  Rush Evans Construction was a certified metal building contractor. Projects included the following:
- Wal-Mart Foundation Repair
- First Baptist Church – steel fabrication connection design
- Stop Log Design – Ottumwa Iowa
- Prison Facility in Harrison AR, steel fabrication connection design
- 16000 sf metal building with bridge crane facility

**Johnson Machine Works, Inc.,** 05/99 to 04/06
**318 N. 11th Street, Chariton, IA 50049**

Structural Engineer & Estimator – Responsible for designing, estimating, sales and negotiating heavy fabrication projects for hydropower plants, Corps of Engineers and Bureau of Reclamations projects. My responsibilities included: material take-offs; labor estimates; written proposals; and negotiating the contracts. Project experience included

NILFISK-FWP-4038

designing water towers, lifting equipment, hydraulic steel structures, foundation design, tainter gates and miter gates. Projects included the following:

- Table Rock Aux. Tainter Gates - $5 million
- Bankhead L&D Miter Gates - $5 million
- Pleasant Lake North Dakota 260,000-gallon standpipe.
- Dover Minnesota – Water Tower Single Pedestal
- Swan Island Pump Station CSO – Portland Oregon Bulkhead

**Civil/Structural Engineer, GS-0810-07 to GS-12,** 03/22/1988 to 05/15/1999
**US Army Corps of Engineers, Little Rock District**

Served as a licensed Professional Engineer;
Designing buildings, hydraulic steel structures and analyzing existing structures for structural integrity. The projects ranged from $50,000 to $200 Million.  Project experience included locks and dams, buildings and bridges for structural adequacy. Project designs include miter gates for Montgomery Point Lock and Dam and tainter gates for Table Rock Dam, and extensive experience with maintenance and repair of the locks and dams on the Arkansas River.  Structural design experience includes steel structures, concrete retaining walls, CMU block construction, and specialty machining and fabrication.

As a structural engineer for the Corps of Engineers, I managed construction contracts for the repair of locks and dams, reviewed requests for proposals; worked with engineers and contractors; reviewed shop drawings; developed 3-D STAAD computer models; made construction estimates and designed detailed engineering drawings.

**Specialty Expertise:**
Hydraulic steel structures or Dam Gates – Tainter gate, miter gate, bulkhead & stop log design, construction and repair. Designed Table Rock Tainter Gates, Montgomery Point Miter Gates, Uttumwa Stoplogs
Worked with for a steel fabrication company that built tainter gates, miter gates, and bulkheads. I helped edit the "Improving Reliability of Spillway Gates" December 2002 USSD publication.
Wood framed structures – worked as a carpenter in the summers in high school & college.

NILFISK-FWP-4039

**EXHIBIT 2 – SITE VISIT PHOTOS**



East Building looking at Column Line 9



Column Line 9

**EXHIBIT**

**2**



Column Line 9 – East Building



Column C-9

NILFISK-FWP-4041



Column Line 9 – front rigid frame



Undamaged rigid frames

3

NILFISK-FWP-4042



8" Interior Columns



Interior steel columns and rigid frame support

4



Temporary wood wall



Damaged purlins at column line 9 & 10 – cable bracing still in place

NILFISK-FWP-4044



Column C14 cable bracing location



Cable bracing

NILFISK-FWP-4045



Column line 16 with cable bracing



Column line 16 with cable bracing

7



Column line 19 with cable bracing



Electrical equipment between column line 9 & 10

NILFISK-FWP-4047



Electrical equipment between column line 9 & 10



Electrical equipment between column line 9 & 10

NILFISK-FWP-4048



CMU block office spaced braced frame and end wall



CMU block office space

10



Rigid frame at Column Line 9



CMU block wall

NILFISK-FWP-4050



8" CMU block wall



Column base anchorage connection

12

NILFISK-FWP-4051



6" CMU block wall broken off



Anchor bolt failure

NILFISK-FWP-4052



Open space north of the building



Concrete ramp into the East building

14

NILFISK-FWP-4053



Dock leveler equipment



Foundation of East building looking north

15

NILFISK-FWP-4054



Foundation of East building looking southwest



From the east building looking southeast

NILFISK-FWP-4055



From the east building looking southeast



Foundation wall approximately 4' tall

17

NILFISK-FWP-4056



East Building



8" Diameter Column supports with embedded base plate

NILFISK-FWP-4057



Anchorage held while the steel member failed



Concrete/handrail damage

19



Cracked and broken CMU block office



Column line 9

NILFISK-FWP-4059



8" Column with concrete foundation blackout



Column Line 21.1 East building end wall

NILFISK-FWP-4060



West building foundation crack



Trailer Park behind the building

22

NILFISK-FWP-4061



Anchor bolt failure



Anchor bolt failure with some spalled concrete

NILFISK-FWP-4062



Tapered end frame at X braced frame



6" wide steel flange of tapered rigid frame

NILFISK-FWP-4063



6" wide steel flange of tapered rigid frame



6"x1/4" wide flange steel rigid frame

25



6"x1/4" wide flange steel rigid frame – 24" deep at the haunch



8" wide flange end column

NILFISK-FWP-4065



8" depth of wide flange beam estimated to be W8x31



Flange thickness

27



8" Deep MC8x20 columns damaged during the tornado



CMU block wall cracked during the tornado

28

NILFISK-FWP-4067



CMU block wall cracked during the tornado



CMU block wall cracked during the tornado

29

NILFISK-FWP-4068



CMU block wall cracked during the tornado



CMU block wall cracked during the tornado

NILFISK-FWP-4069



West building looking east



Rigid frame laterally supported by CMU block walls

NILFISK-FWP-4070



Existing manufacturing building plan



West building removed

NILFISK-FWP-4071



End frame of east building



8" diameter columns supporting the metal building

33

NILFISK-FWP-4072



W8 steel columns used to frame the end wall



Concrete wall on the west building

34



Cracked concrete stairs



Dock levelers that will need to be replaced

35



Drainage issue on the west side of the building



Vertical crack is an expansion joint, the horizontal joint can be repaired

36



Damage to stair handrails



Damage to the concrete stairs

37

NILFISK-FWP-4076



Column support blockout



Dock leveling equipment and the handicap ramp

NILFISK-FWP-4077



Damaged to the metal building ledge



Stair handrail damage

NILFISK-FWP-4078



Damage dock leveling equipment



Handrail and concrete stair damage

40

NILFISK-FWP-4079



Handrail and concrete stair damage



Handrail and concrete ramp damage

NILFISK-FWP-4080



Anchor bolt failure



Damage mechanical equipment

42

NILFISK-FWP-4081



Drainage issues on west building



Drainage issues on west building

NILFISK-FWP-4082



Handicap ramp damage



Concrete slab with Trailor Park in the rear

44



Concrete slab with Trailor Park in the rear



Concrete slab with dock leveling equipment

NILFISK-FWP-4084



Damaged office area



Temporary wall damaged

NILFISK-FWP-4085



Front entrance



Damaged wall panels

NILFISK-FWP-4086



Damaged wall panels



Damaged wall panels

48

NILFISK-FWP-4087



Damaged wall panels



Damaged concrete stairs and handrails

49

NILFISK-FWP-4088



Dock leveling equipment



Frame 9 with damaged Z-purlins

NILFISK-FWP-4089



Frame 9 with 8-inch column intact



Frame 9 with CMU block wall support

NILFISK-FWP-4090



From the Envista's Forensics Report



Example detail of what the existing foundation at the 8" columns should look like

52

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

August 7, 2023

Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.
Emily Milholen McCord
4206 South J.B. Hunt Drive, Ste. 200
Rogers, AR 72758-8131

**Subject:    Repair Estimate and Evaluation of Tornado Repair Cost Estimate prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023**

**I.     Introduction and Description of Assignment**

I am a Senior Preconstruction Specialist for Nabholz Corporation in Little Rock, Arkansas. Nilfisk, Inc. and Nilfisk Holding A/S ("Nilfisk") engaged me as a testifying expert in the lawsuit between Nilfisk and Fort Worth Partners, LLC ("FWP"), currently pending in the United States District Court for the Western District of Arkansas. I was asked to evaluate the Tornado Repair Cost Estimate attached as Exhibit D to the Engineering Evaluation Report prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023 ("MKA Report"), and provide an estimate for the approximate cost to repair the industrial building located at 979 E. Robinson Avenue ("Building").

This report provides my opinions and basis for my opinions as required under Rule 26(A)(2)(B) of the Federal Rules of Civil Procedure. My calculations and analyses are based on my education, training, and experience in construction and construction project cost estimating.

**a.     Qualifications and Experience**

I currently work as a Senior Preconstruction Specialist for Nabholz Corporation. Prior to my current role, I worked as a Vice President of Business Development & Preconstruction for Baldwin and Shell Construction Company. I earned my bachelor's degree in landscape architecture from the University of Arkansas in Fayetteville, Arkansas. I am Certified Professional Estimator (American Society of Professional Estimators), and a Certified Construction Contract Administrator (Construction Specifications Institute). For more information regarding my education, qualifications, and experience, please see my *curriculum vitae* is attached as Exhibit 1.

**b.     Publication History**



EXHIBIT
3

NILFISK-FWP-4092

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

I have not authored any publications in the past ten years.

**c.      Testimonial History**

I have not testified as an expert witness prior to this case.

**d.      Fee Schedule**

I charge $250 per hour for the work performed on behalf of Nilfisk.

**e.      Materials Reviewed**

To prepare my opinions, I reviewed the following documents and materials.

| Document Title | Bates Number |
|---|---|
| Plaintiff's Complaint and Exhibits, dated September 6, 2022 | n/a |
| Plaintiff's Expert Disclosures, June 12, 2023 | n/a |
| CV of Plaintiff's Expert – Kevin McMahon | FWP-000136 – 000137 |
| CV of Plaintiff's Expert – Andre E. Slintak | FWP-000138 – 000141 |
| Engineering Evaluation Report prepared by Andre Slintak, PE and Kevin McMahon of MKA International, Inc., dated June 9, 2023, and Exhibits | FWP-000001 – 000135 |
| J.S. Held Estimate for Repairs | NILFISK-FWP-0028 – 0068 |
| Envista Forensics Report on Structural Damage After Tornado at Nilfisk Inc. Warehouse in Springdale, AR, April 26, 2022, prepared by Guillermo Ramirez | NILFISK-FWP-0069 – 0102 |
| Letter regarding Nilfisk Termination of Lease, May 26, 2022 | NILFISK-FWP-0103 – 0109 |
| Springdale site – Tornado Pictures | NILFISK-FWP-1207 – 1208 |

2

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

| | |
|---|---|
| C.R. Crawford Construction Estimate, May 19, 2023 | FWP-000149 |
| Napa Construction LLC Estimate | FWP-000150 – 0151 |
| Structural Engineering Inspection Report, August 7, 2023, prepared by D. Craig Evans, P.E. | NILFISK-FWP-4025 – NILFISK-FWP-4036 |
| Pinnacle Structures Inc. Materials Information | NILFISK-FWP-4020 – NILFISK-FWP-4024 |

**II.    Analysis and Estimate**

    *a.    Repair Estimate*

The estimate for the approximate cost to repair the Building attached as Exhibit 2, $14,253,578, ("Estimate") is provided solely to rebut the Tornado Repair Cost Estimate attached as Exhibit D to the MKA Report. In addition to the documents above, the Estimate is based upon the observations, analysis, and conclusions within the Structural Engineering Inspection Report prepared by D. Craig Evans and the Envista Forensics Report on Structural Damage After Tornado at Nilfisk Inc. Warehouse in Springdale, AR, April 26, 2022, prepared by Guillermo Ramirez. The original Building plans are not available, and as a result, the scope of the Estimate is based upon the observations and recommendations included within the reports identified above.

The Building is an industrial building that is approximately 200,000 square feet built with steel structural components, with R-panel steel siding and standing seam steel roof. There are interior offices and restrooms within the Building.

The pricing contemplates the use of contemporary materials of like, kind and quality.

The scope of this estimate is limited to full replacement of impacted Building components, specifically steel, siding, roofing, insulation, interior finishing for restrooms and offices, HVAC and electrical wiring and distribution. The Estimate is governed by the following assumptions and exclusions.

Assumptions:

- Access to be provided in an unimpeded manner/fashion to the General Contractor;
- Work to be performed on one continuous basis;
- Work to be performed during normal business hours;

3

NILFISK-FWP-4094

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

- Work to be performed in a code-compliant manner; and
- Work to be completed in a 10-month construction period.

Exclusions:

- Topping slab and reinforcement allowances (totaling $749,055.00), as this line item and all related work are outside of the scope of Nilfisk's obligation per the terms of the parties' Industrial Building Lease.

This concept estimate was produced using cost data history, competitive bidding data from similarly-scoped projects and marketplace input from select vendors. Quantities for the estimate were developed from my understanding of the required square footage and narratives published by the above-referenced report and related observations of D. Craig Evans. Where the documents could not yet provide detail, the Estimate made assumptions as outlined herein.

   *b.*   *Insurance Value Estimate*

As part of my review of this matter, I have also reviewed the adjusted claim estimate of approximately $9.4 million prepared by J.S. Held (NILFISK-FWP-0028 − 0068) with respect to the damage sustained to the Building. A copy of the J.S. Held estimate is attached as Exhibit 3. That the adjusted claim prepared in April 2022 is less that the rebuild estimate in August 2023 is in line with what I would have expected. In my experience, companies, specifically including insurance companies, often value construction claims based upon national indexes, most namely, the Design Cost Data ("DCD") Index related to average square foot construction costs.

Using the DCD index, in the first quarter of 2021 when Nilfisk worked to place the full replacement cost insurance, I would have expected the insured value of the Building to be approximately $8 million. Likewise, using the DCD Index, in August of 2023, I would have expected the insured value of the Building to be approximately $10.3 million. A summary of calculations of expected value and the DCD Index information relied upon for the calculations is included below.

4

NILFISK-FWP-4095

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

Analysis of Insurance Quote into anticipated 2021 and 2023 Values

* Assumed value derived from a $9,428,939 estimated insurance quote in Q2 of 2022

|  | 21-Mar | 22-Apr | 23-Aug |
|---|---|---|---|
| DCD Index | 670 | 790 | 870 |
| Initial SF Value* |  | 47.14 |  |
| Index based multiplier | 0.85 | 0.00 | 1.10 |
| Adjusted SF Value | 39.98 | n/a | 51.91 |
| Building Value | $7,995,899 | $9,428,929 | $10,382,734 |



**DCD 2019 Cost Escalation Index Table**

Use this index table along with the regional modifiers to customize case study costs to a projected date and location.

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 258 | 259 | 260 | 261 | 262 | 263 | 264 | 264 | 264 | 265 | 265 | 266 |
| 1999 | 266 | 267 | 268 | 269 | 270 | 271 | 272 | 274 | 274 | 275 | 276 | 276 |
| 2000 | 277 | 278 | 280 | 282 | 284 | 285 | 286 | 287 | 288 | 288 | 289 | 289 |
| 2001 | 289 | 290 | 292 | 294 | 296 | 297 | 298 | 299 | 299 | 300 | 300 | 300 |
| 2002 | 299 | 300 | 302 | 304 | 306 | 307 | 308 | 309 | 309 | 311 | 311 | 311 |
| 2003 | 311 | 312 | 314 | 316 | 318 | 320 | 321 | 320 | 322 | 324 | 325 | 325 |
| 2004 | 326 | 327 | 329 | 331 | 335 | 337 | 337 | 338 | 339 | 340 | 340 | 340 |
| 2005 | 356 | 357 | 357 | 358 | 360 | 361 | 360 | 365 | 368 | 370 | 371 | 376 |
| 2006 | 385 | 386 | 386 | 387 | 387 | 389 | 390 | 391 | 392 | 395 | 395 | 396 |
| 2007 | 400 | 401 | 402 | 401 | 402 | 405 | 410 | 415 | 415 | 420 | 421 | 422 |
| 2008 | 425 | 427 | 427 | 427 | 428 | 430 | 432 | 434 | 434 | 436 | 437 | 439 |
| 2009 | 440 | 442 | 442 | 443 | 444 | 446 | 447 | 449 | 449 | 450 | 451 | 453 |
| 2010 | 455 | 458 | 458 | 460 | 461 | 462 | 463 | 463 | 465 | 465 | 466 | 466 |
| 2011 | 467 | 467 | 467 | 471 | 472 | 473 | 473 | 475 | 476 | 476 | 476 | 477 |
| 2012 | 477 | 477 | 477 | 481 | 482 | 483 | 483 | 485 | 489 | 489 | 489 | 490 |
| 2013 | 490 | 490 | 490 | 494 | 495 | 496 | 496 | 498 | 498 | 499 | 499 | 499 |
| 2014 | 499 | 500 | 501 | 502 | 503 | 504 | 504 | 507 | 511 | 513 | 513 | 513 |
| 2015 | 515 | 517 | 518 | 519 | 521 | 522 | 524 | 525 | 527 | 528 | 528 | 528 |
| 2016 | 533 | 536 | 541 | 542 | 545 | 546 | 547 | 548 | 548 | 551 | 551 | 551 |
| 2017 | 554 | 558 | 561 | 563 | 564 | 566 | 569 | 571 | 574 | 576 | 576 | 576 |
| 2018 | 575 | 578 | 580 | 582 | 584 | 585 | 588 | 589 | 593 | 595 | 595 | 595 |
| 2019 | 597 | 600 | 603 | 604 | 605 | 608 | 610 | 612 | 614 | 615 | 617 | 618 |
| 2020 | 620 | 622 | 624 | 625 | 626 | 628 | 630 | 632 | 634 | 636 | 638 | 640 |
| 2021 | 640 | 641 | 643 | 645 | 647 | 649 | 651 | 653 | 655 | 658 | 659 | 660 |
| 2022 | 660 | 661 | 663 | 665 | 667 | 669 | 672 | 674 | 675 | 679 | 681 | 682 |
| 2023 | 682 | 684 | 686 | 688 | 690 | 692 | 694 | 696 | 698 | 700 | 702 | 704 |
| 2024 | 704 | 706 | 708 | 710 | 712 | 714 | 716 | 718 | 720 | 724 | 726 | 728 |

Select a Design Cost Data case study file, which is similar to a project you have in mind, for a "base." Using the index table, find the "base" index number. Determine a target date for which your project will go out to bid for the average month of the construction period, for a target date" if it is to be negotiated), and find the index number. Divide the "target" index number by the "base" index number to get a "multiplier." Multiply the cost per square foot by the multiplier to determine the updated cost per square foot. Multiply the updated cost per square foot by the total square feet of your project to get an updated estimated cost. (Use the regional modifier guide on the reverse of this card to determine the cost variations due to area differences.)

5

NILFISK-FWP-4096

Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation
1718 Aldersgate Rd
Little Rock, AR 72205

Respectfully,

*/s/ Jeff Marcussen*_____
Jeff Marcussen
Senior Preconstruction Specialist
Nabholz Corporation

6

NILFISK-FWP-4097

JEFF MARCUSSEN

10 St. Andrews Drive

Little Rock, Arkansas 72212

Mobile: (501) 831-3818

jeffmarcussen1@gmail.com

**PROFESSIONAL EXPERIENCE:**

Nabholz, 2018 - Present

• Senior Preconstruction Specialist (2018 – Present)

Baldwin and Shell Construction Company, 2005-2018

• Vice President of Business Development & Preconstruction (2016 – 2018)

• Director of Preconstruction & Construction Technology (2015-2016)

• Director of CAD/BIM Services (2013 - 2015):

• Estimator (2005 – 2013): In 2012, obtained Certified Professional Estimator (CPE) Status from American Society of Professional Estimators.

Larson Burns and Smith, Inc., 2003-2005

• Designer and construction administrator focusing on city and campus master planning, city parks, urban plazas, environmental restoration, and large-scale commercial projects.

**EDUCATION/CERTIFICATIONS:**

Bachelor of Landscape Architecture; University of Arkansas at Fayetteville

CPE, Certified Professional Estimator

CCCA, Certified Construction Contract Administrator

Professional Associations:

AGC Associated General Contractors of America, Board of Directors, Arkansas Chapter

ASPE American Society of Professional Estimators, Past President, Arkansas Chapter

Little Rock School District EXCEL-Construction Education Program

Arkansas Division of Public-School Academic Facilities and Transportation Review Board Vice Chair

Little Rock Zoo Board of Governors

**PERSONAL:** St. Marks Episcopal Church, Central Arkansas Heart Association, Heart Walk Chair 2022, United Soccer Club Coach, Arkansas Arts Center Contemporaries

| EXHIBIT |
|---|
| **1** |

**PROJECT NAME** *Warehouse Building R.O.M.*
PROJECT LOCATION  Springdale, AR
REVIEW DATE
ARCHITECT
ESTIMATED DURATION  10 mnth
BUILDING SIZE  200,000 sf

| | Location | Group | Description | Takeoff Quantity | Grand Total Amount | Grand Total Price | % Total |
|---|---|---|---|---|---|---|---|
| 1 | BUILDING | | | | | | |
| 2 | | 01-11-00.00 | Summary Of Work | | | | |
| 3 | | | General Conditions | 10 mnth | 536,394 | 53,639,40 /mnth | 3,76% |
| 4 | | | General Requirements | 10 mnth | 299,291 | 29,929,07 /mnth | 2,10% |
| 5 | | | Building Permit & Review Fee Allowance | 1 lsum | 29,929 | 29,929,08 /lsum | 0.21% |
| | | | Summary Of Work | | 865,614 | /mo | 6.07% |
| 6 | | 01-45-00.00 | Quality Control | | | | |
| 7 | | | Testing & Inspections Allowance | 200,000 sqft | 53,132 | 0,27 /sqft | 0.37% |
| | | | Quality Control | | 53,132 | /mo | 0.37% |
| 8 | | 03-05-00.00 | Concrete | | | | |
| 9 | | | *Topping Slab and Reinforcing Allowance - EXCLUDED* | *200,000 sqft* | | */sqft* | |
| 10 | | | Bollards | 12 each | 5,101 | 425.06 /each | 0.04% |
| | | | Concrete | | 5,101 | /sqft | 0.04% |
| 11 | | 05-05-00.00 | Structural Steel | | | | |
| 12 | | | Overhead Door Frames | 6 each | 10,201 | 1,700,23 /each | 0.07% |
| 13 | | | Bollards - Primed | 12 each | 3,424 | 285.35 /each | 0.02% |
| 14 | | | Guardrail | 90 lnft | 10,868 | 120,75 /lnft | 0.08% |
| | | | Structural Steel | | 24,493 | /sqft | 0.17% |
| 15 | | 06-05-05.00 | Rough Carpentry | | | | |
| 16 | | | Rough Carpentry | 44 wks | 53,336 | 1,212,18 /wks | 0.37% |
| | | | Rough Carpentry | | 53,336 | /sqft | 0.37% |
| 17 | | 07-92-00.00 | Joint Sealants | | | | |
| 18 | | | Caulking & Sealants-Building | 16,000 lnft | 63,759 | 3.98 /lnft | 0.45% |
| | | | Joint Sealants | | 63,759 | /sqft | 0.45% |
| 19 | | 08-11-00.00 | Metal Doors And Frames | | | | |
| 20 | | | HM Doors / Frames / Hardware - Single | 14 each | 39,246 | 2,803.29 /each | 0.28% |
| | | | Metal Doors And Frames | | 39,246 | /sqft | 0.28% |
| 21 | | 08-33-00.00 | Overhead Coiling & Sectional Doors | | | | |
| 22 | | | Sectional Doors - Dock Doors / Seal / Levelers | 6 each | 146,645 | 24,440,79 /each | 1.03% |
| | | | Overhead Coiling & Sectional Doors | | 146,645 | /sqft | 1.03% |
| 23 | | 08-51-13.00 | Aluminum Windows | | | | |
| 24 | | | Windows for Breakroom | 32 sqft | 2,720 | 85.01 /sqft | 0.02% |
| | | | Aluminum Windows | | 2,720 | | 0.02% |
| 25 | | 09-91-23.00 | Painting | | | | |
| 26 | | | Finishing / Painting | 200,000 sqft | 212,529 | 1.06 /sqft | 1.49% |
| | | | Painting | | 212,529 | /sqft | 1.49% |
| 27 | | 10-21-13.00 | Toilet Compartments | | | | |
| 28 | | | Toilet compartment components | 2 each | 2,939 | 1,469,37 /each | 0.02% |
| | | | Toilet Compartments | | 2,939 | /sqft | 0.02% |
| 29 | | 10-44-00.00 | Fire Protection Specialties | | | | |
| 30 | | | Fire Ext. - Wall Hungs | 25 each | 3,980 | 159,21 /each | 0.03% |
| 31 | | | Knox Box | 1 each | 1,542 | 1,542,27 /each | 0.01% |
| | | | Fire Protection Specialties | | 5,522 | /sqft | 0.04% |
| 32 | | 13-34-19.00 | Metal Building Systems | | | | |
| 33 | | | PEMB w Insulation and Erection | 200,000 sqft | 7,140,664 | 35,70 /sqft | 50,10% |
| | | | Metal Building Systems | | 7,140,664 | /sqft | 50.10% |
| 34 | | 21-12-00.00 | Fire-Suppression | | | | |
| 35 | | | Fire Protection System | 200,000 sqft | 1,009,511 | 5,05 /sqft | 7.08% |
| | | | Fire-Suppression | | 1,009,511 | /sqft | 7.08% |
| 36 | | 23-05-00.00 | Mechanical Systems | | | | |
| 37 | | | Mechanical Complete | 200,000 sqft | 1,912,757 | 9.56 /sqft | 13.42% |
| | | | Mechanical Systems | | 1,912,757 | /sqft | 13.42% |
| 38 | | 26-05-00.00 | Electrical | | | | |
| 39 | | | Electrical Complete | 200,000 sqft | 1,487,700 | 7.44 /sqft | 10.44% |
| | | | Electrical | | 1,487,700 | /sqft | 10.44% |
| 40 | | 31-05-00.00 | Earthwork | | | | |
| 41 | | | Remove Remaining Building | 60,000 sqft | 637,586 | 10,63 /sqft | 4,47% |
| | | | Earthwork | | 637,586 | /sqft | 4.47% |
| 42 | | 32-06-10.00 | Concrete Site | | | | |
| 43 | | | Concrete Paving - Misc Repair | 10,000 sqft | 90,325 | 9,03 /sqft | 0,63% |
| | | | Concrete Site | | 90,325 | /sqft | 0.63% |
| | | | BUILDING | | 13,753,577 | | 96.49% |

### Estimate Totals



| Description | Amount | Totals | Rate | Cost per Unit |
|---|---|---|---|---|
| Labor | 53,589 | | | |
| Material | 5,308,062 | | | |
| Subcontract | 5,636,056 | | | |
| Equipment | | | | |
| Other | 2,755,871 | | | |
| | 13,753,578 | 13,753,578 | | |
| Contingency | 500,000 | | 3,635 % | |
| Total | | 14,253,578 | | 71.268 /sf |

EXHIBIT
2

NILFISK-FWP-4099

PROJECT NAME   Warehouse Building R.O.M
Springdale, AR

| Group | Description | QUANTITY | SUBTOTAL | TOTAL AMOUNT | % Total |
|---|---|---|---|---|---|
| 01-01-00 | Summary Of Work | | | | |
| | General Requirements | | | | |
| | General Conditions | 16,00 mnth | 510,782 | 526,284 | 3.767% |
| | General Requirements | 16,00 mnth | 280,000 | 280,291 | 2.006% |
| | Building Permit & Review Fee Allowance | 1,00 llum | 29,550 | 29,929 | 0.213% |
| | General Requirements | 16,00 mnth | 824,282 | 855,614 | 6.873% |
| | Summary Of Work | 16,00 mo | 824,282 | 855,614 | 6.073% |
| 01-04-00 | Quality Control | | | | |
| | Testing/Commissioning | | | | |
| | Testing & Inspections Allowance | 200,000,00 sqft | 50,000 | | 0.377% |
| | Testing/Commissioning | 16,00 mo | 50,000 | | 0.373% |
| | Quality Control | 16,00 mo | 50,000 | 53,132 | 0.373% |
| 03-00-00 | Concrete | | | | |
| | Building Concrete | | | | |
| | Topping Slab and Reinforcing Allowance - EXCLUDED | 200,000.00 sqft | | | |
| | Building Concrete | 200,000.00 sqft | 4,800 | 5,101 | 0.036% |
| | Concrete | 200,000.00 sqft | 4,800 | 5,101 | 0.036% |
| 05-00-00 | Structural Steel | | | | |
| | Structural Steel | | | | |
| | Overhead Door Frames | 5,00 each | 9,000 | 10,201 | 0.073% |
| | Bollards at Overhead | 1,00 each | 3,000 | 3,434 | 0.025% |
| | Guardrail | 90,00 lin | 9,270 | 10,808 | 0.077% |
| | Structural Steel | 200,000.00 sqft | 21,970 | 24,493 | 0.175% |
| 05-05-05 | Rough Carpentry | | | | |
| | Rough Carpentry | | | | |
| | Rough Carpentry | 44,00 rolls | 35,200 | 53,336 | 0.374% |
| 07-92-00 | Joint Sealants | | | | |
| | Joint Sealants | 200,000.00 sqft | 35,200 | 53,336 | 0.374% |
| | Caulking And Sealant Options | | | | |
| | Caulking / Sealant Caulking | | | | |
| | Caulking And Sealant Options | 10,000,00 lin | 60,000 | 63,759 | 0.447% |
| | Joint Sealants | 200,000.00 sqft | 60,000 | 63,759 | 0.447% |
| 08-11-00 | Metal Doors And Frames | | | | |
| | Doors & Window | | | | |
| | HM Door/Frame/Hardware-Single | 14,00 each | 34,650 | 39,246 | 0.273% |
| | Metal Doors And Frames | 200,000.00 sqft | 34,650 | 39,246 | 0.273% |
| 08-33-23 | Overhead Coiling & Sectional Doors | 200,000.00 sqft | 34,650 | 39,246 | 0.273% |
| | Service Doors | | | | |
| | Sectional Doors w/Lock, Clear, Track/counter | 5,00 each | 138,000 | 146,645 | 1.029% |

NILFISK-FWP-4100

| Group | Description | QUANTITY | Labor Cost/Unit | Material/Price | MATERIAL | LABOR | Sub Price | SUB | EQUIP | OTHER | SUBTOTAL | Total Cost/Unit | TOTAL AMOUNT | % Total | Other Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | Overhead Ceiling & Sectional Doors | | | | | | | | | | | | 146,645 | 1.025% | |
| 08-01-13 | Aluminum Windows | | | | | | | | | | | | 146,645 | 1.025% | |
| /20 | **Aluminum Windows** | 200,000.00 sqft | /sqft | | | | /sqft | 138,000 | | | 138,000 | 0.69 /sqft | 146,645 | 1.025% | |
| 31 | Aluminum Windows | | | | | | | | | | | | | | |
| | Windows to Breakroom | 32.00 sqft | | /sqft | | | 80.00 /sqft | 2,560 | | | 2,560 | 80.00 /sqft | 2,720 | 0.019% | |
| 32 | **Aluminum Windows** | 32.00 sqft | | | | | | 2,560 | | | 2,560 | | 2,720 | 0.019% | |
| 33 09-01-23 | Painting | | | | | | | | | | | | 2,720 | 0.019% | |
| 34 | Interior & Exterior Painting | | | | | | | | | | | | | | |
| 35 | Flooring / Painting | 200,000.00 sqft | /sqft | | | | 1.20 /sqft | 200,000 | | | 200,000 | 1.20 /sqft | 212,529 | 1.461% | |
| | **Interior & Exterior Painting** | 200,000.00 sqft | /sqft | | | | | 200,000 | | | 200,000 | 1.20 /sqft | 212,529 | 1.461% | |
| 36 | **Painting** | 200,000.00 sqft | /sqft | | | | | 200,000 | | | 200,000 | | 212,529 | 1.491% | |
| 10-21-13 | Toilet Compartments | | | | | | | | | | | | | | |
| /20 | **Plastic Toilet Compartment Components** | | | | | | | | | | | | | | |
| 37 | Toilet compartment components | 120 each | 250.21 each | 950.00 each | 1,500 | 500 | | | | | 2,460 | 1,250.21 each | 2,939 | 0.021% | |
| 38 | Wall compartment components | 120 each | 0.00 /sqft | | 1,500 | 900 | | | | | 3,000 | 0.00 /sqft | 2,939 | 0.021% | |
| | **Toilet Compartments** | 147,850.00 sqft | 0.00 /sqft | | 1,900 | 500 | | | | | 2,400 | 0.02 /sqft | 2,939 | 0.021% | |
| 10-44-00 | Fire Protection Specialties | | | | | | | | | | | | | | |
| /20 | Fire Equipment Cabinets | | | | | | | | | | | | | | |
| 41 | Fire Ext. / Wall Hangs | 25.00 each | 30.00 each | 11.00 each | 3,913 | 375 | 375 | | | | 3,913 | 132.00 each | 3,980 | 0.028% | |
| 42 | Fire Box | 120 each | 75.00 each | 1,250.00 each | 1,250 | 75 | 75 | | | | 1,325 | 1,325.00 each | 1,542 | 0.011% | |
| | **Fire Equipment Cabinets** | 200,000.00 sqft | 0.00 /sqft | | 4,063 | 575 | | | | | 4,638 | 0.02 /sqft | 5,522 | 0.039% | |
| | **Fire Protection Specialties** | 200,000.00 sqft | 0.00 /sqft | | 4,063 | 575 | | | | | 4,638 | 0.02 /sqft | 5,522 | 0.039% | |
| 13-34-00 | Metal Building Systems | | | | | | | | | | | | | | |
| /20 | Pre-Engineered Steel Buildings (Consol) | | | | | | | | | | | | | | |
| 44 | Pre-Engineered Steel Buildings (Consol) | 200,000.00 sqft | | 2.00 /sqft | 4,800,000 | | | 1,800,000 | | 1,800,000 | 6,400,000 | 32.00 /sqft | 7,140,684 | 50.097% | |
| 45 | Pre-Engineered Steel Buildings (Consol) | 150,544.00 sqft | | | | | | 1,800,000 | | 1,800,000 | 6,400,000 | 42.51 /sqft | 7,140,684 | 50.097% | |
| | **Metal Building Systems** | 175,150.00 sqft | 0.00 /sqft | | 4,800,000 | | | 6,400,000 | | 1,800,000 | 6,400,000 | 36.55 /sqft | 7,140,684 | 50.097% | $20 /sqft |
| 21-12-00 | Fire-Suppression | | | | | | | | | | | | | | |
| /20 | Fire Protection System | | | | | | | | | | | | | | |
| 48 | Fire Protection System | 200,000.00 sqft | /sqft | | | | 4.75 /sqft | 950,000 | | | 950,000 | 4.75 /sqft | 1,009,511 | 7.083% | |
| | **Fire-Suppression System** | 200,000.00 sqft | /sqft | | | | | 950,000 | | | 950,000 | 4.75 /sqft | 1,009,511 | 7.083% | |
| 22-00-00 | **Mechanical Systems** | 200,000.00 sqft | /sqft | | | | | 950,000 | | | 950,000 | 4.75 /sqft | 1,009,511 | 7.083% | |
| /20 | Mechanical | | | | | | | | | | | | | | |
| 51 | Mechanical Complete | 200,000.00 sqft | /sqft | | | | 9.00 /sqft | 1,800,000 | | | 1,800,000 | 9.00 /sqft | 1,912,757 | 13.415% | |
| 52 | **Mechanical** | 200,000.00 sqft | /sqft | | | | | 1,800,000 | | | 1,800,000 | 9.00 /sqft | 1,912,757 | 13.415% | |
| 26-00-00 | **Mechanical Systems** | 200,000.00 sqft | /sqft | | | | | 1,800,000 | | | 1,800,000 | 9.00 /sqft | 1,912,757 | 13.415% | |
| /20 | Electrical | | | | | | | | | | | | | | |
| 54 | Electrical Complete | 200,000.00 sqft | /sqft | | | | 7.20 /sqft | 1,440,000 | | | 1,440,000 | 7.20 /sqft | 1,487,700 | 10.437% | |
| 55 | **Electrical** | 200,000.00 sqft | /sqft | | | | | 1,440,000 | | | 1,440,000 | 7.20 /sqft | 1,487,700 | 10.437% | |
| 31-00-00 | **Earthwork** | 200,000.00 sqft | /sqft | | | | | 1,440,000 | | | 1,440,000 | 7.20 /sqft | 1,487,700 | 10.437% | |
| /20 | Earthwork | | | | | | | | | | | | | | |
| 57 | Mass Remaining to Bldg | 60,000.00 sqft | /sqft | | | | 10.00 /sqft | 600,000 | | | 600,000 | 10.00 /sqft | 637,586 | 4.473% | |
| | **Earthwork** | 200,000.00 sqft | /sqft | | | | | 600,000 | | | 600,000 | 3.00 /sqft | 637,586 | 4.473% | |
| 32-00-00 | **Earthwork** | 200,000.00 sqft | /sqft | | | | | 600,000 | | | 600,000 | 3.00 /sqft | 637,586 | 4.473% | |
| /20 | Site Concrete | | | | | | | | | | | | | | |
| 60 | Concrete Paving w/Base Repair | 10.00 sqft | /sqft | | | | 9.00 /sqft | 90,000 | | | 90,000 | 9.00 /sqft | 90,325 | 0.634% | |

| Group | Description | QUANTITY | Labor Cost/unit | Material Price | MATERIAL | LABOR | Sub-Price | SUB | Equip Price | EQUIP | OTHER | SUBTOTAL | Total Cost/unit | TOTAL AMOUNT | %Total | Other Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Concrete | | 200,000.00 /sqft | /sqft | | | | 85,000 | 85,000 | | | | 85,000 | 0.43 /sqft | 90,325 | 0.434% | |
| | Concrete Site | 200,000.00 sqft | /sqft | | | | | | | | | 85,000 | 0.43 /sqft | 90,325 | 0.434% | |



Estimate Totals

| Description | Amount | Totals | Rate | Cost per Unit |
|---|---|---|---|---|
| Labor | 53,584 | | | |
| Material | 5,500,552 | | | |
| Subcontract | 1,500,000 | | | |
| Equipment | | | | |
| Other | 270,441 | | | |
| | 13,333,678 | 13,333,678 | | |
| Contingency | 500,000 | | | |
| **Total** | | **14,203,578** | | 71.268 /sf |

| | | | |
|---|---|---|---|
| | | 0.00 % | |

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| | |
|---|---|
| Insured: | Nilfisk, Inc. |
| Property: | 979 E. Robinson Ave. |
| | Springdale, AR 72764 |

| | | | |
|---|---|---|---|
| Claim Rep.: | Mike Grinnan | Cellular: | (314) 899-6950 |
| Company: | Crawford- Global Technical Services | E-mail: | michael_grinnan@us.crawco.com |

| | | | |
|---|---|---|---|
| Estimator: | Mark Hartmann | Cellular: | (913) 209-0136 |
| Position: | Senior Vice President | E-mail: | mhartmann@jsheld.com |
| Company: | J.S. Held, LLC | | |
| Business: | 13200 Metcalf Avenue, Suite 265 | | |
| | Overland Park, KS 66213 | | |

**Claim Number:** 220331-001    **Policy Number:** RDN-21383-HPP    **Type of Loss:** Tornado

| | | | |
|---|---|---|---|
| Date Contacted: | 4/1/2022 9:59 AM | | |
| Date of Loss: | 3/30/2022 9:59 AM | Date Received: | 4/1/2022 9:59 AM |
| Date Inspected: | 4/5/2022 10:00 AM | Date Entered: | 4/25/2022 9:57 AM |

| | |
|---|---|
| Price List: | ARFA8X_MAR22 |
| | Restoration/Service/Remodel |
| Estimate: | 22040036-NILFISK |

**EXHIBIT**

**3**

NILFISK-FWP-0028

NILFISK-FWP-4103

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

This estimate is based on a site inspection completed by J.S. Held's Mark Hartmann on April 4, 2022. This opinion of probable cost is based on the level of detail of "as-built" conditions provided to us by site inspections. We have not been provided any plans for this complex, nor is the demolition complete at this time.

General Building Description: Industrial storage and manufacturing building, built with steel structural components, with R-panel steel siding and standing seam steel roof. The interior of the warehouse space was not finished. There are interior offices and restrooms with typical office finishes.

Cause of Damage:  A tornado knocked down approximately 75% of the structure. Interior finishes were all affected by secondary water damage and debris being blown into the space. The majority of the building was not accessible due to limited access for safety reasons.

Scope Recap:  Demolition and full replacement of affected steel structure, all exterior siding and insulation, all roofing and insulation, and replacement of interior finishes for office spaces and restrooms. Square foot cost to replace all electrical wiring and distribution, and HVAC. The rebuild scope of work is based on the Envista Forensics report and recommendations dated 04/27/2022.

This opinion reflects J.S. Held's assumption of the pre-loss configuration.  The pricing contemplates the use of contemporary materials of "like, kind and quality".  Furthermore, this evaluation is governed by the following assumptions and exclusions.
Assumptions:
 Access to be provided in an unimpeded manner/fashion to the General Contractor.
 Work to be performed on one continuous basis.
 Work to be performed during normal business hours.
 Work to be performed in a code compliant manner.
 Work to be completed in a 12 month construction period.
 Interior dimensions are estimated based on a rough layout provided by Nilfisk, Inc.
 Depreciation applied using an original build date of 1987 for the siding and interior finishes.
 Depreciation applied using an age of one year for the roof.

Exclusions - Costs associated with:
 Emergency services and/or temporary repairs.
 General demolition.
 Hazardous materials testing or removal.
 Accelerated construction periods and overtime.
 Union or prevailing wage rates.
 Code upgrades.
 Relocation of tenants.

This estimate is subject to review by the Insurance Carrier(s) per contract/policy terms and conditions. J.S. Held LLC recommends that all costs that are anticipated to be part of the claim are submitted for review prior to executing contracts.  To the extent that repair costs proceed on a time and materials basis, we recommend that that the adjustment team monitor these repairs and that the insured keep appropriate records, sign in sheets and documentation of these repairs.

This document is prepared for the adjustment team. Reliance upon this document are for the sole use of the intended recipients. J.S. Held LLC reserves the right to change their opinion should further information become available following the preparation of this presentation.

NILFISK-FWP-0029

NILFISK-FWP-4104

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**22040036-NILFISK**

### General Conditions

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 1. Commercial Supervision / Project Management - per hour | 2,000.00 HR | 66.59 | 0.00 | 13,318.00 | 146,498.00 | (0.00) | 146,498.00 |
| *Provides for full-time supervision for the duration of the project. One supervisor for eight hours per day, five days per week, 50 weeks total.* | | | | | | | |
| 2. Cleaning Technician - per hour | 500.00 HR | 44.33 | 2,161.09 | 2,216.50 | 26,542.59 | (0.00) | 26,542.59 |
| *Provides for general daily clean up for duration of project, two laborers for one hour per day, five days per week, 50 weeks total.* | | | | | | | |
| 3. Temporary construction office - portable (trailer) | 12.00 MO | 279.08 | 0.00 | 334.90 | 3,683.86 | (0.00) | 3,683.86 |
| 4. Temporary toilet (per month) | 48.00 MO | 151.00 | 0.00 | 724.80 | 7,972.80 | (0.00) | 7,972.80 |
| 5. Temporary hand washing station (per month) | 12.00 MO | 243.00 | 0.00 | 291.60 | 3,207.60 | (0.00) | 3,207.60 |
| 6. Dumpster load - Approx. 40 yards, 7-8 tons of debris | 12.00 EA | 794.14 | 929.14 | 952.96 | 11,411.78 | (0.00) | 11,411.78 |
| *Provides for one 40-yard dumpster per month for 12 months for general construction debris during reconstruction.* | | | | | | | |
| 7. Telehandler/forklift (per month) - no operator | 6.00 MO | 3,063.00 | 0.00 | 1,837.80 | 20,215.80 | (0.00) | 20,215.80 |
| 8. Crane and operator - 30 ton capacity | 400.00 HR | 172.00 | 0.00 | 6,880.00 | 75,680.00 | (0.00) | 75,680.00 |
| 9. Skid steer loader and operator | 200.00 HR | 88.97 | 0.00 | 1,779.40 | 19,573.40 | (0.00) | 19,573.40 |
| 10. Taxes, insurance, permits & fees (Bid Item) | 1.00 EA | | | | AS INCURRED | | |
| 11. Engineering fees (Bid Item) | 1.00 EA | | | | AS INCURRED | | |
| 12. Asbestos test fee - self test (per sample) | 1.00 EA | | | | OPEN ITEM | | |
| 13. LABOR ONLY | 1.00 EA | | | | OPEN ITEM | | |
| *Provides for a Safety Coordinator for a large scale project, as incurred.* | | | | | | | |
| **Totals:  General Conditions** | | | **3,090.23** | **28,335.96** | **314,785.83** | **0.00** | **314,785.83** |

### Demolition

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 14. General Demolition (Bid Item) | 145,000.00 EA | 5.00 | 0.00 | 72,500.00 | 797,500.00 | (0.00) | 797,500.00 |
| *Provides for a preliminary place holder for demolition of existing structure.* | | | | | | | |
| **Totals:  Demolition** | | | **0.00** | **72,500.00** | **797,500.00** | **0.00** | **797,500.00** |

### Warehouse

### Structural Components

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|

NILFISK-FWP-0030

NILFISK-FWP-4105

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Structural Components**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 15.  Concrete floor sawing - 6" slab | 696.00 LF | 15.19 | 0.00 | 1,057.22 | 11,629.46 | (0.00) | 11,629.46 |
| *Provides for saw cutting around columns to remove them for replacement. 4 X 2LF cuts per column.* | | | | | | | |
| 16.  Concrete Finisher - per hour | 348.00 HR | 77.24 | 0.00 | 2,687.96 | 29,567.48 | (0.00) | 29,567.48 |
| *Provides for additional labor to remove saw cut concrete around columns and prepare it for new column and finish concrete.* | | | | | | | |
| 17.  Concrete Piles - 18" diameter | 522.00 LF | 72.07 | 700.82 | 3,762.06 | 42,083.42 | (7,364.59) | 34,718.83 |
| *Provides for 6LF piles to replace the columns. This is an estimate only and will need to be confirmed once the demolition is completed.* | | | | | | | |
| 18.  Column - 8" pipe w/base pl./top bkt. | 2,320.00 LF | 56.53 | 8,656.67 | 13,114.96 | 152,921.23 | (35,681.62) | 117,239.61 |
| *Provides for three 8" columns per 25LF of space.* | | | | | | | |
| 19.  Concrete slab on grade - 6" - finished in place | 696.00 SF | 5.33 | 194.76 | 370.96 | 4,275.40 | (2,137.70) | 2,137.70 |
| 20.  Wide Flange Beam - 20 7/8"d. x 6 1/2"w. x 3/8"thick | 7,076.00 LF | 76.55 | 38,158.92 | 54,166.78 | 633,993.50 | (147,931.82) | 486,061.68 |
| *Provides for beams and end columns to span 200 LF. This is an estimate on size only and will be confirmed once plans are prepared to conform with current building standards and codes.* | | | | | | | |
| 21.  Column anchor bolt - 3/4" x 12" x 2" w/2 nuts & washers | 348.00 EA | 18.37 | 373.57 | 639.28 | 7,405.61 | (1,727.97) | 5,677.64 |
| 22.  Steel purlins - C-shape - 8" | 60,000.00 LF | 9.18 | 35,509.50 | 55,080.00 | 641,389.50 | (149,657.55) | 491,731.95 |
| *Provides for steel purlins 4' on center for the entire length of the roof and walls.* | | | | | | | |
| 23.  Paint column - two coats | 522.00 LF | 5.03 | 27.48 | 262.56 | 2,915.70 | (1,457.85) | 1,457.85 |
| *Provides for 6 LF of safety yellow on each column.* | | | | | | | |
| 24.  Concrete Finisher - per hour | 80.00 HR | 77.24 | 0.00 | 617.92 | 6,797.12 | (0.00) | 6,797.12 |
| *Provides for additional labor to remove and replace bolts around perimeter of concrete slab to secure perimeter edge of new building. Two concrete finishers/laborers for ten hours each, five days per week, one full week.* | | | | | | | |
| 25.  Structural Steel Installer - per hour | 80.00 HR | 57.51 | 0.00 | 460.08 | 5,060.88 | (1,180.88) | 3,880.00 |
| *Provides for additional labor to adjust tension cables as recommended by engineer.* | | | | | | | |
| **Totals:  Structural Components** | | | 83,621.72 | 132,219.78 | 1,538,039.30 | 347,139.98 | 1,190,899.32 |

**Exterior Elevations**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 26.  R&R Wall/roof panel - ribbed - 26 gauge - 1 1/8" to 1 1/2" | 12,100.00 SF | 4.75 | 2,784.21 | 5,747.50 | 66,006.71 | (27,573.24) | 38,433.47 |
| *Provides for the removal and replacement of damaged siding still on the upright sections of building.* | | | | | | | |
| 27.  Wall/roof panel - ribbed - 26 gauge - 1 1/8" to 1 1/2" | 41,400.00 SF | 4.23 | 9,526.14 | 17,512.20 | 202,160.34 | (94,341.49) | 107,818.85 |
| 28.  Vinyl-faced/laminated insulation - 4" | 53,500.00 SF | 1.08 | 4,225.16 | 5,778.00 | 67,783.16 | (15,816.07) | 51,967.09 |
| 29.  Sectional overhead door, 10' x 10' - insulated | 16.00 EA | 1,701.94 | 2,148.59 | 2,723.10 | 32,102.73 | (16,051.38) | 16,051.35 |

NILFISK-FWP-0031

NILFISK-FWP-4106

ⓌJS|HELD    **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Exterior Elevations**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 30. Commercial overhead door opener - Trolley type | 16.00 EA | 703.71 | 819.00 | 1,125.94 | 13,204.30 | (6,602.16) | 6,602.14 |
| 31. Loading dock - door seal shelter | 16.00 EA | 1,661.19 | 1,913.18 | 2,657.90 | 31,150.12 | (15,575.07) | 15,575.05 |
| 32. Recessed dock levelers - 10 ton | 16.00 EA | 8,146.98 | 10,835.57 | 13,035.16 | 154,222.41 | (77,111.21) | 77,111.20 |
| 33. Scissor folding gate door - steel | 960.00 SF | 7.55 | 590.62 | 724.80 | 8,563.42 | (4,281.71) | 4,281.71 |
| 34. Handicap/Parking sign - aluminum - large | 16.00 EA | 66.25 | 69.42 | 106.00 | 1,235.42 | (617.71) | 617.71 |
| 35. Steel door, 3' x 7' - fire rated | 13.00 EA | 573.97 | 676.22 | 746.16 | 8,883.99 | (3,109.40) | 5,774.59 |
| 36. Steel door frame - 3' opening | 13.00 EA | 224.53 | 228.85 | 291.88 | 3,439.62 | (1,203.87) | 2,235.75 |
| 37. Lockset - keyed - Medium duty - Commercial grade | 13.00 EA | 129.05 | 140.41 | 167.76 | 1,985.82 | (992.92) | 992.90 |
| 38. Door closer - Heavy duty - Commercial grade | 13.00 EA | 296.48 | 347.30 | 385.42 | 4,586.96 | (2,293.49) | 2,293.47 |
| 39. LAM - Indirect metal halide | 20.00 EA | 367.37 | 536.43 | 734.74 | 8,618.57 | (4,309.30) | 4,309.27 |
| 40. Commercial sign face | 144.00 SF | 28.11 | 351.00 | 404.78 | 4,803.62 | (2,401.82) | 2,401.80 |
| 41. Aluminum window, horiz. slider 12-23 sf | 5.00 EA | 231.92 | 79.63 | 115.96 | 1,355.19 | (677.60) | 677.59 |
| 42. Gable mount power attic vent - Large | 20.00 EA | 496.93 | 304.88 | 993.86 | 11,237.34 | (5,618.68) | 5,618.66 |
| 43. Gable mount power attic vent | 4.00 EA | 464.46 | 48.31 | 185.78 | 2,091.93 | (1,045.98) | 1,045.95 |
| 44. Exhaust fan vent doors- 4' x 4' side exhaust vent covers* | 14.00 EA | 500.00 | 82.09 | 700.00 | 7,782.09 | (3,891.05) | 3,891.04 |
| **Totals: Exterior Elevations** | | | 35,707.01 | 54,136.94 | 631,213.74 | 283,514.15 | 347,699.59 |

**Roof**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 45. R&R Metal roofing - Premium grade | 55,000.00 SF | 11.14 | 23,058.75 | 61,270.00 | 697,028.75 | (8,874.25) | 688,154.50 |
| 46. Metal roofing - Premium grade | 145,000.00 SF | 10.62 | 60,791.25 | 153,990.00 | 1,754,681.25 | (23,395.75) | 1,731,285.50 |
| 47. R&R Vinyl-faced/laminated insulation - 4" | 55,000.00 SF | 1.33 | 4,343.63 | 7,315.00 | 84,808.63 | (464.56) | 84,344.07 |
| 48. Vinyl-faced/laminated insulation - 4" | 145,000.00 SF | 1.08 | 11,451.38 | 15,660.00 | 183,711.38 | (1,224.74) | 182,486.64 |
| 49. Closure strips for metal roofing - inside and/or outside | 4,000.00 LF | 1.84 | 198.90 | 736.00 | 8,294.90 | (110.60) | 8,184.30 |
| 50. Gable trim for metal roofing - 26 gauge | 400.00 LF | 5.56 | 98.67 | 222.40 | 2,545.07 | (33.93) | 2,511.14 |
| 51. Ridge cap - metal roofing | 1,000.00 LF | 5.26 | 217.43 | 526.00 | 6,003.43 | (80.05) | 5,923.38 |
| 52. Ridge end cap for metal roofing | 2.00 EA | 24.96 | 2.40 | 5.00 | 57.32 | (0.76) | 56.56 |

NILFISK-FWP-0032

NILFISK-FWP-4107



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Roof

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 53.  Neoprene pipe jack flashing for metal roofing | 30.00 EA | 54.32 | 74.73 | 162.96 | 1,867.29 | (24.91) | 1,842.38 |
| 54.  Exhaust cap - through roof - 6" to 8" | 20.00 EA | 79.71 | 66.71 | 159.42 | 1,820.33 | (52.02) | 1,768.31 |
| 55.  Exhaust cap - through roof - up to 4" | 6.00 EA | 70.50 | 14.63 | 42.30 | 479.93 | (13.71) | 466.22 |
| 56.  R&R Television antenna | 1.00 EA | 168.27 | 8.53 | 16.82 | 193.62 | (9.04) | 184.58 |
| 57.  Digital satellite system - Detach & reset | 4.00 EA | 40.70 | 0.00 | 16.28 | 179.08 | (0.00) | 179.08 |
| 58.  Gutter / downspout - aluminum - 7" to 8" | 4,000.00 LF | 17.57 | 5,233.80 | 7,028.00 | 82,541.80 | (3,301.67) | 79,240.13 |
| **Totals:  Roof** | | | **105,560.81** | **247,150.18** | **2,824,212.78** | **37,585.99** | **2,786,626.79** |

### MEP's

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 59.  Exposed fire sprinkler system (SF of bldg) open/warehouse | 200,000. SF 00 | 2.05 | 14,235.00 | 41,000.00 | 465,235.00 | (232,617.50) | 232,617.50 |
| 60.  Commercial electrical (SF of bldg) - Average load | 200,000. SF 00 | 11.28 | 49,140.00 | 225,600.00 | 2,530,740.00 | (590,506.00) | 1,940,234.00 |
| 61.  Space Heater - Ceiling hung gas unit - 225,000 BTU | 20.00 EA | 2,316.06 | 3,017.82 | 4,632.12 | 53,971.14 | (26,985.57) | 26,985.57 |
| *Provides for ceiling hung space heaters, exact amount to be determined during demolition.* | | | | | | | |
| 62.  Furnace vent - double wall, 6" | 200.00 LF | 29.83 | 358.02 | 596.60 | 6,920.62 | (3,460.31) | 3,460.31 |
| 63.  Cast iron pipe (no-hub) with fitting and hanger, 2" | 2,200.00 LF | 32.93 | 1,653.80 | 7,244.60 | 81,344.40 | (28,470.55) | 52,873.85 |
| **Totals:  MEP's** | | | **68,404.64** | **279,073.32** | **3,138,211.16** | **882,039.93** | **2,256,171.23** |

### Interior Offices

### Main Level

NILFISK-FWP-0033

NILFISK-FWP-4108



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**Compressors**                                                                 Height: 8'

| | |
|---|---|
| 626.22 SF Walls | 442.97 SF Ceiling |
| 1069.19 SF Walls & Ceiling | 442.97 SF Floor |
| 49.22 SY Flooring | 77.00 LF Floor Perimeter |
| 84.67 LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**          **7' 8" X 6' 8"**          **Opens into Exterior**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 64.  Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 65.  Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 66.  R&R 5/8" drywall - hung, taped, floated, ready for paint | 442.97 SF | 2.54 | 27.21 | 112.50 | 1,264.86 | (246.24) | 1,018.62 |
| 67.  Mask the floor per square foot - plastic and tape - 4 mil | 442.97 SF | 0.23 | 2.59 | 10.18 | 114.65 | (57.34) | 57.31 |
| 68.  Seal the ceiling w/PVA primer - one coat | 442.97 SF | 0.52 | 2.59 | 23.04 | 255.97 | (127.99) | 127.98 |
| 69.  Paint the walls and ceiling - one coat | 1,069.19 SF | 0.59 | 13.55 | 63.08 | 707.45 | (353.73) | 353.72 |
| 70.  Final cleaning - construction - Commercial | 442.97 SF | 0.23 | 9.93 | 10.18 | 121.99 | (0.00) | 121.99 |
| **Totals:  Compressors** | | | **55.87** | **267.80** | **3,001.87** | **785.30** | **2,216.57** |

**Battery Charger**                                                             Height: 8'

| | |
|---|---|
| 1160.67 SF Walls | 1073.52 SF Ceiling |
| 2234.19 SF Walls & Ceiling | 1073.52 SF Floor |
| 119.28 SY Flooring | 143.83 LF Floor Perimeter |
| 151.33 LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**          **7' 6" X 6' 8"**          **Opens into Exterior**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 71.  Contents - move out then reset - Extra large room | 1.00 EA | 193.15 | 0.00 | 19.32 | 212.47 | (0.00) | 212.47 |
| 72.  Light fixture - Detach & reset - Large | 8.00 EA | 65.26 | 0.00 | 52.20 | 574.28 | (0.00) | 574.28 |
| 73.  R&R 5/8" drywall - hung, taped, floated, ready for paint | 1,073.52 SF | 2.54 | 65.94 | 272.68 | 3,065.36 | (596.78) | 2,468.58 |
| 74.  Mask the floor per square foot - plastic and tape - 4 mil | 1,073.52 SF | 0.23 | 6.28 | 24.70 | 277.89 | (138.96) | 138.93 |
| 75.  Seal the ceiling w/PVA primer - one coat | 1,073.52 SF | 0.52 | 6.28 | 55.82 | 620.33 | (310.18) | 310.15 |
| 76.  Paint the walls and ceiling - one coat | 2,234.19 SF | 0.59 | 28.32 | 131.82 | 1,478.31 | (739.17) | 739.14 |

NILFISK-FWP-0034

NILFISK-FWP-4109



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Battery Charger**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 77.  Final cleaning - construction - Commercial | 1,073.52 SF | 0.23 | 24.07 | 24.70 | 295.68 | (0.00) | 295.68 |
| **Totals:  Battery Charger** | | | **130.89** | **581.24** | **6,524.32** | **1,785.09** | **4,739.23** |

**Office 1**                                                                 **Height: 8'**

458.67 SF Walls                           184.44 SF Ceiling
643.10 SF Walls & Ceiling                 184.44 SF Floor
20.49 SY Flooring                         57.33 LF Floor Perimeter
57.33 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 78.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 79.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 184.44 SF | 3.26 | 24.64 | 60.12 | 686.04 | (142.09) | 543.95 |
| 80.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 3.00 EA | 189.61 | 21.17 | 56.90 | 646.90 | (300.18) | 346.72 |
| 81.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 115.08 | 27.37 | 46.02 | 533.71 | (249.47) | 284.24 |
| 82.  Mask the floor per square foot - plastic and tape - 4 mil | 184.44 SF | 0.23 | 1.08 | 4.24 | 47.74 | (23.87) | 23.87 |
| 83.  Paint the walls - one coat | 458.67 SF | 0.59 | 5.81 | 27.06 | 303.49 | (151.76) | 151.73 |
| 84.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 85.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 86.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 2.00 EA | 68.50 | 3.87 | 13.70 | 154.57 | (66.09) | 88.48 |
| 87.  R&R Cove base molding - rubber or vinyl, 6" high | 57.33 LF | 2.89 | 14.42 | 16.58 | 196.68 | (88.57) | 108.11 |
| 88.  Clean floor, strip & wax | 184.44 SF | 0.93 | 18.70 | 17.16 | 207.39 | (0.00) | 207.39 |
| 89.  Final cleaning - construction - Commercial | 184.44 SF | 0.23 | 4.14 | 4.24 | 50.80 | (0.00) | 50.80 |
| **Totals:  Office 1** | | | **124.99** | **272.20** | **3,119.12** | **1,132.53** | **1,986.59** |

NILFISK-FWP-0035

NILFISK-FWP-4110

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| **Office 2** | | **Height: 8'** |
|---|---|---|

865.33 SF Walls                665.24 SF Ceiling
1530.57 SF Walls & Ceiling      665.24 SF Floor
73.92 SY Flooring               108.17 LF Floor Perimeter
108.17 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 90. Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 91. R&R Suspended ceiling system - Standard grade - 2' x 4' | 665.24 SF | 3.26 | 88.86 | 216.86 | 2,474.40 | (512.47) | 1,961.93 |
| 92. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 93. R&R Ceiling diffusers / grills - square, lay-in - 24" | 3.00 EA | 115.08 | 20.53 | 34.54 | 400.31 | (187.11) | 213.20 |
| 94. Mask the floor per square foot - plastic and tape - 4 mil | 665.24 SF | 0.23 | 3.89 | 15.30 | 172.20 | (86.12) | 86.08 |
| 95. Paint the walls - one coat | 865.33 SF | 0.59 | 10.97 | 51.06 | 572.57 | (286.30) | 286.27 |
| 96. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 97. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 98. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 99. Remove Glue down carpet | 665.24 SF | 0.63 | 0.00 | 41.92 | 461.02 | (0.00) | 461.02 |
| 100. Glue down carpet | 765.02 SF | 2.18 | 162.60 | 166.78 | 1,997.12 | (998.57) | 998.55 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 101. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 102. R&R Cove base molding - rubber or vinyl, 6" high | 108.17 LF | 2.89 | 27.21 | 31.26 | 371.08 | (167.11) | 203.97 |
| 103. Final cleaning - construction - Commercial | 665.24 SF | 0.23 | 14.92 | 15.30 | 183.23 | (0.00) | 183.23 |
| **Totals: Office 2** | | | **361.76** | **676.22** | **7,799.83** | **2,730.67** | **5,069.16** |

| **Office 3** | | **Height: 8'** |
|---|---|---|

309.33 SF Walls                92.08 SF Ceiling
401.42 SF Walls & Ceiling      92.08 SF Floor
10.23 SY Flooring              38.67 LF Floor Perimeter
38.67 LF Ceil. Perimeter



| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 104. Contents - move out then reset - Small room | 1.00 EA | 48.34 | 0.00 | 4.84 | 53.18 | (0.00) | 53.18 |

22040036-NILFISK                4/27/2022        Page: 9

NILFISK-FWP-0036

NILFISK-FWP-4111

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Office 3**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 105. R&R Suspended ceiling system - Standard grade - 2' x 4' | 92.08 SF | 3.26 | 12.30 | 30.02 | 342.50 | (70.93) | 271.57 |
| 106. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 107. R&R Ceiling diffusers / grills - square, lay-in - 24" | 3.00 EA | 115.08 | 20.53 | 34.54 | 400.31 | (187.11) | 213.20 |
| 108. Mask the floor per square foot - plastic and tape - 4 mil | 92.08 SF | 0.23 | 0.54 | 2.12 | 23.84 | (11.92) | 11.92 |
| 109. Paint the walls - one coat | 309.33 SF | 0.59 | 3.92 | 18.26 | 204.68 | (102.35) | 102.33 |
| 110. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 111. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 112. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 2.00 EA | 68.50 | 3.87 | 13.70 | 154.57 | (66.09) | 88.48 |
| 113. Remove Glue down carpet | 92.08 SF | 0.63 | 0.00 | 5.80 | 63.81 | (0.00) | 63.81 |
| 114. Glue down carpet | 105.90 SF | 2.18 | 22.51 | 23.08 | 276.45 | (138.23) | 138.22 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 115. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 116. R&R Cove base molding - rubber or vinyl, 6" high | 38.67 LF | 2.89 | 9.73 | 11.18 | 132.67 | (59.76) | 72.91 |
| 117. Final cleaning - construction - Commercial | 92.08 SF | 0.23 | 2.07 | 2.12 | 25.37 | (0.00) | 25.37 |
| **Totals: Office 3** | | | **92.19** | **194.42** | **2,230.49** | **896.23** | **1,334.26** |



**Office 4**                                                                                     **Height: 8'**

334.67 SF Walls                          109.24 SF Ceiling
443.90 SF Walls & Ceiling                109.24 SF Floor
12.14 SY Flooring                        41.83 LF Floor Perimeter
41.83 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 118. Contents - move out then reset - Small room | 1.00 EA | 48.34 | 0.00 | 4.84 | 53.18 | (0.00) | 53.18 |
| 119. R&R Suspended ceiling system - Standard grade - 2' x 4' | 109.24 SF | 3.26 | 14.59 | 35.62 | 406.33 | (84.15) | 322.18 |
| 120. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |

NILFISK-FWP-0037

NILFISK-FWP-4112

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Office 4

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 121.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 3.00 EA | 115.08 | 20.53 | 34.54 | 400.31 | (187.11) | 213.20 |
| 122.  Mask the floor per square foot - plastic and tape - 4 mil | 109.24 SF | 0.23 | 0.64 | 2.52 | 28.29 | (14.15) | 14.14 |
| 123.  Paint the walls - one coat | 334.67 SF | 0.59 | 4.24 | 19.74 | 221.44 | (110.73) | 110.71 |
| 124.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 125.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 126.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 2.00 EA | 68.50 | 3.87 | 13.70 | 154.57 | (66.09) | 88.48 |
| 127.  Remove Glue down carpet | 109.24 SF | 0.63 | 0.00 | 6.88 | 75.70 | (0.00) | 75.70 |
| 128.  Glue down carpet | 125.62 SF | 2.18 | 26.70 | 27.38 | 327.93 | (163.98) | 163.95 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 129.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 130.  R&R Cove base molding - rubber or vinyl, 6" high | 41.83 LF | 2.89 | 10.52 | 12.10 | 143.51 | (64.62) | 78.89 |
| 131.  Final cleaning - construction - Commercial | 109.24 SF | 0.23 | 2.45 | 2.52 | 30.10 | (0.00) | 30.10 |
| **Totals: Office 4** | | | **100.26** | **208.60** | **2,394.47** | **950.67** | **1,443.80** |



**Small Conference**                                                    **Height: 8'**

536.00 SF Walls                           275.87 SF Ceiling
811.87 SF Walls & Ceiling                 275.87 SF Floor
30.65 SY Flooring                         67.00 LF Floor Perimeter
67.00 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 132.  Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 133.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 275.87 SF | 3.26 | 36.85 | 89.94 | 1,026.13 | (212.53) | 813.60 |
| 134.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 135.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 3.00 EA | 115.08 | 20.53 | 34.54 | 400.31 | (187.11) | 213.20 |
| 136.  Mask the floor per square foot - plastic and tape - 4 mil | 275.87 SF | 0.23 | 1.61 | 6.34 | 71.40 | (35.72) | 35.68 |
| 137.  Paint the walls - one coat | 536.00 SF | 0.59 | 6.79 | 31.62 | 354.65 | (177.34) | 177.31 |

NILFISK-FWP-0038

NILFISK-FWP-4113

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Small Conference

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 138.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 139.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 140.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 2.00 EA | 68.50 | 3.87 | 13.70 | 154.57 | (66.09) | 88.48 |
| 141.  Remove Glue down carpet | 275.87 SF | 0.63 | 0.00 | 17.38 | 191.18 | (0.00) | 191.18 |
| 142.  Glue down carpet | 317.25 SF | 2.18 | 67.43 | 69.16 | 828.20 | (414.11) | 414.09 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 143.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 144.  R&R Cove base molding - rubber or vinyl, 6" high | 67.00 LF | 2.89 | 16.85 | 19.36 | 229.84 | (103.50) | 126.34 |
| 145.  Final cleaning - construction - Commercial | 275.87 SF | 0.23 | 6.19 | 6.34 | 75.98 | (0.00) | 75.98 |
| **Totals:  Small Conference** | | | **190.96** | **384.72** | **4,422.86** | **1,656.34** | **2,766.52** |



**Women's Room**                                                           **Height: 8'**

| | | |
|---|---|---|
| 588.00 SF Walls | 337.35 SF Ceiling |
| 925.35 SF Walls & Ceiling | 337.35 SF Floor |
| 37.48 SY Flooring | 73.50 LF Floor Perimeter |
| 73.50 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 146.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 147.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 337.35 SF | 3.26 | 45.06 | 109.98 | 1,254.80 | (259.89) | 994.91 |
| 148.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 149.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 115.08 | 27.37 | 46.02 | 533.71 | (249.47) | 284.24 |
| 150.  Mask the floor per square foot - plastic and tape - 4 mil | 337.35 SF | 0.23 | 1.97 | 7.76 | 87.32 | (43.67) | 43.65 |
| 151.  Paint the walls - one coat | 588.00 SF | 0.59 | 7.45 | 34.70 | 389.07 | (194.55) | 194.52 |
| 152.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 153.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 154.  R&R Cove base molding - rubber or vinyl, 6" high | 73.50 LF | 2.89 | 18.49 | 21.24 | 252.15 | (113.55) | 138.60 |
| 155.  Clean floor, strip & wax | 337.35 SF | 0.93 | 34.20 | 31.38 | 379.32 | (0.00) | 379.32 |

NILFISK-FWP-0039

NILFISK-FWP-4114



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Women's Room**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 156.  Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and stalls.* | | | | | | | |
| 157.  Final cleaning - construction - Commercial | 337.35 SF | 0.23 | 7.57 | 7.76 | 92.92 | (0.00) | 92.92 |
| **Totals:  Women's Room** | | | **208.71** | **396.32** | **4,568.28** | **1,371.85** | **3,196.43** |



**Men's Room**                                                                                            **Height: 8'**

588.00  SF Walls                          337.35  SF Ceiling
925.35  SF Walls & Ceiling          337.35  SF Floor
37.48  SY Flooring                       73.50  LF Floor Perimeter
73.50  LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 158.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 159.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 337.35 SF | 3.26 | 45.06 | 109.98 | 1,254.80 | (259.89) | 994.91 |
| 160.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 161.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 115.08 | 27.37 | 46.02 | 533.71 | (249.47) | 284.24 |
| 162.  Mask the floor per square foot - plastic and tape - 4 mil | 337.35 SF | 0.23 | 1.97 | 7.76 | 87.32 | (43.67) | 43.65 |
| 163.  Paint the walls - one coat | 588.00 SF | 0.59 | 7.45 | 34.70 | 389.07 | (194.55) | 194.52 |
| 164.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 165.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 166.  R&R Cove base molding - rubber or vinyl, 6" high | 73.50 LF | 2.89 | 18.49 | 21.24 | 252.15 | (113.55) | 138.60 |
| 167.  Clean floor, strip & wax | 337.35 SF | 0.93 | 34.20 | 31.38 | 379.32 | (0.00) | 379.32 |
| 168.  Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and stalls.* | | | | | | | |
| 169.  Final cleaning - construction - Commercial | 337.35 SF | 0.23 | 7.57 | 7.76 | 92.92 | (0.00) | 92.92 |
| **Totals:  Men's Room** | | | **208.71** | **396.32** | **4,568.28** | **1,371.85** | **3,196.43** |

NILFISK-FWP-0040

NILFISK-FWP-4115



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| Closet | | | | | Height: 8' |
|---|---|---|---|---|---|

386.67 SF Walls      99.31 SF Ceiling
485.98 SF Walls & Ceiling    99.31 SF Floor
11.03 SY Flooring       99.31 LF Floor Perimeter
48.33 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 170. Contents - move out then reset - Small room | 1.00 EA | 48.34 | 0.00 | 4.84 | 53.18 | (0.00) | 53.18 |
| 171. R&R Suspended ceiling system - Standard grade - 2' x 4' | 99.31 SF | 3.26 | 13.26 | 32.38 | 369.39 | (76.51) | 292.88 |
| 172. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 1.00 EA | 189.61 | 7.06 | 18.98 | 215.65 | (100.06) | 115.59 |
| 173. R&R Ceiling diffusers / grills - square, lay-in - 24" | 1.00 EA | 115.08 | 6.84 | 11.52 | 133.44 | (62.37) | 71.07 |
| 174. Mask the floor per square foot - plastic and tape - 4 mil | 99.31 SF | 0.23 | 0.58 | 2.28 | 25.70 | (12.85) | 12.85 |
| 175. Paint the walls - one coat | 386.67 SF | 0.59 | 4.90 | 22.82 | 255.86 | (127.94) | 127.92 |
| 176. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 177. Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 178. R&R Cove base molding - rubber or vinyl, 6" high | 48.33 LF | 2.89 | 12.16 | 13.96 | 165.79 | (74.67) | 91.12 |
| 179. Clean floor, strip & wax | 99.31 SF | 0.93 | 10.07 | 9.24 | 111.67 | (0.00) | 111.67 |
| 180. Final cleaning - construction - Commercial | 99.31 SF | 0.23 | 2.23 | 2.28 | 27.35 | (0.00) | 27.35 |
| **Totals: Closet** | | | **60.89** | **138.04** | **1,579.00** | **564.90** | **1,014.10** |

| Office 6 | | | | | Height: 8' |
|---|---|---|---|---|---|



380.00 SF Walls      132.75 SF Ceiling
512.75 SF Walls & Ceiling    132.75 SF Floor
14.75 SY Flooring       47.50 LF Floor Perimeter
47.50 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 181. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 182. R&R Suspended ceiling system - Standard grade - 2' x 4' | 132.75 SF | 3.26 | 17.73 | 43.28 | 493.78 | (102.27) | 391.51 |
| 183. R&R Fluorescent - acoustic grid fixture, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 184. R&R Ceiling diffusers / grills - square, lay-in - 24" | 2.00 EA | 115.08 | 13.69 | 23.02 | 266.87 | (124.74) | 142.13 |

22040036-NILFISK                     4/27/2022   Page: 14

NILFISK-FWP-0041

NILFISK-FWP-4116



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Office 6**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 185. Mask the floor per square foot - plastic and tape - 4 mil | 132.75 SF | 0.23 | 0.78 | 3.06 | 34.37 | (17.20) | 17.17 |
| 186. Paint the walls - one coat | 380.00 SF | 0.59 | 4.82 | 22.42 | 251.44 | (125.73) | 125.71 |
| 187. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 188. Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 189. R&R Cove base molding - rubber or vinyl, 6" high | 47.50 LF | 2.89 | 11.95 | 13.74 | 162.97 | (73.40) | 89.57 |
| 190. Clean floor, strip & wax | 132.75 SF | 0.93 | 13.45 | 12.34 | 149.25 | (0.00) | 149.25 |
| 191. Final cleaning - construction - Commercial | 132.75 SF | 0.23 | 2.98 | 3.06 | 36.57 | (0.00) | 36.57 |
| **Totals: Office 6** | | | 83.30 | 185.02 | 2,118.30 | 753.96 | 1,364.34 |



**Office 7**                                                                **Height: 8'**

389.33 SF Walls                    141.35 SF Ceiling
530.69 SF Walls & Ceiling          141.35 SF Floor
15.71 SY Flooring                  48.67 LF Floor Perimeter
48.67 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 192. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 193. R&R Suspended ceiling system - Standard grade - 2' x 4' | 141.35 SF | 3.26 | 18.88 | 46.08 | 525.76 | (108.90) | 416.86 |
| 194. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 195. R&R Ceiling diffusers / grills - square, lay-in - 24" | 3.00 EA | 115.08 | 20.53 | 34.54 | 400.31 | (187.11) | 213.20 |
| 196. Mask the floor per square foot - plastic and tape - 4 mil | 141.35 SF | 0.23 | 0.83 | 3.26 | 36.60 | (18.32) | 18.28 |
| 197. Paint the walls - one coat | 389.33 SF | 0.59 | 4.93 | 22.98 | 257.61 | (128.82) | 128.79 |
| 198. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 199. Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 200. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 3.00 EA | 68.50 | 5.81 | 20.56 | 231.87 | (99.14) | 132.73 |
| 201. R&R Cove base molding - rubber or vinyl, 6" high | 48.67 LF | 2.89 | 12.24 | 14.06 | 166.96 | (75.19) | 91.77 |
| 202. Clean floor, strip & wax | 141.35 SF | 0.93 | 14.33 | 13.14 | 158.93 | (0.00) | 158.93 |

NILFISK-FWP-0042

NILFISK-FWP-4117



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Office 7

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 203. Final cleaning - construction - Commercial | 141.35 SF | 0.23 | 3.17 | 3.26 | 38.94 | (0.00) | 38.94 |
| **Totals: Office 7** | | | **98.62** | **221.98** | **2,540.03** | **928.10** | **1,611.93** |



**Break Room**                                         **Height: 8'**

| 1146.67 SF Walls | 997.85 SF Ceiling |
|---|---|
| 2144.52 SF Walls & Ceiling | 997.85 SF Floor |
| 110.87 SY Flooring | 143.33 LF Floor Perimeter |
| 143.33 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 204. Contents - move out then reset - Extra large room | 1.00 EA | 193.15 | 0.00 | 19.32 | 212.47 | (0.00) | 212.47 |
| 205. R&R Suspended ceiling system - Standard grade - 2' x 4' | 997.85 SF | 3.26 | 133.29 | 325.30 | 3,711.58 | (768.72) | 2,942.86 |
| 206. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 189.61 | 42.34 | 113.76 | 1,293.76 | (600.33) | 693.43 |
| 207. R&R Ceiling diffusers / grills - square, lay-in - 24" | 6.00 EA | 115.08 | 41.06 | 69.04 | 800.58 | (374.20) | 426.38 |
| 208. Mask the floor per square foot - plastic and tape - 4 mil | 997.85 SF | 0.23 | 5.84 | 22.96 | 258.31 | (129.16) | 129.15 |
| 209. Paint the walls - one coat | 1,146.67 SF | 0.59 | 14.53 | 67.66 | 758.73 | (379.38) | 379.35 |
| 210. Paint door/window trim & jamb - 2 coats (per side) | 14.00 EA | 27.50 | 6.37 | 38.50 | 429.87 | (214.95) | 214.92 |
| 211. Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 212. R&R Cove base molding - rubber or vinyl, 6" high | 143.33 LF | 2.89 | 36.05 | 41.42 | 491.69 | (221.43) | 270.26 |
| 213. Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and cabinets.* | | | | | | | |
| 214. Clean floor, strip & wax | 997.85 SF | 0.93 | 101.16 | 92.80 | 1,121.96 | (0.00) | 1,121.96 |
| 215. Final cleaning - construction - Commercial | 997.85 SF | 0.23 | 22.38 | 22.96 | 274.85 | (0.00) | 274.85 |
| **Totals: Break Room** | | | **439.57** | **857.92** | **9,876.63** | **2,737.26** | **7,139.37** |

NILFISK-FWP-0043

NILFISK-FWP-4118



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**Office 8**      **Height: 8'**

| | |
|---|---|
| 780.00 SF Walls | 564.35 SF Ceiling |
| 1344.35 SF Walls & Ceiling | 564.35 SF Floor |
| 62.71 SY Flooring | 97.50 LF Floor Perimeter |
| 97.50 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 216. Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 217. Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 218. R&R 5/8" drywall - hung, taped, floated, ready for paint | 564.35 SF | 2.54 | 34.67 | 143.34 | 1,611.46 | (313.72) | 1,297.74 |
| 219. Mask the floor per square foot - plastic and tape - 4 mil | 564.35 SF | 0.23 | 3.30 | 12.98 | 146.08 | (73.05) | 73.03 |
| 220. Seal the ceiling w/PVA primer - one coat | 564.35 SF | 0.52 | 3.30 | 29.34 | 326.10 | (163.06) | 163.04 |
| 221. Paint the walls and ceiling - one coat | 1,344.35 SF | 0.59 | 17.04 | 79.32 | 889.53 | (444.77) | 444.76 |
| 222. Final cleaning - construction - Commercial | 564.35 SF | 0.23 | 12.66 | 12.98 | 155.44 | (0.00) | 155.44 |
| **Totals: Office 8** | | | **70.97** | **326.78** | **3,665.56** | **994.60** | **2,670.96** |



**Production**      **Height: 8'**

| | |
|---|---|
| 608.78 SF Walls | 417.74 SF Ceiling |
| 1026.52 SF Walls & Ceiling | 417.74 SF Floor |
| 46.42 SY Flooring | 74.92 LF Floor Perimeter |
| 82.00 LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**      7' 1" X 6' 8"      **Opens into Exterior**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 223. Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 224. Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 225. R&R 5/8" drywall - hung, taped, floated, ready for paint | 417.74 SF | 2.54 | 25.66 | 106.10 | 1,192.82 | (232.22) | 960.60 |
| 226. Mask the floor per square foot - plastic and tape - 4 mil | 417.74 SF | 0.23 | 2.44 | 9.60 | 108.12 | (54.06) | 54.06 |
| 227. Seal the ceiling w/PVA primer - one coat | 417.74 SF | 0.52 | 2.44 | 21.72 | 241.38 | (120.69) | 120.69 |
| 228. Paint the walls and ceiling - one coat | 1,026.52 SF | 0.59 | 13.01 | 60.56 | 679.22 | (339.62) | 339.60 |

22040036-NILFISK      4/27/2022      Page: 17

**NILFISK-FWP-0044**

**NILFISK-FWP-4119**

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Production**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 229. Final cleaning - construction - Commercial | 417.74 SF | 0.23 | 9.37 | 9.60 | 115.05 | (0.00) | 115.05 |
| **Totals: Production** | | | **52.92** | **256.40** | **2,873.54** | **746.59** | **2,126.95** |



**Supply Room** **Height: 8'**

| | |
|---|---|
| 854.56 SF Walls | 752.08 SF Ceiling |
| 1606.64 SF Walls & Ceiling | 752.08 SF Floor |
| 83.56 SY Flooring | 104.75 LF Floor Perimeter |
| 117.17 LF Ceil. Perimeter | |

| **Missing Wall - Goes to Floor** | **12' 5" X 6' 8"** | **Opens into Exterior** |
|---|---|---|

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 230. Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 231. Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 232. R&R 5/8" drywall - hung, taped, floated, ready for paint | 752.08 SF | 2.54 | 46.20 | 191.02 | 2,147.50 | (418.07) | 1,729.43 |
| 233. Mask the floor per square foot - plastic and tape - 4 mil | 752.08 SF | 0.23 | 4.40 | 17.30 | 194.68 | (97.35) | 97.33 |
| 234. Seal the ceiling w/PVA primer - one coat | 752.08 SF | 0.52 | 4.40 | 39.10 | 434.58 | (217.30) | 217.28 |
| 235. Paint the walls and ceiling - one coat | 1,606.64 SF | 0.59 | 20.36 | 94.80 | 1,063.08 | (531.54) | 531.54 |
| 236. Final cleaning - construction - Commercial | 752.08 SF | 0.23 | 16.87 | 17.30 | 207.15 | (0.00) | 207.15 |
| **Totals: Supply Room** | | | **92.23** | **408.34** | **4,583.94** | **1,264.26** | **3,319.68** |



**Maintenance** **Height: 8'**

| | |
|---|---|
| 632.00 SF Walls | 389.50 SF Ceiling |
| 1021.50 SF Walls & Ceiling | 389.50 SF Floor |
| 43.28 SY Flooring | 79.00 LF Floor Perimeter |
| 79.00 LF Ceil. Perimeter | |

NILFISK-FWP-0045

NILFISK-FWP-4120

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 237.  Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 238.  Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 239.  R&R 5/8" drywall - hung, taped, floated, ready for paint | 389.50 SF | 2.54 | 23.93 | 98.92 | 1,112.19 | (216.53) | 895.66 |
| 240.  Mask the floor per square foot - plastic and tape - 4 mil | 389.50 SF | 0.23 | 2.28 | 8.96 | 100.83 | (50.42) | 50.41 |
| 241.  Seal the ceiling w/PVA primer - one coat | 389.50 SF | 0.52 | 2.28 | 20.26 | 225.08 | (112.55) | 112.53 |
| 242.  Paint the walls and ceiling - one coat | 1,021.50 SF | 0.59 | 12.95 | 60.26 | 675.90 | (337.97) | 337.93 |
| 243.  Final cleaning - construction - Commercial | 389.50 SF | 0.23 | 8.74 | 8.96 | 107.29 | (0.00) | 107.29 |
| **Totals:  Maintenance** | | | **50.18** | **246.18** | **2,758.24** | **717.47** | **2,040.77** |



**Machine Shop**                                                   **Height: 8'**

753.33 SF Walls                              533.58 SF Ceiling
1286.92 SF Walls & Ceiling                533.58 SF Floor
59.29 SY Flooring                        94.17 LF Floor Perimeter
94.17 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible during the initial inspection, and the scope of work is based on similar work for the Battery Room.* | | | | | | | |
| 244.  Contents - move out then reset - Large room | 1.00 EA | 96.57 | 0.00 | 9.66 | 106.23 | (0.00) | 106.23 |
| 245.  Light fixture - Detach & reset - Large | 6.00 EA | 65.26 | 0.00 | 39.16 | 430.72 | (0.00) | 430.72 |
| 246.  R&R 5/8" drywall - hung, taped, floated, ready for paint | 533.58 SF | 2.54 | 32.78 | 135.52 | 1,523.59 | (296.61) | 1,226.98 |
| 247.  Mask the floor per square foot - plastic and tape - 4 mil | 533.58 SF | 0.23 | 3.12 | 12.28 | 138.12 | (69.06) | 69.06 |
| 248.  Seal the ceiling w/PVA primer - one coat | 533.58 SF | 0.52 | 3.12 | 27.74 | 308.32 | (154.17) | 154.15 |
| 249.  Paint the walls and ceiling - one coat | 1,286.92 SF | 0.59 | 16.31 | 75.92 | 851.51 | (425.76) | 425.75 |
| 250.  Final cleaning - construction - Commercial | 533.58 SF | 0.23 | 11.97 | 12.28 | 146.97 | (0.00) | 146.97 |
| **Totals:  Machine Shop** | | | **67.30** | **312.56** | **3,505.46** | **945.60** | **2,559.86** |

NILFISK-FWP-0046

NILFISK-FWP-4121



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**HR**                                                                          **Height: 8'**

| | | |
|---|---|---|
| 368.00 SF Walls | | 132.00 SF Ceiling |
| 500.00 SF Walls & Ceiling | | 132.00 SF Floor |
| 14.67 SY Flooring | | 46.00 LF Floor Perimeter |
| 46.00 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 251. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 252. R&R Suspended ceiling system - Standard grade - 2' x 4' | 132.00 SF | 3.26 | 17.63 | 43.04 | 490.99 | (101.69) | 389.30 |
| 253. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 254. Mask the floor per square foot - plastic and tape - 4 mil | 132.00 SF | 0.23 | 0.77 | 3.04 | 34.17 | (17.09) | 17.08 |
| 255. Paint the walls - one coat | 368.00 SF | 0.59 | 4.66 | 21.72 | 243.50 | (121.75) | 121.75 |
| 256. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 257. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 258. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 259. Remove Glue down carpet | 132.00 SF | 0.63 | 0.00 | 8.32 | 91.48 | (0.00) | 91.48 |
| 260. Glue down carpet | 151.80 SF | 2.18 | 32.26 | 33.10 | 396.28 | (198.15) | 198.13 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 261. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 262. R&R Cove base molding - rubber or vinyl, 4" high | 46.00 LF | 2.22 | 8.57 | 10.20 | 120.89 | (52.62) | 68.27 |
| 263. Final cleaning - construction - Commercial | 132.00 SF | 0.23 | 2.96 | 3.04 | 36.36 | (0.00) | 36.36 |
| **Totals: HR** | | | **99.63** | **222.44** | **2,546.17** | **984.29** | **1,561.88** |



**HR Conference**                                                               **Height: 8'**

| | | |
|---|---|---|
| 448.00 SF Walls | | 192.00 SF Ceiling |
| 640.00 SF Walls & Ceiling | | 192.00 SF Floor |
| 21.33 SY Flooring | | 56.00 LF Floor Perimeter |
| 56.00 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 264. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 265. R&R Suspended ceiling system - Standard grade - 2' x 4' | 192.00 SF | 3.26 | 25.65 | 62.60 | 714.17 | (147.90) | 566.27 |

NILFISK-FWP-0047

NILFISK-FWP-4122

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## CONTINUED - HR Conference

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 266. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 267. Mask the floor per square foot - plastic and tape - 4 mil | 192.00 SF | 0.23 | 1.12 | 4.42 | 49.70 | (24.86) | 24.84 |
| 268. Paint the walls - one coat | 448.00 SF | 0.59 | 5.68 | 26.44 | 296.44 | (148.22) | 148.22 |
| 269. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 270. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 271. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 3.00 EA | 68.50 | 5.81 | 20.56 | 231.87 | (99.14) | 132.73 |
| 272. Remove Glue down carpet | 192.00 SF | 0.63 | 0.00 | 12.10 | 133.06 | (0.00) | 133.06 |
| 273. Glue down carpet | 220.80 SF | 2.18 | 46.93 | 48.14 | 576.41 | (288.22) | 288.19 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 274. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 275. R&R Cove base molding - rubber or vinyl, 4" high | 56.00 LF | 2.22 | 10.43 | 12.44 | 147.19 | (64.06) | 83.13 |
| 276. Final cleaning - construction - Commercial | 192.00 SF | 0.23 | 4.31 | 4.42 | 52.89 | (0.00) | 52.89 |
| **Totals: HR Conference** | | | **130.77** | **284.24** | **3,256.93** | **1,232.34** | **2,024.59** |



**Manager's Office**                                        **Height: 8'**

448.00 SF Walls                192.00 SF Ceiling
640.00 SF Walls & Ceiling      192.00 SF Floor
21.33 SY Flooring              56.00 LF Floor Perimeter
56.00 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 277. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 278. R&R Suspended ceiling system - Standard grade - 2' x 4' | 192.00 SF | 3.26 | 25.65 | 62.60 | 714.17 | (147.90) | 566.27 |
| 279. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 280. Mask the floor per square foot - plastic and tape - 4 mil | 192.00 SF | 0.23 | 1.12 | 4.42 | 49.70 | (24.86) | 24.84 |
| 281. Paint the walls - one coat | 448.00 SF | 0.59 | 5.68 | 26.44 | 296.44 | (148.22) | 148.22 |
| 282. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 283. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |

22040036-NILFISK                                    4/27/2022        Page: 21

NILFISK-FWP-0048

NILFISK-FWP-4123



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Manager's Office**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 284.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 285.  Remove Glue down carpet | 192.00 SF | 0.63 | 0.00 | 12.10 | 133.06 | (0.00) | 133.06 |
| 286.  Glue down carpet | 220.80 SF | 2.18 | 46.93 | 48.14 | 576.41 | (288.22) | 288.19 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 287.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 288.  R&R Cove base molding - rubber or vinyl, 4" high | 56.00 LF | 2.22 | 10.43 | 12.44 | 147.19 | (64.06) | 83.13 |
| 289.  Final cleaning - construction - Commercial | 192.00 SF | 0.23 | 4.31 | 4.42 | 52.89 | (0.00) | 52.89 |
| **Totals:  Manager's Office** | | | **126.90** | **270.54** | **3,102.36** | **1,166.25** | **1,936.11** |



**Mod Double Story**                                                                 **Height: 8'**

| | | |
|---|---|---|
| 733.33  SF Walls | | 516.67  SF Ceiling |
| 1250.00  SF Walls & Ceiling | | 516.67  SF Floor |
| 57.41  SY Flooring | | 91.67  LF Floor Perimeter |
| 91.67  LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: Not all of the two story offices were accessible, and the following line items provide for two story repairs.* | | | | | | | |
| 290.  Contents - move out then reset | 2.00 EA | 64.39 | 0.00 | 12.88 | 141.66 | (0.00) | 141.66 |
| 291.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 1,033.33 SF | 3.26 | 138.03 | 336.86 | 3,843.55 | (796.05) | 3,047.50 |
| 292.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 8.00 EA | 189.61 | 56.46 | 151.68 | 1,725.02 | (800.43) | 924.59 |
| 293.  Mask more than the floor per square foot - plastic and tape - 4 mil | 1,033.33 SF | 0.23 | 6.05 | 23.76 | 267.48 | (133.75) | 133.73 |
| 294.  Paint more than the walls - one coat | 1,466.67 SF | 0.59 | 18.59 | 86.54 | 970.47 | (485.25) | 485.22 |
| 295.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 296.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 297.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 6.00 EA | 68.50 | 11.62 | 41.10 | 463.72 | (198.24) | 265.48 |
| 298.  Remove Glue down carpet | 516.67 SF | 0.63 | 0.00 | 32.56 | 358.06 | (0.00) | 358.06 |
| 299.  Glue down carpet | 594.17 SF | 2.18 | 126.29 | 129.52 | 1,551.10 | (775.56) | 775.54 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 300.  R&R Carpet - metal transition strip | 6.00 LF | 3.23 | 1.44 | 1.94 | 22.76 | (8.87) | 13.89 |

NILFISK-FWP-0049

NILFISK-FWP-4124


**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Mod Double Story**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 301.  R&R Cove base molding - rubber or vinyl, 4" high | 183.33 LF | 2.22 | 34.14 | 40.70 | 481.83 | (209.67) | 272.16 |
| 302.  Final cleaning - construction - Commercial | 1,033.33 SF | 0.23 | 23.17 | 23.76 | 284.60 | (0.00) | 284.60 |
| **Totals:  Mod Double Story** | | | **419.58** | **901.04** | **10,331.22** | **3,518.32** | **6,812.90** |



**Mod Office 1**                                                               **Height: 8'**

384.00  SF Walls                        144.00  SF Ceiling
528.00  SF Walls & Ceiling              144.00  SF Floor
16.00  SY Flooring                      48.00  LF Floor Perimeter
48.00  LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 303.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 304.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 144.00 SF | 3.26 | 19.23 | 46.96 | 535.63 | (110.94) | 424.69 |
| 305.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 306.  Mask the floor per square foot - plastic and tape - 4 mil | 144.00 SF | 0.23 | 0.84 | 3.32 | 37.28 | (18.64) | 18.64 |
| 307.  Paint the walls - one coat | 384.00 SF | 0.59 | 4.87 | 22.66 | 254.09 | (127.06) | 127.03 |
| 308.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 309.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 310.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 311.  Remove Glue down carpet | 144.00 SF | 0.63 | 0.00 | 9.08 | 99.80 | (0.00) | 99.80 |
| 312.  Glue down carpet | 165.60 SF | 2.18 | 35.20 | 36.10 | 432.31 | (216.17) | 216.14 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 313.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 314.  R&R Cove base molding - rubber or vinyl, 4" high | 48.00 LF | 2.22 | 8.94 | 10.64 | 126.14 | (54.89) | 71.25 |
| 315.  Final cleaning - construction - Commercial | 144.00 SF | 0.23 | 3.23 | 3.32 | 39.67 | (0.00) | 39.67 |
| **Totals:  Mod Office 1** | | | **90.97** | **194.14** | **2,226.16** | **820.59** | **1,405.57** |

NILFISK-FWP-0050

NILFISK-FWP-4125

**JS|HELD**    **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213



**Mod Office 2**                                                                 **Height: 8'**

| 384.00 SF Walls | 144.00 SF Ceiling |
|---|---|
| 528.00 SF Walls & Ceiling | 144.00 SF Floor |
| 16.00 SY Flooring | 144.00 LF Floor Perimeter |
| 48.00 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 316.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 317.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 144.00 SF | 3.26 | 19.23 | 46.96 | 535.63 | (110.94) | 424.69 |
| 318.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 319.  Mask the floor per square foot - plastic and tape - 4 mil | 144.00 SF | 0.23 | 0.84 | 3.32 | 37.28 | (18.64) | 18.64 |
| 320.  Paint the walls - one coat | 384.00 SF | 0.59 | 4.87 | 22.66 | 254.09 | (127.06) | 127.03 |
| 321.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 322.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 323.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 324.  Remove Glue down carpet | 144.00 SF | 0.63 | 0.00 | 9.08 | 99.80 | (0.00) | 99.80 |
| 325.  Glue down carpet | 165.60 SF | 2.18 | 35.20 | 36.10 | 432.31 | (216.17) | 216.14 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 326.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 327.  R&R Cove base molding - rubber or vinyl, 4" high | 48.00 LF | 2.22 | 8.94 | 10.64 | 126.14 | (54.89) | 71.25 |
| 328.  Final cleaning - construction - Commercial | 144.00 SF | 0.23 | 3.23 | 3.32 | 39.67 | (0.00) | 39.67 |
| **Totals:  Mod Office 2** | | | **90.97** | **194.14** | **2,226.16** | **820.59** | **1,405.57** |



**Mod Office 3**                                                                 **Height: 8'**

| 384.00 SF Walls | 144.00 SF Ceiling |
|---|---|
| 528.00 SF Walls & Ceiling | 144.00 SF Floor |
| 16.00 SY Flooring | 144.00 LF Floor Perimeter |
| 48.00 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 329.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 330.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 144.00 SF | 3.26 | 19.23 | 46.96 | 535.63 | (110.94) | 424.69 |

NILFISK-FWP-0051

NILFISK-FWP-4126

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Mod Office 3

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 331. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 332. Mask the floor per square foot - plastic and tape - 4 mil | 144.00 SF | 0.23 | 0.84 | 3.32 | 37.28 | (18.64) | 18.64 |
| 333. Paint the walls - one coat | 384.00 SF | 0.59 | 4.87 | 22.66 | 254.09 | (127.06) | 127.03 |
| 334. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 335. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 336. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 337. Remove Glue down carpet | 144.00 SF | 0.63 | 0.00 | 9.08 | 99.80 | (0.00) | 99.80 |
| 338. Glue down carpet | 165.60 SF | 2.18 | 35.20 | 36.10 | 432.31 | (216.17) | 216.14 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 339. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 340. R&R Cove base molding - rubber or vinyl, 4" high | 48.00 LF | 2.22 | 8.94 | 10.64 | 126.14 | (54.89) | 71.25 |
| 341. Final cleaning - construction - Commercial | 144.00 SF | 0.23 | 3.23 | 3.32 | 39.67 | (0.00) | 39.67 |
| **Totals: Mod Office 3** | | | **90.97** | **194.14** | **2,226.16** | **820.59** | **1,405.57** |



**Mod Office 4**                                                                                          **Height: 8'**

| | |
|---|---|
| 384.00 SF Walls | 144.00 SF Ceiling |
| 528.00 SF Walls & Ceiling | 144.00 SF Floor |
| 16.00 SY Flooring | 48.00 LF Floor Perimeter |
| 48.00 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 342. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 343. R&R Suspended ceiling system - Standard grade - 2' x 4' | 144.00 SF | 3.26 | 19.23 | 46.96 | 535.63 | (110.94) | 424.69 |
| 344. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 345. Mask the floor per square foot - plastic and tape - 4 mil | 144.00 SF | 0.23 | 0.84 | 3.32 | 37.28 | (18.64) | 18.64 |
| 346. Paint the walls - one coat | 384.00 SF | 0.59 | 4.87 | 22.66 | 254.09 | (127.06) | 127.03 |
| 347. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 348. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |

22040036-NILFISK                                                        4/27/2022          Page: 25

NILFISK-FWP-0052

NILFISK-FWP-4127



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## CONTINUED - Mod Office 4

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 349.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 350.  Remove Glue down carpet | 144.00 SF | 0.63 | 0.00 | 9.08 | 99.80 | (0.00) | 99.80 |
| 351.  Glue down carpet | 165.60 SF | 2.18 | 35.20 | 36.10 | 432.31 | (216.17) | 216.14 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 352.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 353.  R&R Cove base molding - rubber or vinyl, 4" high | 48.00 LF | 2.22 | 8.94 | 10.64 | 126.14 | (54.89) | 71.25 |
| 354.  Final cleaning - construction - Commercial | 144.00 SF | 0.23 | 3.23 | 3.32 | 39.67 | (0.00) | 39.67 |
| **Totals:  Mod Office 4** | | | 90.97 | 194.14 | 2,226.16 | 820.59 | 1,405.57 |



**Mod Office 5**                                                                                     **Height: 8'**

|  |  |
|---|---|
| 448.00 SF Walls | 192.00 SF Ceiling |
| 640.00 SF Walls & Ceiling | 192.00 SF Floor |
| 21.33 SY Flooring | 56.00 LF Floor Perimeter |
| 56.00 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 355.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 356.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 192.00 SF | 3.26 | 25.65 | 62.60 | 714.17 | (147.90) | 566.27 |
| 357.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 358.  Mask the floor per square foot - plastic and tape - 4 mil | 192.00 SF | 0.23 | 1.12 | 4.42 | 49.70 | (24.86) | 24.84 |
| 359.  Paint the walls - one coat | 448.00 SF | 0.59 | 5.68 | 26.44 | 296.44 | (148.22) | 148.22 |
| 360.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 361.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 362.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 363.  Remove Glue down carpet | 192.00 SF | 0.63 | 0.00 | 12.10 | 133.06 | (0.00) | 133.06 |
| 364.  Glue down carpet | 220.80 SF | 2.18 | 46.93 | 48.14 | 576.41 | (288.22) | 288.19 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 365.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |

NILFISK-FWP-0053

NILFISK-FWP-4128



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Mod Office 5**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 366. R&R Cove base molding - rubber or vinyl, 4" high | 56.00 LF | 2.22 | 10.43 | 12.44 | 147.19 | (64.06) | 83.13 |
| 367. Final cleaning - construction - Commercial | 192.00 SF | 0.23 | 4.31 | 4.42 | 52.89 | (0.00) | 52.89 |
| **Totals:  Mod Office 5** | | | **112.78** | **232.62** | **2,671.10** | **966.15** | **1,704.95** |

| | Mod Office 6 | | | | | Height: 8' |
|---|---|---|---|---|---|---|

512.00  SF Walls                     240.00  SF Ceiling
752.00  SF Walls & Ceiling           240.00  SF Floor
26.67  SY Flooring                   64.00  LF Floor Perimeter
64.00  LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 368. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 369. R&R Suspended ceiling system - Standard grade - 2' x 4' | 240.00 SF | 3.26 | 32.06 | 78.24 | 892.70 | (184.88) | 707.82 |
| 370. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 371. Mask the floor per square foot - plastic and tape - 4 mil | 240.00 SF | 0.23 | 1.40 | 5.52 | 62.12 | (31.06) | 31.06 |
| 372. Paint the walls - one coat | 512.00 SF | 0.59 | 6.49 | 30.20 | 338.77 | (169.39) | 169.38 |
| 373. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 374. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 375. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 376. Remove Glue down carpet | 240.00 SF | 0.63 | 0.00 | 15.12 | 166.32 | (0.00) | 166.32 |
| 377. Glue down carpet | 276.00 SF | 2.18 | 58.66 | 60.16 | 720.50 | (360.25) | 360.25 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 378. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 379. R&R Cove base molding - rubber or vinyl, 4" high | 64.00 LF | 2.22 | 11.92 | 14.20 | 168.20 | (73.20) | 95.00 |
| 380. Final cleaning - construction - Commercial | 240.00 SF | 0.23 | 5.38 | 5.52 | 66.10 | (0.00) | 66.10 |
| **Totals:  Mod Office 6** | | | **134.57** | **271.02** | **3,115.95** | **1,111.67** | **2,004.28** |

NILFISK-FWP-0054

NILFISK-FWP-4129



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| Entry/Foyer | | Height: 8' |
|---|---|---|
| 422.67 SF Walls | | 165.21 SF Ceiling |
| 587.88 SF Walls & Ceiling | | 165.21 SF Floor |
| 18.36 SY Flooring | | 52.83 LF Floor Perimeter |
| 52.83 LF Ceil. Perimeter | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 381.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 382.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 165.21 SF | 3.26 | 22.07 | 53.86 | 614.51 | (127.27) | 487.24 |
| 383.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 384.  Mask the floor per square foot - plastic and tape - 4 mil | 165.21 SF | 0.23 | 0.97 | 3.80 | 42.77 | (21.39) | 21.38 |
| 385.  Paint the walls - one coat | 422.67 SF | 0.59 | 5.36 | 24.94 | 279.68 | (139.85) | 139.83 |
| 386.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 387.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 388.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 389.  Remove Glue down carpet | 165.21 SF | 0.63 | 0.00 | 10.40 | 114.48 | (0.00) | 114.48 |
| 390.  Glue down carpet | 189.99 SF | 2.18 | 40.38 | 41.42 | 495.98 | (248.00) | 247.98 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 391.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 392.  R&R Cove base molding - rubber or vinyl, 4" high | 52.83 LF | 2.22 | 9.84 | 11.74 | 138.87 | (60.44) | 78.43 |
| 393.  Final cleaning - construction - Commercial | 165.21 SF | 0.23 | 3.71 | 3.80 | 45.51 | (0.00) | 45.51 |
| **Totals:  Entry/Foyer** | | | **100.99** | **212.02** | **2,433.04** | **889.84** | **1,543.20** |



| Men's Room 2 | | Height: 8' |
|---|---|---|
| 281.33 SF Walls | | 88.67 SF Ceiling |
| 370.00 SF Walls & Ceiling | | 88.67 SF Floor |
| 9.85 SY Flooring | | 34.67 LF Floor Perimeter |
| 37.67 LF Ceil. Perimeter | | |

| **Missing Wall - Goes to Floor** | | **3' X 6' 8"** | | **Opens into TBD_ROOM** | | | |
|---|---|---|---|---|---|---|---|
| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 394.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |

NILFISK-FWP-0055

NILFISK-FWP-4130

**⨀ JS|HELD**    **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

CONTINUED - Men's Room 2

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 395. R&R Suspended ceiling system - Standard grade - 2' x 4' | 88.67 SF | 3.26 | 11.84 | 28.90 | 329.80 | (68.31) | 261.49 |
| 396. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 397. R&R Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 115.08 | 27.37 | 46.02 | 533.71 | (249.47) | 284.24 |
| 398. Mask the floor per square foot - plastic and tape - 4 mil | 88.67 SF | 0.23 | 0.52 | 2.04 | 22.95 | (11.48) | 11.47 |
| 399. Paint the walls - one coat | 281.33 SF | 0.59 | 3.57 | 16.60 | 186.15 | (93.08) | 93.07 |
| 400. Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 401. Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 402. R&R Cove base molding - rubber or vinyl, 6" high | 34.67 LF | 2.89 | 8.72 | 10.02 | 118.94 | (53.57) | 65.37 |
| 403. Clean floor, strip & wax | 88.67 SF | 0.93 | 8.98 | 8.24 | 99.68 | (0.00) | 99.68 |
| 404. Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and stalls.* | | | | | | | |
| 405. Final cleaning - construction - Commercial | 88.67 SF | 0.23 | 1.99 | 2.04 | 24.42 | (0.00) | 24.42 |
| **Totals: Men's Room 2** | | | **129.59** | **251.34** | **2,894.64** | **986.63** | **1,908.01** |



**Ladies Room 2**    **Height: 8'**

| | |
|---|---|
| 285.33 SF Walls | 91.00 SF Ceiling |
| 376.33 SF Walls & Ceiling | 91.00 SF Floor |
| 10.11 SY Flooring | 35.17 LF Floor Perimeter |
| 38.17 LF Ceil. Perimeter | |

**Missing Wall - Goes to Floor**        **3' X 6' 8"**        **Opens into TBD_ROOM**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 406. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 407. R&R Suspended ceiling system - Standard grade - 2' x 4' | 91.00 SF | 3.26 | 12.16 | 29.66 | 338.48 | (70.11) | 268.37 |
| 408. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 4.00 EA | 189.61 | 28.23 | 75.84 | 862.51 | (400.22) | 462.29 |
| 409. R&R Ceiling diffusers / grills - square, lay-in - 24" | 4.00 EA | 115.08 | 27.37 | 46.02 | 533.71 | (249.47) | 284.24 |

22040036-NILFISK                4/27/2022        Page: 29

NILFISK-FWP-0056

NILFISK-FWP-4131

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### CONTINUED - Ladies Room 2

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 410.  Mask the floor per square foot - plastic and tape - 4 mil | 91.00 SF | 0.23 | 0.53 | 2.10 | 23.56 | (11.80) | 11.76 |
| 411.  Paint the walls - one coat | 285.33 SF | 0.59 | 3.62 | 16.84 | 188.80 | (94.40) | 94.40 |
| 412.  Paint door/window trim & jamb - 2 coats (per side) | 4.00 EA | 27.50 | 1.82 | 11.00 | 122.82 | (61.41) | 61.41 |
| 413.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |
| 414.  R&R Cove base molding - rubber or vinyl, 6" high | 35.17 LF | 2.89 | 8.85 | 10.18 | 120.67 | (54.34) | 66.33 |
| 415.  Clean floor, strip & wax | 91.00 SF | 0.93 | 9.23 | 8.46 | 102.32 | (0.00) | 102.32 |
| 416.  Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and stalls.* | | | | | | | |
| 417.  Final cleaning - construction - Commercial | 91.00 SF | 0.23 | 2.04 | 2.10 | 25.07 | (0.00) | 25.07 |
| **Totals:  Ladies Room 2** | | | **130.40** | **252.84** | **2,911.60** | **990.84** | **1,920.76** |

**Breakroom 2**　　　　　　　　　　　　　　　　　　　　　　　**Height: 8'**

| 1034.67 SF Walls | 758.56 SF Ceiling |
|---|---|
| 1793.23 SF Walls & Ceiling | 758.56 SF Floor |
| 84.28 SY Flooring | 129.33 LF Floor Perimeter |
| 129.33 LF Ceil. Perimeter | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 418.  Contents - move out then reset - Extra large room | 1.00 EA | 193.15 | 0.00 | 19.32 | 212.47 | (0.00) | 212.47 |
| 419.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 758.56 SF | 3.26 | 101.32 | 247.28 | 2,821.50 | (584.37) | 2,237.13 |
| 420.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 6.00 EA | 189.61 | 42.34 | 113.76 | 1,293.76 | (600.33) | 693.43 |
| 421.  R&R Ceiling diffusers / grills - square, lay-in - 24" | 6.00 EA | 115.08 | 41.06 | 69.04 | 800.58 | (374.20) | 426.38 |
| 422.  Mask the floor per square foot - plastic and tape - 4 mil | 758.56 SF | 0.23 | 4.44 | 17.44 | 196.35 | (98.18) | 98.17 |
| 423.  Paint the walls - one coat | 1,034.67 SF | 0.59 | 13.11 | 61.04 | 684.61 | (342.31) | 342.30 |
| 424.  Paint door/window trim & jamb - 2 coats (per side) | 14.00 EA | 27.50 | 6.37 | 38.50 | 429.87 | (214.95) | 214.92 |
| 425.  Paint door slab only - 1 coat (per side) | 4.00 EA | 21.86 | 1.97 | 8.74 | 98.15 | (49.09) | 49.06 |

22040036-NILFISK　　　　　　　　　　　　　　　　　　4/27/2022　　　Page: 30

NILFISK-FWP-0057

NILFISK-FWP-4132

**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - Breakroom 2**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 426. R&R Cove base molding - rubber or vinyl, 6" high | 129.33 LF | 2.89 | 32.53 | 37.36 | 443.65 | (199.79) | 243.86 |
| 427. Cleaning Technician - per hour | 8.00 HR | 44.33 | 34.58 | 35.46 | 424.68 | (0.00) | 424.68 |
| *Provides for additional labor to clean fixtures and cabinets.* | | | | | | | |
| 428. Clean floor, strip & wax | 758.56 SF | 0.93 | 76.90 | 70.54 | 852.90 | (0.00) | 852.90 |
| 429. Final cleaning - construction - Commercial | 758.56 SF | 0.23 | 17.01 | 17.44 | 208.92 | (0.00) | 208.92 |
| **Totals: Breakroom 2** | | | **371.63** | **735.92** | **8,467.44** | **2,463.22** | **6,004.22** |



**W Office 1**                                        **Height: 8'**

| | | | |
|---|---|---|---|
| 348.25 SF Walls | | 118.35 SF Ceiling | |
| 466.60 SF Walls & Ceiling | | 118.35 SF Floor | |
| 13.15 SY Flooring | | 43.53 LF Floor Perimeter | |
| 43.53 LF Ceil. Perimeter | | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 430. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 431. R&R Suspended ceiling system - Standard grade - 2' x 4' | 118.35 SF | 3.26 | 15.81 | 38.58 | 440.21 | (91.18) | 349.03 |
| 432. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 433. Mask the floor per square foot - plastic tape and tape - 4 mil | 118.35 SF | 0.23 | 0.69 | 2.72 | 30.63 | (15.32) | 15.31 |
| 434. Paint the walls - one coat | 348.25 SF | 0.59 | 4.41 | 20.54 | 230.42 | (115.23) | 115.19 |
| 435. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 436. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 437. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 438. Remove Glue down carpet | 118.35 SF | 0.63 | 0.00 | 7.46 | 82.02 | (0.00) | 82.02 |
| 439. Glue down carpet | 136.10 SF | 2.18 | 28.93 | 29.68 | 355.31 | (177.66) | 177.65 |
| *15 % waste added for Glue down carpet.* | | | | | | | |
| 440. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 441. R&R Cove base molding - rubber or vinyl, 4" high | 43.53 LF | 2.22 | 8.11 | 9.66 | 114.40 | (49.79) | 64.61 |

NILFISK-FWP-0058

NILFISK-FWP-4133



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - W Office 1**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 442.  Final cleaning - construction - Commercial | 118.35 SF | 0.23 | 2.65 | 2.72 | 32.59 | (0.00) | 32.59 |
| **Totals:  W Office 1** | | | **79.26** | **173.42** | **1,986.82** | **742.07** | **1,244.75** |



| W Office 2 | | | Height: 8' |
|---|---|---|---|
| 622.67  SF Walls | | 378.13  SF Ceiling | |
| 1000.79  SF Walls & Ceiling | | 378.13  SF Floor | |
| 42.01  SY Flooring | | 77.83  LF Floor Perimeter | |
| 77.83  LF Ceil. Perimeter | | | |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 443.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 444.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 378.13 SF | 3.26 | 50.51 | 123.26 | 1,406.47 | (291.29) | 1,115.18 |
| 445.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 446.  Mask the floor per square foot - plastic and tape - 4 mil | 378.13 SF | 0.23 | 2.21 | 8.70 | 97.88 | (48.96) | 48.92 |
| 447.  Paint the walls - one coat | 622.67 SF | 0.59 | 7.89 | 36.74 | 412.01 | (206.02) | 205.99 |
| 448.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 449.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 450.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 451.  Remove Glue down carpet | 378.13 SF | 0.63 | 0.00 | 23.82 | 262.04 | (0.00) | 262.04 |
| 452.  Glue down carpet | 434.84 SF | 2.18 | 92.43 | 94.80 | 1,135.18 | (567.60) | 567.58 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 453.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 454.  R&R Cove base molding - rubber or vinyl, 4" high | 77.83 LF | 2.22 | 14.49 | 17.28 | 204.56 | (89.02) | 115.54 |
| 455.  Final cleaning - construction - Commercial | 378.13 SF | 0.23 | 8.48 | 8.70 | 104.15 | (0.00) | 104.15 |
| **Totals:  W Office 2** | | | **194.67** | **375.36** | **4,323.53** | **1,495.78** | **2,827.75** |

22040036-NILFISK                                                          4/27/2022          Page: 32

NILFISK-FWP-0059

NILFISK-FWP-4134



**J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| W Conference Room | | | | | | Height: 8' |
|---|---|---|---|---|---|---|

698.67 SF Walls                     415.33 SF Ceiling
1114.00 SF Walls & Ceiling          415.33 SF Floor
46.15 SY Flooring                   87.33 LF Floor Perimeter
87.33 LF Ceil. Perimeter

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |
| 456. Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 457. R&R Suspended ceiling system - Standard grade - 2' x 4' | 415.33 SF | 3.26 | 55.48 | 135.40 | 1,544.86 | (319.97) | 1,224.89 |
| 458. R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 459. Mask the floor per square foot - plastic and tape - 4 mil | 415.33 SF | 0.23 | 2.43 | 9.56 | 107.52 | (53.77) | 53.75 |
| 460. Paint the walls - one coat | 698.67 SF | 0.59 | 8.86 | 41.22 | 462.30 | (231.16) | 231.14 |
| 461. Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 462. Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 463. R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 464. Remove Glue down carpet | 415.33 SF | 0.63 | 0.00 | 26.16 | 287.82 | (0.00) | 287.82 |
| 465. Glue down carpet | 477.63 SF | 2.18 | 101.52 | 104.12 | 1,246.87 | (623.44) | 623.43 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 466. R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 467. R&R Cove base molding - rubber or vinyl, 4" high | 87.33 LF | 2.22 | 16.26 | 19.38 | 229.51 | (99.87) | 129.64 |
| 468. Final cleaning - construction - Commercial | 415.33 SF | 0.23 | 9.31 | 9.56 | 114.40 | (0.00) | 114.40 |
| **Totals: W Conference Room** | | | **212.52** | **407.46** | **4,694.52** | **1,621.10** | **3,073.42** |



| TBD Room | | | | | | | Height: 8' |
|---|---|---|---|---|---|---|---|

2513.33 SF Walls                    6040.97 SF Ceiling
8554.31 SF Walls & Ceiling          6040.97 SF Floor
671.22 SY Flooring                  313.17 LF Floor Perimeter
319.17 LF Ceil. Perimeter

| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into LADIES_ROOM_ |
|---|---|---|
| Missing Wall - Goes to Floor | 3' X 6' 8" | Opens into MENS_ROOM_2 |

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| *Please note: This room was not accessible and the scope of work is an estimate only for the repairs.* | | | | | | | |

NILFISK-FWP-0060

NILFISK-FWP-4135

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

**CONTINUED - TBD Room**

| DESCRIPTION | QUANTITY | UNIT PRICE | TAX | O&P | RCV | DEPREC. | ACV |
|---|---|---|---|---|---|---|---|
| 469.  Contents - move out then reset | 1.00 EA | 64.39 | 0.00 | 6.44 | 70.83 | (0.00) | 70.83 |
| 470.  R&R Suspended ceiling system - Standard grade - 2' x 4' | 6,040.97 SF | 3.26 | 806.92 | 1,969.36 | 22,469.84 | (4,653.77) | 17,816.07 |
| 471.  R&R Fluorescent - acoustic grid fixture - four tube, 2'x 4' | 2.00 EA | 189.61 | 14.11 | 37.92 | 431.25 | (200.12) | 231.13 |
| 472.  Mask the floor per square foot - plastic and tape - 4 mil | 6,040.97 SF | 0.23 | 35.34 | 138.94 | 1,563.70 | (781.86) | 781.84 |
| 473.  Paint the walls - one coat | 2,513.33 SF | 0.59 | 31.86 | 148.28 | 1,663.00 | (831.50) | 831.50 |
| 474.  Paint door/window trim & jamb - 2 coats (per side) | 2.00 EA | 27.50 | 0.91 | 5.50 | 61.41 | (30.72) | 30.69 |
| 475.  Paint door slab only - 1 coat (per side) | 2.00 EA | 21.86 | 0.98 | 4.38 | 49.08 | (24.55) | 24.53 |
| 476.  R&R Window blind - PVC - 1" - 7.1 to 14 SF | 1.00 EA | 68.50 | 1.94 | 6.86 | 77.30 | (33.05) | 44.25 |
| 477.  Remove Glue down carpet | 6,040.97 SF | 0.63 | 0.00 | 380.58 | 4,186.39 | (0.00) | 4,186.39 |
| 478.  Glue down carpet | 6,947.12 SF | 2.18 | 1,476.61 | 1,514.48 | 18,135.81 | (9,067.91) | 9,067.90 |
| 15 % waste added for Glue down carpet. | | | | | | | |
| 479.  R&R Carpet - metal transition strip | 3.00 LF | 3.23 | 0.72 | 0.96 | 11.37 | (4.45) | 6.92 |
| 480.  R&R Cove base molding - rubber or vinyl, 4" high | 313.17 LF | 2.22 | 58.32 | 69.52 | 823.07 | (358.16) | 464.91 |
| 481.  Final cleaning - construction - Commercial | 6,040.97 SF | 0.23 | 135.47 | 138.94 | 1,663.83 | (0.00) | 1,663.83 |
| **Totals:  TBD Room** | | | **2,563.18** | **4,422.16** | **51,206.88** | **15,986.09** | **35,220.79** |
| **Total:  Main Level** | | | **7,660.67** | **16,120.04** | **184,977.06** | **59,770.22** | **125,206.84** |
| **Total:  Interior Offices** | | | **7,660.67** | **16,120.04** | **184,977.06** | **59,770.22** | **125,206.84** |
| **Total:  Warehouse** | | | **300,954.85** | **728,700.26** | **8,316,654.04** | **1,610,050.27** | **6,706,603.77** |
| **Line Item Totals:  22040036-NILFISK** | | | **304,045.08** | **829,536.22** | **9,428,939.87** | **1,610,050.27** | **7,818,889.60** |

NILFISK-FWP-0061

NILFISK-FWP-4136

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## Grand Total Areas:

| | | |
|---|---|---|
| 22,098.47 SF Walls | 17,643.45 SF Ceiling | 39,741.93 SF Walls and Ceiling |
| 17,643.45 SF Floor | 1,960.38 SY Flooring | 2,754.53 LF Floor Perimeter |
| 0.00 SF Long Wall | 0.00 SF Short Wall | 2,801.20 LF Ceil. Perimeter |
| | | |
| 17,643.45 Floor Area | 18,418.51 Total Area | 22,098.47 Interior Wall Area |
| 16,237.39 Exterior Wall Area | 1,829.83 Exterior Perimeter of Walls | |
| | | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |

**NILFISK-FWP-0062**

**NILFISK-FWP-4137**

**JS HELD**    **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## Summary for Building

| | |
|---|---:|
| Line Item Total | 8,295,358.57 |
| Overhead | 414,768.11 |
| Profit | 414,768.11 |
| Material Sales Tax | 297,019.63 |
| Cleaning Matl Tax | 30.90 |
| Service Sales Tax | 6,994.55 |
| **Replacement Cost Value** | **$9,428,939.87** |
| Less Depreciation | (1,610,050.27) |
| **Actual Cash Value** | **$7,818,889.60** |
| **Net Claim** | **$7,818,889.60** |
| Total Recoverable Depreciation | 1,610,050.27 |
| **Net Claim if Depreciation is Recovered** | **$9,428,939.87** |

Mark Hartmann
Senior Vice President

NILFISK-FWP-0063

NILFISK-FWP-4138

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

### Recap of Taxes, Overhead and Profit

| | Overhead (5%) | Profit (5%) | Material Sales Tax (9.75%) | Cleaning Matl Tax (9.75%) | Service Sales Tax (9.75%) | Manuf. Home Tax (6.5%) | Storage Rental Tax (9.75%) | State Food Tax (1.5%) | Local Food Tax (3.25%) |
|---|---|---|---|---|---|---|---|---|---|
| **Line Items** | | | | | | | | | |
| | 414,768.11 | 414,768.11 | 297,019.63 | 30.90 | 6,994.55 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total** | | | | | | | | | |
| | **414,768.11** | **414,768.11** | **297,019.63** | **30.90** | **6,994.55** | **0.00** | **0.00** | **0.00** | **0.00** |

**NILFISK-FWP-0064**

**NILFISK-FWP-4139**

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## Recap by Room

**Estimate: 22040036-NILFISK**

| | | |
|---|---|---|
| **General Conditions** | 283,359.64 | 3.42% |
| **Demolition** | 725,000.00 | 8.74% |

**Area: Warehouse**

| | | |
|---|---|---|
| **Structural Components** | 1,322,197.80 | 15.94% |
| **Exterior Elevations** | 541,369.79 | 6.53% |
| **Roof** | 2,471,501.79 | 29.79% |
| **MEP's** | 2,790,733.20 | 33.64% |

**Area: Interior Offices**

**Area: Main Level**

| | | |
|---|---|---|
| **Compressors** | 2,678.20 | 0.03% |
| **Battery Charger** | 5,812.19 | 0.07% |
| **Office 1** | 2,721.93 | 0.03% |
| **Office 2** | 6,761.85 | 0.08% |
| **Office 3** | 1,943.88 | 0.02% |
| **Office 4** | 2,085.61 | 0.03% |
| **Small Conference** | 3,847.18 | 0.05% |
| **Women's Room** | 3,963.25 | 0.05% |
| **Men's Room** | 3,963.25 | 0.05% |
| **Closet** | 1,380.07 | 0.02% |
| **Office 6** | 1,849.98 | 0.02% |
| **Office 7** | 2,219.43 | 0.03% |
| **Break Room** | 8,579.14 | 0.10% |
| **Office 8** | 3,267.81 | 0.04% |
| **Production** | 2,564.22 | 0.03% |
| **Supply Room** | 4,083.37 | 0.05% |
| **Maintenance** | 2,461.88 | 0.03% |
| **Machine Shop** | 3,125.60 | 0.04% |
| **HR** | 2,224.10 | 0.03% |
| **HR Conference** | 2,841.92 | 0.03% |
| **Manager's Office** | 2,704.92 | 0.03% |
| **Mod Double Story** | 9,010.60 | 0.11% |
| **Mod Office 1** | 1,941.05 | 0.02% |
| **Mod Office 2** | 1,941.05 | 0.02% |
| **Mod Office 3** | 1,941.05 | 0.02% |
| **Mod Office 4** | 1,941.05 | 0.02% |
| **Mod Office 5** | 2,325.70 | 0.03% |
| **Mod Office 6** | 2,710.36 | 0.03% |
| **Entry/Foyer** | 2,120.03 | 0.03% |
| **Men's Room 2** | 2,513.71 | 0.03% |
| **Ladies Room 2** | 2,528.36 | 0.03% |
| **Breakroom 2** | 7,359.89 | 0.09% |
| **W Office 1** | 1,734.14 | 0.02% |

NILFISK-FWP-0065

NILFISK-FWP-4140

**JS|HELD**  **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

| | | |
|---|---:|---:|
| **W Office 2** | **3,753.50** | **0.05%** |
| **W Conference Room** | **4,074.54** | **0.05%** |
| **TBD Room** | **44,221.54** | **0.53%** |
| **Area Subtotal:  Main Level** | **161,196.35** | **1.94%** |
| **Area Subtotal:  Interior Offices** | **161,196.35** | **1.94%** |
| **Area Subtotal:  Warehouse** | **7,286,998.93** | **87.84%** |
| **Subtotal of Areas** | **8,295,358.57** | **100.00%** |
| **Total** | **8,295,358.57** | **100.00%** |

NILFISK-FWP-0066

NILFISK-FWP-4141

 **J.S. Held**

13200 Metcalf Ave., Suite 265
Overland Park, KS 66213

## Recap by Category with Depreciation

| O&P Items | RCV | Deprec. | ACV |
|---|---|---|---|
| ACOUSTICAL TREATMENTS | 40,280.77 | 9,398.85 | 30,881.92 |
| CLEANING | 9,251.52 | | 9,251.52 |
| CONCRETE & ASPHALT | 84,961.18 | 8,438.43 | 76,522.75 |
| CONTENT MANIPULATION | 2,978.00 | | 2,978.00 |
| GENERAL DEMOLITION | 799,530.63 | | 799,530.63 |
| DOORS | 56,118.90 | 26,502.37 | 29,616.53 |
| DRYWALL | 8,806.60 | 2,054.88 | 6,751.72 |
| ELECTRICAL | 2,256,140.25 | 526,407.79 | 1,729,732.46 |
| MISC. EQUIPMENT - COMMERCIAL | 162,038.56 | 81,019.28 | 81,019.28 |
| HEAVY EQUIPMENT | 104,972.00 | | 104,972.00 |
| FLOOR COVERING - CARPET | 25,972.99 | 12,986.63 | 12,986.36 |
| FLOOR COVERING - VINYL | 4,788.78 | 2,394.45 | 2,394.33 |
| FINISH HARDWARE | 5,531.89 | 2,765.95 | 2,765.94 |
| FIRE PROTECTION SYSTEMS | 410,000.00 | 205,000.00 | 205,000.00 |
| HEAT,  VENT & AIR CONDITIONING | 76,442.14 | 38,221.10 | 38,221.04 |
| INSULATION | 273,780.00 | 14,922.00 | 258,858.00 |
| LABOR ONLY | 155,345.00 | | 155,345.00 |
| LIGHT FIXTURES | 26,013.84 | 11,571.20 | 14,442.64 |
| METAL STRUCTURES & COMPONENTS | 226,305.00 | 105,609.00 | 120,696.00 |
| PLUMBING | 72,446.00 | 25,356.10 | 47,089.90 |
| PAINTING | 29,404.94 | 14,702.58 | 14,702.36 |
| ROOFING | 2,142,703.52 | 28,597.95 | 2,114,105.57 |
| SOFFIT, FASCIA, & GUTTER | 70,280.00 | 2,811.20 | 67,468.80 |
| STEEL COMPONENTS | 1,234,610.96 | 288,075.88 | 946,535.08 |
| TEMPORARY REPAIRS | 13,512.96 | | 13,512.96 |
| WINDOWS - ALUMINUM | 1,159.60 | 579.80 | 579.80 |
| WINDOW TREATMENT | 1,982.54 | 991.35 | 991.19 |
| O&P Items Subtotal | 8,295,358.57 | 1,408,406.79 | 6,886,951.78 |
| Overhead | 414,768.11 | 70,421.30 | 344,346.81 |
| Profit | 414,768.11 | 70,421.30 | 344,346.81 |
| Material Sales Tax | 297,019.63 | 59,301.15 | 237,718.48 |
| Cleaning Matl Tax | 30.90 | | 30.90 |
| Service Sales Tax | 6,994.55 | 1,499.73 | 5,494.82 |
| Total | 9,428,939.87 | 1,610,050.27 | 7,818,889.60 |

NILFISK-FWP-0067

NILFISK-FWP-4142

Main Level

2021JUN24 USDC Current State Plant Layout.dxf.png



Main Level

Page: 41

4/27/2022

22040036-NILFISK

AUTODESK VIEWER



Location Address:
22130 Merchants Way Suite 150,
Katy, TX 77449

TOLL-FREE 888.782.3423
envistaforensics.com

# REPORT ON STRUCTURAL DAMAGE AFTER TORNADO AT NILFISK INC. WAREHOUSE IN SPRINGDALE AR

## GUILLERMO RAMIREZ

Client Insurance File No: 3960001
Envista Matter No: MAT-137403-D4Z1
REPORT DATE: April 26, 2022

Prepared For:
Mike Grinnan
Crawford Global Technical Services
National General Adjuster
P.O. Box 402
Wentzville MO 63385
michael_grinnan@us.crawco.com

CERTAINTY IN AN UNCERTAIN WORLD

PT&C Forensic Consulting Services, P.A. | TX Firm Registration # F-19410 | NC Firm Registration # C-2837

**EXHIBIT 4**

NILFISK-FWP-0069

NILFISK-FWP-4144



## PURPOSE

Crawford Global Technical Services retained Envista to determine extend of damage to the structural systems of the Nilfisk Inc. (Nilfisk) warehouse located at 979 East Robinson Avenue, Springdale, AR 72764, after an EF-3 tornado event that occurred on March 30th, 2022.

## BACKGROUND

Based on observations made of the standing structure and visible debris on site, the subject building consisted of a steel-framed one-story structure supported on a concrete slab foundation. The exterior walls of the subject building were of industrial corrugated metal sheeting and the roof was comprised of corrugated metal roof panels. The interior walls and ceilings were covered by a combination of exposed metal walls in the warehouse areas and CMU and gypsum board (drywall) walls at the break rooms and office areas. The Washington County Appraisal District reports the building was constructed in 1987, subsequent modifications/additions have been performed on the property, however, neither the district or the owner had specific data available. For the purposes of discussion within this letter the front of the building was considered to be north-facing (Figure 1).



*Figure 1 General layout of Nilfisk Inc. warehouse prior to March 30, 2022 (CONNECTExplorer)*

**NILFISK-FWP-0070**

**NILFISK-FWP-4145**



Reportedly, the subject building was damaged during a storm that produced tornadic activity in the area on or about March 30, 2022.

## CONCLUSIONS

After conducting an inspection at the subject property located at 979 East Robinson Avenue, Springdale, AR 72764, it is Envista's professional opinion that:

1. The structural condition of the main frames and braces between grids 20 and 9 did not show clear signs of damage or reduction in performance after the event of March 30th.
2. The cross braces in the remaining structure performed as designed and remain in working condition after the March 30th event.
3. The structural frame in grid 21.1 is not of the same design as the typical frame observed in the remaining structure. It could not be inspected up close during the visit, however, given the different structural system it is recommended to be replaced.
4. The structural frame in grid 9 was not inspected due to safety barriers and debris on the vicinity. It is recommended that a closer inspection be performed of this frame when accessible to determine its residual integrity.
5. The remaining cross brace cables need to be retightened so that both directions have the same tension.
6. Wall panels do not need to be replaced; however, they should be repaired where local damage exists and reconnected to the sill plate if noted separated at locations.
7. Roof membrane should be replaced in the remaining building. The roof panels should be evaluated in a case-by-case basis to determine if replacements are necessary.
8. The concrete in the east and west ends of the building could not be assessed due to the debris still in the area. In areas of the perimeter, it was noted that some locations showed damage due to expansion anchor pull out. Local repair of concrete areas will be necessary during the replacement of the damaged frames.

## DOCUMENTS REVIEWED

The following documents and materials were reviewed and/or referenced as part of Envista's investigation, and/or contain information pertinent to the discussion and conclusions presented herein:

1. Climatic Data https://www.wunderground.com/. (Attachment B, Weather Data)
2. General layout of building, provided by Jose Damian, Quality Manager for Nilfisk Inc.

## PROVIDED INFORMATION

Present during Envista's inspection were representatives from Nilfisk, Guillermo Ramirez and Keith Nygaard from Envista, Mark Harmann from JS Held and Michael Grinnan from Crawford Global. During the inspection, Envista was not allowed to approach the areas with debris from the collapse due to safety considerations. The group entered the portion of the structure still standing for observations.

Jose Damian, quality manager for the property provided Envista with a digital file containing the general layout of the building. This layout is shown in Figure 2 of this report.

**NILFISK-FWP-0071**

**NILFISK-FWP-4146**



Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 2 General layout of Nilfisk Warehouse (Jose Damian)*



*Figure 3 Overall view of damaged and remaining warehouse*



**WEATHER DATA**

A thunderstorm front moved through Arkansas on Wednesday March 30th, 2022, hitting the areas of Little Rock, Johnson and Springdale. A tornado developed south of Joyce Boulevard and east of Steele Boulevard, which is southwest of the Northwest Arkansas Mall in Fayetteville, according to the weather service. From there, it traveled across Main Drive in Johnson and into Springdale, damaging numerous homes and businesses and flipping vehicles. It was reported that seven people were injured, according to Springdale police.

The National Weather Service designated the tornado that hit Springdale as an EF-3, meaning that it had winds from 136 to 165 mph. The tornado was on the ground for 5.2 miles from 4:04 am. to 4:12 am, according to the National Weather Service in Tulsa. Its maximum width was 350 yards.

**OBSERVATIONS**

Envista's team noted that of the previously existing warehouse, complete bays on the west and east ends of the building had collapsed (Figure 3). Only a central portion of the building remained standing with some damage to the building envelope evident.
From the outside, it was noted that the internal structure of the east and west ends of the building had collapsed with no observable structure remaining standing and undamaged in those areas. As seen on Figure 3, the debris from the former structure was still in the area, so no observations could be made beyond looking at the perimeter.

From the information provided by Nilfisk (Figure 2) and the interior survey performed by Envista, the remaining structure was contained by the gridlines 20 to 9 and A to E. The main entrance is located in the bay between grids 20 and 19 along grid A on the north side of the building. The main structural system located at grids 9 to 20 is a steel rigid frame in the north south direction; lateral stability in the east west direction is provided by a series of cross braces at 4 bays of the remaining structure (Figure 4). The cross braces were braided steel cables attached to the structure by turn buckles, located at the north and south walls and the roof structure at the designated bays.

Figure 5, shows an elevation of the rigid frames noted inside of the building. These frames were typical for grids 9 to 20. The horizontal members were of I-shaped steel members with a tapered profile, the end columns were tapered steel flanged shapes with the interior columns measured as 8" structural tubes. Figure 6 shows a layout of the remaining structure showing the frame distribution as described in this paragraph. The spacing between the columns in the rigid frame was measured as 50ft on center, while the spacing between the frames as estimated at 25ft on center. Safety barriers did not allow for a close observation of the frame in grid 9. The portion of the structure standing in grid 21.1 was not typical of the frames observed in the other grids. Envista was informed that the warehouse was likely a product of several modifications/additions, which would explain the different structural system that was noted for this grid (**Error! Reference source not found.**) and later observations on areas of the collapse debris that will be noted in this report.



Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 4 Floor plan of remaining structure*



*Figure 5 Typical rigid frame for the remaining portion of the warehouse.*





*Figure 6 Layout of frames to the remaining portion of the warehouse.*



*Figure 7 Different structural system (opposite side of wood barrier) noted for remaining portion.*





*Figure 8 Detail of perimeter columns at grids A and D*

The perimeter columns were anchored to the concrete slab by a base plate with two bolts embedded into the concrete (Figure 9), the interior structural tube columns were embedded in the concrete (Figure 9) but it is expected that they also had base plates with anchors to the foundation.

As previously mentioned, the lateral stability in the east-west direction is provided by cross braces in the ceiling and in the perimeter walls at 4 locations of the remaining bays (Figure 10 and Figure 11). The braces were braided steel cables connected to the frames by turnbuckles as it can be seen on Figure 8.

As mentioned previously, it was not possible to survey the area with the debris at the east and west portions of the building. However, based on the general layout noted on the exterior (Figure 3) and the information provided by Nilfisk (Figure 2), these areas were loading and unloading areas with truck docks, in addition, the symbols on the general layout plan for the columns depict different column profiles in these areas than the ones observed in the remaining portion of the building. Therefore, it is expected that the structural systems at these locations were different than the ones observed. In addition, from the site observations at the perimeter of the damaged areas, it can be seen that, at the east portion, the connection of the columns to the base plate and the cross brace connection failed during the collapse (Figure 12). On the west side of the building the connection to the slab was fractured with bolt failure and severe deformation of the base plate (Figure 13). In other cases, in the west side, the failure was a pull out of expansion bolts used in the framing of the columns, this pullout resulted in damage in the concrete slab as well (Figure 14).

Several areas of water intrusion on the ceiling were identified by bulging of the ceiling membrane and complete tear outs at other locations (Figure 15)





*Figure 9 Detail of base of interior columns in typical interior frames*



*Figure 10 Cross brace detail at perimeter walls (Typ.)*





*Figure 11 Cross brace at ceiling of east-most bay of remaining portion.*



*Figure 12 Base plate and brace failure on columns at the east side of the property*





*Figure 13 Anchor bolt failure on west side columns*



*Figure 14 Expansion bolt failure with resulting damage to the concrete slab.*





*Figure 15 Water penetration in ceiling (red=tear out; yellow=wrinkles)*

No widespread damage, that can be attributed to the March 30th event, was observed in the exterior wall panels away from the immediate areas at the ends of the remaining structure. At one location on the north face of the remaining structure, the wall panel lifted from the bottom connection (Figure 16). In preparation to removing existing inventory in the warehouse a hole was cut on the north side wall panels (Figure 17). On the south side of the remaining structure no additional damage, that can be attributed to the March 30th event, was observed on the wall panels (Figure 18).

No racking was noted on interior CMU walls or partitions in the remaining portion of the building. No structural cracking was observed and, there was no leaning for the walls out of tolerance.





*Figure 16 Localized panel damage on the remaining structure*



*Figure 17 Opening on north side panel cut after the event of March 30th*

NILFISK-FWP-0081

NILFISK-FWP-4156



Page 5 of 5
Envista Matter No: MAT-137403-D4Z1
Client Insurance Claim No: 3960001



*Figure 18 Wall panel condition on the south side of the remaining structure*



*Figure 19 Measured lean angles at frames of remaining structure.*





*Figure 20 Brace tension at north and south facing wall locations*

**NILFISK-FWP-0083**

**NILFISK-FWP-4158**



## DISCUSSION

The remaining frames were checked using a water bubble and digital level for signs of leaning as the result of lateral forces induced by the high winds. As it can be seen on Figure 5, the plumbness of the columns was measured by a digital and bubble combination level which showed that no measurable displacement or rotation had taken place in the north-south direction. All the columns tested at different locations measured at 90 degrees from the horizontal. In the east-west direction, all the frames measured showed a slight lean towards the west with the out of plumb angle measuring between 89.5 and 89.9 degrees (Figure 19). This is within acceptable construction tolerance and is not likely a sign of significant movement by the frames during the event. No signs of distress or permanent damage was identified in the columns of beam elements of the frames. No concrete cracking was noted at the base of the 8" structural columns or at the base plates or bolts of the perimeter columns part of the frame. The frames at grids 20 to 10 gave no indications of degradation in their ability to perform their structural functions. The frame at grid 9 could not be evaluated up close, but it is estimated that its condition will be similar to the conditions noted for the other frames in grids 20 to 10. The frame in grid 21.1 of Figure 4, was also not evaluated up close, however, given its different nature from the frames in the other grids, it is recommended that it be replaced completely.

The tension on the cables part of the cross brace systems at the walls were noted to be slightly different with the cables facing the west direction having a tighter feel than those facing the east direction (Figure 20). Upon hand testing, both directions did not show signs of connection issues or physical integrity. Nevertheless, it is recommended that both directions are tightened to the same level of tension.

## CONCLUSIONS

After conducting an inspection at the subject property located at 979 East Robinson Avenue, Springdale, AR 72764, it is Envista's professional opinion that:

1. The structural condition of the main frames and braces between grids 20 and 9 did not show clear signs of damage or reduction in performance after the event of March 30th.
2. The cross braces in the remaining structure performed as designed and remain in working condition after the March 30th event.
3. The structural frame in grid 21.1 is not of the same design as the typical frame observed in the remaining structure. It could not be inspected up close during the visit, however, given the different structural system it is recommended to be replaced.
4. The structural frame in grid 9 was not inspected due to safety barriers and debris on the vicinity. It is recommended that a closer inspection be performed of this frame when accessible to determine its residual integrity.
5. The remaining cross brace cables need to be retightened so that both directions have the same tension.
6. Wall panels do not need to be replaced; however, they should be repaired where local damage exists and reconnected to the sill plate if noted separated at locations.
7. Roof membrane should be replaced in the remaining building. The roof panels should be evaluated in a case-by-case basis to determine if replacements are necessary.



8.  The concrete in the east and west ends of the building could not be assessed due to the debris still in the area.  In areas of the perimeter, it was noted that some locations showed damage due to expansion anchor pull out.  Local repair of concrete areas will be necessary during the replacement of the damaged frames.

**CLOSURE**

Photographs taken during our work, which are not included in this report, are retained in our files and are available to you upon request.

This report is for the exclusive use of our client and is not intended for any other purpose.  Our report is based on information made available to us at this time.  Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted by the discovery of additional information.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call or email.


Sincerely,

Envista Forensics

Guillermo Ramirez, PhD.
Principal Engineer

Attachment A: Photographs
Attachment B: Weather Data
Attachment C: Provided Information



# ATTACHMENT A
# #
# Photographs

Photographs taken during our inspection, which have not been included in this report, have been retained in our files and will be made available to you upon your request. Note that the brightness and/or contrast of some photographs may have been enhanced for purposes of clarity. Some photographs may be cropped from their original sizes in order to emphasize a specific item or feature. No significant changes to any photographs were made that would alter factual representations.



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 1.**



*View of north face west corner of building*

**Photograph 2.**



*View of north face east corner of building*



**Photograph 3.**



*View north face west collapsed side of building*

**Photograph 4.**



*View of north face east collapsed side of building*

**NILFISK-FWP-0088**

**NILFISK-FWP-4163**



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 5.**



*View of east end of collapsed building looking south*

**Photograph 6.**



*View of east end of collapsed building looking north*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 7.**



*View of south side of building looking west*

**Photograph 8.**



*View interior of building looking to west end with wood barrier*

NILFISK-FWP-0090

NILFISK-FWP-4165



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 9.**



*View of perimeter column*

**Photograph 10.**



*View of perimeter column with brace*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 11.**



*View of typical interior 8" tube column*

**Photograph 12.**



*View of x-brace on wall*

NILFISK-FWP-0092

NILFISK-FWP-4167



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 13.**



*View of interior of building looking at the east end*

**Photograph 14.**



*View of brace connection on collapsed side of building*

NILFISK-FWP-0093

NILFISK-FWP-4168



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 15.**



*View of failed anchor bolts*

**Photograph 16.**



*View of pull out failure on expansion anchors*



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 17.**



*View of tear out and wrinkling of membrane in roof*

**Photograph 18.**



*View of localized damage in wall panel on north side of building*

NILFISK-FWP-0095

NILFISK-FWP-4170



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Photograph 19.**



*View of cut to wall panel on north side*

**Photograph 20.**



*View of south face of building*

**NILFISK-FWP-0096**

**NILFISK-FWP-4171**



Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

**Attachment B**

**Weather Data**



Recent Cities
Springdale, AR (/weather/us/ar/springdale/36.19,-94.13)

36.28 °N, 94.3 °W

# Bentonville, AR Weather History ★ 🏠

☁ 58° NORTHWEST ARKANSAS REGIONAL AIRPORT STATION (/DASHBOARD/PWS/KARSPRIN54?
CM_VEN=LOCALWX_PWSDASH) | CHANGE ⌄

HISTORY (/HISTORY/DAILY/US/AR/BENTONVILLE/KXNA)

- TODAY (/WEATHER/KXNA)
- HOURLY (/HOURLY/KXNA)
- 10-DAY (/FORECAST/KXNA)
- CALENDAR (/CALENDAR/US/AR/BENTONVILLE/KXNA)
- HISTORY (/HISTORY/DAILY/US/AR/BENTONVILLE/KXNA)
- WUNDERMAP (/WUNDERMAP?LAT=36.28&LON=-94.3)



# Summary

| Temperature (° F) | Actual | Historic Avg. | Record | ▲ |
|---|---|---|---|---|
| High Temp | 70 | 64.5 | 84 | |
| Low Temp | 38 | 39.1 | 17 | |
| Day Average Temp | 52.48 | 51.8 | - | |
| **Precipitation (Inches)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Precipitation (past 24 hours from 11:53:00) | 0.78 | 4.70 | - | |
| **Dew Point (° F)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Dew Point | 49.77 | - | - | |
| High | 61 | - | - | |
| Low | 35 | - | - | |
| Average | 49.77 | - | - | |
| **Wind (MPH)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Max Wind Speed | 24 | - | - | |
| Visibility | 10 | - | - | |
| **Sea Level Pressure (Hg)** | **Actual** | **Historic Avg.** | **Record** | ▲ |
| Sea Level Pressure | 28.34 | - | - | |
| **Astronomy** | **Day Length** | **Rise** | **Set** | ▲ |
| Actual Time | 12h 30m | 7:07 AM | 7:38 PM | |
| Civil Twilight | | 6:41 AM | 8:04 PM | |
| Nautical Twilight | | 6:11 AM | 8:34 PM | |
| Astronomical Twilight | | 5:40 AM | 9:05 PM | |
| Moon: waning crescent | | 6:36 AM | 6:10 PM | |

# Daily Observations

| Time | Temperature | Dew Point | Humidity | Wind | Wind Speed | Wind Gust | Pressure | Precip. | Condition |
|---|---|---|---|---|---|---|---|---|---|
| 12:53 AM | 70 °F | 55 °F | 59 % | S | 24 mph | 35 mph | 28.20 in | 0.0 in | Light Rain / Windy |
| 1:53 AM | 69 °F | 55 °F | 61 % | S | 18 mph | 26 mph | 28.20 in | 0.0 in | Cloudy |
| 2:53 AM | 68 °F | 56 °F | 65 % | S | 14 mph | 0 mph | 28.15 in | 0.0 in | Cloudy |
| 3:44 AM | 65 °F | 59 °F | 81 % | SW | 9 mph | 21 mph | 28.13 in | 0.1 in | Heavy T-Storm |
| 3:47 AM | 64 °F | 59 °F | 83 % | WSW | 14 mph | 21 mph | 28.14 in | 0.1 in | Heavy T-Storm |
| 3:53 AM | 63 °F | 60 °F | 90 % | SSW | 16 mph | 25 mph | 28.14 in | 0.2 in | Heavy T-Storm |
| 4:03 AM | 63 °F | 60 °F | 90 % | SSW | 10 mph | 0 mph | 28.14 in | 0.0 in | T-Storm |

NILFISK-FWP-0099

NILFISK-FWP-4174

| Time | Temperature | Dew Point | Humidity | Wind | Wind Speed | Wind Gust | Pressure | Precip. | Condition |
|------|-------------|-----------|----------|------|------------|-----------|----------|---------|-----------|
| 4:11 AM | 63 °F | 61 °F | 93 % | SW | 10 mph | 0 mph | 28.14 in | 0.1 in | T-Storm |
| 4:28 AM | 62 °F | 61 °F | 96 % | SW | 9 mph | 0 mph | 28.15 in | 0.1 in | Rain |
| 4:36 AM | 62 °F | 60 °F | 93 % | WSW | 14 mph | 0 mph | 28.15 in | 0.2 in | Rain |
| 4:51 AM | 61 °F | 59 °F | 94 % | WSW | 13 mph | 0 mph | 28.14 in | 0.2 in | T-Storm |
| 4:53 AM | 61 °F | 59 °F | 93 % | WSW | 9 mph | 0 mph | 28.13 in | 0.3 in | Heavy T-Storm |
| 5:06 AM | 60 °F | 58 °F | 93 % | WSW | 13 mph | 22 mph | 28.13 in | 0.0 in | Rain |
| 5:44 AM | 59 °F | 57 °F | 93 % | S | 8 mph | 0 mph | 28.13 in | 0.1 in | T-Storm |
| 5:53 AM | 59 °F | 57 °F | 93 % | SSW | 7 mph | 0 mph | 28.12 in | 0.1 in | Rain |
| 6:31 AM | 58 °F | 57 °F | 97 % | SSW | 6 mph | 0 mph | 28.11 in | 0.1 in | Rain |
| 6:53 AM | 58 °F | 57 °F | 97 % | S | 9 mph | 0 mph | 28.11 in | 0.2 in | Rain |
| 7:40 AM | 57 °F | 56 °F | 96 % | SSE | 5 mph | 0 mph | 28.10 in | 0.2 in | Heavy Rain |
| 7:53 AM | 57 °F | 56 °F | 96 % | E | 7 mph | 0 mph | 28.06 in | 0.3 in | Light Rain |
| 8:18 AM | 57 °F | 56 °F | 96 % | SE | 12 mph | 0 mph | 28.06 in | 0.0 in | Light Rain |
| 8:53 AM | 57 °F | 56 °F | 96 % | SSE | 6 mph | 0 mph | 28.09 in | 0.0 in | Light Rain |
| 9:53 AM | 57 °F | 56 °F | 96 % | S | 7 mph | 0 mph | 28.09 in | 0.0 in | Cloudy |
| 10:06 AM | 57 °F | 56 °F | 96 % | SSW | 8 mph | 0 mph | 28.12 in | 0.0 in | Cloudy |
| 10:30 AM | 57 °F | 56 °F | 96 % | SSW | 3 mph | 0 mph | 28.12 in | 0.0 in | Light Rain |
| 10:53 AM | 57 °F | 56 °F | 96 % | SE | 9 mph | 0 mph | 28.08 in | 0.0 in | Light Rain |
| 11:24 AM | 58 °F | 56 °F | 93 % | SE | 10 mph | 0 mph | 28.09 in | 0.0 in | Light Rain |
| 11:53 AM | 58 °F | 57 °F | 97 % | SSE | 9 mph | 0 mph | 28.10 in | 0.0 in | Light Rain |
| 12:17 PM | 50 °F | 49 °F | 96 % | NW | 16 mph | 33 mph | 28.07 in | 0.0 in | Light Rain |
| 12:53 PM | 47 °F | 46 °F | 97 % | NW | 17 mph | 28 mph | 28.11 in | 0.0 in | Light Rain |
| 1:47 PM | 46 °F | 45 °F | 93 % | NNW | 16 mph | 28 mph | 28.10 in | 0.1 in | Rain |
| 1:48 PM | 46 °F | 44 °F | 93 % | NNW | 15 mph | 28 mph | 28.10 in | 0.1 in | Rain |
| 2:18 PM | 46 °F | 44 °F | 93 % | NNW | 13 mph | 0 mph | 28.08 in | 0.0 in | Fog |
| 2:25 PM | 45 °F | 44 °F | 97 % | NW | 14 mph | 23 mph | 28.09 in | 0.0 in | Cloudy |
| 2:53 PM | 44 °F | 43 °F | 96 % | NW | 13 mph | 0 mph | 28.10 in | 0.0 in | Cloudy |
| 3:53 PM | 43 °F | 42 °F | 97 % | NW | 12 mph | 22 mph | 28.11 in | 0.0 in | Fog |
| 4:16 PM | 43 °F | 40 °F | 89 % | NW | 12 mph | 29 mph | 28.13 in | 0.0 in | Cloudy |
| 4:53 PM | 42 °F | 40 °F | 92 % | WNW | 13 mph | 30 mph | 28.16 in | 0.0 in | Light Rain |
| 5:44 PM | 41 °F | 39 °F | 93 % | NW | 12 mph | 22 mph | 28.18 in | 0.0 in | Cloudy |
| 5:53 PM | 41 °F | 39 °F | 93 % | WNW | 20 mph | 30 mph | 28.19 in | 0.0 in | Light Rain |
| 6:53 PM | 40 °F | 37 °F | 89 % | WNW | 9 mph | 0 mph | 28.22 in | 0.0 in | Cloudy |
| 7:22 PM | 39 °F | 37 °F | 93 % | WNW | 8 mph | 0 mph | 28.24 in | 0.0 in | Light Rain |
| 7:27 PM | 39 °F | 37 °F | 93 % | WNW | 13 mph | 22 mph | 28.24 in | 0.0 in | Light Rain |
| 7:53 PM | 39 °F | 37 °F | 93 % | WNW | 10 mph | 0 mph | 28.24 in | 0.0 in | Light Rain |
| 8:53 PM | 38 °F | 35 °F | 89 % | NW | 13 mph | 28 mph | 28.28 in | 0.0 in | Cloudy |
| 9:53 PM | 38 °F | 35 °F | 89 % | WNW | 7 mph | 0 mph | 28.30 in | 0.0 in | Cloudy |
| 10:00 PM | 38 °F | 35 °F | 89 % | WNW | 7 mph | 0 mph | 28.31 in | 0.0 in | Cloudy |
| 10:53 PM | 38 °F | 35 °F | 89 % | W | 6 mph | 0 mph | 28.31 in | 0.0 in | Mostly Cloudy |
| 11:53 PM | 39 °F | 35 °F | 86 % | W | 10 mph | 0 mph | 28.34 in | 0.0 in | Cloudy |

NILFISK-FWP-0100

NILFISK-FWP-4175



Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001

# ATTACHMENT C
#
# Information Provided to Envista

Provided by Nilfisk Inc.



Insured: Nilfisk Inc.
Location: 979 East Robinson Avenue, Springdale, AR 72764

Envista Matter No: MAT-137403-D4Z1
Crawford Global Technical Services Claim No: 3960001



NILFISK-FWP-0102

NILFISK-FWP-4177





**AC472 ACCREDITED**
**MB - 103**



**PINNACLE STRUCTURES, INC.**
P.O. Box 1268   Cabot, AR 72023
Phone: (501) 941-3929 or (800) 201-1534   Fax: (501) 941-1804

# Contract

| Building | A |
|---|---|
| Quote No. | E232883A |
| Rev | |

| Date | 8/4/2023 15:49 | |
|---|---|---|
| Job Number | | District   1 |
| Estimator | DAVID JOHNSON | |

## Customer Information

| | |
|---|---|
| Company | NABHOLZ CLIENT SERVICE |
| Address 1 | 3000 W. 68TH STREET |
| Address 2 | LITTLE ROCK,AR        Zip        72209 |
| Contact | JEFF MARCUSSEN |
| Phone | (501) 217-5519 |
| Fax | |

## Jobsite Information

| | |
|---|---|
| Name | 200X500X30 BUDGET PRICING |
| Address 1 | 25' BAYS |
| Address 2 | Zip |
| City | LITTLE ROCK        State        AR |
| County | PULASKI |
| Is the jobsite inside the city limits? | ☑ Yes   ☐ No |

## Drawing Information

| NUMBER REQUIRED | TYPE |
|---|---|
| 3 | Anchor Bolt Dwgs |
| 0 | Permit Dwgs |
| 3 | Approval Dwgs (Not in production schedule) |
| 2 | Erection Dwgs |
| 1 | Letter of Certification |
| 0 | Design Calculations |
| ☐ Yes   ☑ No | Samples (List on Additional Notes) |
| ☑ Yes   ☐ No | Engineer's Seal |

## Send Drawings To

| | |
|---|---|
| Company | NABHOLZ CLIENT SERVICE |
| Address 1 | |
| Address 2 | Zip |
| Contact | |
| Phone | |
| Fax | |
| Send Dwgs | ☑ US Mail   ☐ Overnite   ☐ 2nd Day |
| This order is for: | ☐ Production   ☑ Approval |
| Requested Delivery by: | |
| Request Drawings by: | |

## Building Information

| Dimensions: | Width | 200 | Length | 500 | Front Slope | 1.0:12 | Back Slope | 1.0:12 |
|---|---|---|---|---|---|---|---|---|
| | Front Eave Ht | 30 | Back Eave Ht | 30 | Peak Offset | 100 | | |
| Building Type: | horizontal peak frames with interior columns | | | | Mod. Col. Spacing: | | 4 at 50 | |
| Sidewall Bays: | 20 at 25 | | | | Mod. Col. Are: | ☐ At fin. Floor | | |
| Mod. Col. Type: | ☑ Pipe   ☐ W Section   ☐ Tube | | | | | ☐ Recessed | | BFF |
| Site Conditions: | | This Building: | ☑ Stands Alone | | ☐ Is an addition to an existing building | | | |
| | | | ☐ Has other structures/objects within 20 ft. | | | | | |

## Design Information

| Building Code: | IBC 21 | | Building Occupancy Category: | II - Normal | Note: Pinnacle Structures uses Allowable Stress Design. | |
|---|---|---|---|---|---|---|
| Live Load: | 20 | PSF | Dead Load: | 2.2 | Is tributary reduction allowed? | ☑ Yes   ☐ No |
| Wind Load: | 115 mph | | Exposure: | C | Importance: | 1.00 |
| Grnd Snow Ld: | 10 | PSF | Exposure: | 1.00 | Importance: | 1.00        Thermal Coefficient:        1.00 |
| | Is snow reduction allowed? | ☑ Yes   ☐ No | | | | |
| Seismic Design: | D | Importance: | 1.00 | $S_{DS}$:   0.38 | $S_{D1}$:   0.23   Site Class:   d | |
| Collateral Load: | 8 | PSF | | | Seismic Use Group: | |
| Additional Loads: | ☐ Mezzanine | | ☐ Cranes | ☐ Point Loads | ☐ Other   (See Additional Notes page) | |
| Serviceability requirements (drift/deflection): | | ☑ Pinnacle Standards | ☐ Other | (See Additional Notes page) | | |
| This building is to be designed: | | Closed | MBMA End Use Class: | | | |

## Included Items

| | |
|---|---|
| ☑ Additional Notes Page | ☐ Existing Building Page   ☐ Additional Building Page   ☐ |
| ☐ Crane/Point/Mezzanine Load Page | ☐ Sketch Page   ☐ |

## Signatures

| | |
|---|---|
| Payment Terms: | NET 30 DAYS |

Contract Price: $ _____
Sales Tax: $ _____ (to be added)
**Contract Price Including Tax: $ _____**

**Freight is Included**
**Anchor bolts are by others and not included in the contract price.**
**If differences in contract and drawings/specifications occur, this contract will govern.**
**To accept this order, please sign the front page and review and initial all other pages**
**The price is only good for (30) days from the date of the quote and that the building must deliver within (60) days of signing the contract to avoid a price increase.**

(Company) _____   Down Payment Required $ _____
(Please Print)

(Signature) _____   Date: _____

**NILFISK-FWP-4020**

**PINNACLE STRUCTURES, INC.**
P.O. Box 1268   Cabot, AR 72023
Phone: (501) 941-3929 or (800) 201-1534   Fax: (501) 941-1804

**Contract**

**MBMA**
METAL BUILDING MANUFACTURERS ASSOCIATION
**AC472 ACCREDITED**
**MB - 103**

**IAS ACCREDITED**

| Building | A | | Date | 8/4/2023 15:49 | |
|---|---|---|---|---|---|
| Quote No. | E232883A | | Job Number | | District 1 |
| Rev | | | Estimator | DAVID JOHNSON | |

| Location | Girt Type | Bracing Type | Column Type | Column Depth | Base Elev. |
|---|---|---|---|---|---|
| Front Sidewall | Bypass | Rod Diagonal Bracing | tapered depth | | 0 |
| Back Sidewall | Bypass | Rod Diagonal Bracing | tapered depth | | 0 |
| Left Endwall | Flush | Rod Diagonal Bracing | | | 0 |
| Right Endwall | Flush | Rod Diagonal Bracing | | | 0 |

### Endwall Framing

| | Frame Type | Bay Spacing (Left to Right) |
|---|---|---|
| Right Endwall | Bearing | 10 at 20 |
| Left Endwall | Bearing | 10 at 20 |

### Framed Openings

| Wall ID | Quantity | Width | Height | Sill Height | Type | Location | Accessories by Pinnacle? |
|---|---|---|---|---|---|---|---|
| | 10 | 12 | 14 | 0 | OHD | ☑ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |
| | | | | | | ☐ Factory ☐ Field | ☐ Yes ☑ No |

Note:  Cover trim supplied for overhead door framed openings only.      Note: For factory located framed openings, include sketch.

Are doors by others designed to resist the wind loads listed above?      ☑ Yes   ☐ No

### Roof Panel

| Panel Type | Panel Gauge | Panel Color | Fastener Type |
|---|---|---|---|
| 24" Doublelock SSR | 24 | Galvalume | STD |

SSR Clip Type:  HIGH FLOAT
SSR Options:  ☐ N/A   YR Weathertight Warranty _____ N/A
              ☐ Other:   ☑ Thermal Blocks (SSR only)   (Insulation thickness): _____
Roof Options:  ☑ UL-90 Rating   ☐ ___ YR Galvalume Warranty   ☐ ___ YR Finish Warranty

### Wall Panel

| Panel Type | Panel Gauge | Panel Color | Fastener Type |
|---|---|---|---|
| PBR | 26 | Sil Poly | STD |

| Base Condition at | ☑ Std Notch | ☑ Base Angle | ☐ Base Girt (6" AFF) | ☐ Base Trim |
|---|---|---|---|---|
| Sheeted Walls: | ☐ BT-20 (1 PC) | ☐ Base Cee | ☐ None | ☐ Base Closure Strips |

Wall Options:  ☐ ___ YR Galvalume Warranty   ☐ ___ YR Finish Warranty

### Insulation

| Roof | Type | Thickness | | | |
|---|---|---|---|---|---|
| Wall | Type | Thickness | Insulation by: | ☑ Others | ☐ Pinnacle |

### Trim/Flashing/Gutters

| Eave/Rake Color | F.O. Color | Corner Color | Downspout Color | Base Color | Quantity | Gutters | Downspouts |
|---|---|---|---|---|---|---|---|
| Sil Poly | Sil Poly | Sil Poly | Sil Poly | N/A | Front Sidewall: | 500 | 21 |
| | | | | | Back Sidewall: | 500 | 21 |

### Open Wall Areas

| Location | Size | Open for | | Support by Pinnacle |
|---|---|---|---|---|
| Front Sidewall | | ☐ Remain Open   ☐ Mat'l by others (Sketch req'd) | | ☐ Yes ☑ No |
| Back Sidewall | | ☐ Remain Open   ☐ Mat'l by others (Sketch req'd) | | ☐ Yes ☑ No |
| Left Endwall | | ☐ Remain Open   ☐ Mat'l by others (Sketch req'd) | | ☐ Yes ☑ No |
| Right Endwall | | ☐ Remain Open   ☐ Mat'l by others (Sketch req'd) | | ☐ Yes ☑ No |

### Below Eave Canopy

| Location | Size | Purlin Type | Soffit Panel | Gauge | Soffit Color | Trim Color |
|---|---|---|---|---|---|---|
| Front Sidewall | | | | | | |
| Back Sidewall | | | | | | |
| Left Endwall | | | | | | |
| Right Endwall | | | | | | |

Canopy roof panel is:   Panel type: _____   Gauge: _____   Color: _____

I have reviewed, understand and agree with all items on this page  _____

**NILFISK-FWP-4021**




# Contract

**PINNACLE STRUCTURES, INC.**
P.O. Box 1268   Cabot, AR 72023
Phone: (501) 941-3929 or (800) 201-1534   Fax: (501) 941-1804

AC472 ACCREDITED
MB - 103

| Building | A | | Date | 8/4/2023 15:49 | |
|---|---|---|---|---|---|
| Quote No. | E232883A | | Job Number | | District 1 |
| Rev | | | Estimator | DAVID JOHNSON | |

## Purlin/Eave Extension

| Location | Size | Soffit Panel | Gauge | Soffit Color | Trim Color |
|---|---|---|---|---|---|
| Front Sidewall | | | | | |
| Back Sidewall | | | | | |
| Left Endwall | | | | | |
| Right Endwall | | | | | |

## Façade

| Location | Size | | | | Type | Back Sheets | Valley Gutter |
|---|---|---|---|---|---|---|---|
| | Proj | Length | Height | Clear Ht | | | |
| Front Sidewall | | | | | | | |
| Back Sidewall | | | | | | | |
| Left Endwall | | | | | | | |
| Right Endwall | | | | | | | |
| Face Panel | Gauge | Face Panel Color | | Soffit Panel | Gauge | Soffit Color | Trim Color |
| | | | | | | | |

## Liner Panel

| Location | Total LF | Height | Panel Type | Gauge | Liner Color | Trim Color |
|---|---|---|---|---|---|---|
| Front Sidewall | | | | | | |
| Back Sidewall | | | | | | |
| Left Endwall | | | | | | |
| Right Endwall | | | | | | |

## Partition

| Type | Size | | Dbl Sheet | Insulated | Panel Type | Gauge | Panel Color | Trim Color |
|---|---|---|---|---|---|---|---|---|
| | Length | Height | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

## Accessories

| Doors | Light Panels | Other |
|---|---|---|
| 5 - 3070M-ST | N/A | N/A |

## Additional Notes and Special Requirements

I have reviewed, understand and agree with all items on this page _____

**NILFISK-FWP-4022**



**Additional Notes**


AC472 ACCREDITED
MB - 103



STRUCTURES. INC.
P.O. Box 1268    Cabot, AR 72023
Phone: (501) 941-3929 or (800) 201-1534    Fax: (501) 941-1804

| | | | |
|---|---|---|---|
| **Building** | | **Date** | 8/4/2023 15:49 |
| **Quote No.** | E232883A | **Job Number** | **District** | 1 |
| **Rev** | | **Estimator** | DAVID JOHNSON |

**Additional Notes and Special Requirements**

PLEASE RETURN ANY APPROVAL DRAWINGS TO THE PINNACLE DRAFTING MANAGER, JOSH FAIRCHILD, AT (jfairchild@pinnaclestructures.com) OR TO THE OFFICE VIA MAIL CARRIER (USPS, FEDEX, UPS).

1.    FOUNDATION DESIGN AND ANCHOR BOLT LENGTHS ARE NOT THE RESPONSIBILITY OF PINNACLE STRUCTURES, INC. **ANCHOR BOLTS ARE NOT DESIGNED TO STABILIZE THE COLUMNS DURING ERECTION. TEMPORARY BRACING AS NEEDED FOR SAFETY IS THE ERECTOR'S RESPONSIBILITY.**

2.    CABLE/ ROD BRACING IS DESIGNED FOR STRUCTURAL LOADS ONLY AND IS **NOT** DESIGNED TO PLUMB THE BUILDING.

3.    IT IS THE RESPONSIBILITY OF THE CUSTOMER TO VERIFY THAT THE BUILDING CODE AND DESIGN LOADING INFORMATION IS CORRECT FOR THE JOBSITE LOCATION

4.    STANDARD PINNACLE PANELS, COLORS, FINISHES, MATERIALS, TRIM / FLASHING DETAILS, METAL PREP AND RED PRIMER QUOTED UNLESS NOTED ON THIS CONTRACT

5.    ALL BUILDING ACCESSORIES ( DOORS, WINDOWS, FANS, LOUVERS, VENTS, ROOF PENETRATIONS, ROOF CURBS, ANCHOR BOLTS, INSULATION, ETC. ) ARE BY OTHERS UNLESS SPECIFICALLY NOTED ON THIS CONTRACT

6.    ALL MISC STEEL ( LINTELS, METAL STUDS, MISC ANGLES, HOT ROLLED SECTIONS SIZED BY OTHERS, ETC.) ARE BY OTHERS UNLESS NOTED ON THIS CONTRACT

7.    IT IS THE RESPONSIBILITY OF THE CONTRACTOR TO PROVIDE PINNACLE WITH EXISTING BUILDING INFORMATION IF MATCHING MATERIALS OR TIE - IN'S ARE REQUIRED

8.    NOTE - CUSTOMER WILL BE RESPONSIBLE FOR ANY ADDITIONAL FREIGHT CHARGES THAT MAY BE INCURRED DUE TO BACK ORDERED MATERIAL THAT WAS WAITING FOR VERIFICATION FROM CUSTOMER

9.    THE CONTRACT PROVIDED IS PINNACLE STRUCTURES' INTERPRETATION OF ANY PLANS AND SPECIFICATIONS PROVIDED FOR THIS PROJECT. IT IS NOT "PER PLANS AND SPECIFICATIONS ". SEE CONTRACT FOR ANY EXCLUSIONS.

10.   IF REQUIRED, PROVIDE DOWNSPOUTS, STD GUTTER, SNOW GUTTER OR,OVERSIZED GUTTER / DOWNSPOUTS PER DESIGN.

11. PROJECTS WHICH ARE RELEASED IMMEDIATELY FOR PRODUCTION MUST DELIVER AT THE EARLIEST AVAILABLE DATE UNLESS APPROVED OTHERWISE BY PINNACLE. PINNACLE RESERVES THE RIGHT TO ADJUST PRICING DUE TO MARKET CONDITIONS FOR ANY CUSTOMER DELAYED DELIVERIES.

12. PROJECTS REQUIRING APPROVAL OR PERMIT DRAWINGS FOR REVIEW PRIOR TO RELEASING FOR PRODUCTION MUST BE RELEASED WITH FIFTEEN (15) DAYS FROM RECEIPT OF SUBMITTAL DRAWINGS AND MUST DELIVER AT THE EARLIEST AVAILABLE DATE. PINNACLE RESERVES THE RIGHT TO ADJUST PRICING DUE TO MARKET CONDITIONS FOR ANY CUSTOMER DELAYED DELIVERIES.

I have reviewed, understand and agree with all items on this page _____

**NILFISK-FWP-4023**



**STANDING SEAM Info**



**MBMA**
METAL BUILDING MANUFACTURERS' ASSOCIATION
**AC472 ACCREDITED**
**MB - 103**



**IAS**
**ACCREDITED**

P.O. Box 1268    Cabot, AR 72023
Phone: (501) 941-3929 or (800) 201-1534    Fax: (501) 941-1804

| Building | | Date | 8/4/2023 15:49 | |
|---|---|---|---|---|
| Quote No. | E232883A | Job Number | | District | 1 |
| Rev | | Estimator | DAVID JOHNSON | |

**Additional Notes and Special Requirements**

**Note:** A seaming tool kit is needed for the type of roof panel quoted with this job. The seaming tool kit rental fee is NOT included in the building price quoted. Rental rates are determined by Pinnacle's rate schedule. For specific rates, please contact MATT MULLER at 800-201-1534. Note - PINNACLE seamers must be used for weathertight warranty to be valid.

Seamer rates are :    $ 2,000.00 deposit
$ 500.00 freight ( round trip )
$ 50.00 / day  seamer rental

Note - Battenlok and Superlok hand crimper - $5.00 / day

**Weathertight Warranty Information ( if required )**

**Standard Warranties:**

| Warranty Type | Pinnacle Maximum Liability |
|---|---|
| Standard 1 | $ 0.20 sq ft |
| Standard 2 | $ 3.50 sq ft |
| Standard 3 | No Dollar Limit |

Note : A Standard 3 Weathertight Warranty requires an Pinnacle Structures, Inc. Certified Installer with photo I.D. to be present at jobsite at all times.

**Single Source Warranties:**

| Warranty Type | Pinnacle Maximum Liability |
|---|---|
| Single Source 1 | $ 7.00 sq ft |
| Single Source 2 | $ 14.00 sq ft |
| Single Source 3 | No Dollar Limit |

Note : All Single Source Weathertight Warranties require an Pinnacle Structures, Inc. Certified Installer with photo I.D. to be present at jobsite at all times. Additionally, 3 inspections at key phases of the roof installation will be required.

I have reviewed, understand and agree with all items on this page _____

**NILFISK-FWP-4024**

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**FORT WORTH PARTNERS, LLC**                                   **PLAINTIFF**

　　**VS.**                     **CASE NO. 5:22-cv-05181-TLB**

**NILFISK, INC. and**
**NILFISK HOLDING A/S, a Danish Corporation**          **DEFENDANTS**

### AFFIDAVIT OF SARAH SPARKS DIEBOLD

STATE OF ARKANSAS            )
                             ) ss.
COUNTY OF _____ )

SARAH SPARKS DIEBOLD, being duly sworn according to law, upon her oath, states:

1.　　I am above the age of 21 and competent in all respects to submit this Affidavit. I am a manager of Fort Worth Partners, LLC ("**FWP**"). I am submitting this Affidavit in connection with and in support of FWP's Motion for Summary Judgment (the "**Motion**") against Nilfisk, Inc. ("**Nilfisk**") and Nilfisk Holding A/S, a Danish Corporation ("**Nilfisk Holding**")

2.　　FWP and Nilfisk are party to a lease guaranteed by Nilfisk Holding, which is at issue in this case. True and correct copies of those relevant documents are attached to the Motion as Exhibits A through A-3. Thereunder, FWP has leased to Nilfisk certain real estate located at 979 E. Robinson Ave., Springdale, Arkansas 72764 (the "**Property**").

3.　　FWP has owned the Property since 2016. Nilfisk, or its predecessor in interest, has leased the Property since 2006, and Nilfisk Holding has guaranteed such lease since 2017.

4.　　The Property housed an approximately 200,000 square foot warehouse-style building—which was actually two 100,000 square foot buildings tied together (the "**Building**").

5.     On or about March 30, 2022, an EF-3 tornado moved through Springdale, Arkansas, and hit the Property. The tornado significantly damaged the Building, demolishing roughly 75% of it.

6.     FWP subsequently learned that, on the date of the tornado, the insurance policy procured and maintained by Nilfisk contained a policy limit of $5,149,999. This was an event of default under the lease's Full Replacement Cost Insurance Obligation, as defined in FWP's Motion and Complaint.

7.     As a result of the tornado, Defendants purportedly terminated the lease and ceased paying rent after August 1, 2022.

8.     FWP notified Defendants through counsel of their Full Replacement Cost Insurance Obligation defaults under the lease. To date, Defendants have not cured that default because Defendants have not procured any additional insurance beyond the policy with a policy limit of $5,149,999.

9.     Under the lease and guaranty, FWP expected Defendants to either honor their Full Replacement Cost Insurance Obligation or pay for any excess cost to rebuild out of Defendants' pockets. The lease was a "net lease," meaning that all costs of rent, taxes, insurance, maintenance, repair, and replacement were to fall on Defendants.

10.     Defendants previously acknowledged their obligations when they paid approximately $2 million just to replace the roof of the Building in late 2019 and early 2020—before the tornado. Based on this, Defendants (a) affirmed their obligation to pay all costs or maintenance, repair, and replacement, and (b) should have known that $5.149 million of replacement cost insurance was woefully insufficient, since the roof replacement alone accounted for roughly 40% of the policy limit.

2

11.    If Defendants do not honor their Full Replacement Cost Insurance Obligation, that places the substantial risk of loss for the Property on FWP. The lease wasn't intended to place such risk on FWP, which is why the Full Replacement Cost Insurance Obligation was exclusively Defendants'. This is a material provision of the lease, and it was important to FWP when FWP purchased the Property.

12.    The lease clearly provides that Defendants were obligated to honor their Full Replacement Cost Insurance Obligation, and since they didn't, they are obligated to pay the excess cost to rebuild out of their own pockets. The lease clearly does not obligate FWP to pay for such cost.

13.    Because FWP counted on Defendants to honor their Full Replacement Cost Insurance Obligation, FWP simply cannot feasibly afford to rebuild the Building. FWP certainly wants to, and plans to, rebuild the Building as quickly as possible, so that FWP can begin re-letting the Building and generating rent income. But FWP needed Defendants to honor their Full Replacement Cost Insurance Obligation so FWP could use the insurance proceeds to rebuild.

14.    In other words, Defendants' breaches have left FWP with no Building, insufficient insurance proceeds to rebuild the Building, no tenant, and no rent income.

15.    Under the third lease amendment, Defendants were obligated to pay monthly base rent of $61,000 per month from October 31, 2021 until October 31, 2023, then $62,525 per month from October 31, 2023 until October 31, 2024. Defendants have not paid any rent since August 1, 2022.

16.    Additionally, the lease permits FWP to recover interest on all amounts due under the lease from the due date at a rate of 3% plus JP Morgan Chase Bank's prime rate. *See* Lease, Sec. 21.3.

3

17.    Since Defendants purportedly terminated the lease on August 1, 2022, FWP will use the rate as of that date, which was 5.5% according to JP Morgan Chase Bank's publicly available historical prime rate data, so FWP is entitled to 8.5% interest on the amount necessary to rebuild the Building from August 1, 2022 until the Court enters its award.

18.    That per diem amount is $5,182.58, calculated as follows: $22,254,628.81 (the cost of replacement estimated by FWP's expert less the Partial Payment and footings, foundations, and other structures below grade) X .085, then ÷ 365 = $5,182.58 per day in interest accrual.

19.    As of October 27, 2023, 452 days have passed since August 1, 2022, amounting to $2,342,526.16 in accrued interest.

Dated this 27th day of October, 2023.

_Sarah Sparks Diebold_
Sarah Sparks Diebold, Manager

## ACKNOWLEDGEMENT

STATE OF ARKANSAS            )
                                              ) ss.
COUNTY OF Crawford      )

Subscribed and sworn before me on this 27th day of October, 2023.

_Lauren A. Lance_
Notary Public

_09/03/2025_
My Commission Expires

48621\0001\10339461.v1

# EXHIBIT E



# EVIDENCE OF COMMERCIAL PROPERTY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 04/07/2022 |

THIS EVIDENCE OF COMMERCIAL PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS EVIDENCE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE ADDITIONAL INTEREST.

| PRODUCER NAME, CONTACT PERSON AND ADDRESS | PHONE (A/C, No, Ext): 1-877-945-7378 | COMPANY NAME AND ADDRESS | NAIC NO: 12831 |
|---|---|---|---|
| Willis Towers Watson Midwest, Inc.<br>c/o 26 Century Blvd<br>P.O. Box 305191<br>Nashville, TN  372305191  USA | | State National Insurance Company Inc<br>1900 L. Don Dodson Drive<br>Bedford, TX  76021 | |

| FAX (A/C, No): 1-888-467-2378 | E-MAIL ADDRESS: certificates@willis.com | IF MULTIPLE COMPANIES, COMPLETE SEPARATE FORM FOR EACH |
|---|---|---|

| CODE: | SUB CODE: | POLICY TYPE |
|---|---|---|
| AGENCY CUSTOMER ID #: | | Commercial Property |

| NAMED INSURED AND ADDRESS | LOAN NUMBER | POLICY NUMBER |
|---|---|---|
| Nilfisk, Inc.<br>9435 Winnetka Avenue North<br>Brooklyn Park, MN 55445 | | RDN-21383-HPP |

| EFFECTIVE DATE | EXPIRATION DATE | CONTINUED UNTIL TERMINATED IF CHECKED |
|---|---|---|
| 04/01/2021 | 04/01/2022 | |

| ADDITIONAL NAMED INSURED(S) | THIS REPLACES PRIOR EVIDENCE DATED: |
|---|---|

**PROPERTY INFORMATION**   (ACORD 101 may be attached if more space is required)   ☒ BUILDING  OR ☒ BUSINESS PERSONAL PROPERTY

LOCATION / DESCRIPTION
Re: 979 East Robinson Ave, Springdale AR 72764

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES.  LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

**COVERAGE INFORMATION**     PERILS INSURED     BASIC ☐   BROAD ☐   SPECIAL ☒

| COMMERCIAL PROPERTY COVERAGE AMOUNT OF INSURANCE: | | $ See Below | | DED: 100,000 |
|---|---|---|---|---|

| | YES | NO | N/A | |
|---|---|---|---|---|
| ☐ BUSINESS INCOME   ☐ RENTAL VALUE | | | ☒ | If YES, LIMIT:                    Actual Loss Sustained; # of months: |
| BLANKET COVERAGE | | ☒ | | If YES, indicate value(s) reported on property identified above: $  See Below |
| TERRORISM COVERAGE | ☒ | | | Attach Disclosure Notice / DEC |
|    IS THERE A TERRORISM-SPECIFIC EXCLUSION? | | ☒ | | |
|    IS DOMESTIC TERRORISM EXCLUDED? | | ☒ | | |
| LIMITED FUNGUS COVERAGE | ☒ | | | If YES, LIMIT: 15,000                             DED: 100,000 |
| FUNGUS EXCLUSION (If "YES", specify organization's form used) | | | ☒ | |
| REPLACEMENT COST | ☒ | | | |
| AGREED VALUE | ☒ | | | |
| COINSURANCE | | ☒ | | If YES,           % |
| EQUIPMENT BREAKDOWN (If Applicable) | | ☒ | | If YES, LIMIT:                                      DED: |
| ORDINANCE OR LAW  - Coverage for loss to undamaged portion of bldg | ☒ | | | If YES, LIMIT: 250,000                      DED: 100,000 |
|    - Demolition Costs | ☒ | | | If YES, LIMIT: 1,176,935                  DED: 100,000 |
|    - Incr. Cost of Construction | ☒ | | | If YES, LIMIT: 1,176,935                  DED: 100,000 |
| EARTH MOVEMENT (If Applicable) | ☒ | | | If YES, LIMIT: 7,061,610                  DED: 100,000 |
| FLOOD (If Applicable) | ☒ | | | If YES, LIMIT: 7,061,610                  DED: 100,000 |
| WIND / HAIL INCL   ☒ YES ☐ NO   Subject to Different Provisions: | ☒ | | | If YES, LIMIT: 7,061,610                  DED: 100,000 |
| NAMED STORM INCL   ☒ YES ☐ NO   Subject to Different Provisions: | ☒ | | | If YES, LIMIT: 7,061,610                  DED: 100,000 |
| PERMISSION TO WAIVE SUBROGATION IN FAVOR OF MORTGAGE HOLDER PRIOR TO LOSS | ☒ | | | |

**CANCELLATION**

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS.

**ADDITIONAL INTEREST**

| ☐ CONTRACT OF SALE | ☐ LENDER'S LOSS PAYABLE | ☒ LOSS PAYEE | LENDER SERVICING AGENT NAME AND ADDRESS |
|---|---|---|---|
| ☐ MORTGAGEE | | | |

NAME AND ADDRESS

First Security Bank
720 Garrison Avenue
Fort Smith, AR 72901

| AUTHORIZED REPRESENTATIVE |
|---|
| *Et g. How* |

©2003-2015 ACORD CORPORATION.  All rights reserved.

ACORD 28 (2016/03)          The ACORD name and logo are registered marks of ACORD

SR ID: 22448941     BATCH: 2479115     CERT: W24518251

NILFISK-FWP-0007

**AGENCY CUSTOMER ID:** _____

**LOC #:** _____

### ACORD®

## ADDITIONAL REMARKS SCHEDULE

Page __2__ of __2__

| AGENCY | NAMED INSURED |
|---|---|
| Willis Towers Watson Midwest, Inc. | Nilfisk, Inc.<br>9435 Winnetka Avenue North<br>Brooklyn Park, MN 55445 |

| POLICY NUMBER | | |
|---|---|---|
| See Page 1 | | |

| CARRIER | NAIC CODE | |
|---|---|---|
| See Page 1 | See Page 1 | EFFECTIVE DATE: See Page 1 |

**ADDITIONAL REMARKS**

THIS ADDITIONAL REMARKS FORM IS A SCHEDULE TO ACORD FORM,

FORM NUMBER: ____28____ FORM TITLE: Evidence of Commercial Property

Proprety Limits Consist of the following:
Real / Building Value:  $5,149,999
Personal Proprety (Including Improvements & Betterments) Value:  $1,151,000

Earth Movement excluded in State of California, Pacific Northwest Seismec Zones and New Madrid Seismic Zone
Flood Excluded in Special Food Hazard Zones and Moderate Flood Hazard Zones Per policy conditions/terms.

First Security Bank, as lienholder, is included as Loss Payee as required by written contract.

---

**ACORD 101 (2008/01)**

© 2008 ACORD CORPORATION.  All rights reserved.

**The ACORD name and logo are registered marks of ACORD**

NILFISK-FWP-0008

# EXHIBIT F



250 Marquette Avenue South
Suite 800
Minneapolis, MN 55401
P: 612-305-7500
F: 612-305-7501

Zachary J. Crain
Direct Dial: 612-305-7725
Email: zcrain@nilanjohnson.com

May 20, 2022

<u>Via Email</u>
Kyle T. Unser
Kutak Rock LLP
5111 W. J.B. Hunt Drive, Suite 300
Rogers, AR 72758

**Re:   NILFISK, INC.**
        **SPRINGDALE ARKANSAS**

Dear Mr. Unser:

Our firm represents Nilfisk, Inc.  I am writing in connection with the Industrial Building Lease (the "Lease") dated April 12, 2006, as amended, by and between Nilfisk (as successor to Alto U.S., Inc.) and your client Fort Worth Partners, LLC (as successor to FR Net Lease Co-Investment Program 5, LLC) ("FWP").  Capitalized terms herein shall have the meaning set forth in the Lease.

We would like to schedule a meeting among the principals of Nilfisk and your client in person in Springdale.  The purpose of the meeting is to discuss a mutually-beneficial termination of the Lease and assignment of available insurance proceeds relating to the incident occurring on March 30, 2022.

In addition to scheduling this meeting, I feel compelled to address any concerns of Nilfisk's compliance with the Lease.  Nilfisk of course denies any allegations that it is in breach of the Lease.  At all times, Nilfisk has maintained the insurance as required under the Lease, and has consistently provided evidence of the coverage to FWP without objection from FWP or its lender.

Further, I am concerned about the reported conduct from FWP over the past six weeks.  First, I understand that FWP chose to refuse a simple and reasonable request from Nilfisk to perform some emergency roof work to prevent further damage to the Premises.  Following that refusal, there was a telephone call where you implied that Nilfisk should proceed with the work, notwithstanding your written correspondence to the contrary.  Second, I have reviewed the termination calculation provided, which is completely inconsistent with Exhibit E of the Lease because it includes FWP's interest expenses as "equity."  Third, yesterday you delivered news of apparent fixed price bids for replacement of the property, each in excess of $37 million.  In your

Kyle T. Unser
Kutak Rock LLP
May 20, 2022
Page 2

email, you admit that the bids are excessive because they include costs for foundation and slab replacement.  And the fact that you did not bother to include the bids leads me to believe that you agree they would not stand to scrutiny.  But moreover, nothing in the Lease would entitle your client to a brand new building even in the event of a tornado.  These communications all evidence bad faith conduct by FWP.

Nilfisk reserves its right to provide notice of termination of the Lease pursuant to Section 18.3, and in the event FWP rejects the Event of Loss Purchase Offer, terminate the Lease upon payment of amounts as specifically limited within Section 18.3.

The purpose of proposing the meeting is to get the parties back into a situation where they can work together in good faith to find a mutually-agreeable resolution in a quick fashion.  Please provide some potential dates that your client is available, along with confirmation that your client is ready, willing and able to resolve this matter in good faith.

Any future communication should be directed to me.


Sincerely,

Nilan Johnson Lewis PA


Zachary J. Crain

cc:    Katie Koehler, Esq.

# EXHIBIT G



**NILAN JOHNSON LEWIS** PA

250 Marquette Avenue South
Suite 800
Minneapolis, MN 55401
P: 612-305-7500
F: 612-305-7501

Zachary J. Crain
Direct Dial: 612-305-7725
Email: zcrain@nilanjohnson.com

May 26, 2022

Via Federal Express Overnight and Email

Fort Worth Partners, LLC
c/o Sarah Sparks Diebold
1662 E. Amber Drive
Fayetteville, AR 72703
sdiebold@arkpoly.com

Kutak Rock, LLP
234 East Millsap, Suite 200
Fayetteville, AR 72703
Attn: Tameron Bishop
tameron.bishop@kutakrock.com

Re:  **Nilfisk, Inc.**
       **Notice of Termination of Lease**

Dear Sir or Madam,

Nilan Johnson Lewis PA represents Nilfisk, Inc. ("Nilfisk") in connection with the Industrial Building Lease dated April 12, 2006, by and between Nilfisk (as successor to Alto U.S., Inc.) and Fort Worth Partners, LLC (as successor to FR Net Lease Co-Investment Program 5, LLC) ("FWP") (as amended by that certain First Amendment to Lease dated as of June 12, 2015, that certain Second Amendment to Lease Agreement dated October 10, 2017, and by that certain Third Amendment to Lease Agreement dated October [no date], 2021, collectively, the "Lease"). Capitalized terms herein shall have the meaning set forth in the Lease.

This letter serves as Nilfisk's notice of its intent to terminate the Lease as of the next rental payment date under Section 18.3 of the Lease. The Lease shall terminate on July 1, 2022 (the "Termination Date").

In accordance with Section 18.3 of the Lease and in the case of a Major Casualty, please find enclosed a certificate from an architect licensed in the State of Arkansas in which the architect has determined, in its good faith judgment, that the Premises cannot be completely restored or rebuilt for continued use and occupancy in Tenant's business within a building construction period of two hundreds seventy (270) days computed from the hypothetical date of commencement of such construction.

Further, in accordance with and subject to Section 18.3 of the Lease, this letter constitutes an irrevocable offer (a "Event of Loss Purchase Offer") by Nilfisk to FWP to purchase the Premises on the Termination Date. This Event of Loss Purchase Offer must be rejected by written notice to Nilfisk no later than fifteen (15) days prior to the Termination Date, otherwise Landlord shall be conclusively considered to have accepted the Event of Loss Purchase Offer. In the event Landlord accepts the Event of Loss Purchase Offer, Nilfisk reserves the right to dispute Landlord's calculation of the purchase price pursuant to Section 18.3.2.2 and Exhibit E of the Lease.

In the event that FWP rejects the Event of Loss Purchase Offer, Nilfisk reserves the right to terminate the Lease upon payment of amounts as specifically limited to those outlined in Section 18.3 of the Lease.

4880-3904-0289.1

Fort Worth Partners, LLC
1662 E. Amber Drive
Fayetteville, AR 72703
Page 2


Please direct any future communication regarding this matter to me. We look forward to your prompt response regarding the Event of Loss Purchase Offer.

Sincerely,

Nilan Johnson Lewis PA

Zachary J. Crain

cc:     Kyle Unser, Esq. (Kyle.Unser@KutakRock.com)
        Katie Koehler, Esq.

Enclosure

## CERTIFICATE OF ARCHITECT

The undersigned hereby certifies as follows:

1.      Level 5 Architecture is a licensed architect in the State of Arkansas, with license number LL271.

2.      Attached hereto, as <u>Exhibit A</u>, is a true, complete and correct copy my assessment for the timeline for repair and reconstruction of the existing warehouse building located at 979 E. Robinson Ave., in Springdale, Arkansas.

3.      I have determined, in my good faith judgment, that the Premises cannot be completely restored or rebuilt for continued use and occupancy as a warehouse within a building construction period of two hundred seventy (270) days computed from the hypothetical date of commencement of such construction.

IN WITNESS WHEREOF, the undersigned has executed this Certificate effective as of May _24_ , 2022.


_____
Justin Gilmore, AIA, NCARB

1

**<u>EXHIBIT A</u>**

**LEVEL 5 ARCHITECTURE ASSESSMENT**

**(attached)**



# NILFISK ASSESSMENT

## May 24, 2022

To Whom It May Concern:

Level 5 Architecture has been hired to assess the extent of damage caused by an EF-3 tornado to the existing warehouse building at 979 E. Robinson Ave. in Springdale, Arkansas and prepare a timeline for repair/reconstruction and a rough order of magnitude for construction costs for such repair.

**Initial Assessment**

The tornado, on March 30, 2022 caused extensive damage to the existing building and we consider the entire building a complete loss until further assessment can be completed under safer conditions.  The extent of uplift damage the entire structure has caused some potential damage to the existing concrete foundation of the building as shown below.



P.O Box 1012
104 S. Main Street
Mansfield, TX 76063
817.842.0212 office

326 Holcomb St.
Suite 101
Springdale, AR 72764
479.756.1661 office

level5architecture.com



# NILFISK ASSESSMENT

## May 24, 2022

Once the existing metal warehouse building has been removed, we can further evaluate the existing foundation for further damage and complete a repair plan for the installation of a new building on top of the existing slab. We see where there was an existing restroom building and some minor offices located outside or within the existing warehouse structure. Only the facilities located outside of the main warehouse building can be salvaged and reused for the potential reconstruction of this facility. All other elements of this building will need to be considered unusable and will be considered to be removed and reconstructed per the timeline and construction budgets below:

**Proposed Reconstruction Timeline:**

1. Preliminary Design - 2 weeks (concurrent with Item 2)
2. Demo existing building - 4 weeks (concurrent with Item 1)
3. Send design to PEMB Supplier for engineering design
4. Existing slab evaluation by structural engineer - 2 weeks
5. Coordination of pre-engineered metal building design and foundation design - 2 weeks
6. Construction Permitting - 2 weeks
7. Production and fabrication of metal building - 20 weeks
8. Erecting of metal building - 8 weeks
9. Electrical/Lighting Install - 8 weeks
10. Framing and plumbing install of restrooms/offices - 8 weeks
11. HVAC installation of restrooms/offices - 6 weeks
12. <u>Final Clean and Certificate of Occupancy – 2 Weeks</u>

### Total Potential Timeline from Start of Redesign – 62 Weeks

P.O Box 1012
104 S. Main Street
Mansfield, TX 76063
817.842.0212 office

326 Holcomb St.
Suite 101
Springdale, AR 72764
479.756.1661 office

level5architecture.com



# NILFISK ASSESSMENT

## May 24, 2022

Level 5 would like to thank you for the opportunity to provide the above information and analysis for the proposed reconstruction of the damaged building.  We are sincerely sorry for the loss of this building and subsequent loss of business that has ensued and will be willing to help in any capacity to get this operation back up and running.  Please let us know if you need anything additional information or have any additional questions.

Regards,

Justin Gilmore, AIA, NCARB

P.O Box 1012
104 S. Main Street
Mansfield, TX 76063
817.842.0212 office

326 Holcomb St.
Suite 101
Springdale, AR 72764
479.756.1661 office

level₅architecture.com

# EXHIBIT H



Marshall S. Ney | **Partner**
Direct: (479) 695-6049
Fax: (501) 244-5389
E-mail: mney@fridayfirm.com

3350 South Pinnacle Hills Parkway
Suite 301
Rogers, Arkansas 72758
www.FridayFirm.com

June 2, 2022

**VIA E-MAIL AND FEDEX**
Mr. Zachary J. Crain
NILAN JOHNSON LEWIS
250 Marquette Avenue South
Suite 800
Minneapolis, MN 55401
zcrain@nilanjohnson.com

> **Re:  Nilfisk, Inc. ("Nilfisk")**
> **Notice of Default and Material Breach and**
> **Rejection of Event of Loss Purchase Offer**

Dear Zachary:

As I previously notified you by email, this firm represents Fort Worth Partners, LLC ("**FWP**") and, in connection with the same, I write in response to your May 26 letter.

Pursuant to Sections 10.1, 10.2 and 20.2 of the Industrial Building Lease dated April 12, 2006, as amended on or about June 12, 2015 and October 10, 2017 ("**Lease**"),[1] Nilfisk and Nilfisk Holding A/S, a Danish Corporation ("**Guarantor**") hereby are notified of their Default and material breach of the Lease by virtue of their failure to procure and maintain an:

> "all-risk" commercial property insurance [issued by an insurance company with a Best rating of A- or better] covering the improvements constructed, installed or located on the Premises (but excluding Tenant's Property) against all loss or damage caused by fire, ice, hurricane, windstorm and such other risks of physical loss or damage as are covered by a causes of loss special form insurance policy, which coverage shall, at all times, be in an amount equal to one hundred percent (100%) of the then "full replacement cost" of the Premises subject to a deductible not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) (**"Full Replacement Cost"** shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade). (Emphasis in original).

---

[1] You mention a Third Amendment from October 2021. Please provide a copy of the same for inspection and review.

9220850.1

Mr. Zachary J. Crain
NILAN JOHNSON LEWIS
June 2, 2022
Page 2

Because the Default and material breach are incapable of cure, demand hereby is made that Nilfisk: (1) immediately tender to FWP the full estimated replacement cost of the Premises, less footings, foundations and other structures below grade, in the amount of $35,766,553.05; and (2) immediately commit in writing to fully indemnity and hold FWP harmless for any additional cost that may be incurred in replacing the Premises.

In the event Nilfisk and the Guarantor fail to fully satisfy this demand within ten (10) days of the date of this letter, FWP will proceed to file suit against both Nilfisk and the Guarantor and seek a joint and several judgment against them in the amount of all of damages caused by the Default and material breach, the costs of litigation, prejudgment interest at the rate of six (6%) percent, and attorney's fees.

This demand letter does not in any way waive or release Nilfisk or the Guarantor from any other Defaults or material breaches that have or may hereafter be discovered, all such claims being expressly reserved. In the event a lawsuit is necessary, all claims will be asserted against.

Regarding Nilfisk's attempt to invoke Section 18.3 of the Lease by purportedly making an Event of Loss Purchase Offer, Nilfisk lost that right as of the date of its Default and material breach by failing to procure and maintain Full Replacement Cost Insurance, and certainly as of the date of the total loss of the Premises with no such insurance being in place. This said, and in an abundance of caution, FWP rejects the attempted Event of Loss Purchase Offer. By stating this rejection, FWP does not waive and instead reserves any and all rights under the Lease, and at law and equity.

Regarding your request for a meeting, I'm not optimistic it will be productive given Nilfisk's posture to date, but if you and representatives of Nilfisk desire to come to Arkansas, Sarah Diebold and I will meet with you.

Sincerely yours,

Marshall S. Ney

MSN:cep

9220850.1

Mr. Zachary J. Crain
NILAN JOHNSON LEWIS
June 2, 2022
Page 3


cc via FedEx:

      NILFISK, INC.
      14600 21st Ave.
      North Plymouth, MN 55447
      Attn: Real Property Leasing Manager

      NILFISK, INC.
      14600 21st Ave.
      North Plymouth, MN 55447
      Attn: Legal Dept.

      NILFISK HOLDING A/S, a Danish Corporation
      c/o NATIONAL CORPORATE RESEARCH, LTD.
      3208 Asher Avenue
      Little Rock; Arkansas 72204



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

# EXHIBIT I



250 Marquette Avenue South
Suite 800
Minneapolis, MN 55401
P: 612-305-7500
F: 612-305-7501

Zachary J. Crain
Direct Dial: 612-305-7725
Email: zcrain@nilanjohnson.com

July 22, 2022

<u>Via Email</u>
Marshall S. Ney
Friday Eldredge & Clark LLP
3350 South Pinnacle Hills Parkway
Suite 301
Rogers, AR 72758
mney@fridayfirm.com

**Re:    NILFISK, INC.
          SPRINGDALE ARKANSAS**

Dear Mr. Ney:

I am writing in connection with the Industrial Building Lease (the "Lease") dated April 12, 2006, as amended, by and between Nilfisk (as successor to Alto U.S., Inc.) and your client Fort Worth Partners, LLC (as successor to FR Net Lease Co-Investment Program 5, LLC) ("FWP"). Capitalized terms herein shall have the meaning set forth in the Lease.

First, this letter confirms that the Lease will terminate on August 1.  Nilfisk will have completed vacating the space by that date.  On or before August 1, Nilfisk will be paying to FWP the following:

1.  Base Rent of $1,967.74 for one day's rent (August 1);

2.  Tax payment of $40,460.58, for pro-rated taxes through August 1, 2022 [based on annual tax amount due of $69,361.00];[1]

3.  Insurance proceeds of $5,149,999.00, previously received by Nilfisk; and

4.  Insurance deductible of $100,000.00.

---

[1] Section 3.1.2 of the Lease states that Tenant is responsible for "any Taxes that are due and payable at any time or from time to time during the Term."  Because the payment is not owed until after the Term, Nilfisk denies that it is responsible for any tax payment.  Nevertheless, out of an abundance of caution and without waiving any arguments that the payment is not owed, Nilfisk is choosing to make this pro-rated tax payment.

Marshall S. Ney
Friday Eldredge & Clark LLP
July 22, 2022
Page 2


If these amounts are incorrect, please let me know right away, along with a detailed explanation of any dispute.  If I don't hear otherwise, Nilfisk will proceed with paying these amounts to complete the termination as of August 1.

Second, the name and contact information for the fence contractor is:

> Modern Fence Supply
> Contact: Owner - Allen Wallis
> Email: awallis@modernfencesupply.com
> Phone: 918.268.4198

Third, I have enclosed the most recent liability insurance certificate as you requested.  Nilfisk has continued seeking additional property insurance coverage, but has not been successful thus far.  We expect that builder's risk coverage should protect the landlord as soon as a contractor is selected and engaged by FWP.

Fourth, notwithstanding my instructions to arrange access with me, I understand that you and your client have both appeared on-site to inspect the Premises, without notice and without permission of Nilfisk.  You were both seen within the structure, and neither of you were wearing protective equipment.  Your client has done this more than once.  The property is clearly posted to prevent unauthorized access.  All visitors are required to make appointments, and to wear protective equipment (including hard hats and vests).  This is for your safety, as well as the safety and protection of Nilfisk and its contractors who are working to remove Nilfisk property.  Until delivery of the premises on August 1, please have your client arrange with Nilfisk and its contractors prior to visiting the property, and please ensure that appropriate protective equipment is worn.

Finally, we have heard no information from you since our meeting concerning the proposals discussed.  Nilfisk remains in a position to discuss a reasonable mutually-agreeable process for repairing the Premises in a manner that would allow a new tenant to take possession as soon as possible.  More than a month has passed, which could have been used to prepare for such repairs.  From our understanding, no engineers, architects or contractors have visited the site on behalf of FWP. We would expect that FWP would want to move this process along more quickly.


Sincerely,

Nilan Johnson Lewis PA


Zachary J. Crain

Enclosures

Marshall S. Ney
Friday Eldredge & Clark LLP
July 22, 2022
Page 3


cc:     Katie Koehler, Esq.

# EXHIBIT J



| Marshall S. Ney    Partner | 3350 South Pinnacle Hills Parkway |
| --- | --- |
| Direct: (479) 695-6049 | Suite 301 |
| Fax: (501) 244-5389 | Rogers, Arkansas 72758 |
| E-mail: mney@fridayfirm.com | www.FridayFirm.com |

July 25, 2022

**VIA E-MAIL**
Mr. Zachary J. Crain
NILAN JOHNSON LEWIS
250 Marquette Avenue South
Suite 800
Minneapolis, MN  55401
zcrain@nilanjohnson.com

Re:   **Nilfisk, Inc. ("Nilfisk")**
      **Springdale, Arkansas**

Dear Zachary:

I write to respond to your letter of July 22, 2022 as follows:

1.  Fort Worth Partners, LLC ("**FWP**") disputes your calculations of what is owed.  For a proper understanding, please see my letter of June 2, 2022, which is incorporated herein.  Should any amounts be paid short of the full amounts due, they will be accepted only with the clear understanding that such payments do not constitute an accord and satisfaction and are accepted without waiver of or prejudice to any of FWP's claims and other rights against Nilfisk, all such claims and rights being reserved.

2.  The insurance certificate you provided was dated the same day as your letter, and it was not effective as of the date of the total loss of the Premises.  Please immediately provide the certificate that existed as of the date of the loss.  This certificate should be readily available to you or your client.

3.  You have no right to "instruct" on how and when the FWP accesses the Premises. Please recall the provision of the Lease regarding FWP's access rights under the present circumstances:

    **16.  LANDLORD'S RIGHTS.** Landlord, Agent and their respective agents, employees and representatives shall have the right to enter and/or pass through the Premises at any time or times upon reasonable prior notice (except in the event of emergency) to examine and inspect the Premises and to show them to actual and prospective lenders, prospective purchasers or mortgagees of the Premises or

9334425.1

Mr. Zachary J. Crain
NILAN JOHNSON LEWIS
July 25, 2022
Page 2

      providers of capital to Landlord and its affiliates; and in connection with the foregoing, to install a sign at or on the Premises to advertise the Premises for lease or sale; during the period of six (6) months prior to the Expiration Date (or at any time, if Tenant has vacated or abandoned the Premises or is in default under this Lease) as extended if a Renewal Option has been exercised, Landlord and its agents may exhibit the Premises to prospective tenants. Additionally, Landlord and Agent shall have the following rights with respect to the Premises, exercisable without notice to Tenant, without liability to Tenant, and without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for setoff or abatement of Rent: (a) to have pass keys, access cards, or both, to the Premises; and (b) to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy at any time after Tenant vacates or abandons the Premises for more than thirty (30) consecutive days or without notice to Landlord of Tenant's intention to reoccupy the Premises.

4.    You are 100% wrong in your statement that FWP has not brought professionals to the Premises for inspection since our meeting.

      This letter does not in any way waive or release Nilfisk or the Guarantor from any Defaults or material breaches that have or may hereafter be discovered, all such claims being expressly reserved.  In the event a lawsuit is necessary, all claims will be asserted against.

      Sincerely yours,

      Marshall S. Ney

MSN:cep

# EXHIBIT K



Nilfisk, Inc.

9435 Winnetka Avenue North
Brooklyn Park, MN 55445

General Phone: 800-569-0344
Customer Service Phone: 800-989-2235
Fax: 800-989-6566
www.nilfisk.us

August 4, 2022

FORT WORTH PARTNERS, LLC
609 W DICKSON
UNIT 509
FAYETTEVILLE, AR 72701

Dear Fort Worth Partners:

Fort Worth Partners, LLC (the "Landlord") leases to Nilfisk, Inc. ("Nilfisk") the premises located at 979 East Robinson Avenue, Springdale, AR 72764 (the "Premises"), pursuant to an Industrial Building Lease agreement dated April 12, 2006, as amended (collectively "Lease").

By letter dated May 26, 2022, Nilfisk sent Landlord notice of termination of the Lease. Nilfisk vacated and surrendered its right to possess the Premises on August 1, 2022. Since August 1, 2022, Nilfisk has been ready, willing and able to make a payment to Landlord in the amount of $5,292,427.32. The Landlord has refused to provide Nilfisk with Landlord's wiring information to make this payment without this written communication from Tenant.

This confirms the understanding and acknowledgement that Nilfisk's surrender of possession and payment to Landlord shall in no way extinguish or otherwise affect Tenant's obligations to the Landlord under the Lease. Nilfisk has no intention of claiming that Nilfisk's surrender of the Premises or Landlord's acceptance of funds constitutes an accord and satisfaction and both Landlord and Nilfisk are reserving all rights and potential claims.

Sincerely,

Nilfisk, Inc.

By: Jamie O'Neill, SVP, General Manager, Americas

# EXHIBIT L



Marshall S. Ney    |    Partner
Direct: (479) 695-6049
Fax: (501) 244-5389
E-mail: mney@fridayfirm.com

3350 South Pinnacle Hills Parkway
Suite 301
Rogers, Arkansas 72758
www.FridayFirm.com

July 28, 2023

**VIA E-MAIL ONLY**

Ms. Karen Freeman
kfreeman@mwlaw.com
Mr. Colt Galloway
cgalloway@mwlaw.com
Ms. Emily McCord
emccord@mwlaw.com

  **Re: Nilfisk, Inc. ("Nilfisk")**
    **Notice of Default and Material Breach**

Dear Karen, Colt and Emily:

   As you know, this firm represents Fort Worth Partners, LLC ("**FWP**"). This letter serves to notify Nilfisk and Nilfisk Holding A/S, a Danish Corporation ("**Guarantor**," with Nilfisk, "**Defendants**") of their additional Default and material breach of the Lease by virtue of their failure to promptly and diligently repair, rebuild, or replace the Premises as required by Section 18.1 of the Lease.

   It has now been roughly 16 months since the Premises was destroyed by the tornado, and Defendants have indicated very clearly that they will not be honoring this Lease obligation. I presume that position will not change, and therefore, request that Defendants waive the 30-day notice provision of Section 20.2(b) of the Lease. If not, demand hereby is made that Defendants discharge their obligations under Section 18.1.

   In the event Defendants fail to fully satisfy this demand within thirty (30) days of the date of this letter (or shorter if Defendants waive the thirty (30) day notice period), FWP will proceed to seek leave to amend its complaint against Defendants and seek a joint and several judgment against them in the amount of all of damages caused by this additional Default and material breach, the costs of litigation, prejudgment interest, and attorney's fees.

   This demand letter does not in any way waive or release Defendants from any other Defaults or material breaches that have or may hereafter be discovered, all such claims being expressly reserved.

   Please note that we're sending this letter to you on behalf of Defendants, in lieu of sending directly to Defendants, as a result of this ongoing litigation. If you would prefer we send directly to Defendants in accordance with the Lease, please so advise us.

Ms. Freeman, Mr. Galloway & Ms. McCord
July 28, 2023
Page 2

Sincerely yours,

Marshall S. Ney

MSN:ccp

# EXHIBIT M

1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF ARKANSAS
2                     FAYETTEVILLE DIVISION
  FORT WORTH PARTNERS, LLC,    )
3                              )
               PLAINTIFF,      )
4                              )
  VS.                          ) CASE NO.
5                              ) 5:22-cv-05181-TLB
  NILFISK, INC. AND            )
6  NILFISK HOLDING A/S, A      )
  DANISH CORPORATION           )
7                              )
               DEFENDANTS      )
8

9        -----------------------------------

10                  ORAL DEPOSITION OF

11                  STEEN DANDANELL

12                  OCTOBER 10, 2023

13       -----------------------------------

14     ORAL DEPOSITION OF STEEN DANDANELL, produced as a

15  witness at the instance of the PLAINTIFF, and duly

16  sworn, was taken in the above-styled and numbered

17  cause on the 10th of October, 2023, from 9:16 a.m., to

18  12:47 p.m., before Jennifer Norman, CCR in and for the

19  State of Arkansas, reported by machine shorthand, via

20  videoconference, pursuant to the Federal Rules of

21  Civil Procedure.

22

23

24

25



Case 5:22-cv-05181-TLB    Document 33-1    Filed 10/30/23    Page 411 of 493 PageID #: 958
FORT WORTH PARTNERS vs NILFISK                                    30(b)(6)
DANDANELL, STEEN on 10/10/2023                                         2

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3       Mr. Marshall S. Ney - (via videoconference)

 4       FRIDAY, ELDREDGE & CLARK, LLP

 5       3350 South Pinnacle Hills Parkway, Suite 301

 6       Rogers, Arkansas 72758

 7       (479) 695-6049

 8       Mney@fridayfirm.com

 9

10   FOR THE DEFENDANTS:

11       Ms. Emily McCord - (present with witness)

12       Mr. Colt Galloway - (present with witness)

13       MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC

14       4206 South JB Hunt Drive, Suite 200

15       Rogers, Arkansas 72758

16       479-464-5652

17       Emccord@mwlaw.com

18       Cgalloway@mwlaw.com

19

20

21

22

23

24

25
```



1  evidence of what the full replacement cost of the
2  building was as of March 20 of 2022?
3  A.  We have an estimate based on the results of what
4  appeared in the insurance policy of $5,149,000.
5  Q.  You have a document that says the full replacement
6  cost of the building was --
7  A.  No.
8  Q.  Do you have any evidence of what the replacement
9  cost of the building was as of March of 2022?
10 A.  No, we don't.
11 Q.  Have you made any efforts to determine that value?
12 A.  I'm not sure I understand the question.
13 Q.  Has Nilfisk undertaken any effort to value the
14 total -- the total replacement cost of the building as
15 of March of 2022?
16 A.  No, I don't believe we have done that.  We have
17 relied on the insurer's assessment of the
18 $9.4 million.
19 Q.  Is it Nilfisk's position that the full replacement
20 cost of the building as of March of 2022 was
21 $9.4 million?
22 A.  Can you repeat the date, please?
23 Q.  March 20, 2022.
24 A.  Yes.  That is what we were provided from the
25 insurance company.



```
 1                   MS. McCORD:  Objection.
 2   A.  I think I already testified to that, yes.
 3   Q.  So you're testifying under oath that the
 4   calculation was done --
 5   A.  I'm testifying that I have not seen the numbers.
 6   Q.  All right.  Can you testify --
 7   A.  But I have no knowledge on whether that was -- it
 8   was -- the calculations were done or not.  I think
 9   I've clarified on that earlier.
10   Q.  I want this record to be crystal clear on this,
11   Mr. Dandanell.
12                   Do you have any evidence whatsoever that
13   a calculation was done to come up with the $5 million
14   value?
15                   MS. McCORD:  Objection.
16   A.  No, I haven't.
17   Q.  All right.  And do you have any evidence to
18   suggest that -- strike that.
19                   Do you have any basis to tell me today
20   under oath that the value to -- I'm going to strike
21   that again.  Let me get this question correct.
22                   Can you dispute that somebody, including
23   Julie Patton, believed that the lease mandated a
24   $5 million value?
25                   MS. McCORD:  Objection.
```



www.ArkansasRealtimeReporting.com

 1                    MR. NEY:   Okay.

 2   Q.   Mr. Dandanell, do you agree with me that, after

 3   the tornado occurred, there was no way to

 4   retroactively increase the amount of insurance that

 5   existed on the Premises?

 6   A.   Yeah.   I believe attempts were made, but yeah.

 7   Because if a fire hits you -- or if your house is

 8   burning, it's difficult to achieve the fire insurance,

 9   yes, I agree.

10   Q.   Do you agree with me that the lease required

11   Nilfisk to promptly and diligently repair, rebuild, or

12   replace the buildings in the event of a casualty?

13                    MS. McCORD:   Objection.

14   A.   I'm not sure I understand your question.

15   Q.   Turn back to Exhibit 2, in Section 18.1, on Page

16   15.

17   A.   Okay.

18   Q.   Under Section 18.1 of Exhibit 2, do you agree with

19   me that the tenant, Nilfisk, had the obligation to

20   promptly and diligently repair, rebuild, or replace

21   the buildings in the event of a casualty?

22                    MS. McCORD:   Objection.

23   A.   I agree that is what's stated in the 18.1, but I

24   don't believe it's applicable in this case.

25   Q.   Why is that?



www.ArkansasRealtimeReporting.com

1  A.  Because it's a major casualty.

2  Q.  Okay.  Do you agree that a tornado is a casualty?

3            MS. McCORD:  Objection.

4  A.  I believe that we have provided evidence that the

5  building could not be repaired within 270 days; and

6  that's why it falls under the major casualty clause.

7  Q.  Do you recall my question?

8  A.  Yes.

9  Q.  Was the tornado a casualty?

10  A.  I believe it says what it does.  And I don't

11  recall having seen the word "tornado" in it, so I

12  don't know how to answer that question.

13  Q.  Well, did the tornado affect all or a substantial

14  portion of the Premises?

15  A.  Yes, what I've stated.  I don't know -- so, yeah,

16  I do.

17  Q.  Do you agree that the rebuild obligation requires

18  Nilfisk to restore the Premises to the condition in

19  which they were immediately prior to such damage or

20  destruction irrespective of whether any insurance

21  proceeds are adequate or available to repair, rebuild,

22  or replace the buildings?

23            MS. McCORD:  Objection.

24  A.  I don't believe we have a rebuild obligation.

25  Q.  So it's you're theory that --



1   Q.  So my question to you is:  Does Nilfisk have a
2   position on whether or not the building was a total
3   loss for insurance purposes?
4           MS. McCORD:  Objection.
5           MR. NEY:  Emily, put on the record what
6           your basis for objecting is to ask the
7           question within the scope of his
8           designation.  I asked him:  "Does Nilfisk
9           have a position on whether or not the
10          building was a total loss"; and you
11          objected.  So state the basis of that on the
12          record.
13          MS. McCORD:  You've asked the question
14          several times, and he has answered the
15          question.  I think maybe that's the fifth or
16          sixth time.
17          MR. NEY:  You've objected on every time
18          I've asked him total loss.  Not just -- not
19          just the last time.
20  Q.  Mr. Dandanell, does Nilfisk have a position on
21  whether or not that the building was a total loss for
22  insurance purposes; yes or no?
23  A.  Yes.
24  Q.  What's Nilfisk's position?
25  A.  It is a total loss.  It's a major casualty.

```
 1                    MS. McCORD:  Objection.  I want you to
 2              clarify, please, Marshall.  The tornado was
 3              on March 30th.
 4                    MR. NEY:  Okay.
 5                    MS. McCORD:  So for clarity, are you
 6              talking about before or after the tornado?
 7                    MR. NEY:  I'll ask it for March 30th.
 8   Q.  Does Nilfisk --
 9                    MS. McCORD:  I think we already
10              established that.
11   Q.  Does Nilfisk have any evidence whatsoever that the
12   full replacement cost of the building on March 30,
13   2022, was $5,149,999?
14   A.  No.
15   Q.  Do you agree with me that Nilfisk wanted the
16   building to be deemed a total loss so that it could
17   exit the Premises?
18                    MS. McCORD:  Objection.
19   A.  I have not -- no, I can't speak of that.
20   Q.  You don't know either way?
21   A.  No.
22   Q.  By the way, just as an aside, the Exhibits 9 and
23   10, did you review those before today?
24   A.  Yes.  They were part of the case file.
25                    (Exhibit 5 marked for identification.)
```

1  you see that?

2  A.  Yeah.  And I think that was accepted by us that

3  the payment of 5.149 million was not by deduction of

4  accord and satisfaction.

5  Q.  Yeah.  You agree that Fort Worth Partners'

6  acceptance of the money was not an accord and

7  satisfaction; correct?

8  A.  Yes, that's correct.

9  Q.  So why has Nilfisk asserted that there's an accord

10  and satisfaction when all parties agreed in advance of

11  that payment that it was not an accord and

12  satisfaction?

13  A.  I believe it was put in under the advice of legal

14  counsel.  I do believe, under my understanding,

15  without being a lawyer, that that would be the process

16  when answering to a claim in the beginning -- yeah, in

17  the beginning of a case like this.

18  Q.  Are you aware that there has to be a good-faith

19  basis to assert a defense like that?

20  A.  And I would imagine in the beginning of the case,

21  there is.

22  Q.  And are you aware that your previous counsel sent

23  a letter that said that the money would not constitute

24  an accord and satisfaction?

25  A.  Yes, I am.



1  Q.  And are you aware that I wrote a response that

2  said that the money was being accepted with that

3  understanding that it was not an accord and

4  satisfaction?

5  A.  Yeah.  And I believe we agreed to that, if that is

6  what you call it, as a response.

7  Q.  In fact, are you aware that in the answer to the

8  complaint that Nilfisk even admitted that there was no

9  accord and satisfaction?

10 A.  I think I already testified to that.  Yes, I

11 believe that we all concur to the fact that there was

12 no accord and satisfaction.  I don't think there's any

13 dispute on that subject.

14 Q.  What is your factual basis for saying that no

15 damage has been caused to Fort Worth Partners?

16 A.  Sorry.  I just need to recall.  There's no claim.

17 I mean, no loss has been -- could you please repeat?

18 Q.  Yeah.  I'm just reading from Paragraph 36 -- I'm

19 sorry -- Paragraph 35.  "Defendants affirmatively

20 assert that they did not breach the lease nor any of

21 the amendments to the lease nor cause any damage to

22 plaintiff."

23            And I'm asking:  What is the factual

24 basis to say that Nilfisk did not cause any damage to

25 Fort Worth Partners?



ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

1  A.  To my understanding, no claim or no -- what do you

2  call it -- claim for loss has been filed by the

3  plaintiff.  I believe the only thing that is -- no.

4  Q.  Let me ask it this way:  Do you agree with me that

5  Fort Worth Partners owns the property in question?

6  A.  Yes.

7  Q.  And do you agree that most of the building was

8  destroyed by a tornado?

9  A.  Yes.

10  Q.  Do you agree with me that Nilfisk has not

11  repaired, replaced, or rebuilt the building?

12            MS. McCORD:  Objection.

13  A.  Yes, because we're not obligated to do so.

14  Q.  Do you agree with me that Nilfisk terminated the

15  lease early?

16            MS. McCORD:  Objection.

17  A.  Yes.  We -- we terminated the lease according to

18  contract, yes.

19  Q.  Do you agree with me that Nilfisk has not paid any

20  -- has not paid rent through the end of the lease term

21  nor will it pay rent through the end of the lease

22  term?

23            MS. McCORD:  Objection.

24  A.  Yes.

25  Q.  Do you agree with me that Nilfisk has abandoned



1  course, we're not going to pay rent for a terminated
2  lease.
3  Q.  Well, under the lease, the landlord would be
4  receiving $60,000-plus per month; is that correct?
5  A.  That is correct.
6  Q.  And isn't it true Nilfisk's position is it's done
7  everything it's required to do under the lease?
8  A.  That is correct.
9  Q.  And isn't it true that Nilfisk's position is that
10 Fort Worth Partners should bear the cost of
11 reconstruction?
12         MS. McCORD:  Objection.
13 A.  I think it's -- no.  It's Nilfisk's position that
14 we have fulfilled our obligations in the contract.
15 Q.  That's not what I asked you, Mr. Dandanell.  Is it
16 Nilfisk's position that, if the cost to reconstruct
17 exceeds $5 million, that that cost should be borne by
18 Fort Worth Partners?
19 A.  Yes.
20 Q.  Under Paragraph 37, Nilfisk asserts that Fort
21 Worth Partners' damages are barred by the tacit
22 agreement rule.
23         What facts is Nilfisk relying on to say
24 that there was a tacit agreement between Fort Worth
25 Partners and Nilfisk?



1                    REPORTER CERTIFICATION

2          I, JENNIFER NORMAN, Certified Court Reporter

3    for the State of Arkansas, do hereby certify to the

4    following:

5          1) that on October 10th, 2023, the witness,

6    STEEN DANDANELL, was duly sworn by me prior to the

7    taking of testimony as to the truth of the matters

8    attested to and contained therein;

9          2) that the foregoing pages contain and are a

10   true and correct transcription of the proceedings as

11   reported verbatim by me via realtime stenography to

12   the best of my ability and transcribed at or under my

13   direction and supervision, and subject to appropriate

14   changes submitted by witness, if any, during his/her

15   requested reading and signing of this deposition

16   according to the Arkansas Rules of Civil Procedure;

17         3) that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in

19   which this proceeding was taken; and that I am not a

20   relative or employee of any attorney employed by the

21   parties hereto;

22         4) that I am not financially interested or

23   otherwise interested in the outcome of this action

24   that affects or has substantial tendency to affect

25   impartiality or requires me to relinquish control of



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5       5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10 administrator involved in this matter;

11      6) that signature of the witness is not

12 waived.

13      This transcript is prepared at request of

14 counsel for the PLAINTIFF, and all fees are billed

15 directly to them in compliance with Arkansas Board of

16 Court Reporter Examiners Regulations Section 19.

17      Witness my hand and seal this 12th day of

18 October, 2023

19

20 _____

21 JENNIFER NORMAN, CCR
   LS Certificate #768, State of Arkansas
22 Arkansas Realtime Reporting
   1130 E Millsap Rd
23 Fayetteville AR 72703
   479-301-2040
24 www.ArkansasRealtimeReporting.com

25



# EXHIBIT N

1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
2                     FAYETTEVILLE DIVISION
FORT WORTH PARTNERS, LLC,   )
3                           )
                PLAINTIFF,  )
4                           )
VS.                         ) CASE NO.
5                           ) 5:22-cv-05181-TLB
NILFISK, INC. AND           )
6  NILFISK HOLDING A/S, A    )
DANISH CORPORATION          )
7                           )
                DEFENDANTS  )
8

9       ----------------------------------

10                ORAL DEPOSITION OF

11             D. CRAIG EVANS, P.E.

12                OCTOBER 12, 2023

13      ----------------------------------

14     ORAL DEPOSITION OF D. CRAIG EVANS, P.E., produced

15  as a witness at the instance of the PLAINTIFF, and

16  duly sworn, was taken in the above-styled and numbered

17  cause on the 12th of October, 2023, from 9:38 a.m., to

18  11:17 a.m., before Jennifer Norman, CCR in and for the

19  State of Arkansas, reported by machine shorthand, via

20  videoconference, pursuant to the Federal Rules of

21  Civil Procedure.

22

23

24

25



**www.ArkansasRealtimeReporting.com**

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3       Mr. Marshall S. Ney - (via videoconference)
 4       FRIDAY, ELDREDGE & CLARK, LLP
 5       3350 South Pinnacle Hills Parkway, Suite 301
 6       Rogers, Arkansas 72758
 7       (479) 695-6049
 8       Mney@fridayfirm.com
 9
10   FOR THE DEFENDANTS:
11       Ms. Emily McCord - (present with witness)
12       Mr. Colt Galloway - (present with witness)
13       MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC
14       4206 South JB Hunt Drive, Suite 200
15       Rogers, Arkansas 72758
16       479-464-5652
17       Emccord@mwlaw.com
18       Cgalloway@mwlaw.com
19
20
21
22
23
24
25
```



1   A.  My report gave my recommendations as if I were

2   giving basic repairs and information.  But certainly,

3   before I stamp a foundation replacement or a

4   foundation repair, it would require some destructive

5   testing; that is correct.

6   Q.  And as I understand it, you would want to do both

7   core sampling and scanning -- x-ray scanning; is that

8   correct?

9   A.  That is correct.

10  Q.  Do you agree with me that a repaired and

11  reinforced foundation is not the condition that

12  existed before the tornado?

13  A.  The foundation was as designed in 1981.  So there

14  was no need to repair or reinforce the building that

15  was designed based on the codes that applied during

16  the original construction.

17  Q.  I understand.  In fact, in your report, you opine

18  that the foundation appears to have performed its

19  functions adequately since designed; correct?

20  A.  That is correct.

21  Q.  And so the condition of the foundation for that

22  reason, prior to the tornado, was not a repaired and

23  overlaid foundation; correct?

24  A.  That is correct.

25  Q.  So I generally talked about x-ray core sampling,



1  through 21.

2  Q.  All right.  And so can we agree that the current

3  rigid moment frames do not -- they did not have

4  additional reinforcing prior to the tornado?

5  A.  Well, actually, the reason why they exist, they're

6  still functioning, they were reinforced by the CMU

7  block wall.  But to meet the perceived code, I threw

8  in the option to reanalyze those, because obviously

9  the moment frame is what failed.

10  Q.  But, again, I want a clear record on this.  The

11  additional reinforcing that you're contemplating is

12  reinforcing that did not exist prior to the tornado;

13  correct?

14  A.  That option has remained available, yes.

15  Q.  All right.  I'm going to ask it again.  I want the

16  record to be clean on this.

17          The additional reinforcing that you have

18  put in as an option, if that were applied, that would

19  be reinforcing that exists after the tornado but did

20  not exist prior to the tornado; correct?

21  A.  That is correct.

22  Q.  I'm still on Page 9.  You talk about a topping

23  slab; correct?

24  A.  I threw that, again, out as an option.  I have not

25  done testing and I haven't analyzed the foundation



1  with the latest kickout forces to know for sure

2  whether or not an additional topping slab is needed or

3  even reinforced slab is needed.

4  Q.  Can we equate -- I'm sorry.  I didn't mean to

5  interrupt you.

6  A.  The foundation is not covered in the lease

7  agreement; and so therefore, I don't think it's going

8  to be required as a part of this estimate.  But as an

9  engineer that looks at the whole structure to get it

10  back up to current codes, that option was thrown out

11  there as an option for me at a later date.

12  Q.  All right.  My question is this:  Can you agree

13  with me that prior to the tornado, the building did

14  not have a six-inch-thick topping slab?

15  A.  It did not.

16  Q.  Do you understand what the use of the building

17  was?

18  A.  Industrial.

19  Q.  Do you know how many times the loading bay doors

20  were used by trailers and containers?

21  A.  I have no idea.

22  Q.  Do you know what the relative height was of the

23  existing foundation to trailers or containers that

24  were backed up to the loading bay doors?

25  A.  Roughly four -- roughly four feet.



1  Q.  But in terms of whether a trailer that was backed

2  up to a bay door was level with the interior

3  foundation or not, do you know what that relative

4  difference was?

5  A.  Well, that's the purpose of the leveling --

6  dock-leveling equipment.  So no.

7  Q.  Okay.  Would you agree with me that if we change

8  the interior floor by raising it six inches, that that

9  would impact the relative height for ingress and

10 egress of trailers and containers through the bay

11 doors?

12 A.  The six-inch topping slab is not mandated.  I can

13 actually reinforce the existing slab.  It's just

14 thrown out as on option.  And also, the leveling

15 equipment is noted for repair.  And so those things

16 can also change.  So these issues would all be covered

17 in the design phase if so deemed.

18 Q.  Mr. Evans, while I appreciate that information, I

19 would also appreciate a direct response to my

20 question, which was:  Would you agree with me that if

21 we added six inches to the height of the foundation,

22 that it would impact negatively the relative height

23 between the foundation floor and trucks -- or I'm

24 sorry -- trailers or containers backing up to the bay

25 doors?



ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

1  Q.  Would you agree with me that the additional

2  lateral support that would either be bolted or welded

3  on would be a condition that did not exist prior to

4  the tornado?

5  A.  That is correct.  But the building wasn't

6  designed -- the building is going to be different

7  regardless.  And the estimate includes all new frames,

8  not keeping these frames.

9  Q.  You say:  "The CMU block wall cracks will need to

10  be tuck pointed using Helifix anchors with epoxy

11  across the cracks."

12          Do you agree with me that having the

13  block wall cracks tuck-pointed using Helifix anchors

14  with epoxy across the cracks is a condition that did

15  not exist before the tornado?

16  A.  I do agree that that condition did not exist

17  before to the tornado, yes.

18  Q.  Of the final bullet on this page, it says:  "The

19  west building shipping area may need some paving or

20  drainage work."  I'm confused by the word "may."  So

21  does it need that work, or does it not?

22  A.  Well, as a further review of the contract, it's

23  not included in the lease agreements for anything

24  including the foundation or below grade.

25          Based on my report, I believe it's



1  A.  Nabholz created an estimate; and he deemed it more

2  time efficient to remove the building and replace the

3  building.

4  Q.  Okay.  So --

5  A.  The metal building system.

6  Q.  All right.  Is that consistent with your opinion

7  that the entire building should be removed and

8  replaced?

9  A.  My opinion is you can if the cost warrants.  I

10  haven't studied it completely to see whether or not it

11  would be more expensive or less expensive to repair

12  the existing structure that's left, the 60,000 square

13  feet that's left, or to replace the structure.

14  Q.  So I'm going to put this in my words, and then you

15  take all the shots at it you want and make sure.  I

16  want to walk away from this with your opinion.

17          But what I hear you saying is that the

18  Nabholz opinion is the same as MKA's less and except

19  the issue with "what do we do with the foundation"?

20  A.  Again, the Nabholz opinion is it was more cost

21  efficient, time efficient to replace the metal

22  building structure completely.

23          My recommendation is that if you so deem,

24  if it's cost effective to replace the metal building

25  frames as opposed to repair the metal or reinforce the



 1  metal frames, then either way is acceptable to me.  I

 2  just need a metal building system that meets the

 3  current code.

 4  Q.  Okay.  So let me make sure we're on the same page.

 5  Your opinion, which incorporates the Nabholz estimate,

 6  is that we're going to repair the foundation and we're

 7  going to replace the building; is that correct?

 8  A.  The metal building estimate is included in to

 9  bring it up to code.  All the foundation may or may

10  not be in there.  We have to bring it up to code.  I

11  don't know all the ins and outs the testing will

12  require.

13           So does that answer your question?

14  Q.  I'm not sure that it does.  Let's take it in

15  pieces.

16           Does everybody -- does your report, by

17  incorporating the Nabholz report, agree with MKA that

18  the pre-engineered metal building will be replaced

19  with a new one?

20  A.  I believe Frank Allison's report and my report

21  says the existing metal building system that's still

22  there is functional and can be repaired.

23           The estimate used to compare or refute the

24  estimate used by MKA does include replacing all

25  200,000 square feet of the metal building system.



1   Q.   But your testimony is that the estimate you

2   obtained from Nabholz includes an estimate for that as

3   well; correct?

4   A.   For the 200,000 square feet to be removed and

5   replaced, that's what the estimate includes.

6   Q.   And that's the only estimate you have, relative to

7   the pre-engineered metal building, is to remove and

8   replace; correct?

9   A.   That is correct.

10  Q.   What is your understanding of the size of the

11  pre-engineered metal building that will be replaced?

12  A.   200,000 square feet.

13  Q.   All right.  Mr. Evans, are you good with math?

14  A.   I'm okay with math.

15  Q.   All right.  What is 200 times 500?

16  A.   100,000.

17  Q.   I agree with you.  See, we've reached agreement

18  today.

19  A.   Oh, good.

20  Q.   All right.  Now, I want you to turn in your

21  report.  It's Page 4020, and it is the bid that

22  Nabholz obtained for the pre-engineered metal

23  building.

24             MS. McCORD:  What number?

25             MR. NEY:  4020.



**www.ArkansasRealtimeReporting.com**

 1                    Tell me when you're there.

 2                    THE WITNESS:  Do we have this?  I was

 3             thinking that was on the back.

 4                    MR. NEY:  I can pull it up if it helps.

 5  A.  Yeah, I'll look on my own.  Pinnacle -- I know

 6  what you're referring to.  There's two -- this

 7  building has two buildings; each one of them are

 8  100,000 square feet.  They quoted one half of one

 9  building.  The Nabholz includes two buildings.  But

10  that's Jeff's expertise, Nabholz's.

11  Q.  Yeah, I don't see -- I don't see where the actual

12  price is in the Pinnacle bid.

13  A.  That will be up to Jeff.  I believe that the

14  original building was the east building built in '81,

15  and the adjacent building was the west building built

16  in '87, possibly.

17  Q.  So your understanding is we've got two buildings

18  that both meet this spec; is that right?

19  A.  That is correct.

20  Q.  And would they be tied together?

21  A.  They would be connected at the metal frame

22  building.

23  Q.  So in the bid, it says this building will stand

24  alone as opposed to being connected to another

25  building; is that correct?



1   A.  Of course, this is just a rough ballpark estimate.
2   Full design hasn't been included.  They're comparing
3   what was there.  You had two individual buildings that
4   were independent with skin connecting over it.  So --
5   but, again, it's just rough, raw estimates.
6           The building -- the steel frame in 2021 --
7   or 21.1, whatever, 20.1, is an end wall.  That's how I
8   know these were separate buildings.
9   Q.  I've got just a few more questions.
10          Mr. Marcussen at Nabholz, who identified
11  him as the individual to prepare the cost estimate?
12  A.  I'm assuming one of the Nilfisk attorneys.
13  Q.  All right.  Can we agree that his estimate of
14  $14,253,578 is more than $5 million?
15  A.  We can agree that those numbers are different,
16  yes.
17  Q.  Can we agree that the 14 million is more than the
18  5 million?
19  A.  Obviously.
20  Q.  Did you have any input at all on Mr. Marcussen's
21  cost opinion?
22  A.  He got my report, and we discussed my report
23  during the process of my report.
24  Q.  But did you actually talk to him about any of the
25  cost elements that appear in his report?



1                    REPORTER CERTIFICATION

2           I, JENNIFER NORMAN, Certified Court Reporter

3    for the State of Arkansas, do hereby certify to the

4    following:

5           1) that on October 12, 2023 the witness,

6    D. CRAIG EVANS, P.E., was duly sworn by me prior to

7    the taking of testimony as to the truth of the matters

8    attested to and contained therein;

9           2) that the foregoing pages contain and are a

10   true and correct transcription of the proceedings as

11   reported verbatim by me via realtime stenography to

12   the best of my ability and transcribed at or under my

13   direction and supervision, and subject to appropriate

14   changes submitted by witness, if any, during his/her

15   requested reading and signing of this deposition

16   according to the Arkansas Rules of Civil Procedure;

17          3) that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in

19   which this proceeding was taken; and that I am not a

20   relative or employee of any attorney employed by the

21   parties hereto;

22          4) that I am not financially interested or

23   otherwise interested in the outcome of this action

24   that affects or has substantial tendency to affect

25   impartiality or requires me to relinquish control of



1  an original or copies of a deposition transcript

2  before it is certified, or that requires me to provide

3  any service not made available to all parties to the

4  action; and

5         5) that I have no contract with the parties,

6  attorneys, or persons with an interest in the action;

7  and that I am not knowingly identified on a preferred

8  provider list, whether written or oral, for any

9  litigant, insurance company, or third-party

10  administrator involved in this matter;

11         6) that signature of the witness is not

12  waived.

13         This transcript is prepared at request of

14  counsel for the PLAINTIFF, and all fees are billed

15  directly to them in compliance with Arkansas Board of

16  Court Reporter Examiners Regulations Section 19.

17         Witness my hand and seal this 16th day of

18  October, 2023

19

20  _____

21         JENNIFER NORMAN, CCR
       LS Certificate #768, State of Arkansas
22     Arkansas Realtime Reporting
       1130 E Millsap Rd
23     Fayetteville AR 72703
       479-301-2040
24     www.ArkansasRealtimeReporting.com

25



# EXHIBIT O

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF ARKANSAS
 2                     FAYETTEVILLE DIVISION
   FORT WORTH PARTNERS, LLC,   )
 3                             )
                 PLAINTIFF,    )
 4                             )
   VS.                         ) CASE NO.
 5                             ) 5:22-cv-05181-TLB
   NILFISK, INC. AND           )
 6 NILFISK HOLDING A/S, A      )
   DANISH CORPORATION          )
 7                             )
                 DEFENDANTS    )
 8

 9       -----------------------------------

10                 ORAL DEPOSITION OF

11               JEFFREY M. MARCUSSEN

12                 OCTOBER 12, 2023

13       -----------------------------------

14     ORAL DEPOSITION OF JEFFREY M. MARCUSSEN, produced

15 as a witness at the instance of the PLAINTIFF, and

16 duly sworn, was taken in the above-styled and numbered

17 cause on the 12th of October, 2023, from 1:07 p.m., to

18 2:28 p.m., before Jennifer Norman, CCR in and for the

19 State of Arkansas, reported by machine shorthand, via

20 videoconference, pursuant to the Federal Rules of

21 Civil Procedure.

22

23

24

25
```



```
 1                A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3       Mr. Marshall S. Ney - (via videoconference)

 4       FRIDAY, ELDREDGE & CLARK, LLP

 5       3350 South Pinnacle Hills Parkway, Suite 301

 6       Rogers, Arkansas 72758

 7       (479) 695-6049

 8       Mney@fridayfirm.com

 9

10   FOR THE DEFENDANTS:

11       Ms. Emily McCord - (present with witness)

12       Mr. Colt Galloway - (present with witness)

13       MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC

14       4206 South JB Hunt Drive, Suite 200

15       Rogers, Arkansas 72758

16       479-464-5652

17       Emccord@mwlaw.com

18       Cgalloway@mwlaw.com

19

20

21

22

23

24

25
```



1  services you were to provide?

2  A.  I believe so.

3  Q.  I'm going to ask you to provide all of these

4  emails, including the terms of your engagement to

5  Ms. McCord, at the conclusion of this deposition so

6  that I can see what your engagement was.  Okay?

7  A.  Sure.

8  Q.  In your own words, what were you asked to do?

9  A.  I was asked to review and refute the report

10  provided by MKA advisors, and then provide an estimate

11  of what I thought the project would cost based on our

12  understanding of that.

13  Q.  So when you say you would provide an estimate

14  based upon what you believe the cost of the project

15  would be, how would you gain your understanding of

16  what the project should be?

17  A.  Through a report provided by Craig that was also

18  mentioned in mine.

19  Q.  All right.  So I'm going to use my words and, you

20  know, you take exception to anything that I say wrong.

21           Were you asked to provide an estimate of

22  the cost to fulfill the scope that was outlined in

23  Mr. Evans' report?

24  A.  Yes.

25  Q.  And did you do that?



1  Q.  Okay.  So just, for example, any line item that

2  you have provided, I would be able to review the Excel

3  spreadsheet and understand how you came up with a

4  particular line item; is that right?

5  A.  Should be able to, yes.

6  Q.  And here today, without the benefit of those

7  pages, are you able to give specific, detailed

8  testimony about how individual numbers in your report

9  were calculated?

10  A.  Yes, I believe so.

11  Q.  All right.  As to every one of them?

12  A.  I believe so, yes.

13  Q.  Okay.  Mr. Marcussen, did you ever visit the site

14  in question?

15  A.  No, sir.  I relied upon the images provided from

16  Craig and his observations of the site.

17  Q.  So the answer is, no, you did not ever visit the

18  site?

19  A.  That's correct; no, I did not.

20  Q.  You agree with me that it might have been

21  beneficial to visit the site?

22  A.  Perhaps.  But it's fairly common to, at this

23  high-level of an estimate, to be able to do something

24  off site.  It's not uncommon.

25  Q.  Well, and fair enough to that point.  I agree with



1  make sure that we could get that information to review

2  with Craig to ensure that it met those needs.  And

3  then from there, was able to come up with a unit cost

4  basis to apply to the project.

5  Q.  And who did you --

6            MR. NEY:  I'm waiting for the siren to

7            subside.  I don't know if you can hear that.

8            Emily, can you hear it at your office a

9            block away?

10           MS. McCORD:  No.  I think it's a little

11           further than a block.

12           MR. NEY:  Well, I know I'm just a block

13           from you.

14           MS. McCORD:  I can't hear it.

15  Q.  Mr. Marcussen, who did you talk to at Pinnacle

16  Structures?

17  A.  I spoke with one of our sales reps that we deal

18  with for most projects.

19  Q.  Is that who, in your experience, Nabholz uses for

20  pre-engineered metal buildings?

21  A.  We use a variety of manufacturers and suppliers,

22  but they are one of them, yes.

23  Q.  Ultimately, if Pinnacle was going to provide the

24  components for a pre-engineered metal building, would

25  they give you a bid?



1    A.   Yes, sir.

2    Q.   And in this instance, did Pinnacle Structures give

3    you a bid?

4    A.   No, sir, they did not.

5    Q.   Why not?

6    A.   Well, at this level, it's not a set of documents

7    to bid from.  So, again, this was to get a design

8    criteria that we would propose to the engineer to make

9    sure that it would fit the right requirements.  And

10   then from there, we're able to discuss what a project

11   of this would cost on a unit-cost basis.  And that's

12   how we established the value for the pre-engineered

13   metal building component of the project.

14   Q.   So what are the design specs of the building that

15   you estimated?

16   A.   It's based on the wind loads and whatever other

17   loading that Craig recommended.  That's not something

18   I really delve into.  That's something I share back

19   with Craig based on the metal building manufacturer's

20   recommendation; and then he approves those or says

21   we're at least on the right track.

22   Q.   Why didn't you provide that information to

23   Pinnacle Structures and let them give you a price?

24   A.   That's not commonplace for them.  Typically, with

25   a metal building component, they provide their



1   breakdown of what their loading would be and what

2   their design is based on; then the engineer of record

3   reviews that and approves it.  So that's what we did

4   in this instance.

5   Q.  Well, but you've said at some point Pinnacle

6   Structures would give you a price before you would

7   purchase the components for a pre-engineered metal

8   building; isn't that right?

9   A.  Correct.

10  Q.  But they didn't do that here; correct?

11  A.  That's correct.

12  Q.  So if you would, go to Page 4020 in your report.

13  And that's the sheet that says "Contract from Pinnacle

14  Structures."  And I would like you to explain that

15  document to me.

16  A.  Okay.  Is there anything specifically, or just

17  explain the document in its entirety?

18  Q.  Well, fair point.  When you're there, tell me, and

19  I'll ask you some questions.

20  A.  Okay.  I'm here.

21  Q.  All right.  What is the purpose of this document?

22  A.  Again, this is where I communicated with Pinnacle,

23  telling them I was looking for a -- trying to work

24  through a budget number for a project, told them the

25  approximate dimensions and location of where it would



www.ArkansasRealtimeReporting.com

1   go.

2              And so from there, they generate their

3   design criteria that's listed below, which was then

4   reviewed with Craig to make sure it was in line with

5   the proper codes required.

6   Q.  Yeah.  But there's also a line where it says

7   "contract price," and it's blank.  Can you tell me why

8   it's blank?

9   A.  Because this isn't a contract from the standpoint

10  of a bid.  This is just budgetary information they

11  provided to make sure we're looking at the right

12  structure.

13  Q.  But Pinnacle Structures clearly would have the

14  ability to give a price based on these dimensions and

15  these loads, would it not?

16  A.  Yes.

17  Q.  So why didn't you ask them to provide that?

18  A.  I communicated with them verbally to get a

19  unit-cost price to plug in for an estimate based on

20  the criteria we had.

21  Q.  Okay.  Thank you, but that wasn't my question.

22              My question is:  Why would you not have

23  Pinnacle Structures, who you were using to provide a

24  pre-engineered metal building, to provide their

25  pricing and to incorporate that as part of your



```
 1   report?
 2   A.  Well, because typically at this stage of the game
 3   as far as the design, they've got a rough dimension of
 4   the building.  So it's not like it's something that
 5   they have documents to tie into a contract with.
 6   Q.  So you're saying they don't have enough
 7   information to give a price at this point?
 8                   MS. McCORD:  Object.
 9   Q.  Is that what you're saying, Mr. Marcussen?
10   A.  They have enough information to give me a budget
11   number like we discussed, but not enough to give a
12   contract.
13   Q.  Why didn't you ask them to give you a budget
14   number in this document?
15   A.  Typically they do not on something where there's
16   not a design document to base it off of from a floor
17   plan.
18   Q.  Is there anything in writing where they have
19   provided you a budget number for this building?
20   A.  No, sir.
21   Q.  And are you saying they only gave you a number for
22   what I see on this page?
23   A.  Correct.  Correct.  That's correct.
24   Q.  What was that number?
25   A.  There was a unit cost per square foot.  And so I
```



1  A.  Yeah, I'm about to.  It's my understanding that

2  these loads would apply across the board.

3  Q.  Why did you obtain a document that shows loads for

4  a 100,000-square-foot building instead of a

5  200,000-square-foot building?

6  A.  Again, it was based on just to get some general

7  criteria to make sure that the building would meet the

8  codes.  It wasn't to necessarily pin it down.  It was

9  to get, again, general criteria that we knew that this

10 building would handle what was required for that

11 particular location.

12 Q.  Well, wouldn't the design be significantly

13 different to accomplish the same loads in a

14 200,000-square-foot building versus a

15 100,000-square-foot building?

16 A.  I'm not an engineer.  I'm not sure on the loads,

17 what that requirement would be.

18 Q.  Is it true that you just made a mistake in getting

19 this document from Pinnacle and you were mistaken that

20 it was 100,000-square-foot building instead of a

21 200,000-square-foot building?

22              MS. McCORD:  Object.

23 A.  No, sir.

24 Q.  Well, can you explain to me in a way that I will

25 understand why you solicited this document from



1  Pinnacle based on a 100,000-square-foot building

2  instead of a 200,000-square-foot building?

3  A.  We based it off of general dimensions to

4  accomplish the overall square footage; that way, they

5  could at least get base sizing and spacing so that

6  they could see what the size of the members would be,

7  as well as get these loads that we've discussed so

8  that we could talk about a range of square-foot unit

9  costs for that.

10        Again, the reason for it is because this

11  is early in the process and there's not design

12  documentation from architecture or engineers for the

13  whole design package.

14        And so commonly, and such as this, it

15  would be typically a phone conversation of, "Here is a

16  rough order of magnitude of what building size would

17  be or could be," and then trying to get enough

18  information in to verify that we're at least going

19  down the right track for a building purpose.

20  Q.  Mr. Marcussen, I understand that the actual design

21  could change aspects of the building.  But the one

22  certainty was that the building that would be

23  constructed was 100 percent bigger than the one that

24  is on the piece of paper that is 4020.

25        So why wouldn't you use the known



1   dimensions as opposed to a footprint that is half the

2   size of the known dimensions?

3   A.   I did use the known dimensions in my estimate.

4   This is, again, just to confirm the unit cost.  So

5   again, the conversations with Pinnacle, it was that

6   that unit cost would cover either one of those because

7   the unit wasn't a lump-sum number.  So the overall

8   square footage of the building was accounted for in

9   the estimate that I provided.

10  Q.   Mr. Marcussen who prepared -- who completed the

11  numbers that appear on page 4020?

12  A.   Who completed the numbers?

13  Q.   Yes.  Who filled out the document?

14  A.   I know that I was in conversation with their sales

15  rep, David Johnson.  And so I'm assuming that either

16  he did or their engineer or someone.  I don't know who

17  provided that information within Pinnacle.

18  Q.   Okay.  Someone in Pinnacle completed the form that

19  is on Page 4020; right?

20  A.   That's correct.

21  Q.   And are you the person who provided the width and

22  the length for inclusion in that document?

23  A.   Yes, correct.

24  Q.   Why did you provide numbers that were half the

25  size of the known dimensions?



1  A.  Like I said, we were trying to get a range of

2  magnitude of what the project would be.  And so this

3  is, again, a document to help lead us into that

4  direction.

5  Q.  Mr. Marcussen, would it be any harder to

6  accomplish that task if you had provided dimensions

7  that comprised 200,000 square feet?

8              MS. McCORD:  Object.

9  A.  No.

10 Q.  Wouldn't it have made more sense to provide the

11 correct dimensions?

12             MS. McCORD:  Objection.

13 A.  No.  Because, again, this is just to validate a

14 square-foot unit cost.  It wasn't to get a hard number

15 from a vendor at an early stage.  It was, again, to

16 make sure that we're in the right direction from a

17 unit-cost basis.

18 Q.  Why didn't you just provide ten square feet?

19 A.  Because I was trying to go with the known

20 dimension of the project in a particular direction to

21 get something that we could benchmark off of to move

22 forward.

23 Q.  Okay.  So the known dimensions were 100 percent

24 larger than what you provided.  So if you were trying

25 to go for the known dimensions, as you have just



1  A.  Not according to my understanding of their design

2  anticipated in the plan.

3  Q.  A few minutes ago, I understood you to say you

4  didn't know because you weren't an engineer.  But do

5  you have an understanding whether member sizes would

6  be different?

7  A.  No, I do not.

8  Q.  Okay.  And a few minutes ago you told me that the

9  numbers that were used in the width and length

10  document were provided by you.  Was that correct

11  testimony or incorrect testimony?

12  A.  It was correct.

13  Q.  Was it your understanding that Pinnacle would

14  ultimately provide components for a

15  200,000-square-foot building, or that it would provide

16  components for two 100,000-square-foot buildings that

17  would be tied together?

18  A.  One building in its entirety.

19  Q.  Okay.  Mr. Evans testified this morning that the

20  reason why this document only said 100,000 square feet

21  was because it was going to be two buildings that were

22  tied together.  So that's not your understanding;

23  correct?

24  A.  Correct.

25  Q.  And so in preparing your estimate, you didn't



Case 5:22-cv-05121-TLB Document 33-1 Filed 10/30/23 Page 454 of 493 PageID #1798
FORT WORTH PARTNERS vs NILFISK
MARCUSSEN, JEFFREY on 10/12/2023

29

1  estimate the cost of what it would be to tie two

2  buildings together, did you?

3  A.  No.

4  Q.  In Mr. Evans' report, he had a fair amount of

5  discussion about salvaging the portion of the building

6  that is still standing, and then add to it.  Did you

7  prepare a bid for that option?

8  A.  No.  The way I looked at the project was to, from

9  constructability and quickness, go ahead and demolish

10  what was left and then build back new.  Looked at kind

11  of the analysis to do the remaining, as he had

12  mentioned, or doing new.

13           The new method seemed to be, again, a

14  better option from the construction standpoint to be

15  able to have a clean site that was going to be built

16  back in a better-than-what's-there manner, so more of

17  an upgrade.

18           But then also, too, from a

19  constructability standpoint, it made sense to be able

20  to have all new construction going rather than trying

21  to repair what is left and then tie into that

22  particular building.

23  Q.  Do you know what Pinnacle Structures' lead time is

24  to get components for a 200,000-square-foot

25  pre-engineered metal building?



1  three-and-a-quarter percent fee, that would be what

2  the total percentage would be.

3  Q.  Well, general conditions are in addition -- there

4  are general conditions that are beyond profit and

5  overhead, are there not?

6  A.  Yes.  But the overhead that we would consider for

7  this project would be covered by the general

8  conditions.  The profit is pure profit in the fee

9  margin.  We don't have an extra line that we put

10  overhead on top of.  Anything that we think of or need

11  from overhead are included in general conditions.

12  Q.  Do you have authority to commit Nabholz to do this

13  project for a 3 percent profit?

14  A.  No, sir.

15  Q.  Did you seek that authority before you put it in

16  your report?

17  A.  No, sir.  Because that fee is what we typically

18  use on projects such as this; so I didn't have to go

19  and consult on it.

20  Q.  All right.  So can you testify today that if

21  Nabholz were selected to do this project that the

22  owner could rely upon it doing it for 3 percent

23  profit?

24  A.  No, sir.

25  Q.  I didn't see any equipment costs in here.  Can you



1  Q.  So if you calculated it based upon the cost of the

2  potential overlaid slab -- strike that.

3            Mr. Evans testified that you calculated

4  it based upon the potential cost of the overlay slab.

5  If that was his testimony, would he be mistaken?

6  A.  Yes, because that factor is not in the estimate,

7  that value.  And so that percentage wouldn't be

8  drawing off of it, yes.

9  Q.  Would you agree with me that the biggest

10  difference between your estimate and MKA's is whether

11  the existing slab is salvaged or replaced?

12  A.  Yes, sir.

13  Q.  And there are a lot of scope differences, for

14  example, the extent of electrical work that has to be

15  done in the building.

16            Is it fair to say that what you put in

17  for electrical is base level and has not been designed

18  to any degree at this point?

19  A.  That's correct.  It's the base level anticipated

20  to get a building properly powered, but in the most

21  basic sense.

22  Q.  So if additional electrical is required to restore

23  the building to pre-loss condition, then that would

24  increase the cost of your estimate; correct?

25  A.  Yes, sir.



www.ArkansasRealtimeReporting.com

1   Q.  Would you agree with me that if the destructive

2   testing of the slab reveals that some or all of it

3   needs to be replaced that you don't have enough

4   contingency built into your estimate?

5              MS. McCORD:  Objection.

6   A.  I think there's enough contingency to handle some

7   minor repairs; but if it is to be replaced in its

8   entirety, there is not enough there to cover it.

9   Q.  Does the $7 million that has been estimated for

10  the pre-engineered metal building include labor?

11  A.  Yes, sir.

12  Q.  And who would that labor be provided by?

13  A.  Typically a metal building erector.  So it would

14  be a subcontract laborer that would provide that.

15  Q.  Will you turn -- do you still have the Pinnacle

16  document in front of you, Mr. Marcussen?

17  A.  Yes, sir, I do.

18  Q.  Will you turn to Page 4023, please.

19  A.  Yes, sir.

20  Q.  So would you agree with me that this page lists

21  things that are not the responsibility of Pinnacle

22  Structures?

23  A.  Yes, sir, that is correct.

24  Q.  All right.  For each one of them, will you tell me

25  where you have included a line item in your estimate



1    to cover for the -- cover the things that are not

2    provided by Pinnacle Structures?

3    A.  The anchor bolts are provided within our metal

4    building unit cost; so I increased the units there to

5    cover for that.  The next --

6    Q.  What line item is that?

7    A.  That's Item Number 1.  I'm sorry.

8    Q.  No.  In your report, what item is it in?

9    A.  Oh, it's under the pre-engineered metal building

10   subtitle.

11   Q.  So even though it's not included, you increased --

12   you included it in your number?

13   A.  Correct, yes, sir.  I looked at their exclusions,

14   and then based on that, increased the amounts of unit

15   costs in that line item to account for those.

16   Q.  Okay.  So anything -- all of these things -- let

17   me see if I can shortcut this.

18              Everything that's not covered by Pinnacle

19   Structures, you did an independent estimate for and

20   then included it in your cost for a pre-engineered

21   metal building; is that right?

22   A.  Yes, sir.  And then I did have a line item under

23   structural steel for some miscellaneous steel

24   components to cover for those items.  So it's between

25   the two structural steel and Pinnacle's -- or the



1  pre-engineered metal building, any discrepancies

2  between their number and where we landed at an

3  estimate is where I covered for the items left out on

4  their scope.

5  Q.  Did you include an amount for freight charges?

6  A.  Yes, sir.

7  Q.  Okay.  How much?

8  A.  It's, again, where I bumped the unit cost to cover

9  for that.

10  Q.  By how much?

11  A.  I can't answer that.

12  Q.  Would we need to take a look at the detail that

13  supports your summary report to know that number?

14  A.  No, sir.  It's more because I just -- I plugged in

15  an extra unit for that.  And so, again, it's within my

16  calculation to, you know, increase it by an amount to

17  cover for the freight.  The unit that I used after

18  discussing with them typically covers for not just the

19  building, but also the freight itself.  And so that

20  unit should have the freight within it, but I don't

21  know what that exact amount of freight would be.

22  Q.  When you say "a unit," what do you mean?

23  A.  Sorry.  A cost per square foot.  So the cost per

24  square foot I used for the materials included freight

25  within it.  So that -- the freight is included within


ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

1  that unit cost, but I don't know how much that freight

2  is within that unit.

3  Q.  So you don't have any breakdown of how you reached

4  a specific unit cost?

5  A.  No, sir.  There's no breakdown.

6  Q.  So if you had to explain how you reached a unit

7  cost today, you're not able to?

8  A.  Well, it would be what we talked about earlier.

9  Basically, again, interpolating back with Pinnacle on

10  here is what the typical range of building of this

11  size would be turnkey, for material to be delivered on

12  site, what are we seeing for that unit cost.  And

13  that's the unit cost that I used.

14  Q.  I understand that.  But I'm saying if I wanted to

15  analyze all of the components for your ultimate unit

16  cost, are you saying you don't have the ability

17  precisely to describe that today?

18  A.  That's correct.

19  Q.  Nabholz get any special pricing with Pinnacle

20  Structures not available to others?

21  A.  We do have buying power.  And so -- but everything

22  of this nature is typically bid out on a sub-trade.

23  So if we do realize any advantage, we hope that it

24  comes during bid day in getting a better number.

25  Q.  Did you utilize any of those advantages in



www.ArkansasRealtimeReporting.com

1                  REPORTER CERTIFICATION

2          I, JENNIFER NORMAN, Certified Court Reporter

3    for the State of Arkansas, do hereby certify to the

4    following:

5          1) that on October 12, 2023 the witness,

6    JEFFREY M. MARCUSSEN, was duly sworn by me prior to

7    the taking of testimony as to the truth of the matters

8    attested to and contained therein;

9          2) that the foregoing pages contain and are a

10   true and correct transcription of the proceedings as

11   reported verbatim by me via realtime stenography to

12   the best of my ability and transcribed at or under my

13   direction and supervision, and subject to appropriate

14   changes submitted by witness, if any, during his/her

15   requested reading and signing of this deposition

16   according to the Arkansas Rules of Civil Procedure;

17         3) that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in

19   which this proceeding was taken; and that I am not a

20   relative or employee of any attorney employed by the

21   parties hereto;

22         4) that I am not financially interested or

23   otherwise interested in the outcome of this action

24   that affects or has substantial tendency to affect

25   impartiality or requires me to relinquish control of



1   an original or copies of a deposition transcript

2   before it is certified, or that requires me to provide

3   any service not made available to all parties to the

4   action; and

5          5) that I have no contract with the parties,

6   attorneys, or persons with an interest in the action;

7   and that I am not knowingly identified on a preferred

8   provider list, whether written or oral, for any

9   litigant, insurance company, or third-party

10  administrator involved in this matter;

11         6) that signature of the witness is not

12  waived.

13         This transcript is prepared at request of

14  counsel for the Plaintiff, and all fees are billed

15  directly to them in compliance with Arkansas Board of

16  Court Reporter Examiners Regulations Section 19.

17         Witness my hand and seal this 16th day of

18  October, 2023

19

20  _____

21  JENNIFER NORMAN, CCR
    LS Certificate #768, State of Arkansas

22  Arkansas Realtime Reporting
    1130 E Millsap Rd

23  Fayetteville AR 72703
    479-301-2040

24  www.ArkansasRealtimeReporting.com

25



# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FORT WORTH PARTNERS, LLC                                          PLAINTIFF

     VS.                       CASE NO. 5:22-cv-05181-TLB

NILFISK, INC. and
NILFISK HOLDING A/S, a Danish Corporation                        DEFENDANTS

AFFIDAVIT OF ANDRE SLINTAK, P.E.

STATE OF ~FLORIDA~ )
                          ) ss.
COUNTY OF ~PALM BEACH~ )

ANDRE SLINTAK, P.E., being duly sworn according to law, upon is oath, states:

1.     I am above the age of 21 and competent in all respects to submit this Affidavit.

2.     I am a licensed Professional Engineer with MKA International, Inc. ("**MKA**"). My Arkansas license number is 17873.

3.     Fort Worth Partners, LLC ("**FWP**") retained MKA, and by extension, me and my colleague, Kevin McMahon (a construction consultant), as testifying experts in this case. Our qualifications are listed in our respective CVs, which are enclosed with our report at Bates labeled pages FWP-000136-141.

4.     I am submitting this Affidavit in connection with and in support of FWP's Motion for Summary Judgment (the "**Motion**") against Nilfisk, Inc. ("**Nilfisk**") and Nilfisk Holding A/S, a Danish Corporation ("**Nilfisk Holding**").

5.     The report (Bates labeled pages FWP-000001-142; the "**MKA Report**") is a true and correct copy of the expert report we prepared in this case.

6.    On or about May 24, 2023, I inspected certain real estate located at 979 E. Robinson Ave., Springdale, Arkansas 72764 (the "**Property**"). The Property had suffered severe tornado damage on or about March 30, 2022.

7.    As stated in the MKA Report, the total cost to reconstruct the Building is $27,722,974.03. If one deducts from that amount the costs for footings, foundations, and other materials below grade (as well as the associated profit and overhead), the total cost to reconstruct the Building is $27,547,056.13.

8.    I stand behind the scope of work contemplated in and proposed by the MKA Report. I would stamp my Arkansas professional engineer seal on such scope.

Dated this 27th day of October, 2023.

_____
Andre Slintak, P.E.

**ACKNOWLEDGEMENT**

STATE OF    Florida           )
                                         ) ss.
COUNTY OF   Palm Beach  )

Subscribed and sworn before me on this 27 day of October, 2023.

_____
Notary Public

GRANT KAPLAN
Notary Public · State of Florida
Commission # HH 351896
My Comm. Expires May 15, 2027
Bonded through National Notary Assn.

_____
My Commission Expires

2

# EXHIBIT Q



250 Marquette Avenue South
Suite 800
Minneapolis, MN 55401
P: 612-305-7500
F: 612-305-7501

Zachary J. Crain
Direct Dial: 612-305-7725
Email: zcrain@nilanjohnson.com

June 10, 2022

<u>Via Email</u>
Marshall S. Ney
Friday Eldredge & Clark LLP
3350 South Pinnacle Hills Parkway
Suite 301
Rogers, AR 72758
mney@fridayfirm.com

**Re:    NILFISK, INC.**
**SPRINGDALE ARKANSAS**

Dear Mr. Ney:

I am writing in response to your June 2, 2022 letter in connection with the Industrial Building Lease (the "Lease") dated April 12, 2006, as amended, by and between Nilfisk (as successor to Alto U.S., Inc.) and your client Fort Worth Partners, LLC (as successor to FR Net Lease Co-Investment Program 5, LLC) ("FWP").  Capitalized terms herein shall have the meaning set forth in the Lease.

From the outset, I appreciate FWP's willingness to meet in person in your office next week. Nilfisk believes that cool heads working together can come to a mutually-beneficial, prompt and reasonable resolution.  I only write this letter to preserve Nilfisk's rights, and not to interfere with what I hope are productive discussions next week.

Nilfisk has been advised that the Premises is not a total loss, although it still qualifies as a Major Casualty under the Lease.  There is still a portion of the Premises that was relatively untouched by the tornado, and the remaining structure can be repaired and rebuilt.  It is my understanding that your client has not had a contractor or other professional inspect the Premises. Nilfisk can certainly arrange for such an inspection. Please just let me know who Nilfisk can coordinate that access with.  We expect this will be important for your client to be able to truly understand the cost of repairing the Premises.

Based on your client's rejection of the Event of Loss Purchase Offer, the Lease expires on August 1 (the next rental payment date that occurs not less than forty-five (45) days after the delivery of the Termination Notice).

Marshall S. Ney
Friday Eldredge & Clark LLP
June 10, 2022
Page 2

As mentioned in my May 20 letter to your client's previous counsel, Nilfisk denies that it is in default under the Lease.  Even if there was a default in obtaining insurance coverage, Section 20.2 of the Lease allows Nilfisk a period of 30 days from the date of notice to cure such default. That cure period expires July 3, but Section 20.2 allows Nilfisk additional time to continue diligently pursuing a cure.

Notwithstanding Nilfisk's denial that it is in breach of the Lease, and out of an abundance of caution, Nilfisk is in the process of obtaining additional insurance coverage for the Premises. Given the current physical condition of the Premises, we do not expect that such additional insurance coverage will be obtained prior to termination of the Lease on August 1, 2022, but Nilfisk will continue diligently pursuing such coverage.  The initiation of any litigation prior to August 1 would be premature under the Lease.

Once again, this letter is sent simply to reserve Nilfisk's rights.  Nilfisk is optimistic the parties will be able to establish a mutually-beneficial path towards resolution, including the prompt undertaking of construction of repairs of the Premises, during our meeting next week.

Sincerely,

Nilan Johnson Lewis PA

Zachary J. Crain

cc:     Katie Koehler, Esq.

4875-1330-9732

## THIRD AMENDMENT TO LEASE AGREEMENT

THIS **THIRD AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is made and entered into as to be effective the _____ day of October, 2021, by and between **FORT WORTH PARTNERS, LLC**, an Arkansas limited liability company ("Landlord"), and **NILFISK, INC.**, a Minnesota corporation ("Tenant") (Landlord and Tenant referred to herein separately as a "Party" and collectively as the "Parties").

**WHEREAS**, FR NET LEASE CO-INVESTMENT PROGRAM 5, LLC, a Delaware limited liability company ("Original Landlord") and ALTO U.S., Inc., a Delaware corporation ("Original Tenant") entered into a certain Industrial Building Lease dated as of April 12, 2006 (the "Original Lease"), as amended by that certain First Amendment to Lease dated as of June 12, 2015 between Original Landlord and Tenant (the "First Amendment"), which Lease was assigned by Original Landlord to Landlord and by Original Tenant to Tenant, under which Landlord is currently leasing to Tenant certain premises located at the Southwest corner of Highway 412 and Highway 265, Springdale, Arkansas, as more particularly described in the Lease (the "Premises");

**WHEREAS**, Landlord and Tenant subsequently amended and modified certain terms and conditions of the Original Lease, as amended by the First Amendment, by executing and entering into that certain Second Amendment to Lease Agreement, dated October 10th, 2017 (the "Second Amendment;" and collectively with the Original Lease and the First Amendment, the "Lease"); and

**WHEREAS**, Landlord and Tenant desire to amend, modify and revise the Lease in accordance with the terms and provisions set forth below.

**NOW THEREFORE**, for and in consideration of the forgoing premises and mutual promises and covenants of the parties hereto, as set forth herein and in the Lease, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Amendment to Lease. This Amendment does hereby amend, revise and modify the Lease only as follows:

(a)     Term. The term of the Lease is hereby extended for a period of twenty-four (24) months, unless sooner terminated pursuant to the terms of the Lease. The Expiration Date under the Lease shall be October 31, 2024.

(b)     Base Rent. The base rent for the Premises shall be $61,000 per month from October 31, 2021 until October 31, 2023, and $62,525 per month from October 31, 2023 until October 31, 2024. This provision does not amend or modify any additional rental obligations of Tenant under the Lease.

2.      Lease Commission. Upon the full execution and delivery of this Amendment, Landlord shall pay a leasing commission to Hughes Marino in an amount equal to 3% of the gross base rent for October 31, 2022 until October 31, 2024. Tenant warrants and represents that no

additional commissions are or may become due or owing with respect to the Lease or this Amendment. Tenant agrees to indemnify Landlord for any fees, costs, expenses or damages incurred by Tenant as a result of the inaccuracy or breach of this representation and warranty.

3.      No Assignment or Sublease. Tenant represents and warrants that Tenant currently occupies the Premises and Tenant has not transferred, assigned, or sublet any portion of the Premises nor entered into any license or concession agreements with respect thereto.

4.      No Defaults under Lease. The Parties acknowledge and agree as follows:

(a)     Tenant has accepted possession of the Premises, and any improvements required by the terms of the Lease have been completed to the full and complete satisfaction of Tenant.

(b)     All conditions of the Lease to be performed by Landlord necessary to the enforceability of the Lease have been satisfied and Landlord is not in default thereunder.

(c)     Tenant has not delivered any notice to Landlord regarding a default by Landlord thereunder.

(d)     Tenant has no knowledge of any fact that, with the passing of time or providing of notice, would constitute an event of default under the Lease.

(e)     As of the date hereof, there is no claim of setoff under the Lease or otherwise against rent or other charges due or to become due thereunder.

5.      Conflicts; Ratification. In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall supersede and control. The Lease, as amended by this Amendment, contains the entire agreement of the Parties and no representations, inducements, promises or agreements, oral or otherwise, between the Parties not embodied herein shall be of any force or effect. Except as herein modified and amended, all terms and conditions of the Lease, including but not limited to that certain attendant Guaranty of Lease executed by NILFISK HOLDING A/S, a Denmark corporation, in favor of Landlord, are incorporated herein and shall remain in full force and effect, and are hereby ratified and confirmed by Landlord and Tenant, and, by signing below, the named guarantor of the Lease.

6.      Miscellaneous.

6.1.    Definitions. All capitalized terms used herein shall have the meanings given to such terms in the Lease, except as further defined herein.

6.2.    Authority. Each of the Parties represents and warrants that such Party has full power and authority to execute and deliver this Amendment and to perform the respective obligations of such Party pursuant hereto. Each of the Parties has duly authorized the execution, delivery and performance of this Amendment and each person signing this Amendment is duly authorized and has all requisite authority to execute and deliver this Amendment on behalf of the Party for which such person is signing. This Amendment constitutes the valid and legally binding

obligations of the Parties enforceable in accordance with the provisions hereof. The invalidity of this Amendment with respect to any Party shall not affect this Amendment regarding any other Party.

6.3.    Modification and Waiver. This Amendment may not be changed, amended or modified in any respect whatsoever or any obligation contained herein be waived, except in writing signed by the Parties.

6.4.    Review; Construction of Agreement. Each Party acknowledges and agrees that, prior to the execution of this Amendment, such Party had an adequate opportunity to seek all desired legal or other professional advice in connection herewith and that each such Party has, to the satisfaction of such Party, obtained such legal and professional advice regarding this Amendment. The fact that one of the Parties to this Amendment may be deemed to have drafted or structured any provision of this Amendment shall not be considered in construing or interpreting any particular provision of this Amendment, either in favor of or against such Party. Whenever used herein, the singular number includes the plural, the plural the singular, and the use of any gender includes all genders. The paragraph headings are inserted for convenience of reference only and shall not be deemed to be a part of this Amendment.

6.5.    Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

6.6.    Governing Law. This Amendment shall be governed by and interpreted pursuant to the laws of the State of Arkansas without regard to principles of conflicts of laws that would require or permit the application of any other law.

6.7.    Successors and Assigns. The terms and provisions of this Amendment shall bind, and inure to the benefit of, the Parties and their respective successors and assigns.

6.8.    Severability. If any provision of this Amendment shall for any reason and to any extent be invalid or unenforceable, the remainder of this Amendment and the application of such provision shall not be affected thereby, but rather shall be enforced to the maximum extent possible.

6.9.    Entire Agreement. This Amendment and the Lease constitute the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior or contemporaneous agreements, whether written or oral. No covenants, agreements, terms, provisions, undertakings, statements, representations or warranties, whether written or oral, made or executed by any Party or any employee, representative or agent thereof, shall be binding upon any Party unless specifically set forth in the Lease or in this Amendment.

EXECUTED and DELIVERED to be effective of as of the day and year first above written.

**LANDLORD:**

**FORT WORTH PARTNERS, LLC,**

*Sarah Sparks Diebold*
Sarah Sparks Diebold, Manager

**TENANT:**

**NILFISK, INC.,**

By: _____

Name: _Carl Mosler_____

Title: _Director DC Operations, Americas_

Reviewed, affirmed, acknowledged, consented to and agreed to by:

**NILFISK HOLDING A/S**

By: _____

Name: _BIRGIT JESPERSEN_

Title: _SVP SUPPLY CHAIN_

4866-0438-6816.3                    4

# EXHIBIT R

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF ARKANSAS
### FAYETTEVILLE DIVISION

**FORT WORTH PARTNERS, LLC**                                    **PLAINTIFF**

      **VS.**                    **CASE NO. 5:22-cv-05181-TLB**

**NILFISK, INC. and**
**NILFISK HOLDING A/S, a**
**Danish Corporation**                                    **DEFENDANTS**

### DEFENDANTS' ANSWERS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendants, Nilfisk, Inc. and Nilfisk Holding A/S, a Danish Corporation (collectively, "Defendants" or "Nilfisk"), by and through their attorneys, for their Answers and Responses to Plaintiff, Fort Worth Partners, LLC's First Set of Interrogatories and Requests for Production of Documents, state as follows:

### SPECIFIC OBJECTION TO PLAINTIFF'S DEFINITIONS AND INSTRUCTIONS

Nilfisk objects to the definitions and instructions preceding Plaintiff's First Set of Interrogatories and Requests for Production of Documents. Through such definitions and instructions, Plaintiff improperly seeks to expand the scope of Federal Rule of Civil Procedure 26 and to impose obligations not otherwise required by law or rule. In responding to Plaintiff's First Set of Interrogatories and Requests for Production of Documents, Nilfisk does not waive any objection recognized under Arkansas law including those afforded under the attorney-client privilege and work product doctrines. Nilfisk further responds without prejudice to its right to produce evidence of any and all facts, to modify these responses if necessary, and to rely upon other facts that it may discover through additional investigation and/or discovery.

**INTERROGATORY NO. 1:** Please state the names, addresses, and telephone numbers of all persons known or believed to have any knowledge or information concerning the allegations or subject matter of the Complaint and for each such person, state what knowledge or information

1

they possess.

**ANSWER TO INTERROGATORY NO. 1:**  Objection. This interrogatory calls for Nilfisk to speculate as to the knowledge each individual identified below possesses. Subject to and without waiving its objection, Nilfisk states that the following individuals may have knowledge concerning the subject matter of Plaintiff's Complaint.

1.    Julie Patton, Head of Operational Finance, Americas, Nilfisk, Inc., who may be contacted through Nilfisk's counsel of record in this matter;

2.    Tammy Ketcher, Human Resources Business Partner for Nilfisk, Inc., who may be contacted through Nilfisk's counsel of record in this matter;

4.    Carl Mosier, former Director, DC Operations Americas for Nilfisk, Inc., whose last known address is 2460 Riverfront Lane, Fayetteville, AR 72703, and last known telephone number is 817-600-2551;

5.    Jonas Frokjaer-Jensen, former Vice President of Treasury and Insurance for Nilfisk A/S who may be contacted through Nilfisk's counsel of record in this matter;

6.    Laura Bethke, former Tax Director for Nilfisk, Inc., whose last known address is: 8027 Berkshire Lane N, Maple Grove, MN 55311, and last known telephone number is 763-420-9956;

7.    Tina Hansen, former Corporate Tax Director for Nilfisk, Inc., whose last known address is 20326 151st Street NW, Elk River, MN 55330, and last known telephone number is 612-991-6463; and

8.    Merry Cravens, Senior Associate - Client Service and Delivery for WTW, an insurance services provider for Nilfisk, who may be contacted through Nilfisk's counsel of record in this matter.

Please note that the contact information for Nilfisk's former employees is marked

2

CONFIDENTIAL in accordance with the terms of the Agreed Protective Order entered in this matter. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**INTERROGATORY NO. 2:** Please state the names, addresses, and telephone numbers of all persons whom you and/or your attorneys plan to call as witnesses at the trial of this cause, also stating the substance of the testimony expected from each such person.

**ANSWER TO INTERROGATORY NO. 2:** At this early stage in litigation, with discovery and Nilfisk's investigation into this matter ongoing, Nilfisk has not yet made a determination regarding each individual it may call as a witness at trial. However, Nilfisk anticipates it may call the individuals identified by either party throughout discovery. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**INTERROGATORY NO. 3:** Please state the names, addresses, and telephone numbers of all persons whom you and/or your attorneys plan to call as expert witnesses at the trial of this cause.

**ANSWER TO INTERROGATORY NO. 3:** At this early stage in litigation, with discovery and Nilfisk's investigation into this matter ongoing, Nilfisk has not yet made a determination regarding who it may call as an expert witness at the trial of this matter. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**INTERROGATORY NO. 4:** For each expert identified in the preceding Interrogatory, please provide the following:

(a)     The subject matter on which said expert witness is expected to testify;

(b)     The substance of all facts and opinions to which said witness is expected to testify; and

(c)     A summary of the grounds for each opinion.

**ANSWER TO INTERROGATORY NO. 4:** Nilfisk adopts and incorporates as if set

forth here in full its answer to Interrogatory No. 3.

**REQUEST FOR PRODUCTION NO. 1:**   If any person identified in your answers to Interrogatory Nos. 3 and 4 has prepared any written reports which contain his or her opinions and conclusions, please attach a copy of such written reports to your answers to these Interrogatories.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**  Objection. Nilfisk objects to this request for production to the extent is seeks draft reports protected under Federal Rule of Civil Procedure 26(b)(4). Subject to and without waiving its objection, Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 3.

**INTERROGATORY NO. 5:**  If any potential expert witness has formed opinions and conclusions but has not fully reduced them to writing, please state the following:

(a)    Each of the opinions and conclusions held by such experts which have not been fully reduced to writing; and

(b)    The factual basis for each such opinion or conclusion.

**ANSWER TO INTERROGATORY NO. 5:**   Objection. Nilfisk objects to this interrogatory to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 3.

**REQUEST FOR PRODUCTION NO. 2:**  Please produce a copy of the curriculum vitae for each expert witness whom you plan to have testify at any hearing or trial of this cause.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**   Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 3.

**REQUEST FOR PRODUCTION NO. 3:**  For each expert witness identified in response to Interrogatory Nos. 3 and/or 4, please produce any and all of each expert's notes (hand-written or typed), reports, computer-generated graphics, memorandum, literature relied upon, any

4

documents prepared by such experts in connection with his or her work on this case, and all documents provided to the expert witness by the Plaintiff or his attorneys and representatives in this case.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:** Objection. Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Nilfisk further objects to this request for production to the extent is seeks draft reports protected under Federal Rule of Civil Procedure 26(b)(4). Subject to and without waiving its objections, Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 3.

**REQUEST FOR PRODUCTION NO. 4:** For each expert witness identified in response to Interrogatory Nos. 3 and/or 4, please produce a copy of such expert's entire file for this matter.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:** Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 3.

**INTERROGATORY NO. 6:** Please identify and list separately each and every item of documentary evidence which you plan to offer at the trial of this case.

**ANSWER TO INTERROGATORY NO. 6:** At this early stage in litigation, with discovery and Nilfisk's investigation into this matter ongoing, Nilfisk has not yet made a determination regarding "each and every item of documentary evidence" it plans to offer at the trial of this case. However, Nilfisk anticipates that the documents or other tangible items identified by either party throughout discovery may be introduced at the trial of this matter. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**REQUEST FOR PRODUCTION NO. 5:** Please produce a copy of each document identified in your answer to the preceding Interrogatory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:** Nilfisk adopts and

5

incorporates as if set forth here in full its answer to Interrogatory No. 6.

**INTERROGATORY NO. 7:**  Please list separately each and every demonstrative aid, tangible item, photograph, videotape, or recording that you plan to use at the trial of this case.

**ANSWER TO INTERROGATORY NO. 7:**  At this early stage in litigation, with discovery and Nilfisk's investigation into this matter ongoing, Nilfisk has not yet made a determination regarding "each and every demonstrative aid, tangible item, photograph, videotape, or recording" it plans to use at the trial of this case. However, Nilfisk anticipates that the documents or other tangible items and photographs identified by either party throughout discovery may be introduced at the trial of this matter. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**INTERROGATORY NO. 8:**  Please identify list separately each and every effort that either Defendant made to obtain full replacement cost insurance, as described in the Complaint.

**ANSWER TO INTERROGATORY NO. 8:**  Objection. This request is an improper "contention" interrogatory to which Nilfisk need not respond or which must be held in abeyance until the completion of discovery. *See Helmert v. Butterball, LLC*, No. 4:08CV00342 JLH, 2010 WL 4537096, at *1 (E.D. Ark. Nov. 3, 2010); *Hanna v. Johnson*, 233 Ark. 409 (1961) ("In our view, the Arkansas Discovery Statutes were never intended to require a party answering interrogatories to write a complete essay relative to all of the allegations contained in a complaint."). Subject to and without waiving its objections, Nilfisk refers Plaintiff to the attached documents and communications.

**REQUEST FOR PRODUCTION NO. 6:**  Please produce all documents and communications that relate to your answer to the preceding Interrogatory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**    Nilfisk adopts and incorporates as if set forth here in full its answer and objections to Interrogatory No. 8. Subject to

and without waiving its objections, Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**INTERROGATORY NO. 9:**  Please identify the name, phone number, and address of each and every architect, engineer, builder, and other construction or restoration professional(s) you retained or communicated with in relation to the facts at issue in this case.

**ANSWER TO INTERROGATORY NO. 9:**  Objection. Nilfisk objects to this interrogatory to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk identifies the following individuals: Justin Gilmore, AIA, NCARB, Level 5 Architecture, 326 Holcomb St., Springdale, AR, 72764, 479-756-1661; Mark Hartmann, Senior Vice President, J.S. Held, LLC, 13200 Metcalf Avenue, Suite 265, Overland Park, KS, 66213, 913-444-6247; and Guillermo Ramirez, PhD, P.E., Principal Engineer, Envista Forensics, 22130 Merchants Way, Suite 150, Katy, TX 77449, 888-782-3473.

**REQUEST FOR PRODUCTION NO. 7:** Please produce all documents and written communications exchanged between you and such architect(s), engineer(s), builder(s), and other construction or restoration professional(s).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**  Objection. Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Further, Nilfisk objects to this request to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the documents produced with its Initial Disclosures. Nilfisk will supplement this response if necessary in accordance with applicable rules.

**REQUEST FOR PRODUCTION NO. 8:** Please produce all estimates you received for the cost to repair and/or replace the Building.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:** Objection. Nilfisk objects to this request to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the documents produced with its Initial Disclosures.

**INTERROGATORY NO. 10:** Please identify all insurance policies you maintained related to the Building.

**ANSWER TO INTERROGATORY NO. 10:** Objection. Nilfisk objects to this request in that it is overly broad, unduly burdensome and intended to harass and annoy in that it is not limited in scope, or manner. Subject to and without waiving its objections, Nilfisk states that it maintained State National Insurance Company, Inc., policy number RDN-21383-HPP at the time of the tornado. Further, Nilfisk refers Plaintiff to the attached policies, Bates labeled NILFISK-FWP-0116 - NILFISK-FWP-1206.

**REQUEST FOR PRODUCTION NO. 9:** Please produce a copy of each insurance policy identified in your answer to the preceding Interrogatory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:** Nilfisk adopts and incorporates as if set forth here in full its objections and answer to Interrogatory No. 10.

**INTERROGATORY NO. 11:** State whether there is an insurance policy (including umbrella type policies) in force which is covering you for this action. If so, state the name of the company, the policy number, and the limits of liability. Also, state whether you are being defended by your carrier under a reservation of rights.

**ANSWER TO INTERROGATORY NO. 11:** Nilfisk states no insurance policy is covering its defense of this case.

**REQUEST FOR PRODUCTION NO. 10:** Produce a copy of any insurance policies (including umbrella type policies) covering you for this action as well as a copy of the declaration

8

page to such policies.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**    Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 11.

**REQUEST FOR PRODUCTION NO. 11:** Produce a copy of any insurance quotes for the Property or Building that you did not accept.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**    Nilfisk states that it is not aware of any "insurance quotes for the Property or Building that [it] did not accept." Nilfisk will supplement this response if necessary in accordance with applicable rules.

**INTERROGATORY NO. 12:**  Please state the names, addresses, and telephone numbers of all insurance brokers and agents with whom you have consulted regarding the procurement or possible procurement of insurance for the Property or Building.

**ANSWER TO INTERROGATORY NO. 12:**    Nilfisk states that Willis Towers Watson Midwest, Inc. ("WTW") served as its insurance services provider related to the Property and Building. WTW's Minnesota office is located at 8400 Normandale Lake Blvd., Suite 1700 Bloomington, MN  55437, and its telephone number is 952-842-7000.

**REQUEST FOR PRODUCTION NO. 12:** Please produce all documents and written communications exchanged between you and such insurance brokers and agents regarding the procurement or possible procurement of insurance for the Property or Building.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**    Objection.    Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the attached documents and communications.

**REQUEST FOR PRODUCTION NO. 13:** Produce copies of any video recordings or

photographs you have that depict any part of the damage to the Property or Building following the tornado on or about March 30, 2022.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**  Objection. Nilfisk objects to this request to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the photographs included within the April 26, 2022 Envista Forensics Report, Bates labeled NILFISK-FWP-0069 through NILFISK-FWP-0102, and the photographs included within the Level 5 Architecture Assessment, Bates labeled NILFISK-FWP-0107 through NILFISK-FWP-0109, both of which were produced with Nilfisk's Initial Disclosures. Further, Nilfisk refers Plaintiff to the attached photographs, Bates labeled NILFISK-FWP-1207 - NILFISK-FWP-1208.

**INTERROGATORY NO. 13:**  Please identify the insurance policy that you received proceeds under in relation to the Building.

**ANSWER TO INTERROGATORY NO. 13:**  Nilfisk refers Plaintiff to policy number RDN-21383-HPP, Bates labeled NILFISK-FWP-0116 through NILFISK-FWP-0224, referenced in Nilfisk's Answer to Interrogatory No. 10.

**REQUEST FOR PRODUCTION NO. 14:**  Please produce all documents and communications that relate to or tend to support your answer to the preceding Interrogatory, including all communications and documents related to all insurance claims you submitted.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**  Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 13. Further, Nilfisk refers Plaintiff to the attached documents and communications.

**INTERROGATORY NO. 14:**  Please identify all documents, communications, and other evidence that tends to support or prove your allegation that portions of the Building can still be salvaged or reused.

10

**ANSWER TO INTERROGATORY NO. 14:**    Objection. Nilfisk objects to this interrogatory to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the April 26, 2022 Envista Forensics Report, produced with Nilfisk's Initial Disclosures, Bates labeled NILFISK-FWP-0069 through NILFISK-FWP-0102. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**REQUEST FOR PRODUCTION NO. 15:**  Please produce all documents that relate to or tend to support your answer to the preceding Interrogatory.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**  Objection. Nilfisk objects to this request to the extent it seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk adopts and incorporates as if set forth here in full its answer to Interrogatory No. 14.

**REQUEST FOR PRODUCTION NO. 16:**    Please produce all documents and communications you have exchanged with anyone (including internally) concerning the damage to the Property and/or the Building.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**  Objection. Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Nilfisk further objects to this request to the extent is seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the attached documents and communications. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**REQUEST FOR PRODUCTION NO. 17:**    Please produce all documents and communications you have exchanged with anyone (including internally) concerning your

insurance coverage for the damage to the Property and/or the Building.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:** Objection. Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the attached documents and communications. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

**REQUEST FOR PRODUCTION NO. 18:** Please produce all documents and communications you have exchanged with anyone (including internally) concerning the Lease.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:** Objection. Nilfisk objects to this request to the extent it seeks impressions of counsel and information protected by the attorney-client privilege, the work-product doctrine, or other similar doctrine. Nilfisk further objects to this request to the extent is seeks information related to non-testifying or consulting experts. Subject to and without waiving its objections, Nilfisk refers Plaintiff to the attached documents and communications. Nilfisk will supplement this answer if necessary in accordance with applicable rules.

Respectfully submitted,

Karen P. Freeman (Ark. Bar No. 2009094)
Colt D. Galloway (Ark. Bar No. 2016212)
**MITCHELL, WILLIAMS, SELIG
GATES & WOODYARD, P.L.L.C.**
4206 South J.B. Hunt Drive, Suite 200
Rogers, Arkansas 72758
(479) 464-5650
kfreeman@mwlaw.com
cgalloway@mwlaw.com

*Attorneys for Defendants Nilfisk, Inc. and Nilfisk
Holding A/S, a Danish Corporation*

12

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 17th day of March, 2023, I served the above document via electronic

mail upon the following:

Marshall S. Ney
Kael K. Bowling
FRIDAY, ELDREDGE & CLARK, LLP
mney@fridayfirm.com
kbowling@fridayfirm.com

*/s/Karen P. Freeman*
Karen P. Freeman

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**FORT WORTH PARTNERS, LLC**                                          **PLAINTIFF**

**VS.**                              **NO. 5:22-cv-05181-TLB**

**NILFISK, INC. and
NILFISK HOLDING A/S, a
Danish Corporation**                                          **DEFENDANTS**

## DEFENDANTS' EXPERT DISCLOSURES

Defendants Nilfisk, Inc, and Nilfisk Holding A/S, a Danish Corporation (collectively, "Nilfisk" or "Defendants"), by and through their attorneys, Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., and for their Expert Disclosures, state as follows:

## PRELIMINARY STATEMENT

Nilfisk provides theses expert disclosures subject to and without waiving its defenses, including, but not limited to, that Plaintiff Fort Worth Partners, LLC ("Plaintiff") has no damages resulting from its breach of contract claim related to Nilfisk's alleged failure to obtain sufficient "full replacement cost" insurance. Even if the Court concludes Plaintiff has plead recoverable damages, the rebuild estimate provided within Plaintiff's expert report is not the appropriate measure of damages for Plaintiff's alleged breach of contract claim under Arkansas law.

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Nilfisk hereby discloses the following testifying experts.

1.      D. Craig Evans, P.E.
        Principal Structural Engineer
        Ace Engineering, Inc.
        PO Box 21671 Little Rock, AR 72221

Mr. Evans' curriculum vitae and written report are attached and bates-labeled NILFISK-FWP-4025 through NILFISK-FWP-4177. Mr. Evans was compensated $4,400 for all work associated with the preparation of his report in this case and will be compensated at a rate of $200

per hour for any subsequent work or testimony in this case. All opinions expressed by Mr. Evans are to a reasonable degree of probability or certainty in his field of expertise.

2.    Jeff Marcussen
      Senior Preconstruction Specialist
      Nabholz Corporation
      1718 Aldersgate Rd
      Little Rock, AR 72205

Mr. Marcussen's curriculum vitae, and written report are attached and bates-labeled NILFISK-FWP-4092 through NILFISK-FWP-4143. Mr. Marcussen will be compensated at a rate of $250 per hour for work and any testimony in this case. Mr. Marcussen has not previously testified as an expert witness. All opinions expressed by Mr. Marcussen are to a reasonable degree of probability or certainty in his field of expertise.

As discovery is still ongoing, it may be necessary for the experts disclosed above to review additional documents and materials. Accordingly, each disclosed expert reserves the right to supplement his expert report, and Nilfisk reserves the right to supplement these expert disclosures, if necessary, in accordance with applicable rules.

<div style="margin-left: 40%;">

Respectfully submitted,

Karen P. Freeman (Ark. Bar No. 2009094)
Emily Milholen McCord (Ark. Bar No. 2009164)
Colt D. Galloway (Ark. Bar No. 2016212)
**MITCHELL, WILLIAMS, SELIG**
**GATES & WOODYARD, P.L.L.C.**
4206 South J.B. Hunt Drive, Suite 200
Rogers, Arkansas  72758
(479) 464-5650
kfreeman@mwlaw.com
cgalloway@mwlaw.com

*Counsel for Defendants Nilfisk, Inc. and Nilfisk*
*Holding A/S, a Danish Corporations*

</div>

## **CERTIFICATE OF SERVICE**

I certify that on the 7th day of August, 2023, I served the above document via electronic

mail upon the following:

Marshall S. Ney
Kael K. Bowling
FRIDAY, ELDREDGE & CLARK, LLP
mney@fridayfirm.com
kbowling@fridayfirm.com

*/s/Karen P. Freeman*
Karen P. Freeman

# EXHIBIT S

**From:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>
**Sent:** Monday, February 28, 2022 8:07 AM CST
**To:** Julie Patton <jpatton@nilfisk.com>
**CC:** Giang Hilberg <ghilberg@nilfisk.com>
**Subject:** RE: Insurance renewal information - deadline 22. February 2022
**Attachment(s):** "Copy of Group 2022_2023 Renewal form template_US.xlsx"

Ok, then my file must have been incorrect.

Regarding Springdale – I will move the 869.100 from building to lease improvements. Like the attached.

*Best regards*

**Jonas Frøkjær-Jensen**
*Vice President Treasury & Insurance*
*Phone +45 2240 0622*

---

**From:** Julie Patton <jpatton@nilfisk.com>
**Sent:** 28. februar 2022 15:03
**To:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>
**Cc:** Giang Hilberg <ghilberg@nilfisk.com>
**Subject:** RE: Insurance renewal information - deadline 22. February 2022

We did include the $5m in prior years, for Morgantown – I think we missed it for BPK.

Springdale is $5m for the physical building per the lease and the remainder is for the equipment and machinery we have installed.

Thanks.
Julie

**Julie Patton**

Office:  763-745-3724 | Mobile: 702-467-3322 | jpatton@nilfisk.com  |  nilfisk.us

---

**From:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>
**Sent:** Monday, February 28, 2022 7:47 AM
**To:** Julie Patton <jpatton@nilfisk.com>
**Cc:** Giang Hilberg <ghilberg@nilfisk.com>
**Subject:** RE: Insurance renewal information - deadline 22. February 2022

Morning Julie

Thanks for submitting the renewal values. Giang and I am just consolidation the values now and I have a question regarding the USD 5m insurance coverage mandated for building that you have added to Morgantown & Brooklyn Park. I don't recall these from the past, are they new or just discovered for this renewal?

Also for the Springdale property – we have the 5mUDS obligation for the property, but you are reporting 5.869.100 USD – why insure more than 5mUSD?

*Best regards*

**Jonas Frøkjær-Jensen**
*Vice President Treasury & Insurance*
*Phone +45 2240 0622*

---

**From:** Julie Patton <jpatton@nilfisk.com>
**Sent:** 17. februar 2022 16:30
**To:** Giang Hilberg <ghilberg@nilfisk.com>
**Cc:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>
**Subject:** RE: Insurance renewal information - deadline 22. February 2022

Giang, please see attached – let me know if you have any further questions.

Thanks.
Julie

**Julie Patton**

Office:  763-745-3724 | Mobile: 702-467-3322 | jpatton@nilfisk.com  |  nilfisk.us

---

**From:** Giang Hilberg <ghilberg@nilfisk.com>

**Sent:** Thursday, February 17, 2022 4:01 AM
**To:** Julie Patton <jpatton@nilfisk.com>
**Subject:** FW: Insurance renewal information - deadline 22. February 2022

Dear Julie,

Could you be able to help filling in the information to the template " 2022_2023 Renewal form template " attached ?
I have gone through the file that you sent to me , but It includes many information and I don't know exactly which information I should take from that. It would be helpful if you could help to fill in the form.

I also attach here the similar report that you sent last year for your reference .

Thank you very much,

Best regards/ Med venlig hilsen

**Giang Hilberg**
Treasury Manager

Nilfisk A/S  |  Group Treasury & Insurance  |  Kornmarksvej 1  |  2605 Brøndby  |  Denmark  |
Cell: +45 22467369|  ghilberg@nilfisk.com  |  www.nilfisk.com



---

**From:** Julie Patton <jpatton@nilfisk.com>
**Sent:** 14. februar 2022 15:39
**To:** Giang Hilberg <ghilberg@nilfisk.com>
**Cc:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>
**Subject:** RE: Insurance renewal information - deadline 22. February 2022

Giang, this is what we provided to the US insurance broker for our renewals.  The boiler and machinery tab has our physical locations – the business interruption income is provided by Jonas, usually in March.

Thanks.
Julie

**Julie Patton**

Office:  763-745-3724 | Mobile: 702-467-3322 |  jpatton@nilfisk.com  |  nilfisk.us

---

**From:** Giang Hilberg <ghilberg@nilfisk.com>
**Sent:** Monday, February 14, 2022 2:02 AM
**To:** Gary Edmondson <GEdmondson@nilfisk.com>; Mona Pedersen <monpedersen@nilfisk.com>; Stefan Renner <frenner@nilfisk.com>; Metin Duman <mduman@nilfisk.com>; Anne Li <anli@nilfisk.com>; Camilo Marinho <cmarinho@nilfisk.com>; Julie Patton <jpatton@nilfisk.com>; Mary Lou Acuna <MAcuna@hydrotek.us>; Dorthe Rigtrup <DFRigtrup@nilfisk.com>; Michael Jensen <mojensen@nilfiskfood.com>; Peter Winthereik <pwinthereik@nilfisk.com>
**Cc:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>; Carsten Bankel <cbankel@nilfisk.com>
**Subject:** FW: Insurance renewal information - deadline 22. February 2022

Dear all,

I would be very much appreciated if you could help to remind entities to send the Insurance Renewal Information to me by the **22 February, 2022**.

So far I have received from Nilfisk Greece.

Thank you very much and have a nice day.

Best regards/ Med venlig hilsen

**Giang Hilberg**
Treasury Manager

Nilfisk A/S  |  Group Treasury & Insurance  |  Kornmarksvej 1  |  2605 Brøndby  |  Denmark  |
Cell: +45 22467369|  ghilberg@nilfisk.com  |  www.nilfisk.com

**CONFIDENTIAL**

**From:** Giang Hilberg
**Sent:** 28. januar 2022 13:42
**To:** Gary Edmondson <GEdmondson@nilfisk.com>; Mona Pedersen <monpedersen@nilfisk.com>; Anne Li <anli@nilfisk.com>; Camilo Marinho <cmarinho@nilfisk.com>; Julie Patton <jpatton@nilfisk.com>; Mary Lou Acuna <MAcuna@hydrotek.us>; Dorthe Rigtrup <DFRigtrup@nilfisk.com>; Michael Jensen <mojensen@nilfiskfood.com>; Peter Winthereik <pwinthereik@nilfisk.com>
**Cc:** Jonas Froekjaer-Jensen <jfjensen@nilfisk.com>; Carsten Bankel <cbankel@nilfisk.com>; Tracy Fowler <tfowler@nilfisk.com>; Benjamin Blunck <bblunck@Nilfisk.com>; Reinhard Mayer <rmayer@nilfisk.com>; Dongping Guo <dguo@nilfisk.com>
**Subject:** Insurance renewal information - deadline 23. February 2022

**Dear All,**

Nilfisk's insurance agreements are up for renewal 1. April 2022 and we need to provide updated renewal information consisting of all addresses with Nilfisk values – to ensure we have correct and adequate insurance coverage in place.

Renewal information needs to be submitted to our insurers beginning of March enable them to submit renewal offers and start issuing the needed policies for the new insurance period April 2022 to March 2023.

Most insurance agreements are based on budget revenue, which will be submitted centrally, however for our Property All Risk insurance we will require information and help to submit updated renewal information.

I kindly ask that the following individuals coordinate that all relevant employees receive this request – just forward the message and keep me cc.:

**Gary Edmondson – all European SAP sales entities**
**Mona Pedersen, Stefan Renner & Metin Duman – all European non-SAP sales entities**
**Anne Li – all APAC sales entities**
**Camilo Marinho – all LATAM sales entities**
**Julie Patton – US shared service**
**Mary Lou – HPW (Hydrotek & Pressure Pro)**
**Dorthe Rigtrup – Consumer**
**Michael Jensen – Nilfisk Food**
**Peter Winthereik – all Operations entities (Production and Distribution)**

Please see the attached:
- 2022_2023 Renewal form template, use this template to report renewal information. In the file there is also an explanation over how to complete the renewal form.
- Nilfisk values 2021 _2022– expiring term, includes values reported last year (changes reported during the year may not be fully reflected in the file)

Thank you for your help with this request and please ensure that information is sent to me, in line with the finance calendar,  **deadline 22. February 2022.**

If you have questions or comments feel free to revert to me.


Best regards/ Med venlig hilsen

**Giang Hilberg**
Treasury Manager
Nilfisk A/S  |  Group Treasury & Insurance  |  Kornmarksvej 1  |  2605 Brøndby  |  Denmark  |
Cell: +45 22467369|  ghilberg@nilfisk.com  |  www.nilfisk.com



**CONFIDENTIAL**