IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

FORT WORTH PARTNERS, LLC                                               PLAINTIFF

V.                              CASE NO. 5:22-CV-05181

NILFISK, INC. and
NILFISK HOLDING A/S,
a Danish Corporation                                                  DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case arises from a lease between Plaintiff Fort Worth Partners, LLC ("FWP") and Defendants Nilfisk, Inc. and Nilfisk Holding A/S, a Danish Corporation (collectively, "Nilfisk") of a building that was severely damaged by a tornado. On February 20, 2024, the case came before the Court for a final pre-trial conference. At that time, the Court made a number of rulings related to the following pending motions, which are fully briefed and ripe for review: Nilfisk's Motion to Exclude the Testimony of Andre Slintak and Kevin McMahon (Doc. 41) ("Nilfisk's *Daubert* Motion"); FWP's Motion for Summary Judgment (Doc. 33); and Nilfisk's Motion for Summary Judgment (Doc. 36). This Order memorializes those rulings. To the extent anything in this Order differs from the Court's rulings from the bench, this Order shall control. For the reasons that follow, Nilfisk's *Daubert* Motion is **DENIED**; FWP's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**; and Nilfisk's Motion for Summary Judgment is **DENIED**.

## I.  BACKGROUND

### A.  Factual Background

The following facts are undisputed. This matter concerns a lease agreement (the "Lease") between Nilfisk and FWP for a commercial building located at 979 E. Robinson

Ave., in Springdale, Arkansas (the "Building"). The Building is an approximately 200,000 square foot warehouse-style building, which is comprised of two approximately 100,000-square-foot sections, the eastern section and western section. On March 30, 2022, an EF-3 tornado touched down in Springdale and damaged the Building. All 100,000 square feet of the western section and 40,000 square feet of the eastern section collapsed. The portion of the eastern section that remained standing was damaged.

Under the Lease, FWP owned the Building (and the property on which it sits) and was the lessor; Nilfisk, Inc. was the sole tenant; and Nilfisk Holding A/S, a Danish Corporation was the sole guarantor. The Lease includes four parts: an Industrial Lease Agreement for the Building (the "Original Lease") (Doc. 2-1) and three amendments (Docs. 2-2, 2-3, 2-4). FWP and Nilfisk were not parties to the Original Lease. Nilfisk, Inc. became tenant under the First Amendment in 2015; FWP purchased the Building and became successor in interest to the Original Lease and First Amendment on May 17, 2016; and Nilfisk Holding A/S became guarantor under the Second Amendment in 2017. The parties agreed to triple-net lease terms: In addition to rent and utilities, Nilfisk was obligated to pay for all property-related expenses, including real estate taxes, fire and casualty insurance, and all maintenance and repairs.

By its own terms, the Lease is governed by Arkansas law, "the state in which the Premises is located." (Doc. 2-1, p. 19). Two terms of the Lease are most important to the case at bar: Sections 10.2 and 18.3. Section 10.2 imposes an obligation on the tenant to maintain commercial property insurance:

> **10.2. Coverage Amounts.** Tenant shall purchase and maintain, throughout the Term, a Tenant's Policy(ies) of (i) "all-risk" commercial property insurance covering the improvements constructed, installed or located on the Premises (but excluding Tenant's Property) against all loss

or damage caused by fire, ice, hurricane, windstorm and such other risks of physical loss or damage as are covered by a causes of loss special form insurance policy, which coverage shall, at all times, be in an amount equal to one hundred percent (100%) of the then "full replacement cost" of the Premises subject to a deductible not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) ("**Full Replacement Cost**" shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade) . . . .

(Doc. 2-1, p. 9 (the "Full Replacement Cost Insurance Obligation")). Section 18.3

provides, *inter alia*, a termination procedure which is triggered by a Major Casualty:

**18.3.1.** If a (i) Casualty, (ii) Condemnation, or (iii) Material Temporary Taking shall affect all or a substantial portion of the Premises, and:

**18.3.1.1.** [I]n the case of a Casualty, such Casualty shall be deemed a "total loss" for insurance purposes or shall be determined to be a loss of such dimension that the Premises cannot be completely restored or rebuilt within two hundred seventy (270) days computed after the hypothetical date of commencement of such construction (a "**Major Casualty**") . . .

then Tenant may, at its option, exercisable not later than sixty (60) days after the date of such Major Casualty or Condemnation, deliver to Landlord (A) notice (a "**Termination Notice**") of its intention to terminate this Lease on the next rental payment date that occurs not less than forty five (45) days after the delivery of such notice (the "**Termination Date**") . . . (C) in the case of a Major Casualty, (x) the certificate of an architect licensed in the state in which the Premises is located stating that the architect has determined, in its good faith judgment, that the Premises cannot be completely restored or rebuilt for continued use and occupancy in Tenant's business within a building construction period of two hundred seventy (270) days computed from the hypothetical date of commencement of such construction or (y) written confirmation from the issuer of the applicable insurance policy that it will treat the damage to the Building or Buildings as a "total loss"; and (D) an irrevocable offer (a "**Event of Loss Purchase Offer**") by Tenant to Landlord to purchase the Premises on the Termination Date.

If Landlord shall reject the Event of Loss Purchase Offer by written notice given to Tenant not later than fifteen (15) days prior to the Termination Date, this Lease shall terminate on the Termination Date, except with respect to obligations and liabilities of Tenant or Landlord hereunder, actual or contingent, which have arisen on or prior to the Termination Date . . . .

3

*Id.* at pp. 14.

Nilfisk maintained property insurance policies on the Building from 2016 to 2022, renewed annually. FWP received certificates of each annual policy from Nilfisk. Although the amount of property insurance Nilfisk obtained on the Building varied from 2016 to 2022, Nilfisk never obtained more than $10 million in property insurance on the Building in any year during its Lease of the Building. Prior to the tornado, FWP received a 2021-2022 certificate of property insurance for the Building, which was the certificate outlining the amount of coverage on the Building when the tornado struck in March 2022. That amount was $5,149,999.

After the tornado struck, Nilfisk's insurer assessed the damage to the Building, evaluated the estimated cost to repair it, and ultimately paid out the policy limits under the 2021-2022 property insurance policy: $5,149,999.00. In August 2022, Nilfisk paid FWP a total of $5,292,427.32, which included all of the property insurance proceeds Nilfisk received related to the damage to the Building, and vacated the Building on or about August 1, 2022.

### B.  Procedural Background

FWP filed its Complaint (Doc. 2) on September 6, 2022, bringing a breach of contract claim against Nilfisk under the Lease. The Complaint alleges that Nilfisk breached Section 10.2's Full Replacement Cost Insurance Obligation, improperly "exercise[d] their casualty, termination, and purchase offer rights under the Lease," and vacated "the Building prior to the expiration of the term" of the Lease. (Doc. 2, ¶ 25).

FWP seeks damages for (1) the difference between the cost to replace the Building (less footings, foundations, and other structures below grade) and the $5,292,427.32 paid by or on behalf of Nilfisk in August 2022, and (2) the unpaid rent Nilfisk owes from August

2022, when Nilfisk vacated the Building, to October 2024, the expiration date of the Lease. (Doc. 2-4, p. 1). On August 1, 2023, FWP filed a Motion to amend its Complaint (Doc. 25) to include a new theory of breach under Section 18.1 of the Lease. The Court denied that Motion (Doc. 32), finding that it was not timely and did not satisfy Fed. R. Civ. P. 16(b).

The parties filed their cross-motions for summary judgment on October 30, 2023, and Nilfisk filed its *Daubert* motion that same day. There are two additional liminal motions pending that are not addressed in this Order (Docs. 72 & 74). This matter is scheduled for a bench trial on February 26, 2024.

## II.  NILFISK'S *DAUBERT* MOTION

Nilfisk argues that testimony from FWP's experts Andre Slintak and Kevin McMahon should be stricken as irrelevant and inadmissible. Slintak is a licensed engineer and McMahon is a professional estimator. Slintak and Mahon both contributed to FWP's June 9, 2023 Engineering Evaluation Report (the "Report") (Doc. 33-1. pp. 69–203); Slintak evaluated the damage and reparability of the Building, and McMahon estimated the cost to rebuild it.

In the Report, Slintak and McMahon concluded that the Building "cannot be repaired" due to damage to its foundation, and that the entirety of the Building "must be demolished in order to be reconstructed." *Id.* at p. 85. Slintak and McMahon initially estimated replacement cost value of the Building to be $27,722,974.03, and later revised their estimate to $27,547,056.13 after deducting costs for footings, foundations, and other

materials below grade as well as associated profit and overhead pursuant to Section 10.2.

(Doc. 33-1, pp. 86, 464–65).

## A. Legal Standard

The decision whether to exclude expert testimony is committed to a district court's

discretion, subject to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead*

*Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014). Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if: (a) the expert's scientific, technical, or other specialized knowledge will
> help the trier of fact to understand the evidence or to determine a fact in
> issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

The Eighth Circuit applies these elements through a three-part test:

> First, evidence based on scientific, technical, or other specialized
> knowledge must be useful to the finder of fact in deciding the ultimate
> issue of fact. This is the basic rule of relevancy. Second, the proposed
> witness must be qualified to assist the finder of fact. Third, the proposed
> evidence must be reliable or trustworthy in an evidentiary sense, so that,
> if the finder of fact accepts it as true, it provides the assistance the finder
> of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir.

2008)).

It follows that the proponent of expert testimony bears the burden of showing by a

preponderance of the evidence that the above requirements are satisfied; however,

"[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor

of admissibility." *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir.

2006). Proponents of an expert need not show that their expert's assessment is correct,

only that it is reliable—a lower standard. Fed. R. Civ. P. 702 advisory committee's note to

6

2000 amendment. When assessing the validity of scientific information in particular, the trial court may consider one or more of the following non-exclusive factors: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted [in the relevant scientific community]." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)). A district court possesses broad discretion in making its reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

## B. Discussion

Turning first to relevance, Nilfisk argues that Slintak's and McMahon's opinions regarding rebuilding are irrelevant "because they do not bear on any actual claim asserted in this case." (Doc. 42, p. 6). In support of this argument, Nilfisk quotes Slintak's deposition testimony, in which he repeatedly referred to basing the Report's conclusion that repair was not feasible on an "overlying specification" that "the structure was to be returned to its preloss condition." (Doc. 41-4, pp. 4–5). Slintak opined that "performing a substantial number of isolated repairs or rehabilitations around the perimeter and the interior of the slab" would "create[e] a condition which didn't exist there prior." *Id.* at p. 4.

Nilfisk argues that the "overlying specification" to which Slintak referred was Section 18.1 of the Lease and that, because FWP did not plead its breach of contract claim under that Section, Slintak's testimony is irrelevant for lack of "fit" to the claim. This argument does not carry water. Slintak stated in his deposition that he had not personally seen the Lease's requirements and that it was not his role to interpret leases or contracts.

7

*Id.* at p. 5. And while it may be true that FWP's breach of contract claim was brought under Section 10.2, it is a basic tenet of contract law that "different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible." *Tyson Foods, Inc. v. Archer*, 147 S.W.3d 681, 685–86 (Ark. 2004) (citing *Continental Cas. Co. v. Davidson*, 463 S.W.2d 652 (Ark. 1971)).

Slintak's and McMahon's testimony speaks to the issue of damages. The operative measure of damages here is "the difference between the amount of insurance on the property and . . . the property's replacement cost." *DWB, LLC v. D&T Pure Trust*, 550 S.W.3d 420, 431 (Ark. Ct. App. 2018). That measure requires FWP to establish the Building's replacement cost, as defined in Section 10.2—and that is precisely what Slintak and McMahon endeavored to do with their estimate. Regardless of whether their opinions are deemed credible at trial, their estimate is certainly relevant under the damages standard.

Next, Nilfisk argues that Slintak's and McMahon's testimony is inadmissible because FWP cannot recover the amount to fully rebuild the Building under Arkansas law. Here, Nilfisk essentially restates its inflated damages arguments from its Motion for Summary Judgment. For the reasons laid out in subsection III.B.2.d, *infra* (discussing Nilfisk's inflated damages arguments), the Court declines to strike Slintak and McMahon's testimony on those grounds. Accordingly, the Court finds that FWP's experts' testimony is relevant and admissible. Nilfisk's *Daubert* Motion is **DENIED**.

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla  of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby, Inc.,* 477 U.S. at 248).

Where, as here, the parties have filed cross-motions for summary judgment, this same standard applies. But each motion must be reviewed in its own right, with each side

"entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *see also Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998).

## B. Discussion

In its Motion for Summary Judgment, FWP urges the Court to find on the undisputed facts that Nilfisk breached Section 10.2 of the Lease by failing to procure and maintain an "all-risk" commercial property insurance policy as required by the Full Replacement Cost Insurance Obligation, and that FWP is entitled to damages as a result. Specifically, FWP argues that it is owed:

> a total of $23,919,928.81, which comprises $27,547,056.13 for the cost to replace the Building (less footings, foundations, and other structures below grade, and associated profit and overhead), plus $915,000 (the amount of base rent from August 2022 through October 31, 2023, i.e.15 months), plus $750,300 (the annual rent for October 31, 2023 through October 31, 2024, i.e. 12 months) less the Partial Payment [$5,292,427.32].

(Doc. 33, ¶ 4).

Nilfisk's Motion advances four arguments for summary judgment: that FWP's claim is barred by (1) the applicable statute of limitations and (2) the doctrine of avoidable consequences, (3) that Section 10.2 of the Lease is an unenforceable agreement to agree, and (4) that FWP's damages claim is inflated and unavailable under Arkansas law. In its Response to FWP's Motion, Nilfisk raises several more rebuttal arguments, most importantly that Nilfisk properly terminated the Lease and that genuine issues of material fact preclude summary judgment for FWP.

To streamline its analysis, the Court will first consider FWP's breach and damages argument and Nilfisk's rebuttal arguments in subsection III.B.1, below. Then, in subsection III.B.2, the Court will consider Nilfisk's four arguments for summary judgment.

### 1. FWP's Motion for Summary Judgment

#### a. Liability for Breach

The first issue raised by FWP's Motion for Summary Judgment is whether Nilfisk breached the Lease by failing to comply with Section 10.2's Full Replacement Cost Insurance Obligation. In Arkansas, to prove common law breach of contract, a Plaintiff must show: "(1) an enforceable contract exists, (2) the defendant has a duty under the contract, (3) the defendant violated that duty, and (4) the plaintiff was damaged." *Smith v. S. Farm Bureau Cas. Ins. Co.*, 18 F.4th 976 (8th Cir. 2021). "When performance of a duty under a contract is contemplated, any non-performance of that duty is a breach." *Zufari v. Architecture Plus*, 323 Ark. 411, 420 (1996) (citing Restatement (Second) of Contracts § 235 (2) (1981)).

Here, it is undisputed that the Lease is an enforceable contract between FWP and Nilfisk. And for the reasons laid out in subsection III.B.2.c, *infra*, the Court finds as a matter of law that the language of Section 10.2 bound Nilfisk to an unambiguous, reasonably certain, and thus enforceable, duty to comply with the Full Replacement Cost Insurance Obligation.

Moreover, the undisputed facts show that Nilfisk breached its duty under the Full Replacement Cost Insurance Obligation. The parties do not dispute that the amount of property insurance on the Building on March 30, 2022 was $5,149,999. At least three estimates have been furnished by the parties as to the cost of rebuilding or repairing the Building in a manner that complies with Section 10.2. FWP's expert witnesses estimate the cost to rebuild the Building to be $27,547,056.13, accounting for deductions for the costs for footings, foundations, and other materials below grade, as well as the associated

profit and overhead. (Doc. 33-1, pp. 86, 464–65). For the purpose of rebuttal, Nilfisk's experts estimate the approximate cost to repair the Building to be $14,253,578. (Doc. 51-17, p. 10). Nilfisk also points the Court to an estimated replacement cost value of $9,428,939.87, which was calculated by its insurer in April 2022. *See* Doc. 51, p. 4; Doc. 36-23, pp. 1, 36. FWP responds that the insurer's low estimate is inadmissible hearsay—but the Court need not decide that issue now. Reviewing these facts in the light most favorable to Nilfisk leads the Court to conclude that even under the lowest (contested) estimate of the Building's replacement cost value, $9.4 million, Nilfisk was underinsured by more than $4 million, thus damaging FWP in at least that amount. *DWB, LLC v. D&T Pure Trust*, 550 S.W.3d 420, 431 (Ark. Ct. App. 2018) (finding that where a tenant has a replacement cost insurance obligation and then underinsures that obligation, the measure of damages is "the difference between the amount of insurance on the property and . . . the property's replacement cost"). For these reasons, the Court finds that Nilfisk breached Section 10.2's Full Replacement Cost Insurance Obligation as a matter of law.

### b. Materiality of Breach

The second issue is whether Nilfisk's breach was material, thus discharging FWP from its obligations under the Lease. Generally, "the failure of one party to perform his contractual obligations releases the other party from his obligations." *Taylor v. George*, 92 Ark. App. 264, 272 (2005) (collecting cases). But "for one party's obligation to perform to be discharged, the other party's breach must be material." *Id.* at 272–73. If the breach "'is not so material as to discharge the other party's duty of performance, the latter's only remedy is damages for the partial breach.'" *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 307 (1985) (quoting Corbin, Contracts, § 1253 (1962)). "A material breach is a

failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party." *Spann v. Lovett & Co*., 2012 Ark. App. 107, 21 (2012). "An influential circumstance in the determination of the materiality of a failure fully to perform a contract is the extent to which the injured party will obtain the substantial benefit that he reasonably anticipated." *Taylor*, 92 Ark. App. at 273 (citing *TXO Prod. Corp.* 287 Ark. 304 (1985)).

Here, the Court finds that Nilfisk's breach was material for two reasons. The first is that, as FWP argues in its Motion, the full cost of replacing the Building after loss from a tornado is clearly a "substantial benefit"; under any of the replacement cost estimates advanced by the parties in this case, the replacement cost value of the Building was several million dollars. And the express language of Section 10.2 makes clear that it was reasonable for FWP to anticipate it would receive that benefit in the event of a loss like a tornado. *See* Doc. 2-1, p. 9 ("Tenant shall purchase and maintain . . . 'all-risk' commercial property insurance . . . against all loss or damage caused by . . . windstorm . . . which coverage shall . . . be in an amount equal to . . . the then 'full replacement cost' of the Premises . . ."). The allocation of risk is a substantial, material benefit under any lease of a valuable property asset like the Building at issue here.

The second reason Nilfisk's breach was material is that it cut short the monies required to restore the Building. As a result, the Building could not continue to operate as a commercial property, and FWP could not relet it. In this sense, Nilfisk's breach of the Full Replacement Cost Insurance Obligation prevented both parties from "curing" the damage that prohibited them from benefiting from the Building's commercial value as landlord and lessee—Nilfisk prolonged the damage to the Building by stymying its repair

or replacement. Because the Court finds that Nilfisk's breach of the Full Replacement Cost Insurance Obligation was material as a matter of law, the breach released FWP from further obligations under the Lease.

### c. Damages

The final issue is damages. "The underlying purpose in awarding damages for breach of contract is to place the injured party in as good a position as he would have been in had the contract been performed." *Cook v. Cook*, 378 S.W.3d 275, 289 (Ark. Ct. App. 2010). Here, damages related to Nilfisk's breach of the Full Replacement Cost Insurance Obligation and damages from unpaid rent are required to place FWP in that position. The Court's analysis begins with the former.

Under *DWB, LLC*, the measure of damages where a tenant fails to meet a replacement cost insurance obligation is "the difference between the amount of insurance on the property and . . . the property's replacement cost." 550 S.W.3d at 431. Here, the amount of insurance Nilfisk held on the property, $5,149,999, is undisputed. But the Building's replacement cost is contested; most critically, through conflicting expert witness testimony. FWP's estimate is nearly twice as much as Nilfisk's, primarily because the parties' dueling experts disagree about whether the Building can be repaired or must be rebuilt entirely. In any event, the Court finds the matter of the cost to repair or replace the building to be inappropriate for summary judgment. The Court also declines to strike either side's expert testimony prior to trial.[1]

---

[1] FWP attacked Nilfisk's experts' methodology in its Motion for Summary Judgment, rather than filing a *Daubert* motion. The Court has considered FWP's arguments and declines to strike Nilfisk's expert testimony here.

Next, the Court turns to the issue of damages for unpaid rent. As Nilfisk points out, "Plaintiff's claim regarding Nilfisk's termination of the Lease is entirely dependent upon its breach claim related to insufficient insurance coverage." (Doc. 51, p. 18). Pursuant to the Court's finding that Nilfisk materially breached Section 10.2 by failing to comply with the Full Replacement Cost Insurance Obligation, FWP was released from the casualty, termination, and purchase offer rights allocated to Nilfisk under Section 18.3 when Nilfisk vacated the property on or about August 1, 2022. Consequently, Nilfisk's termination of the Lease through that process was improper: FWP was no longer bound by its obligations under the Lease after Nilfisk's material breach.

> The traditional view, under common law, gives a landlord three options when a lessee abandons the premises: 1) he may refuse to accept abandonment, let the premises lie idle, and sue the tenants as the rent matures; 2) accept the keys as a surrender of possession, thereby terminating the lease and reenter on his own account; or 3) reenter and relet for the tenant's account and hold the tenant liable for any difference in the agreed rent and that of the new tenant.

*Weingarten/Arkansas, Inc. v. ABC Interstate Theatres, Inc.*, 306 Ark. 64, 67 (1991) (citing *Grayson v. Mixon*, 5 S.W.2d 312 (1928)).

Here, only the first option is available to FWP because the tornado rendered the Building unusable and Nilfisk's breach prevented the parties from replacing it. Under the general rule, FWP would be entitled in this case to the unpaid rent from August 2022 until trial, set for February 2024, and to file subsequent lawsuits for the remaining months' rent until the Lease's expiration date, October 31, 2024. *See Advance Food Servs., Inc. v. Cooper Realty Invs., Inc.*, 2002 WL 31019349, at *4 (Ark. Ct. App. Sept. 11, 2002) (citing *Grayson*, 5 S.W.2d 312, 314–15 (1928)) (holding that "either multiple suits for each month's rent or one suit at the end of the lease term were contemplated by the first common-law option"). However, given the Court's rulings from the bench, the parties

15

agreed in the pretrial conference that because the Building will not be replaced until after the Lease's termination date, the end date for FWP's damages for unpaid rent extends through October 2024.

As the Court discusses further in subsection III.B.2.b, *infra*, the Court would ordinarily turn next to the question of whether FWP complied with its general duty to mitigate damages. But Arkansas imposes no such duty on landlords on these facts. *Browne v. Dugan*, 74 S.W.2d 640, 645 (Ark. 1934); *see also* Howard W. Brill, Arkansas Law of Damages, § 25:4 (5th ed. 2004) ("Confused case law leads to the conclusion that the landlord has no common law duty to mitigate by attempting to sublet the premises after the tenant's breach and abandonment."); Jeremy K. Brown, *A Landlord's Duty to Mitigate in Arkansas: What It Was, What It Is, and What It Should Be*, 55 Ark. L. Rev. 123, 125–28 (2002) (similar). And even if it did, the Court finds that it was reasonable for FWP not to relet the Building after Nilfisk vacated it because doing so would have required FWP to incur the significant cost of replacing the damaged Building on its own.

Therefore, the Court finds that Nilfisk is liable for a total of $1,665,300 in unpaid rent, calculated as follows:

- $915,000—fifteen months' rent at $61,000 per month (August 2022 through October 2023), the first rate set in the Third Amendment's base rent schedule, *see* Doc. 2-4, p. 1; plus

- $250,100—four months' rent at $62,525 per month (November 2023 through February 2024), the second base rent rate in the same, applied through this case's trial date, *see id.*; plus

- $500,200—the present value of the eight months' rent at $62,525 per month, *see id.*, that will accrue after trial through the end of the Lease term (March through October 2024).[2]

In conclusion, for the foregoing reasons, FWP's Motion for Summary Judgment is **GRANTED** on the question of Nilfisk's liability for breach and damages for unpaid rent and **DENIED** on the question of damages for breach of Section 10.2's Full Replacement Cost Insurance Obligation.

### 2. Nilfisk's Motion for Summary Judgment

### a. Statute of Limitations

The first issue Nilfisk raises is whether FWP's breach of contract claim under Section 10.2 is barred by the applicable five-year statute of limitations. Nilfisk contends that because it only held $8,302,200 in property insurance in May 2016 and "never obtained more than $10 million" in coverage, to the extent the replacement value was more than that, Nilfisk's breach began to accrue in May 2016 when FWP purchased the Building and assumed the Lease—more than six years before FWP filed its Complaint. (Doc. 37, p. 11). This is a disingenuous contention.

In Arkansas, "[a]ctions to enforce written obligations, duties, or rights . . . shall be commenced within five (5) years after the cause of action shall accrue." Ark. Code Ann. § 16-56-111. The cause of action accrues in a breach of contract claim "when the plaintiff could have first maintained the action to a successful conclusion.'" *Dupree v. Twin City*

---

[2] The Court has not calculated the present value of these future rents here; it has instead used $500,200 as placeholder for that value. The parties are directed to confer and attempt to stipulate to the discounted present value. Otherwise, FWP should present proof or argument as to how the damages for future rents should be calculated to account for the present value of future damages.

*Bank*, 300 Ark. 188, 191 (1989). "Said another way, '[a] cause of action accrues the moment the right to commence an action comes into existence, and the statute of limitations commences to run from that time.'" *Pennington v. BHP Billiton Petroleum (Fayetteville), LLC*, 2021 Ark. 179, 3 (2021) (quoting *Ray & Sons Masonry Contractors, Inc. v. U.S. Fid. & Guar. Co.*, 353 Ark. 201, 216 (2003)).

The parties focus their accrual arguments on two Arkansas cases, *Pennington* and *Beckworth v. Diamante, Private Membership Golf Club, LLC*, 2010 Ark. App. 814 (2010), and dispute their import to the facts at bar. *Pennington* concerned "contracts requir[ing] defendants to make a monthly royalty payment to plaintiffs," which were, "potentially, in a different amount each month." 2021 Ark. 179 at 6. The question presented to the Supreme Court of Arkansas was "whether Arkansas law prevents plaintiffs from pursuing their breach-of-contract claim when the first breach occurred outside the statute-of-limitations period." *Id.* at 1–2. The court analogized the monthly royalty payments to monthly installment payments in a debtor-creditor relationship and found that "[e]ach monthly underpayment constituted a separate cause of action for breach of contract." *Id.* at 5. Therefore, the Court held that a separate statute-of-limitations period began as each monthly royalty payment became due, and that "[t]he existence of monthly underpayments of royalties outside the limitations period does not bar recovery for underpayments within the limitations period under Arkansas law." *Id.* at 6. Citing *Pennington*, FWP argues that "it doesn't matter that Defendants breached the Full Replacement Cost Insurance Obligation annually from 2016 through 2021." (Doc. 48, p. 5). Instead, "[w]hat matters for statute of limitations purposes is that Defendants again breached it when they procured the policy at the time of the tornado." *Id.*

Nilfisk counters that *Pennington* is "wholly inapplicable to the facts of this case and to Plaintiff's breach claim" because "Plaintiff's underinsurance breach claim does not involve the breach of a monthly payment obligation"; *Beckworth* is "more directly on point." (Doc. 56, p. 2). That case concerned a private golf course and club that was developed as part of a subdivision. *Beckworth*, 2010 Ark. App. 814 at 1. Every property owner in the subdivision was entitled to club membership but was required to pay monthly dues under a recorded covenant. *Id.* at 1–2. The plaintiff argued that because the subdivision's developer had sold over ninety lots without collecting monthly dues from their owners in breach of the covenants, the developer should not be able to enforce them against her. *Id.* at 3–4. The plaintiff further argued that the sale of those lots was a continuing breach, so that the statute of limitations did not begin to run until the practice terminated, bringing her claim within the five-year statute of limitations. *Id.* at 5. However, the court concluded that the breach of contract claim accrued, and the statute of limitations began to run when the lots were first sold. *Id.* at 10. Nilfisk argues that, under *Beckworth*, "Plaintiff could have asserted its breach claim as soon as Nilfisk originally placed insurance in May 2016 . . . and Plaintiff's underinsurance claim is time-barred." (Doc. 56, p. 3). FWP counters that unlike the continuing breach theory in *Beckworth*, FWP's claim arises from "a particular, discreet, single breach [that] resulted to monetary damage to Plaintiff." *Id.* "The policy in place at the time of the tornado is the policy that caused Plaintiff's monetary damages— not the 2016 policy." *Id.*

Applied to the facts at bar, the Court finds *Pennington* to be more instructive than *Beckworth*. Like the monthly royalty payments in *Pennington*, Nilfisk purchased annual insurance policies in different amounts each year to satisfy the Full Replacement Cost

Insurance Obligation. Assuming, as Nilfisk, argues, that each policy breached that insurance obligation, each breach was distinct, not continuous. By contrast, the breach at issue in *Beckworth* was continuous—each of the ninety lot sales breached the same covenant in the same way, by not enforcing the monthly dues payments. The Court finds the two cases useful insofar as they distinguish between discreet and continuous breaches—and finds a discrete breach to be at issue here.

The Court's analysis is further guided by the Supreme Court of Arkansas' opinion in *Shelter Mut. Ins. Co. v. Nash*, 357 Ark. 581, 587–88 (2004). Although *Nash* concerned a breach of an underinsured motorist policy not an insurance obligation under a lease, the court's accrual framework is elucidating here:

> A cause of action for breach of contract accrues the moment the right to commence an action comes into existence, and occurs when one party has, by words or conduct, indicated to the other that the agreement is being repudiated or breached. In ordinary contract actions**, the statute of limitations begins to run upon the occurrence of the last element essential to the cause of action.**

*Id.* at 587–88 (emphasis added) (internal citations omitted); *see also Chapman v. Alexander*, 307 Ark. 87, 88 (1991).

Under *Nash*, the narrow question is when each element of FWP's breach of contract claim first occurred. Taking each in turn: (1) An enforceable contract existed between FWP and Nilfisk as early as May of 2016, when FWP purchased the Building and became a party to the Lease. (2) Nilfisk first incurred a duty to maintain Full Replacement Cost Insurance under Section 10.2 at that same time. (3) While Nilfisk may have been underinsured as early as 2016, violating that duty, the violation at issue occurred on April 1, 2021, when the operative 2021-2022 policy took effect. But FWP was not (4) *damaged* by that violation until the Tornado damaged the building on March 30,

2022. *Cf. Ray & Sons Masonry Contractors, Inc. v. U.S. Fid. & Guar. Co.*, 353 Ark. 201, 216 (2003) (citing *Larson Mach., Inc. v. Wallace*, 268 Ark. 192 (1980)) ("To be subjected to damage, there must be a loss."). The intuition here is simple: "Full Replacement Cost" is determined by the loss at issue, and underinsurance relative to that replacement cost determines breach. FWP could not have sought underinsurance damages arising from a 2022 tornado under a 2016 insurance policy any more than the "Full Replacement Cost" for "all loss or damage caused by" the "windstorm" at issue here was knowable until the tornado actually struck. (Doc. 2-1. p. 9). Therefore, under *Nash*, the last element essential to FWP's cause of action for breach of Section 10.2 did not begin to accrue until March 30, 2022. Holding otherwise would lead to absurd results. For these reasons, the Court finds that the applicable five-year statute of limitations has not run.

### b. Avoidable Consequences

The second issue is whether FWP's breach of contract claim is barred by the doctrine of avoidable consequences, as recognized by Arkansas courts. *See Greenway Equip., Inc. v. Johnson*, 602 S.W.3d 142, 149 (Ark. Ct. App. 2020) (citing *Bill C. Harris Constr. Co. v. Powers*, 262 Ark. 96, 104–05 (1977); *Taylor v. George*, 92 Ark. App. 264, 273 (2005); *Quality Truck Equip. Co. v. Layman*, 51 Ark. App. 195, 199 (1995)). "The doctrine applies in both tort and contract cases," Brill, *supra*, § 4:6 (citing *Powers*, 262 Ark. at 105), and "provides that a party cannot recover damages for a wrong, even if it is legally attributable to and proximately caused by another party, if the resulting damages could have been avoided or reduced." *Id*. Under the doctrine, "[r]easonable diligence and ordinary care are all that are required." *Taylor*, 92 Ark. App. at 273 (citing *Enter. Sales Co.*

*v. Barham*, 270 Ark. 544, 551 (1980)). "[R]easonableness is judged under an objective standard." Brill, *supra*, at § 4:6.

"The burden of proving that a non-breaching party could have avoided some or all of the damages by acting prudently rests on the breaching party, not only on the question of causation of damages for failure to avoid harmful consequences, but also on the question of the amount of damage that might have been avoided." *Taylor*, 92 Ark. App. at 273 (citing *Powers*, 262 Ark. at 104–05); *see also* Brill, *supra*, at § 4:6 ("The defendant must establish both that damages resulted from a failure to act prudently and the amount of damage that might have been avoided."). A plaintiff's failure to mitigate damages does not relieve the defendant of liability. *Cf. Powers*, 262 Ark. at 111 ("Failure to mitigate damages does not relieve a tortfeasor of liability. It is a consideration, only, in the computation of the amount of damages.").

Here, the primary measure of damages is "the difference between the amount of insurance on the property and . . . the property's replacement cost." *DWB, LLC v. D&T Pure Trust*, 550 S.W.3d 420, 431 (Ark. Ct. App. 2018). Turning first to the amount of insurance on the property, the Court first observes that Section 10.2 provided FWP the option, not the obligation, to procure additional insurance. The Lease laid the Full Replacement Cost Insurance *Obligation* on the tenant, as is characteristic of a triple-net lease. But regardless, once loss occurred, it became impossible to mitigate damages by procuring additional insurance. As the saying goes, the damage was done.

Turning next to the Building's replacement cost, the Court finds that the parties may present evidence at trial that damages were not reasonably mitigated in the period

since the tornado struck, thus increasing the Building's replacement cost. However, they have not done so here.

"In most cases, *whether one acted reasonably* in minimizing, mitigating, or avoiding damages is a question of fact." *Taylor*, 92 Ark. App. at 273 (emphasis added) (citing *Powers*, 262 Ark. at 105; *Layman*, 51 Ark. App. at 199). Without more, the Court cannot find that Nilfisk has met its burden of proving the absence of a genuine dispute of material fact on the question of whether FWP "caus[ed] [ ] damages [by] fail[ing] to avoid harmful consequences" and "the question of the amount of damage that might have been avoided," if any. *Taylor*, 92 Ark. App. at 273 (citing *Powers*, 262 Ark. at 104–05). Consequently, the Court finds that summary judgment is inappropriate on this issue, though the doctrine of avoidable consequences remains available at trial.

### c. Unenforceable Agreement to Agree

The third issue Nilfisk raises is whether Section 10.2's Full Replacement Cost Insurance Obligation is an unenforceable agreement to agree. Nilfisk argues that "the Lease's obligation to obtain 'Full Replacement Cost' insurance" on the Building "'in an amount equal to one hundred percent (100%) of the ***then*** 'full replacement cost' of the Premises,'" (Doc. 37, p. 16 (emphasis in original) (quoting Doc. 2-1, p. 9)), is unenforceable because it "requires the parties to subsequently reach an agreement with respect to the unsettled terms in the future. . . ." (Doc. 56, p. 5).

In Arkansas insurance law, "replacement cost" is a term of art that distinguishes the cost to replace or repair an insured property from the property's actual cash value. *See, e.g.*, *Stokes v. Harrell*, 289 Ark. 179, 180 (1986) (considering the term as applied to an insureds commercial store and its inventory after both were destroyed by a fire);

*Nickelson v. State Farm Fire & Cas. Co.*, 1998 WL 75660, at *1–2 (Ark. Ct. App. Feb. 11, 1998) (considering the term as applied to an insured's home that was similarly destroyed). That distinction maps onto the general technical definition of replacement cost insurance:

> Replacement cost coverage was devised to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone. That is, while a standard policy compensating an insured for the actual cash value of damaged or destroyed property makes the insured responsible for bearing the cash difference necessary to replace old property with new property, replacement cost insurance allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value.

12A Jordan R. Plitt et al., Couch on Ins. § 176:56 (3d ed. 2023) (footnotes omitted). Because "replacement cost" insurance is a term of art, it is not vague.

Moreover, Section 10.2 precisely defines "Full Replacement Cost" in plain language consistent with the technical meaning of "replacement cost" insurance: It specifically refers to the "cost of replacing the Premises" rather than the Premise's actual cash value. *See* Doc. 2-1, p. 9 (emphasis omitted) ("'Full Replacement Cost' shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade . . . ."). Where parties clearly and unambiguously express their intent, a court should look to the plain language in construing the agreement. *Troutman Oil Co.*, 75 Ark. App. at 352 (citing *Coble v. Sexton*, 71 Ark. App. 122 (2000)). Here, the plain language of Section 10.2 clearly and unambiguously imposes a present obligation on Nilfisk to maintain Full Replacement Cost Insurance as that term is used in Arkansas insurance law and expressly defined in the Lease.

In rejoinder, Nilfisk gets spun up about the inclusion of the word "then" in Section 10.2. *See* Doc. 37, p. 16 (arguing the word "then" was "based on some hypothetical future

date," that it was "dynamic in nature," and "require[d] Nilfisk to annually . . . predict the price of construction for the following year") (internal quotation marks omitted)). But this argument is unpersuasive. "Then" means "at that time," generally, *Then*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/then [https://perma.cc/CB82-C3PX], and "at the time of loss," technically, Plitt et al., *supra*, § 176:56. Read in context, the term "then" is also unambiguous and does not require the parties to reach further agreement in the future to define it. "Then" means at the time of the tornado damage.

At bottom, Nilfisk's argument reveals that it understands precisely what the Full Replacement Cost Insurance Obligation requires. For example, Nilfisk is correct that, as applied, "then" means "the date of damage to the building giving rise to a claim under the insurance policy" and that determining the "cost of replacing the Premises" would have required taking into account factors like "the cost of construction," the prices of materials and labor," and "market conditions" each year, when the time came to reapply for insurance coverage. (Doc. 37, p. 16). That is precisely what Nilfisk did when it applied for property insurance policies each year from 2016 to 2022. This course of performance further demonstrates that Nilfisk understood the meaning of "then replacement cost" in Section 10.2. *DWDubbell Arkansas, LLC*, 2021 WL 4392493, at *4 (citing *Swafford Ice Cream v. Sealtest Foods*, 483 S.W.2d 202, 204 (Ark. 1972)) ("To the extent a contract is indefinite on its face, the parties' conduct may cure the uncertainty."). Therefore, the Court finds that the Full Replacement Cost Insurance Obligation is enforceable.

### d. Inflated Damages

The fourth and final issue is whether FWP's damages claim is inflated. Nilfisk makes two arguments to this effect. The first is that FWP's damages are limited to those

that would have been recoverable under a policy with limits that would have complied with the Full Replacement Cost Insurance Obligation. Nilfisk cites two failure to procure insurance cases in support of this proposition: *Derby v. Blankenship*, 217 Ark. 272 (1950) and *Martin v. Langley*, 252 Ark. 121 (1972). But these cases are inapposite because the instant case is a breach of contract case, not a failure to procure insurance case between insurance agents and insureds. Here, as previously discussed, the measure of damages for breach of Section 10.2 is "the difference between the amount of insurance on the property and . . . the property's replacement cost." *DWB, LLC*, 550 S.W.3d at 431.

Next, Nilfisk argues that "Arkansas case law confirms recoverable damages in cases involving significant damage or destruction to an aged, damaged property is not the replacement cost to build a new structure." (Doc. 37, p. 20). "Plaintiff is not entitled to a 2023 Cadillac when it was previously driving a 1981 Buick," Nilfisk continues. *Id.* at p. 22. "Any damages award to Plaintiff must take into account 'age condition and depreciated state' of the Building prior to the tornado." *Id.* Nilfisk accurately states the general damages rule. But "[p]arties are free to contract on any terms that do not violate public policy or Arkansas statutes. In particular, contracting parties may fashion their own remedies in the event of a breach." *Conway Com. Warehousing, LLC v. FedEx Freight E., Inc.*, 2011 Ark. App. 51, 7 (2011) (citations omitted).

Here, Section 10.2 expressly provides that "'Full Replacement Cost' shall be interpreted to mean the cost of replacing the Premises *without deduction for depreciation or wear and tear*, less the cost of footings, foundations and other structures below grade." (Doc. 2-1, p. 9) (emphasis added). The language of the Lease thus obviates Nilfisk's argument. "The parties here agreed on a remedy in the event of a breach, and [the Court]

see[s] no reason why they should not be bound to it." *Conway Com. Warehousing, LLC*, 2011 Ark. App. at 7. For these reasons, Nilfisk's arguments fail to show that FWP's damages claim is inflated as a matter of law. If FWP was previously driving a 1981 Buick, it is entitled to a 2024 replica of that vehicle as a matter of law.

To summarize, then: Nilfisk's Motion for Summary Judgment is **DENIED** pursuant to the Court's findings that FWP's breach of contract claim is not barred by the applicable statute of limitations, is not an unenforceable agreement to agree, and that FWP's damages claim is not inflated under Arkansas law. Although the Court finds that FWP had a duty to mitigate damages, Nilfisk's Motion is also **DENIED** on that issue, though it remains available at trial.

## IV. CONCLUSION

For the foregoing reasons: Nilfisk's *Daubert* Motion (Doc. 41) is **DENIED**. FWP's Motion for Summary Judgment (Doc. 33) is **GRANTED** with respect to Nilfisk's liability for FWP's breach of contract claim and damages for unpaid rent under the Lease and **DENIED** insofar as material issues of fact remain as to Nilfisk's damages for breach of the Lease's Full Replacement Cost Insurance Obligation. Finally, Nilfisk's Motion for Summary Judgment (Doc. 36) is **DENIED**.

**IT IS SO ORDERED** on this 22nd day of February, 2024.

*/s/ Timothy L. Brooks*
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE