**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**FORT WORTH PARTNERS, LLC**                                          **PLAINTIFF**

**V.**                          **CASE NO. 5:22-CV-05181**

**NILFISK, INC. and**
**NILFISK HOLDING A/S,**
**a Danish Corporation**                                          **DEFENDANTS**

**<u>BENCH TRIAL OPINION AND ORDER</u>**

1

## TABLE OF CONTENTS

**I. BACKGROUND** ................................................................................................ 3

**II. FINDINGS OF FACT** ...................................................................................... 6

   **A. Stipulated Findings of Fact** ....................................................................... 6

   **B. Findings of Fact as to Damages** ............................................................... 8

     *1. The Lease* ............................................................................................. 8

     *2. The Building's Prior Use* ...................................................................... 9

     *3. The Building's Prior Structure* ........................................................... 10

     *4. The Tornado Damage* ....................................................................... 13

     *5. Damages for the Full Replacement Cost of the Building and Foundation* ......... 15

     *6. The Present Value of Future Unpaid Rent* ......................................... 30

     *7. Evidence as to Other Damages Under the Lease* ............................... 30

**III. CONCLUSIONS OF LAW AND DAMAGES FINDINGS** ............................ 31

   **A. The Court's Interpretation of "Full Replacement Cost"**
   **as Defined by the Lease** ............................................................................ 31

     *1. Section 10.2's General Damages Framework* .................................... 31

     *2. The Meaning of "Less the Cost of Footings, Foundations and Other Structures Below Grade."* ......... 32

   **B. Damages for Breach of Section 10.2** ...................................................... 41

   **C. Damages for Unpaid Rent** ...................................................................... 41

   **D. Other Damages Under the Lease** ........................................................... 42

   **E. Pre- and Post-Judgment Interest** ........................................................... 43

     *1. Prejudgment Interest* ......................................................................... 43

     *2. Post-Judgment Interest* ...................................................................... 45

   **F. Attorneys' Fees** ...................................................................................... 46

**IV. CONCLUSION** ............................................................................................ 46

## I. BACKGROUND

This matter came before the Court for a two-day bench trial on February 26 and 27, 2024. Plaintiff Fort Worth Partners, LLC ("FWP") brought a breach of contract claim against Defendants Nilfisk, Inc. and Nilfisk Holding A/S, a Danish Corporation (collectively, "Nilfisk"). The contract at issue is an Industrial Lease Agreement (the "Lease") (Docs. 2-1–2-4) for a building that was severely damaged by a tornado. FWP is the landlord, Nilfisk, Inc. is the tenant, and Nilfisk Holding A/S is the guarantor under the Lease.

In its Complaint, FWP alleged that: Nilfisk breached its obligation under the lease to maintain full replacement cost insurance on the building; improperly exercised its casualty, termination, and purchase offer rights after the tornado struck; and improperly vacated the building prior to the expiration of the Lease. (Doc. 2, ¶ 25). FWP seeks damages for the replacement cost of the building, as defined by the Lease—less $5,292,427.32, which was paid by or on behalf of Nilfisk in August 2022—and damages for unpaid rent.

Prior to trial, the parties filed cross-motions for summary judgment. The Court issued a Memorandum Opinion and Order (Doc. 82) granting in part and denying in part FWP's motion and denying Nilfisk's motion outright. With respect to liability, the Court found that Nilfisk breached the Full Replacement Cost Insurance Obligation set forth in Section 10.2 of the Lease. Because Nilfisk's breach was material, it released FWP from further obligations under the Lease. Accordingly, the Court found that Nilfisk is liable for approximately $1,665,300 in damages for unpaid rent. However, the Court explained in its Opinion that FWP's damages award for unpaid rent was a placeholder value because

it included $500,200 in unpaid future rent in place of the present value of that amount. The Court instructed the parties to confer in advance of trial and stipulate to the present value of the rent that would accrue after trial until the end of the lease term in October 2024. *See* Doc. 82, p. 17 n.2 (the Court's instruction); Doc. 91 (the parties' post-trial stipulation). This Order incorporates the stipulated present value into a final damages award for unpaid rent, as specified *infra* at Section III.C.

After summary judgment, only damages issues remained for trial—one major and several minor. The major issue was determining the Building's Full Replacement Cost as defined by Section 10.2 of the Lease. As this Order discusses at length, Section 10.2 provides that "'Full Replacement Cost' shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade." (Doc. 2-1, p. 9 [hereinafter the FRC Value]). Pursuant to that definition, the Court's task at trial was to determine the FRC Value, so that it could be used as an input to calculate Nilfisk's damages liability for its breach—which is equal to the FRC value less Nilfisk's August 2022 payment of $5,292,427.32. The minor issues before the Court were finalizing Nilfisk's damages liability for unpaid rent, using the stipulated present value of unpaid future rent; making a finding as to whether FWP is entitled to damages for costs for property taxes, insurance, and fencing incurred as a result of Nilfisk's breach; determining pre-judgment interest; and addressing attorneys' fees.

The parties submitted Stipulated Facts and Agreed Basis of Applicable Law (Doc. 80) and trial briefs (Docs. 83 & 84) in advance of trial. Both parties also filed motions in limine (Docs. 72 & 74). The Court heard argument on the motions in limine at the pretrial

4

conference but deferred ruling on them until trial. *See* Docs. 89 & 90 (finding the motions moot pursuant to the Court's subsequent rulings from the bench).

The parties stipulated to the introduction of eight plaintiff's exhibits and ten defense exhibits at trial. FWP called four witnesses: Andre Slintak, Professional Engineer at MKA International (Plaintiff's engineering expert); Sara Sparks Diebold, corporate representative for FWP (Plaintiff's lay witness); Kevin McMahon, professional estimator and Vice President at MKA International (Plaintiff's damages expert); and Jeff Marcussen, professional estimator and Senior Preconstruction Specialist at Nabholz (Defendant's rebuttal damages expert). Nilfisk called two witnesses: D. Craig Evans, Principal Structural Engineer and Owner of ACE Engineering, Inc. (Defendant's rebuttal engineering expert), and Mr. Marcussen. The parties stipulated to the admission of expert reports and their attachments, which the Court received as exhibits and materials that the testifying experts relied upon. *See* Doc. 92, pp. 11–13; Ct.'s Ex. 1.

The parties submitted post-trial briefs at the Court's direction (Docs. 94 & 95).[1] This case is fully submitted and ready for decision, and the Court makes findings pursuant

---

[1] In a footnote in its post-trial brief, Nilfisk moved for judgment as a matter of law on FWP's breach of contract claim under Federal Rule of Civil Procedure 52(c). (Doc. 95, p. 1 n.1). FWP then filed a Motion to Strike Nilfisk's Motion, arguing that it was improper under Local Rule 7.2(a) and lacked any evidentiary basis. *See also* Doc. 97 (Nilfisk's Response); Doc. 100 (FWP's Reply). The Court rejected the same argument on summary judgment, *see* Doc. 82, pp. 19–21, and Nilfisk did not present evidence on or re-urge the issue at trial. Nilfisk's motion is therefore **DENIED** for the reason stated in the Court's summary judgment order. *Id.*

to Rule 52(a)[2] herein. The Court's complete findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) are as follows.[3]

## II. FINDINGS OF FACT

### A.  Stipulated Findings of Fact

The Court makes the following findings of facts based on the parties' stipulations:

1.  This matter concerns a lease agreement (the "Lease") between Nilfisk and FWP for a commercial building located at 979 E. Robinson Ave., Springdale, Arkansas (the "Building").

2.  Under the Lease, FWP owned the Building and was the lessor. Nilfisk, Inc. was the sole tenant, and Nilfisk Holding A/S, a Danish Corporation, was the guarantor. (Doc. 2-3, p. 1). The Lease includes four parts: the Original Lease and three amendments. The contractual history of the Lease is as follows:

    • On April 12, 2006, the prior landlord for the Building and the prior tenant executed an Industrial Lease Agreement for the Building (the "Original Lease") (Doc. 2-1; Pl.'s Ex. 1; Defs.' Ex. 1).

    • On June 12, 2015, Nilfisk executed a First Amendment to the Original Lease ("First Amendment") and began to lease the Building (Doc. 2-2; Pl.'s Ex. 2; Defs.' Ex. 2).

---

[2] "In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . . It will be sufficient if the findings of fact and conclusions of law . . . appear in an opinion or memorandum of decision filed by the court." Fed. R. Civ. P. 52(a).

[3] To the extent any of the Court's findings of fact constitute conclusions of law, or mixed findings of fact/conclusions of law, the Court adopts those conclusions as if they had been restated as conclusions of law. The opposite also applies.

- On May 17, 2016, FWP purchased the Building and became successor in interest to the Original Lease and First Amendment.

- On October 10, 2017, Nilfisk and FWP executed a Second Amendment to the Original Lease ("Second Amendment") (Doc. 2-3; Pl.'s Ex. 3; Defs.' Ex. 3).

- In October 2021, Nilfisk and FWP executed a Third Amendment to the Original Lease ("Third Amendment") (Doc. 2-4; Pl.'s Ex. 4; Defs.' Ex. 4).

3.    The Building is an approximately 200,000-square-foot warehouse-style building, which is comprised of two approximately 100,000-square-foot sections, the east building and the west building.

4.    Nilfisk maintained property insurance on the Building from 2016 to 2022, and FWP received certificates of property insurance from Nilfisk each year during that period.

5.    On March 30, 2022, a tornado damaged the Building.

6.    Prior to the tornado, FWP received the 2021–2022 certificate of property insurance for the Building, which was the certificate outlining the property insurance coverage on the Building at the time of the tornado.

7.    After assessing the damage to the Building and evaluating the estimated cost to repair the Building, Nilfisk's insurer paid out the "building limits of $5,149,999.00." (Doc. 80, p. 3).

8.    In August 2022, Nilfisk paid FWP a total of $5,292,427.32, which included the $5,149,999.00 in property insurance proceeds that Nilfisk received.

**B. Findings of Fact as to Damages**

Having reviewed all exhibits and trial testimony, the Court makes the following additional findings of fact:

***1. The Lease***

9. By its own terms, the Lease is governed by Arkansas law. (Doc. 2-1, p. 19).

10. The parties agreed to a triple-net lease: In addition to rent and utilities, Nilfisk was obligated to pay for all property-related expenses including real estate taxes, fire and casualty insurance, and all maintenance and repairs. *Id.* at pp. 1–3 (Section 2 (rent)), 5–6 (Section 3 (operating expenses, including taxes)), 9–10 (Section 10 (insurance)), 11–12 (Section 13 (repairs and maintenance) and Section 14 (utilities)).

11. Under the Third Amendment, "[t]he base rent for the Premises shall be . . . $62,525 per month from October 31, 2023 until October 31, 2024." (Doc. 2-4, p. 1).

12. Section 10.2 imposes an obligation on the tenant to maintain commercial property insurance:

> **10.2. Coverage Amounts.** Tenant shall purchase and maintain, throughout the Term, a Tenant's Policy(ies) of (i) "all-risk" commercial property insurance covering the improvements constructed, installed or located on the Premises (but excluding Tenant's Property) against all loss or damage caused by fire, ice, hurricane, windstorm and such other risks of physical loss or damage as are covered by a causes of loss special form insurance policy, which coverage shall, at all times, be in an amount equal to one hundred percent (100%) of the then "full replacement cost" of the Premises subject to a deductible not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) ("Full Replacement Cost" shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade) . . . .

8

*Id.* at p. 9 [hereinafter the Full Replacement Cost Insurance Obligation].

### 2. The Building's Prior Use[4]

13.  Prior to the tornado, the Building was "a standard 200,000 square foot industrial facility," (Doc. 93, p. 255:19–20), which Nilfisk used to assemble, quality assurance test, and package products, and to store inventory for distribution. *Id.* at pp. 255:18–256:3.[5]

14.  Nilfisk operated at least ten forklifts in the Building. *Id.* at p. 256:4–11.

---

[4] As this Order discusses below, the prior use of the Building is an important factual input to determining its FRC Value. FWP is entitled to the FRC Value of the Building as it stood immediately prior to the tornado damage, but it is not entitled to any improvements. As the Court held in its summary judgment Opinion, "If FWP was previously driving a 1981 Buick, it is entitled to a 2024 replica of that vehicle as a matter of law." (Doc. 82, p. 27).

Sara Sparks Diebold, corporate representative for FWP, was the only witness called to testify from personal knowledge as to the prior use of the Building. Ms. Diebold holds a one-percent ownership position in FWP and manages its operations. (Doc. 93, p. 254:9–16). Her operational duties at FWP include managing tenants, and indeed Ms. Diebold testified that she visited the Building on approximately five occasions while Nilfisk was operating there pursuant to her tenant-management duties. *Id.* at 255:4–15. Nilfisk's expert witnesses testified that they were made aware that Nilfisk used the Building as a warehouse and distribution facility. *See id.* at pp. 285:13–15, 352:16–353.

FWP describes the Building as an "industrial facility" in their papers and expert witness testimony. *E.g.*, Doc. 92, at pp. 92:24–93:2 However, FWP's experts testified that they did not actually know what the Building was used for before conducting their site visit and producing their report and estimate. *Id.* at 93:2–3 (Mr. Slintak: "Whether it was being currently used as a warehouse or not, I can't say one way or the other . . . . I did not investigate and [it] wasn't germane to my conclusions [ ]."); Doc. 93, pp. 196:24–197:5 (Defense counsel: "In fact, before yesterday, I don't believe you or your colleague had an understanding as to what the warehouse was being used for, did you?" Kevin McMahon, FWP's expert estimator: "No." Defense counsel: "So you weren't aware of its operations and its use as a distribution center?" Mr. McMahon: "No."). Therefore, Ms. Diebold's testimony stood alone as direct evidence as to the Building's prior use.

[5] For ease of reading, the Court includes citations at the end of each numbered paragraph instead of after each sentence hereinafter, except when citing a direct quote from the record.

### 3. The Building's Prior Structure[6]

#### i. The Building

15.    The Building consisted of two steel-framed buildings, the east building and the west building, each with abutting gable walls. Together, the buildings spanned 1,000 feet east-to-west and 200 feet north-to-south, for a combined footprint of 200,000 square feet. (Doc. 92, p. 34:1–7; Doc. 93, p. 305:6–11; Pl.'s Ex. 6, p. 5; Defs.' Ex. 6, p. 4028).

---

[6] Plaintiff's engineering expert, Andre Slintak, conducted a site visit on May 24, 2024, to evaluate the tornado damage to the Building and determine whether it could be repaired. He was accompanied by Steven Prichard, an estimator with MKA International. (Doc. 92, pp. 29:25–32:10).

Mr. Slintak produced an Engineering Evaluation Report (Pl.'s Ex. 6) to communicate his findings from the site visit. As inputs to the report, he also considered historical arial images of the Building from Google Maps; tornado data from the National Oceanic and Atmospheric Administration's ("NOAA") National Weather Service ("NWS"); a Structural Damage Report prepared by Envista Forensics during Nilfisk's insurance investigation, dated April 26, 2022 ("Envista Forensics Report"), sometimes referred to in the transcript as the "J.S. Held Estimate"; a Building Code Implications Report prepared by Engineering Consultants, Inc. for Plaintiff's counsel on October 20, 2022 ("Engineering Consultants Report"); the 2021 Arkansas Fire Prevention Code Volume II for Buildings; and a discussion he convened with Ed Stith, the City of Springdale Building Department's Structural Plans Examiner, on May 24, 2023. *See* Doc. 92, pp. 23:12–29:24, 42:10–44:2; Pl.'s Ex. 6, pp. 4–5.

Defendants' rebuttal engineering expert, D. Craig Evans, also produced a Structural Engineering Inspection Report and an Evaluation of the Engineering Evaluation Report prepared by Mr. Slintak. (Defs.' Ex. 6). To prepare his report and evaluation, Mr. Evans conducted his own site visit on July 28, 2023. *Id.* at p. 4025. He also considered the following documents and materials as inputs to his report: FWP's Complaint and Exhibits; FWP's expert disclosures; the CVs of Mr. Slintak and Mr. McMahon; Mr. Slintak's Engineering Evaluation Report; the J.S. Held Estimate for Repairs; the Envista Forensics Report; a letter regarding Nilfisk's termination of the Lease dated May 26, 2022; photographs of the tornado damage; and materials information from Pinnacle Structures, Inc. *Id.* at pp. 282:25–284:1; Defs.' Ex. 6, pp. 4026–27.

16.     The engineering experts' visual inspections of the remaining portion of the east building revealed that the Building was a pre-engineered, steel-framed structure, comprised of moment frames in the north-south direction and cable cross bracing in the east-west direction. Each moment frame was essentially a steel arch that spanned the 200-foot north-south dimension of the Building and was attached to the foundation's perimeter. The base of each frame was fastened to the foundation with steel base plates and threaded anchor bolts at equally spaced, twenty-five-foot increments. The frames were supported by three equally spaced, load-bearing interior columns. The gable walls at the end of each building consisted of a moment frame with extra end columns spaced at twenty feet. (Doc. 92, pp. 32:11–35:10; Pl.'s Ex. 6, p. 6; Defs.' Ex. 6, p. 4028).

ii. The Foundation

17.     The foundation's visible exterior extends about four feet above the ground on average (the building sits on a slope). The foundation is comprised of a perimeter stem wall that is set into the ground and a concrete slab that sits atop it and forms the floor of the Building. The foundation system is not fully visible; much of it lies inside the visible exterior of the slab and stem wall or underground. (Doc. 92, pp. 46:13–47:12; Pl.'s Ex. 6, p. 7; Defs.' Ex. 6, p. 4028).

18.     Control joints were cut into the surface of the slab in a 12.5-foot square grid. Several sets of concrete stairs provide access from ground level to the top of the slab. Neither party conducted testing of the slab, so its thickness is unknown. (Doc. 92, pp. 47:8–12, 55:16–56:9; Pl.'s Ex. 6, p. 7; Defs.' Ex. 6, p. 4028).

19.    The foundation was not tested to determine its internal composition. However, the engineering experts agreed that its construction appeared consistent with a concrete foundation composed of a slab, a perimeter stem wall, and two sub-slab support systems: thickened stem walls and strip footings along the perimeter of the slab where the moment frames and exterior gable wall columns were joined to the foundation; and spread footings below the slab supporting the interior columns by way of concrete pedestals that extended from the spread footing through the slab.[7] The engineering experts opined that apart from the concrete structure discussed above, the structure is likely supported by backfill—and that the spread footings sit above the four-foot level mark within the foundation's interior (i.e., above ground level). Mr. Slintak estimated that approximately 2,400 linear feet of strip footing sits below ground level. (Doc. 92, pp. 46:9–47:12, 50:13–25; Pl.'s Ex. 6, p. 7; Defs.' Ex. 6, pp. 4028–30).

20.    The construction of the east and west buildings differs in one important respect: The interior columns in the west building were I-beams that were fastened to the footing pedestals with base plates and anchor bolts, but the interior columns in the east building are hollow, steel cylinders set into the foundation itself—certainly into the pedestals and possibly deeper, into the spread footings as well. (Doc. 92, pp. 46:9–47:12; Pl.'s Ex. 6, p. 7; Defs.' Ex. 6, pp. 4028–30).

---

[7] A strip footing is an underground layer of concrete that sits below the stem wall and is wider than the stem wall to support the vertical load of the stem wall and structure above it. A spread footing is a discrete, rectangular bit of concrete that supports a smaller concrete pedestal which protrudes through the slab and supports a column that sits on top of it. In two dimensions, a spread footing and pedestal resemble an upside-down "T." Strip and spread footings are structural supports for each steel Building column.

*4. The Tornado Damage*

21.   On March 30, 2022, an EF-3 tornado touched down in Johnson, Arkansas and tacked northeast into Springdale; its wind speeds reached 135–145 miles per hour. The NWS's tornado path map, Exhibit A to Mr. Slintak's report, shows that the Building was directly in the tornado's path. (Pl.'s Ex. 6, pp. 5, 22–23; Defs.' Ex. 6, p. 4027).

22.   The Building was struck by the tornado and severely damaged by its wind force and impacts from wind-born debris. All 100,000 square feet of the west building and approximately 40,000 square feet of the east building collapsed. (Doc. 92, pp. 36:4–37:5; Pl.'s Ex. 6, pp. 5, 14–15; Defs.' Ex. 6, p. 4027).

The engineering experts observed and photographed the following damage during their site visits:

i. Damage to the Remaining Section of the East Building

23.   At the east end of the east building, about 200 feet of the building was removed. The west end and northeast corner showed displacement or deformation of the wall and roof framing, metal roof panels, ends of the roof purlins, roof trim edges, and steel framing. Assorted lights, sprinkler lines, conduits, and electrical boxes were deformed or displaced throughout. Temporary wood framing and plywood sheathing was installed at both the east and west ends of the east building to bar entry to the remaining structure. (Doc. 92, pp. 68:12–69:7; Pl.'s Ex. 6, pp. 13–14).

24.   The wall panels, insulation, and roof panels of the remaining portion of the east building were damaged beyond repair. However, the interior moment frames of the

13

remaining section of the east building appeared undamaged, and the cable bracing at the roof appeared largely intact. (Defs.' Ex. 6, pp. 4028–29; Pl.'s Ex. 6, p.13).

ii. Damage to the Foundation

25.   The most striking damage to the foundation was the litany of sheared, deformed, and corroded anchor bolts, base plates, and cylindrical column stubs that protrude from its stem wall and pedestals. At some anchor bolt locations, the slab appears cracked. In others, steel base plates are deformed and displaced. Corroded, shorn-off interior cylindrical column stubs—resembling steel tree stumps—remain embedded throughout the concrete slab in the destroyed portion of the east building. (Doc. 92, pp. 64:16–67:10, 71:14–73:20; Pl.'s Ex. 6, pp. 14–15).

26.   The slab is cracked in other areas, including a longitudinal crack that appeared to extend across the length of the slab where the east and west buildings' gable walls were once joined. The slab is spalled—i.e., the concrete is marred where flakes, chips, or chunks have broken off—in many locations along its perimeter. (Doc. 92, pp. 57:2–14, 63:2–7; Pl.'s Ex. 6, pp. 14–15; Defs.' Ex. 6, p. 4030).

27.   Fourteen hydraulic dock levelers, which are set into the concrete where loading bays once stood, are significantly damaged. (Doc. 92, p. 63:2–7; Pl.'s Ex. 6, pp. 14–15; Defs.' Ex. 6, p. 4030).

28.   Finally, at least six sets of concrete stairs are cracked and spalled, and their handrails are displaced. (Doc. 92, pp. 61:22–62:25, 70:14–71:6; Pl.'s Ex. 6, p. 14; Defs.' Ex. 6, pp. 4028–29).

### 5. Damages for the Full Replacement Cost of the Building and Foundation

#### i. The Experts' Replacement Cost Estimates

FWP estimated a replacement cost of $27,722,974.03, while Nilfisk estimated a replacement cost of $ 14,253,578.00. (Pl.'s Ex. 6, p. 112; Defs.' Ex. 6, p. 4034). The biggest single difference between the parties' estimates is that FWP estimated over $8.5 million to demolish and rebuild the Building's foundation, while Nilfisk only included estimates for repairs and a topping slab. Below, the Court discusses which items FWP has proved by a preponderance of the evidence to a reasonably certain amount.

#### ii. Legal Standard

In Arkansas, the factfinder is instructed that "[a] party who has the burden of proof on a proposition must establish it by a preponderance of the evidence." Ark. Model Jury Instr., Civ. AMI 202 (2024). "The burden of proving damages is on the party claiming damages." *Christmas v. Raley*, 260 Ark. 150, 160 (1976) (citing *St. Louis, Iron Mountain & Southern Railway Co. v. Saunders*, 85 Ark. 111 (1908)); *see also* Howard W. Brill, Arkansas Law of Damages § 5:1 (5th ed. 2004) (collecting cases). Therefore, under Arkansas law, it is FWP's burden to prove damages.

The Arkansas Supreme Court has explained that a damages claimant must demonstrate the amount of damages with reasonable certainty. *Morton v. Park View Apartments*, 315 Ark. 400, 405 (1993). They must not be "fixed only by sheer speculation." *Milligan v. Gen. Oil Co.*, 293 Ark. 401, 408 (1987); *see also Christmas*, 260 Ark. at 160 ("The evidence of damages must be such as to allow findings from established facts and not by conjecture." (citing *Mo. & Ark. Railway Co. v. Treece*, 210 Ark. 63 (1946))). Therefore, "if no proof is presented to the trial court that would enable it to fix damages in

dollars and cents, the court cannot award damages," *Milligan*, 293 Ark. at 405–06 (citing *Winkle v. Grand Nat'l Bank*, 267 Ark. 123 (1980)), but "if it is reasonably certain that some loss has occurred, it is enough that damages can be stated only approximately." *Morton*, 315 Ark. at 405 (citing *Jim Halsey Co. v. Bonar*, 284 Ark. 461 (1985)). The Court proceeds with its damages findings under this standard.

### iii. The Replacement Cost of the Building

29.   The estimators ultimately agreed that the Building should be replaced, not repaired. At trial, Mr. Evans, Defendants' rebuttal engineering expert, initially recommended repairing the building but eventually agreed with the other experts that it should be replaced. (Doc. 93, pp. 201:15–23, 336:5–24, 289-3–11).

30.   Based on the four experts' concurrence, the Court finds, as a threshold matter, that the FRC Value must be calculated based on the cost of replacing the Building.

### (a) The Cost of Demolishing the Building

31.   Mr. McMahon, Plaintiff's damages expert, estimated the cost of demolishing the remaining structure of the Building to be $878,400.00. *Id.* at pp. 227:1–6, 227:25–228:1–6; Pl.'s Ex. 6, p. 68. Mr. Marcussen, Defendants' damages expert, estimated the cost of demolishing the remaining structure to be $637,586.00. However, Mr. Marcussen did not testify at trial as to why his estimate for demolition of the remaining section of the Building was approximately $240,000 lower than Mr. McMahon's. *See, e.g.*, Doc. 93, pp. 351:19–352:15 (Mr. Marcussen testifying as to his own estimate for demolishing the Building without distinguishing it from Mr. McMahon's); *see also id.* at p. 227:11–15; Defs.' Ex. 6, p. 4099. One reason

for the discrepancy is that Mr. McMahon's estimate included $146,400.00 in overhead and profits.

32. The Court finds Mr. McMahon's estimate to be reasonably certain based on his testimony and the weight of the other evidence presented. And while the Court finds both experts to be credible, Mr. Marcussen's testimony did not rebut Mr. McMahon's more detailed estimate for this line item; he merely quoted a different figure. Therefore, the Court finds that the cost of demolishing the remaining structure of the Building is $732,000.00, the cost of demolition less Mr. McMahon's overhead and profit estimate, which the Court takes up in subsection I.B.5(v), *infra*.

#### (b) The Cost of Replacing the Metal Superstructure

33. The parties' estimates as to the cost of replacing the metal building system were nearly identical: Mr. McMahon estimated $7,138,611.89, and Mr. Marcussen estimated $7,140,664.00. Here, too, Mr. Marcussen's testimony did not focus on rebutting Mr. McMahon's estimate, likely in light of their near-agreement. (Doc. 93, pp. 367:14–368:6; Pl.'s Ex. 6, p. 109; Defs.' Ex. 6, p. 4099).

34. The Court finds that Mr. McMahon's estimate is reasonably certain and, in light of the experts' concurrence, further finds that the cost of replacing the metal superstructure is $7,138,611.89.

#### (c) The Cost of Electrical

35. When Mr. McMahon estimated the Building's electrical scope, he "looked at it as an industrial facility" rather than assuming it was used solely as a warehouse. (Doc. 93, p. 183:9–14). Based on that scope, he estimated the total cost of electrical to be $3,976,150.33. Mr. McMahon testified that in addition to the basic electrical

components needed to operate any 200,000-square-foot building (e.g., to power lighting and other basic operations), he included in his scope a battery charging station to charge forklifts. His estimate would allow for "about 12" forklifts to charge overnight. (Doc. 93, p. 238:13–16.) He also included the electrical capacity to run an equipment packaging area, which would use conveyors and other equipment. Mr. McMahon testified that he did not know whether these capabilities were present in the original Building and that had he estimated costs based on a warehouse with the addition of the charge station for the forklifts, he would have decreased the cost of electrical by approximately twenty-five percent. *Id.* at p. 239:8–23; *see also id.* at pp. 209:10–19, 210:19–211:10, 237:21–238:7, 238:13–239:7; Pl.'s Ex. 6, p. 111.

36.  Mr. Marcussen estimated the replacement cost of the Building's electrical systems to be $1,487,700.00, based on his assumption that the Building was used solely as a standard distribution warehouse. Mr. McMahon countered that Mr. Marcussen's budget is a residential square footage allowance that is ill-fit to the Building in question. Similarly, FWP pointed to Mr. Marcussen's representations in his deposition that his electrical allocation was "just enough to keep the power on" as evidence that the allocation was insufficient to meet the needs of the replacement Building. Doc. 93, p. 362:16–19; *see also id.* at pp. 241:7–17, 352:16–353:12; Defs.' Ex. 6, p. 4099.

37.  Both Mr. Evans and Mr. Marcussen were aware that Nilfisk used the Building as a distribution warehouse. Accordingly, Mr. Marcussen disagreed that an industrial-grade electrical scope was appropriate because he was unaware of industrial

applications in the Building that would require it (e.g., cold storage requiring significant HVAC capabilities). But he cautioned that "if there's an extensive amount of equipment inside that needs to be powered, whether it's manufacturing, or, again, just additional equipment that I wasn't privy to that had large electrical loads, then you obviously would have to increase that electrical value as well." (Doc. 93, p. 353:21–25; *see also id.* at pp. 285:13–15, 352:16–353:20).

38. Ms. Diebold, FWP's fact witness, was the only witness who testified as to the Building's prior use. She testified that Nilfisk assembled, quality-assurance tested, and packaged some of their products there. (Doc. 93, p. 255:20–23). Ms. Diebold also testified that Nilfisk operated forklifts in the Building but she did not count them; based on its size, she would estimate that at least ten were in use. *Id.* at p. 256:4–11. While the Court finds Ms. Diebold's testimony to be credible, it was the only substantive evidence about the Building's prior use. Beyond calling the Building an "industrial facility" and referring to one piece of equipment, "a box-forming machine," she did not assert that power-intensive systems, like conveyor belts or cold storage, existed in the Building. *Id.* at 255:20–23.

39. The Court finds the Building had the electrical capacity to be used as a distribution warehouse, but FWP has not met its burden of proving that the entire Building had the electrical capabilities associated with a full-scale industrial facility. Instead, the Court applies the twenty-five percent reduction to Mr. McMahon's quote that he testified would be consistent with "lighting and a charge station." *Id.* at 239:18–23.

40. For these reasons, the Court finds that the cost of replacing the electrical is $2,982,112.75.

### (d) The Cost of Miscellaneous Equipment

41.   Mr. McMahon included a $1,283,291.00 line item for "Miscellaneous Equipment," (Pl.'s Ex. 6, p. 111), but provided little detail as to what it accounted for, (Doc. 93, pp. 211:16–212:16 (Defense counsel: "Based upon what I read of your deposition back in October, at that point, you weren't really sure what went into this category, is that correct?" Mr. McMahon: "That's correct.")). Mr. Marcussen objected to that line item as unusual and nonspecific. *Id.* at p. 351:15–16 ("I don't know what that is. There is probably something in there, I just don't know what it is.").

42.   Without more, the Court cannot find that the evidence supports awarding $1,283,291.00 in damages for unspecified miscellanea; FWP has not shown that such a cost is reasonably certain to be necessary to replace the Building.

### (e) Unrebutted Costs

43.   Nilfisk did not rebut the remaining line items in Mr. McMahon's estimate, which totaled $5,659,053.60. The Court finds that Mr. McMahon's testimony and expert report were reliable and sufficiently detailed to show these unrebutted costs of replacing the Building were reasonably certain.

### iv. The Replacement Cost of the Foundation

In its role as a factfinder, based on the evidence presented, the Court makes the following findings as to damages for the replacement cost of the foundation:

### (a) The Cost of Foundation Testing

44.   Neither party conducted foundation testing beyond a visual inspection to determine the extent of the internal damage to the foundation, but FWP's damages expert acknowledged that no building owner would undertake the cost of replacing the

foundation before doing some testing to determine the extent of the damage. *Id.* at p. 202:2–5.

45. Mr. Evans estimated that the nondestructive ground-penetrating-radar tests (GPR) and minimally destructive core-drilling tests which he recommended would cost "about $30,000." *Id.* at pp. 292:3–294:19. Mr. Marcussen allocated $53,123.00 for foundation testing based on his research and estimating software. (*Id.* at p. 345:13–16; Defs.' Ex. 6 p. 4099).

46. Mr. McMahon testified, based on his work on other projects, that he estimated testing for a facility like this one to cost $250,000 because "[w]e would have to do a lot of penetrating tests, understand the depth, the width of the spread footings so that that information could be relayed to the building manufacturer for the proper design of that building." (Doc. 93, p. 246:4–7). However, Mr. McMahon testified that testing was not needed to know that the anchor bolts needed to be replaced, and with them the concrete they were set into. Therefore, he did not include a line item for testing in his estimate. *Id.* at pp. 247:19–248:6.

47. The Court finds Mr. Marcussen's estimate for testing to be reasonable and well supported by the evidence, as it was based on the testing scope recommended by Mr. Evans and backed by his regionally targeted estimating software. Mr. McMahon, while a credible expert witness to be sure, did not provide a data-driven estimate in his report.

48. Therefore, the Court finds by the weight of the evidence that the reasonably certain cost of testing the foundation is $53,123.00.

(b) Is FWP's Foundation Cost Recommendation Reasonably Certain?

It is FWP's burden to prove that "it is reasonably certain that some loss has occurred" to the foundation, *Morton*, 315 Ark. at 405 (citing *Jim Halsey Co.*, 284 Ark. 461), by presenting proof to the Court "that would enable it to fix damages in dollars and cents," *Milligan*, 293 Ark. at 405–06 (citing *Winkle*, 267 Ark. 123). For the reasons that follow, the Court finds that FWP has not met its burden with respect to the foundation and is therefore not entitled to recover the cost of demolishing and replacing it.

FWP's engineering expert, Mr. Slintak, offered one theory of loss: that it is "highly likely" that the force of the tornado and the Building's collapse caused structural damage to the concrete foundation and therefore the whole foundation needed to be replaced. *See* Pl.'s Ex. 6, pp. 16–17; Doc. 93, pp. 404:4–405:9. Nilfisk's engineering expert offered a countervailing theory in rebuttal: that the Building collapsed because the metal superstructure failed where it was joined to the foundation; that this failure plane shows the foundation's structure was resilient to the tornado's wind force; and that besides a few marks and spalls needing repair, there was "no indication that the foundation failed" structurally. *See* Doc. 93, pp. 287:22–289:11. Mr. Evans analogized his theory to a tree falling during a storm: "[I]f a tree fails, a tree limb is knocked off, then the failure plane is up at the tree limb. If the trunk is pulled up, then obviously the failure plane is at the base of the foundation of the tree." *Id.* at p. 285:19–22. The first question as to damages is: Did FWP prove with reasonable certainty that Mr. Slintak's theory is the correct one?

In many ways, Mr. Slintak's theory is persuasive. Based on his inspection of the foundation, he explained that the "force that was able to bend those three-quarter inch anchors, [ ] got transmitted into the concrete," (Doc. 93, p. 404:7–8), so the bent and

22

broken anchor bolts peppered across the slab show that the concrete probably sustained micro fractures—and may have been fully fractured. *See id.* at p. 405:5–9, 404:9–10 ("I would be highly suspect of reusing that concrete."). The Court finds Mr. Slintak to be a credible expert, and his testimony is supported by the photographs he included in his report, which depict shorn anchor bolts and spalling where they are set into foundation pedestals. *See, e.g.*, Pl.'s Ex. 6, p. 133. But the Court cannot penetrate any farther into the foundation than Mr. Slintak's photographs and testimony did; without more, the Court is left scratching the surface. As Mr. Slintak conceded himself with respect to foundation damage, "*We don't know* . . . ." (Doc. 93 p. 405:5–9 (emphasis added)).

Yet the extent of foundation damage was certainly *knowable*. The record shows that evidence as to the internal condition of the foundation was readily available to FWP in discovery through destructive and non-destructive testing. Indeed, Mr. Slintak testified at length about two testing options, GPR scans and core sampling, that could have yielded conclusive, empirical—indeed, *concrete*—evidence as to the extent of tornado damage to the foundation and its capacity to comply with the current building code. (Doc. 92, pp. 49:18–50:12; Doc. 93, pp. 319:21–320:9). But no testing was conducted, and the foundation remains a black box.

Mr. Slintak testified that an unknown foundation presents design challenges to a structural engineer. For example, he explained the problems that an unknown foundation presented with respect to spread footings:

> THE COURT: So you have used this term "unknown foundations" several times. What is it about the foundations exactly that is unknown? Is it the depth? The width? What is it?

[MR. SLINTAK:] Sure. . . . [Y]ou don't know the soil parameters of the soil that's supporting the foundation, what type of soil it is, how well is it compacted. You don't know the size of the foundation that's bearing on top of the soil because, without getting too nerdy, pressure is force that is applied over an area. So, if you don't know the size of the spread footing, and that spread footing is too small, if you are putting more load onto it, then that pressure is going to increase. Imagine snow shoes. If you jump out into the snow and you don't have snow shoes on, you are going to sink right through the powder. If you have snow shoes on, you're going to walk on top of the snow. The spread footings are the snow shoes.

THE COURT: Did this building collapse because the spread footings weren't strong enough?

[MR. SLINTAK:] That's not a conclusion in my investigation, no, Your Honor.

THE COURT: So why do we need to replace the spread footings?

[MR. SLINTAK:] Because the building that's going to go back on top of them is going to be designed to the current code, which is going to be applying additional forces onto an existing foundation, and *its type is unknown and its capacity is unknown*.

(Doc. 92, pp. 146:2–147:7 (cleaned up) (emphasis added)). In other words, rebuilding on an unknown foundation could be dangerous if it turned out to be severely damaged, but FWP did not conduct the necessary testing to determine whether this was the case.

Conversely, Mr. Slintak conceded that testing could have revealed that only minor foundation repairs were necessary. *See id*. at p. 148:17–23 (The Court: "Could an engineer come up with a strategy—using ground penetrating radar and core drilling—to determine the dimensions of the spread footing rather than tearing up 200,000 square feet?" Mr. Slintak: "[Y]eah. Just because it's an unknown foundation type doesn't mean it's not ascertainable."); *id*. at p. 95:20–25 (Defense counsel: "Did you happen to do any testing?" Mr. Slintak: "I did not do any testing. My investigation was a visual analysis of

the conditions." Defense counsel: "No destructive testing?" Mr. Slintak: "I did not, no." Defense counsel: "No non-destructive testing?" Mr. Slintak: "I did not, no."); *id.* at p. 113:11–15 (Defense counsel: "But it's possible, is it not, that that destructive or nondestructive testing could have revealed that the foundation was fine and could be code compliant with some repairs?" Mr. Slinktak: "That's plausible.").

What's more, the estimators agreed that the testing was inexpensive relative to the replacement cost of the foundation. Based on their testimony, the Court found that the cost of testing is $53,123. *See supra* ¶ 48. And even Mr. McMahon—who estimated a testing cost that was nearly five times higher—conceded that before any owner of a building spent seven or eight million dollars to repair a foundation, they would want some testing done. (Doc. 93, p. 202:2–5).

That no testing was conducted is also puzzling in light of FWP's argument that only the below-grade portions of the footings and foundations should be excluded from the FRC Value. *See infra* Section III.A. Based on his visual inspection, Mr. Slintak predicted that 2,400 linear feet of strip footing sits below ground level based on his visual inspection, *see supra* ¶ 19, which, under FWP's theory, would be exempted if it was found to be below grade. The lack of additional empirical evidence supporting Mr. Slintak's theory is doubly problematic because Nilfisk's expert, Mr. Evans, offers a persuasive, countervailing theory in rebuttal (although it, too, suffers for lack of testing). He maintained that because the failure plane of the building—the anchor bolts—was focused above the concrete slab, the visual evidence did not support Mr. Slintak's assessment that the foundation's internal structure was severely damaged. (Doc. 93, pp. 287:22–289:11). Like Mr. Slintak, the Court finds Mr. Evans to be a credible expert witness in the field of

engineering, and his rebuttal casts further doubt on the reasonable certainty of Mr. Slintak's view.

Ultimately, the Court finds that the conflicting expert testimony is inconclusive as to the internal condition of the foundation; that is, the evidence presented is insufficient to make a finding as to the foundation's internal damage from established facts and not merely conjecture. *Christmas*, 260 Ark. at 160 (citations omitted). In its post-trial brief, FWP argues that "Mr. Slintak [ ] didn't perform testing, but that's because he concluded it wasn't cost-effective and it wouldn't change his analysis—in his words: 'At some point, you just have to wipe the slate clean and start from scratch.'" (Doc. 94, p. 4 n.3 (quoting Doc. 92, 53:19-54:25)). But it is the claimant's burden to prove damages to a reasonable certainty. And having thoroughly reviewed the evidence presented, the Court finds that FWP has not met its burden in light of the comparably credible expert testimony on the other side. Without additional empirical data as to the internal condition of the foundation, FWP asks the Court to play structural engineer to determine which expert's theory is the right one. The Court declines to dust off its protractor and slide rule—to do so would epitomize "sheer speculation." *Milligan v. Gen. Oil Co.*, 293 Ark. at 401. Therefore, the Court cannot award damages for the cost of removing and replacing the foundation.

(c) Is Nilfisk's Foundation Cost Recommendation Reasonably Certain?

Next the Court considers the evidence presented in Nilfisk's repair estimate and makes the following findings of fact. First, the Court finds Mr. Evans and Mr. Marcussen were credible experts. Next, the Court finds that there is ample evidence on the record to show with reasonable certainty that testing is a necessary first step to foundation repair. *See, e.g.*, Doc. 93, p. 292:5–6 (Mr. Evans: "The first thing I would do is do some testing

26

to verify the existing structure is acceptable."). Continued uncertainty as to the foundation's condition won't do.

The Court also finds extensive evidence to show that resetting anchor bolts and base plates, repairing cracks and spalling, repairing stairs and loading bays, and removing and replacing pedestals—where necessary—are reasonably certain costs. (Doc. 92, pp. 57:2–14, 61:22–67:10, 70:14–73:20; Pl.'s Ex. 6, pp. 14–15; Defs.' Ex. 6, p. 4028–30). Both experts' visual inspections of the foundation produced robust findings as to the foundation's exterior, and the Court finds Mr. Evans's repair methodology to be supported by the weight of the evidence. Finally, the Court finds that the cracks and spalls throughout the slab evince a reasonably certain loss for which damages for a topping slab may be awarded on the weight of the evidence. Given that the slab makes up the floor of the Building and the risk to personnel and equipment that the marred slab presents, *see* Doc. 92, p. 76:13–22 ("[I]t's not desirable, having driven a forklift, to have a load . . . encounter—I'll call it a pothole or one of these gouges—and to have a load teeter on you, potentially putting somebody who is not in the forklift at risk for the cargo falling down upon them."), the Court finds that a topping slab is necessary to restore the slab to its pre-loss condition.

49.     For these reasons, the Court finds that the full replacement cost of the foundation is the sum of Mr. Marcussen's $500,000.00 contingency estimate for repairs and his $750,000.00 estimate for a three-inch topping slab, a total of $1,250,000.00. *See* Doc. 93, pp, 352: 6–15, 381:16–25, 384:7–10; Defs.' Ex. 6, pp. 4095, 4099.[8]

---

[8] The Court notes that its finding as to the full replacement cost of the foundation is an input to, not the product of, the FRC Value calculation set forth in Section 10.2. The Court will proceed with calculating the FRC Value after resolving the dispute between the

v. The Costs of Profit and Overhead

50.     Another large difference between FWP and Nilfisk's estimates was their profit and overhead margins. Mr. McMahon's estimated profit was $2,111,915.70, which amounts to 7.62 percent of the total MKA estimate. *Id.* at pp. 212:20–213:5; Pl.'s Ex. 6, p. 112. Mr. McMahon's estimated overhead was also $2,111,915.70, 7.62 percent of his total estimate, which sums to a total 15.24 percent. (Doc. 93, pp. 212:20–213:5; Pl.'s Ex. 6, p. 111). The Envista Forensics Report, however, estimated a combined profit and overhead margin of about 10 percent. (Doc. 93, p. 213:9–22).

51.     Mr. Marcussen estimated 3.25 percent profit, which amounted to $432,921.00. *Id.* at p. 343:8–25; Defs.' Ex. 6, p. 4262. His estimated overhead was $516,857, a 3.63 percent margin. (Doc. 93, p. 344:1–9; Defs.' Ex. 6, p. 4258). Together, Mr. Marcussen's profit and overhead estimates sum to 6.88 percent of his total estimate—less than half of Mr. McMahon's 15.24 percent. Mr. Marcussen justified his lower margin by explaining that Arkansas's local market for general contractors is quite competitive, and that his approximately 7 percent profit and overhead margin reflected competitive rates in that market. He estimated that a realistic profit margin on a project of this scope would range from 3 to 5 percent. (Doc. 93, pp. 354:21–356:6).

52.     Mr. McMahon countered that he did not expect a reputable contractor would be willing to take on the project for three percent profit. Moreover, he testified that Mr.

---

parties as to the meaning of Section 10.2's "Full Replacement Cost" definition, which it addresses in Section III.A of this Order.

Marcussen's profit estimate was not an apples-to-apples comparison with his own because Mr. Marcussen did not account for a general contractor's fee and overhead, and job site overhead—both of which would increase Mr. Marcussen's total. *Id.* at pp. 220:15–20, 221:4–16.

53.   The Court gives weight to Mr. Marcussen's expertise as a local estimator in Arkansas, where he has worked in commercial construction for twenty years and as a certified estimator since 2012. Based on Mr. Marcussen's testimony, the Court agrees that a fifteen percent margin is unreasonably high. However, the Court also credits Mr. McMahon's testimony that three percent profit is too low, and that Mr. Marcussen's overhead estimate may not be a direct comparison to his own. Therefore, the Court finds that, as in the Envista Forensics Report, a ten percent margin for profit and overhead is supported by the weight of the evidence here: five percent for profit, the high end of Mr. Marcussen's range; and five percent for overhead, Mr. Marcussen's estimate plus a hedge against unaccounted-for costs.

vi. The Total Replacement Cost of the Building and Foundation

For these reasons, the Court finds that FWP has carried its burden in showing with reasonable certainty that the full replacement cost of the Building and foundation is $19,596,391.36, as summarized in the table below.

| Cost Category | Line Item | Damages Award |
|---|---|---|
| Replacement Cost of the Building | Demolition | $732,000.00 |
| | Metal Superstructure | $7,138,611.89 |
| | Electrical | $2,982,112.75 |
| | Unrebutted Costs | $5,659,053.60 |
| Foundation Costs | Testing | $53,123.00 |
| | Repair | $500,000.00 |
| | Topping Slab | $750,000.00 |
| Profit & Overhead | (10% Margin) | $1,781,490.12 |
| **Total** | | **$19,596,391.36** |

However, this preliminary finding is distinct from Section 10.2's FRC Value because the deductions for "footings, foundations and other structures below grade" and Nilfisk's prior payment have not yet been applied. The Court makes a final finding as to the FRC Value in Section III.B, *infra*.

### 6. The Present Value of Future Unpaid Rent

54.    The Parties stipulated that the present value of the $500,200 in future rent under the Lease for the period of March 2024, the month after trial, through October 2024, the end of the Lease term, is $484,625.37. (Doc. 91, p. 1).

### 7. Evidence as to Other Damages Under the Lease

55.    Since Nilfisk vacated the Building in August 2022, Ms. Diebold testified that FWP incurred costs from taxes, liability insurance, and fencing. The Court finds her testimony to be credible, based on her personal knowledge from her operations management work for FWP.

56.    In 2022, Nilfisk paid $40,460.58 for prorated property taxes through August 1, 2022. (Pl.'s Ex. 8, p. 1). FWP paid the balance of taxes in the sum of $28,900.42. *Cf.* Doc. 93, p. 257:19–25

57.    FWP has procured liability insurance for the property since Nilfisk vacated the Building in August of 2022; FWP paid approximately $2,800.00 in premiums in 2022, $2,650.00 in 2023. *Id.* at p. 258:18–24.

58.    Finally, Ms. Diebold testified that FWP paid $20,194.00 annually to Modern Fence Supply for security fencing, which they installed around the perimeter of the Building after the tornado. *Id.* at pp. 259:3–8, 273:5–22.

### III. CONCLUSIONS OF LAW AND DAMAGES FINDINGS

### A. The Court's Interpretation of "Full Replacement Cost" as Defined by the Lease

Before the Court can complete its calculation of the FRC Value, it must resolve a dispute between the parties as to the meaning of the last phrase in Section 10.2's definition of "Full Replacement Cost": "less the cost of footings, foundations and other structures below grade." The following section positions the dispute within Section 10.2's general damages framework and proceeds to resolve it as a matter of law.

### 1. Section 10.2's General Damages Framework

As the Court held in its summary judgment order, "the measure of damages where a tenant fails to meet a replacement cost insurance obligation is 'the difference between the amount of insurance on the property and . . . the property's replacement cost.'" (Doc. 82, p. 14 (quoting *DWB, LLC v. D&T Pure Trust*, Ark. App. 283, *16 (2018)); *see also id.* at p. 24 ("Here, the plain language of Section 10.2 clearly and unambiguously imposes a present obligation on Nilfisk to maintain Full Replacement Cost Insurance as that term is used in Arkansas insurance law and expressly defined in the Lease."). The parties also unambiguously expressed their intention that the measure of damages for breach of Section 10.2's Full Replacement Cost Insurance Obligation should be calculated using the definition of "Full Replacement Cost" (i.e., the FRC Value) set forth therein:

> "Full Replacement Cost" shall be interpreted to mean the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade.

(Doc. 2-1, p. 9).

The parties stipulated that the amount of insurance Nilfisk held on the property when the tornado damage occurred was $5,149,999.00. *See supra* ¶¶ 6–7. They also stipulated that Nilfisk paid FWP $5,292,427.32 in August 2022, which included its insurance payout. *Id.* at ¶ 8. Accordingly, the Court restates that the measure of Nilfisk's damages liability for breach of Section 10.2's Full Replacement Cost Insurance Obligation is equal to the FRC Value less Nilfisk's prior payment of $5,292,427.32.

### 2. The Meaning of "Less the Cost of Footings, Foundations and Other Structures Below Grade"

FWP and Nilfisk disagree on two inputs to the FRC Value: (a) the meaning of the word "grade" and (b) the construction of the phrase "less the cost of footings, foundations and other structures below grade." In interpreting the disputed term and phrase, the Court is guided by the rules of contract interpretation set forth by the Arkansas Supreme Court in *Coleman v. Regions Bank*:

> The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement.

364 Ark. 59, 65, (2005) (citing *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164 (1992); *Valmac Indus., Inc. v. Chauffeurs, Teamsters & Helpers Local Union No. 878*, 261 Ark. 253 (1977); and *Missouri Pac. R.R. Co. v. Strohacker*, 202 Ark. 645 (1941)). No evidence was presented as to the intent of the parties when they entered the Lease. Accordingly,

the Court turns to its textual tools of contract interpretation—plain meaning and the canons of construction—to resolve the parties' dispute.

### i. The Meaning of "Grade"

FWP and Nilfisk dispute the meaning of the term "grade," as it is used in Section 10.2. In essence, FWP maintains that "grade" means "ground level," pursuant to its definition in the International Building Code ("IBC"). Nilfisk counters that "grade" means the level of the finished floor, i.e., the top of the slab. This dispute is significant because, under Nilfisk's definition, footing and foundation costs would be entirely exempted from the FRC Value. The Court finds that this dispute presents a mixed question of law and fact. *Keller v. Safeco Ins. Co. of Am.*, 317 Ark. 308, 312 (1994) ("The initial determination of the existence of an ambiguity in a contract rests with the trial court, and if an ambiguity exists, the meaning becomes a question of fact for the fact finder.").

As a legal matter, the Court concludes that the meaning of "grade" is unambiguous because it is a term of art in the building construction and engineering trades. "Ordinarily, it is the duty of the court in the trial of cases to construe a written contract and declare its terms and meaning to the jury." Ark. Model Jury Instr., Civ. AMI 2413 (2024) cmt. (citing *Wilkes v. Stacy*, 169 S.W. 796, 797 (1914)). "A contract relating to the ordinary transactions of life is to be construed according to its plain, ordinary, and popular meaning." *Id*. However, "words of art or words connected with or peculiar to a particular trade, profession, or occupation are to be given the signification attached to them by experts in such art or trade, profession, or occupation unless it appears the words were used in a different sense." Ark. Model Jury Instr., Civ. AMI 2414 (2024) cmt. (citing *Les-Bil, Inc.*, 256 Ark. 905).

Here, Section 10.2 expressly ties the word "grade" to the construction and engineering terms "footings" and "foundations," and no evidence was presented to show that that the parties used "grade" in a different sense than its technical meaning in those fields. Although FWP, Nilfisk, and the original parties to the Lease were presumably not engineers, they are in the business of leasing commercial buildings. The Lease's detail and use of construction and engineering terms evinces sophistication among the contracting parties, such that the technical definition of "grade" is appropriate where they contemplated insuring the premises "against all loss or damage caused by fire, ice, hurricane, windstorm, and such other risks of physical loss . . . ." (Doc. 2-1, p. 9 (Section 10.2)). For these reasons, the Court finds that "grade" is used as an unambiguous term of art in the building construction and engineering fields in Section 10.2. Therefore, it must be interpreted "as experienced and knowledgeable members of th[ose] trade[s] or occupation[s] use [it]." Ark. Model Jury Instr., Civ. AMI 2414 (2024).

Although the Court finds the meaning of "grade" to be unambiguous as a matter of law, it also acknowledges that the parties presented extrinsic evidence as to the term's technical meaning: the testimony from its two engineering experts. Mr. Slintak testified that "grade" means "the average of the ground that is immediately adjacent to a structure or a wall or a foundation." (Doc. 92, p. 128:4–6). He explained that the "ground is not perfectly smooth, so [grade means] the nominal level of what the ground is." *Id.* at p. 128:6–8. He pointed the Court to the IBC both as the governing code and as being consistent with his definition. *Id.* at p. 128:9–13; Doc. 93, pp. 387:21–388:15. Mr. Evans countered that "grade" instead means the elevation level of the finished floor—here, approximately four feet above ground level. *Id.* at p. 290:9–18. Based on that definition,

he represented that the Building's footings and foundation were both entirely below grade. *Id.* at pp. 290:23–291:3. However, Mr. Evans also recognized the IBC as the code that governed the Building's reconstruction. *See* Doc. 93, p. 289:12–16. Insofar as Mr. Evans's expert testimony creates ambiguity as to the technical meaning of "grade" in the engineering field, his credibility on this issue is undermined by his deference to the IBC.

The Court thus turns to the IBC for the technical definition of grade. It defines "grade plane" as

> a reference plane representing the average of finished ground level adjoining the building at exterior walls. Where the finished ground level slopes away from the exterior walls, the reference plane shall be established by the lowest points within the area between the building and the lot line or, where the lot line is more than 6 feet from the building, between the building and a point 6 feet from the building.

2021 IBC, Section 202, https://codes.iccsafe.org/content/IBC2021P2/chapter-2-definitions#IBC2021P2_Ch02_Sec202 [https://perma.cc/7BSQ-HMGJ] (cleaned up). The Court notes that the IBC defines "grade plane" instead of "grade." And that makes sense: Both terms refer to a geometric plane that represents "the average of finished ground level adjoining the building at exterior walls." The Court thus finds that the IBC's definition of "grade plane" provides the meaning of "grade" in Section 10.2.

The Court's finding is supported by the law and the facts. The Court's legal conclusion that the IBC definition reflects the unambiguous meaning of "grade" controls under well-established law in Arkansas. And as a factual matter, the weight of the evidence supports the same finding. Both expert engineering witnesses agree that the IBC is the engineering and construction authority that governs the Building and foundation

35

at issue. For these reasons, the Court finds "grade," means "ground level," not "floor level," in Section 10.2.

### ii. Construction of the Phrase

The parties also dispute the construction of the phrase, "less the cost of footings, foundations and other structures below grade," as it appears in Section 10.2. The determination of whether an ambiguity exists is ordinarily a question of law, and "even when a contract is ambiguous, if the meaning of an ambiguity does not depend on disputed extrinsic evidence, the construction and legal effect of the contract remain questions of law." Ark. Model Jury Instr., Civ. AMI 2414 (2024) cmt. (citing *Smith v. Prudential Prop. & Cas. Ins. Co.*, 340 Ark. 335, 341 (2000)). The parties did not put on extrinsic evidence as to the construction of the phrase; instead, they relied on legal arguments in their briefing. Accordingly, the Court views the construction of the phrase as a question of law.

Nilfisk's position is that the phrase excludes all footings and all foundations, above- and below-grade, from the Lease's definition of "Full Replacement Cost." (Doc. 95, pp. 6–7 ("Applying the plain meaning of 'less' leads to only one conclusion—the Lease did not require Nilfisk to account for foundations or footings in the purchase of 'Full Replacement Cost' insurance." (citation omitted))).[9] Nilfisk also argues that "the express inclusion of 'foundations' and 'footings' without qualifying language indicates that the parties intended to exclude both in their entirety from the definition of 'Full Replacement

---

[9] FWP does not dispute the meaning of "less," nor does the Court see the need for a lengthy analysis of that term. Where "less" is used as a preposition, as here, its plain meaning is "diminished by" or "minus." *Less,* Mirriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/less [https://perma.cc/2D5S-3CTS].

Cost.'" (Doc. 83, p. 6). "Had the parties intended to only exclude 'structures below grade' there would be no need to separately list 'footings' and 'foundations.'" *Id.*

FWP counters that its "interpretation—that only below-grade footings, foundations, and structures are excluded—is correct," (Doc. 65, p. 6), and points to the *noscitur a sociis* and *ejusdem generis* canons to explain that "when the Lease says 'other structures below grade' in the same list, immediately after it says 'footings' and 'foundations,' that necessarily means that the list only includes 'footings' and 'foundations' that are below grade," *id.* (citation omitted). Nilfisk responds that FWP's interpretation "is inconsistent with the ordinary definition of the word 'foundation,' which are not limited to only structures that are below grade." (Doc. 95, p. 7 n.10 (citations omitted)). As explained in the prior section, the Court first reiterates that "grade" means "ground-level," not "floor-level."

> The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. . . . It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement.

*Coleman*, 364 Ark, 59, 65 (2005). When a written contract expresses the parties' intentions in "clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Crockett v. Shelter Mut. Ins. Co.*, 2019 Ark. 365, at *4. However, language is not infallible, and a contract's language "is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one *equally reasonable* interpretation." *Crittenden Cnty. v. Davis*, 2013 Ark. App. 655, at *7 (emphasis added).

While Nilfisk and FWP offer different interpretations of "footings, foundations, and other structures below grade," they are not equally reasonable. Nilfisk's interpretation

reflects the plain and natural meaning of "foundation" and "footing." Dictionaries generally define "foundation" as a "base" for a building, not solely the underground portion of that base.[10] Thus, "foundation" is commonly understood to encompass both the above- and below-ground portions of the substructure that supports a building. Similarly, while leading dictionaries define "footings" as a particular component of a foundation, they also do not restrict the meaning of footings to only the portions that are below ground.[11] Further, FWP's own expert indicated that footings can be either above- or below-grade. *See* Doc. 92, pp. 48:14–49:12 (Mr. Slintak testifying that the Building's strip footings are below grade, but the spread footings are probably above grade). Therefore, the Court agrees with Nilfisk that the ordinary definitions of foundation and footing are not limited to

---

[10]   *See Foundation*, American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=foundation   [https://perma.cc/ZF64-YXLC] ("A wall or other structure, as of concrete or masonry, usually extending below ground level and forming the base upon which a building rests."); *Foundation*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/foundation [https://perma.cc/YPH2-GPC4] ("the structures below the surface of the ground that support a building"); *Foundation*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/foundation [https://perma.cc/787Y-96AE] ("an underlying base or support, especially: the whole masonry substructure of a building"); *Foundation*, Oxford English Dictionary, https://www.oed.com/dictionary/foundation_n?tab=meaning_and_use#3597023 [https://perma.cc/74TN-PDRD] ("The solid ground or base (natural or built up) on which an edifice or other structure is erected; also, the lowest part of a building, usually constructed below the ground-level.").

[11]   *See, e.g.*, *Footing*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/footing [https://perma.cc/CS78-RAN3] ("an enlargement at the lower end of a foundation wall, pier, or column to distribute the load"); *Footing,* Oxford English Dictionary, https://www.oed.com/dictionary/footing_n?tab=meaning_and_use#3979387 [https://perma.cc/J2VM-MHRK] ("A projecting course at the base of a wall or other structure that acts as a reinforced foundation; the reinforced base or foundation of an upright structure."); *Footing*, American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=footing [https://perma.cc/S2LH-V3E3] ("The supporting base or groundwork of a structure, as for a monument or wall.").

structures, or portions of structures, that are below grade, and the use of "other structures below grade" in the same list does not modify their plain meaning.

FWP nonetheless tries to create ambiguity by distributing the words "below grade" not only to "other structures," but also to "foundations" and "footings." In so doing, FWP relies on the *noscitur a sociis* and *ejusdem generis* canons. However, canons of construction "furnish[ ] no warrant for . . . importing into a contract an ambiguity which otherwise would not exist, or, under the guise of construction, by forcing from plain words unusual and unnatural meanings." *Plunkett v. Metro. Life Ins. Co.*, 192 Ark. 1065, 1146 (1936); *cf. Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (rejecting the use of *ejusdem generis* and *noscitur a sociis* "to create ambiguity where the statute's structure and text suggest none").

And FWP's proposed interpretation is anything but reasonable: It would cut a single piece of concrete—or liability for it—into two at the point that it is level with the ground. It is telling that while FWP asks the Court to draw the line for liability at grade, its expert did not do so. To exclude "footings, foundations and other structures below grade" from his estimate, Mr. Slintak subtracted the cost of replacing the strip footings only, not the portion of the vertical stem walls that "could go down 2 feet, 3 feet, 4 feet" below grade, probably because FWP's interpretation is so groundless that its own expert did not think to divide the cost of the "monolithically" cast vertical wall into its below-grade and above-grade components. *See* Doc. 92, pp. 50:16–51:9, 130:24–131:6.

Consider again the analogy of the tree. A tree has both above-grade and below-grade parts, and we even have different names for them: trunks and branches and leaves on the one hand, and roots on the other. But if you agreed to buy a beautifully landscaped

house including "trees, flowers, and other plants above grade," you would be quite disappointed to arrive on move-in day and find only felled trees, cut flowers, and a dug-up yard because your purchase didn't include the roots. Here too, FWP has offered no reason to conclude that dividing a single chunk of concrete into two at ground level is the plain and ordinary meaning of the phrase that would have been understood by the parties. Instead, FWP's interpretation seems both unusual and unnatural.

The context in which the phrase is used further belies FWP's argument. Section 10.2 is titled "Coverage Amounts" and requires the tenant, Nilfisk, to maintain coverage "in an amount equal to one hundred percent (100%) of the then 'full replacement cost' of the Premises." (Doc. 2-4, p. 9). It goes on to define Full Replacement Cost, as described above, as "the cost of replacing the Premises without deduction for depreciation or wear and tear, less the cost of footings, foundations and other structures below grade." *Id.* FWP asserts that "replacement cost insurance policies are not new or unique." (Doc. 65, p. 5). But as FWP's experts testified, it is not possible to determine how much of the foundation is below grade with a visual inspection alone but instead would require, on FWP's account, hundreds of thousands of dollars of testing. (Doc. 92, pp. 48:14–50:25; Doc. 93, p. 245:24–246:7). A replacement cost provision that would require such expensive testing before Nilfisk could determine the required Coverage Amount would certainly be novel, and no provision of the Agreement contemplates who would bear the cost of that testing.

The plain meaning of the text, especially in its context within the replacement cost insurance provision, shows that the contracting parties intended the phrase "less the cost of footings, foundations and other structures below grade" to mean that the FRC Value

excludes the cost of all foundations and footings, whether above or below grade, and any other structures that are below grade.

## B. Damages for Breach of Section 10.2

Pursuant to the Court's previous findings of fact and conclusions of law, the Court finds that the "Full Replacement Cost" Value, as defined in Section 10.2 is $12,870,528.74, as illustrated in the table below.

| Cost Category | Line Item | Damages Award |
|---|---|---|
| Replacement Cost of the Building | Demolition | $732,000.00 |
| | Metal Superstructure | $7,138,611.89 |
| | Electrical | $2,982,112.75 |
| | Unrebutted Costs | $5,659,053.60 |
| Profit & Overhead | (10% Margin) | $1,651,177.82 |
| Nilfisk's August 2022 Payment | | -$5,292,427.32 |
| **Total** | | **$12,870,528.74** |

## C. Damages for Unpaid Rent

In its summary judgment opinion, the Court held that Nilfisk is liable for a total of $1,665,300 in unpaid rent, calculated as follows:

- $915,000—fifteen months' rent at $61,000 per month (August 2022 through October 2023), the first rate set in the Third Amendment's base rent schedule; plus

- $250,100—four months' rent at $62,525 per month (November 2023 through February 2024), the second base rent rate in the same, applied through this case's trial date; plus

- $500,200—the present value of the eight months' rent at $62,525 per month that will accrue after trial through the end of the Lease term (March through October 2024).

41

Doc. 82, pp. 16–17 (citing Doc. 2-4, p. 1); *see also* Pl.'s Ex. 4, p. 1. The Court explained

that $500,200 was a placeholder for the present value of $500,200 in unpaid future rent.

(Doc. 82, p. 17 n.2). The parties stipulated that the present value of future rent under the

Lease for the period of March 2024 through October 2024 is $484,625.37. (Doc 91, p. 1).

Therefore, substituting $484,625.37 for the placeholder in the arithmetic above, the Court

finds that Nilfisk is liable for a total of $1,649,725.37 in unpaid rent.

### D. Other Damages Under the Lease

The parties agreed to a triple-net lease. *See supra* ¶ 11. Under its terms, Nilfisk is

obligated to pay for all property-related expenses, including real estate taxes, fire and

casualty insurance, and all maintenance and repairs. *Id.*; Doc. 2-1, pp. 5–6 (Section 3

(operating expenses, including taxes)), 9–10 (Section 10 (insurance)), 11–12 (Section 13

(repairs and maintenance). After Nilfisk vacated the Building in August 2022, FWP paid

$28,900.42 in taxes, *see* Pl.'s Ex. 8, p. 1; Doc. 93, p. 264:22–24, and $5,450.00 in

insurance premiums, *see* Doc. 93, p. 264:13–17, for which Nilfisk is liable under Sections

3 and 10 of the Lease. FWP also paid at least $20,194.00 to fence in the property after

the tornado damaged it. *Id.* at 264:18–21.[12] Nilfisk is also liable for the fencing costs

because they were caused by its breach of Section 10.2 of the Lease, which prevented

the Building from being replaced, creating the ongoing need for a fence. In total, the Court

finds Nilfisk liable for $54,544.42 for these other damages under the Lease.

---

[12] Ms. Diebold testified that FWP has paid $20,194.00 "annually" to Modern Fence Supply, but FWP only seeks damages for $20,194.00, i.e., one-year's payment. *See* Doc. 94 at pp. 2, 9 (FWP's post-trial brief). Ms. Diebold's testimony suggests that FWP may have paid this expense since as far back as 2022. *See also* Pl.'s Ex. 8, p. 2 (Nilfisk recommending Modern Fence Supply to FWP on July 22, 2022). However, as the burden of proving damages is FWP's, *Christmas*, 260 Ark. at 160, the Court awards the one-year's payment sought in its post-trial brief.

### E. Pre- and Post-Judgment Interest

### *1. Prejudgment Interest*

Prejudgment interest is governed by state law in diversity cases. *Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 735 F.3d 993, 1004 (8th Cir. 2013).  In Arkansas:

> Prejudgment interest is compensation for recoverable damages wrongfully withheld from the time of the loss until judgment. Prejudgment interest is allowable where the amount of damages is definitely ascertainable by mathematical computation, or if the evidence furnishes data that makes it possible to compute the amount without reliance on opinion or discretion. This standard is met if a method exists for fixing the exact value of a cause of action at the time of the occurrence of the event that gives rise to the cause of action.

*Reynolds Health Care Servs., Inc. v. HMNH, Inc.*, 364 Ark. 168, 180 (2005) (citations omitted). "If the damages are not by their nature capable of exact determination, both in time and amount, prejudgment interest is not an item of recovery." *Dorsett v. Buffington*, 2013 Ark. 345, 11 (citations omitted).

On this issue, the Eighth Circuit's decision in *Simmons Foods, Inc. v. Industrial Risk Insurers* is directly on point. 863 F.3d 792 (8th Cir. 2017). The *Simmons Foods* case is a familiar one. It was tried in this Court, FWP's counsel was an attorney for the defendant, and Mr. McMahon was one of their expert witnesses. (Doc. 93, pp. 234:5–235:20). The case concerned a 120,000 square-foot metal building that sustained considerable damage to its roof and supporting columns during a snowstorm. *Simmons Foods*, 863 F.3d at 795. Simmons owned the building and entered into two materially identical property insurance contracts with Industrial Risk Insurers that were in effect when the snowstorm hit. *Id*. The parties disputed how the policies covered the loss:

Simmons argued that it was entitled to recover the cost to rebuild the structure, and Industrial Risk Insurers maintained that they were only liable for the cost to repair it. *Id.* The case went to trial, and the jury returned a $2,817,380.11 verdict for Simmons. *Id.* at 800. This Court later awarded Simmons prejudgment interest under Arkansas Code § 4-57-101(d). *Simmons Foods*, 863 F.3d. at 796.

The Eighth Circuit reversed and vacated this Court's prejudgment interest award, reasoning as follows:

> In Simmons's case, the jury had to exercise discretion to reach a verdict based on "conflicting testimony" and estimates that "varied substantially" as to Simmons's damages. This suggests "the amount due [Simmons] was neither liquidated as a dollar sum nor ascertainable by fixed standards." . . .

> [T]he jury awarded Simmons $2,817,380.11. Neither party suggested this figure at trial, nor do they offer any explanation on appeal as to how the jury may have reached this sum. . . . The jury had to use its discretion to ascertain which experts to believe, which expenses were covered under the policies, and whether the invoices "reflected reliable and fair dollar amounts." The need for such discretion means Simmons's damages were not capable of exact determination until the jury spoke and the district court entered judgment, and prejudgment interest was not appropriate.

*Id.* at 799–800 (footnote omitted) (first quoting *Woodline Motor Freight, Inc. v. Troutman Oil Co., Inc.*, 327 Ark. 448, 454 (1997), then *Yazdianpour v. Safeblood Techs., Inc.*, 779 F.3d 530, 540 (8th Cir. 2015) (quoting *Sims v. Moser*, 373 Ark. 491, 509 (Ark. 2008)) (internal quotation marks omitted)).

Here, like in *Simmons Foods*, the factfinder was tasked with reaching a verdict based on conflicting—and credible—expert testimony, which featured estimates that varied substantially as to FWP's damages for the replacement cost of the Building and its

foundation. And like in *Simmons Foods*, the factfinder had to "use its discretion to ascertain which experts to believe, which expenses were covered under the policies, and whether the [estimates] 'reflected reliable and fair dollar amounts.'" 863 F.3d at 800. That the evidence was submitted to a jury in *Simmons Foods* and to the Court in this matter's bench trial is of no moment. In both cases, "the need for such discretion means [FWP]'s damages were not capable of exact determination until the [factfinder] spoke." *Id.* To be sure, as in any bench trial, this Order provides far more visibility into the factfinder's reasoning than the jury's verdict in *Simmons Foods*. But in both cases, the factfinder returned a damages award that was different than the figures presented by the parties at trial. And as in *Simmons Foods*, here that award was not ascertainable by fixed standards prior to trial—most notably because the parties disagreed by a wide margin on foundation costs. For these reasons, *Simmons Foods* controls. Because it was not possible to "compute the damages amount without reliance on opinion or discretion," *Reynolds Health Care Servs., Inc.*, 364 Ark. at 180 (citations omitted), "prejudgment interest is not an item of recovery," *Dorsett*, 2013 Ark. 345 at 11 (citations omitted).

### 2. Post-Judgment Interest

Post-judgment interest is determined by federal law and is mandatory under 28 U.S.C. § 1961. *Travelers Prop. Cas. Ins. Co. of Am.*, 735 F.3d at 1008. "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of judgment." 28 U.S.C. § 1961(a) (footnote omitted). Because the Court will defer judgment until after

the FWP attorneys' fees award is decided, it also defers stating the interest rate for post-judgment interest. *See Travelers Prop. Cas. Ins. Co. of Am.*, 735 F.3d at 1008.

### F. Attorneys' Fees

Arkansas Code § 16-22-308 permits an award of reasonable attorneys' fees to the prevailing party in a contract case consistent with local rates. "The prevailing party is determined by analyzing each cause of action and its subsequent outcome. Ultimately, the prevailing party is determined by who comes out on top at the end of the case." *Mountain Pine Timber, Inc. v. Smith*, 2016 Ark. App. 197, at *3 (2016) (citations and quotation marks omitted). The award, however, is not mandatory; the district court retains discretion in deciding whether to award fees and in what amount. The Court notes that awards are based on locality pay.

Here, FWP prevailed on its breach of contract claim at summary judgment (Doc. 82), so the Court may award reasonable attorneys' fees. FWP is directed to file a motion for attorneys' fees within fourteen days of this Order. Nilfisk may respond within seven days of FWP's motion.

### IV. CONCLUSION

Having considered the applicable law, the findings of fact made above, the evidence submitted at trial, and the parties' briefing, the Court awards damages as follows:

**To Fort Worth Partners, LLC:**

Breach of Section 10.2:    $12,870,528.74

Unpaid Rent:                 $1,649,725.37

Other Damages:              $54,544.42

**Total:**                      **$14,574,798.53**

**IT IS THEREFORE ORDERED** that Plaintiff Fort Worth Partners, LLC be awarded damages in the collective sum of $14,574,798.53, as specified above. The Court will defer judgment for FWP until after the attorneys' fees award is decided.

**IT IS SO ORDERED** on this 30th day of September, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE